ACCEPTED
01-15-00919-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
10/29/2015 8:39:34 AM
CHRISTOPHER PRINE
CLERK

NO. 01-15-00919-CV

NO. _____

---

**IN THE COURT OF APPEALS**
**FOR THE _____DISTRICT OF TEXAS**
**HOUSTON, TEXAS**

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
10/29/2015 8:39:34 AM
CHRISTOPHER A. PRINE
Clerk

---

**In Re:**
**VICKI JOHNS, INDIVIDUALLY AND AS AN HEIR OF BRIAN EDWARD JOHNS, DECEASED**

---

On Petition for Writ of Mandamus to the Probate Court Number One (1) of Harris County, Texas, in Cause No. 415980-401

---

**PETITION FOR WRIT OF MANDAMUS**

---

**GEORGE K. FARAH**
**State Bar No.  24040882**
**SARAH C. DIONNE**
**State Bar No. 24072229**
**GUERRA & FARAH, PLLC**
**4101 Washington Ave., 3rd Floor**
**Houston, Texas 77007**
**T:  (713) 529-6606**
**F:  (713) 529-6605**
**Email: gkf@gflawoffices.com**
**Email: scd@gflawoffices.com**

**ATTORNEYS FOR RELATOR**

**IDENTITY OF PARTIES AND COUNSEL**

**Relator**:
**Vicki Johns (Intervenor in the trial court)**
GEORGE K. FARAH
State Bar No. 24040882
SARAH C. DIONNE
State Bar No. 24072229
GUERRA & FARAH, PLLC
4101 Washington Ave., 3rd Floor
Houston, Texas 77007
T: (713) 529-6606
F: (713) 529-6605
Email: gkf@gflawoffices.com
Email: scd@gflawoffices.com

**Respondent:**
Honorable Loyd Wright
Presiding Judge of Probate Court Number One (1)
Harris County Civil Courthouse
201 Caroline, 6th Floor
Houston, Texas 77002

**Real Parties in Interest**:
**Francis Sowell and Corey Johns (Plaintiffs in trial court)**
Rusty Hardin
Bob Wynne
RUSTY HARDIN & ASSOCIATES, LLP
5 Houston Center
1401 McKinney, Suite 2250
Houston, TX 77010

Robert S. MacIntyre, Jr.
MacIntyre McCulloch Stanfield Young
2900 Weslayan, Suite 150
Houston, Texas 77027

**Party:**

**James Johns, Sr. (Intervenor in trial court)**

Darrell A. Apffel
S. Benjamin Shabot
BETTISON DOYLE APFFEL & GUARINO, P.C.
1100 Gulf Freeway, Suite 100
League City, Texas 77573

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ……….…................................... ii

TABLE OF CONTENTS ……….…........................................................ iv

TABLE OF AUTHORITIES............................................................vi

STATEMENT OF CASE ..........................................................viii

STATEMENT OF JURISDICTION...............................................ix

ISSUE PRESENTED................................................................ix

> **Whether Respondent's Order Denying Intervenor, Vicki Johns', Motion to Compel Discovery Responses pursuant to Tex. R. Civ. P. 215.1 (b) was an abuse of discretion by ignoring the Plaintiffs' failure to timely and adequately respond to Intervenor's Interrogatories and Intervenor's Request for Production.**

RELATORS' RECORD ..........................................................x

STATEMENT OF FACTS...........................................................1

SUMMARY OF ARGUMENT......................................................3

STANDARD OF REVIEW……………………………………………..4

ARGUMENT ....................................................................4

    A. **Plaintiffs have waived their objections to Relator's discovery requests when Plaintiffs failed to timely assert their objections. Therefore, the court should compel production**...........................4

    B. **Relator has no adequate remedy on appeal as the case would proceed to trial without allowing Relator a sufficient opportunity for discovery of evidence which goes to the heart of her claim**……………….......….....................................9

CONCLUSION……………………………………………………………………...17

PRAYER...............................................................................…18

CERTIFICATION…………………………………………………………………...19

CERTIFICATE OF SERVICE.................................................................20

CERTIFICATE OF COMPLIANCE .......................................................21

APPENDIX……………………………………………………………………….22

# TABLE OF AUTHORITIES

## CASES

*Alvarado v. Farah Mfg.*, 830 S.W.2d 911, 914 (Tex. 1992)……………….……6

*Clark v. Trailways, Inc.,* 774 S.W.2d 647 (Tex. 1989)……………………..……...7

*Hobson v. Moore*, 734 S.W.2d 341 (Tex.1987)…………………….……..……6

*Independent Insulating Glass Southwest, Inc. v. Street,* 722 S.W.2d 798, 802 (Tex. App. - Fort Worth 1987, writ dism'd)…………………………………………8

*In re Cerberus Capital Mgmt., L.P.,* 164 S.W.3d 379, 382 (Tex. 2005)………..….4

*In re Dana Corp.*, 138 S.W.3d 298, 301 (Tex.2004)………………...…………..viii

*In re Prudential Ins*., 148 S.W.3d 124, 135-36 (Tex.2004)………...…….…..viii, 4

*In re Texas Farmers Insurance Exchange,* 990 S.W.2d 337 (Tex. App. Texarkana 1999, original proceeding)…………………………………………………..8

*Jampole v. Touchy,* 673 S.W.2d 569 (Tex.1984)…………………………………14

*Nat'l Hockey League v. Metro. Hockey Club, Inc.,* 427 U.S. 639 (1976)…..……..7

*Remington Arms Co. v. Canales*, 837 S.W.2d 624, 625 (Tex.1992)……….……5, 6

*Walker v. Packer,* 827 S.W.2d 833, 843(Tex. 1992)……………………......10, 17

## STATUTES AND REGULATIONS

34 CFR 99.31(a)(9)(ii)(A)-(B)…………………………………………...…………..7

Tex. Govt. Code Sec. 22.221(a) and (b)(1)……………………………...…viii

Tex. R. Civ. P. 193.2(e)…………………………………………………….....1, 6,

Tex. R.Civ.P. 193.4 (a)……………………………………………...…….…8

Tex. R. Civ. P. 196.2…………………………………………….......…1, 5

Tex. R. Civ. P. 197.2……………………………………...…...….1, 5

Tex. R. Civ. P. 215.1 (b)……………………………...…….....….viii, 3

# STATEMENT OF CASE

*Nature of the case:* Wrongful Death action brought by Plaintiff Frances Sowell, Individually and as Heir of Brian Edward Johns, deceased, and as Administrator of Brian Edward Johns, deceased; Corey Johns, Individually and as Heir of Brian Edward Johns, deceased; Intervened by James Johns, Sr., and Vicki Johns, Individually and as Heir of Brian Edward Johns, deceased, against The Dow Chemical Company, Rohm and Haas Company, Rohm and Hass Texas, Inc., Tim Fox and Julio Rodriguez for the wrongful death. The Plaintiffs, Intervenor, James Johns and Intervenor, Vicki Johns have all entered into a global settlement with all Defendants. The only remaining issues are how to divide the settlement proceeds between Plaintiffs, Intervenor, James Johns and Intervenor, Vicki Johns. In addition, Plaintiffs are challenging Intervenor, Vicki Johns' common law marriage to the deceased, Brian Johns.

*Trial Court*: The Honorable Loyd Wright, Judge Presiding, the Probate Court Number One (1) of Harris County, Texas.

Disposition: Intervenor, Vicki Johns, filed a Motion to Compel discovery responses against Plaintiffs based on Plaintiffs failure to provide adequate responses to Intervenor's Interrogatories and Requests for Production. The trial court denied the motion, in part.

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this mandamus action by virtue of Tex. Govt. Code Sec. 22.221(a) and (b)(1) which allows a party to apply for a Writ of Mandamus against a judge of a district or county court in the court of appeals district, when the trial court abuses its discretion. Relators must show the trial court abused its discretion and that Relators are without an adequate appellate remedy. *In re Prudential Ins*., 148 S.W.3d 124, 135 (Tex.2004); *In re Dana Corp.*, 138 S.W.3d 298, 301 (Tex.2004).

## ISSUE PRESENTED

Whether Respondent's Order Denying Intervenor, Vicki Johns', Motion to Compel Discovery Responses pursuant to Tex. R. Civ. P. 215.1 (b) was an abuse of discretion when Plaintiff's failed to timely object and respond to Intervenor's Interrogatories and Intervenor's Request for Production.

# RELATOR'S RECORD

Relator's Tab 1    --    Intervenor, Vicki Johns', Deposition

Relator's Tab 2    --    Intervenor's Motion to Compel and CPS's Motion
                         to Quash Subpoena Hearing Transcript

Relator's Tab 3    --    Plaintiff, Corey Johns', Deposition

Relator's Tab 4    --    Intervenor's January 28, 2015 Discovery Requests

Relator's Tab 5    --    Plaintiffs' responses to Request for Production

Relator's Tab 6    --    Plaintiffs' Responses to Intervenor's First
                         Set of Interrogatories

Relator's Tab 7    --    Intervenor's March 27, 2015 Discovery Requests

Relator's Tab 8    --    Plaintiffs' Responses to Intervenor's March
                         27, 2015 Discovery Requests

Relator's Tab 9    --    Email from Intervenor, Vicki Johns, and Brian
                         Johns, deceased

# STATEMENT OF FACTS

Relator, Vicki Johns, seeks mandamus relief from this Court against Respondent, Judge Loyd Wright, the presiding judge of the Probate Court Number One (1) of Harris County, Texas. Relator contends that Respondent's order denying, in part, Relator's Motion to Compel Discovery Responses against Plaintiffs in the trial court, Frances Sowell and Corey Johns is an abuse of discretion violating Tex. R. Civ. P. 193.2(e), 196.2, 197.2(a) (which provides the applicable deadline for a party to file its written response to requests for production and responses to request for interrogatories). Relator has no adequate appellate remedy. Relator seeks a writ of mandamus compelling Respondent to order the objections of Plaintiffs to be withdrawn and ordering responses to Relator's Requests for Productions, Interrogatories and Second Request for Production.

On January 28, 2015, Relator, Vicki Johns, propounded the following discovery requests: (1) Intervenor, Vicki Johns' First Request for Production to Plaintiff Frances Sowell and Corey Johns, (2) Intervenor, Vicki Johns' First Set of Interrogatories to Plaintiff Corey Johns, Individually and as Heir of Brain Edward Johns, Deceased, and (3) Intervenor, Vicki Johns' First Set of Interrogatories to Plaintiff Frances Sowell, Individually and as Heir of Brian Edward Johns, Deceased, and as Administrator for the Estate of Brain Edward Johns, Deceased. [Tab4]

1

Specifically, Relator requested an authorization to obtain educational records for Corey Johns:

> No. 13: A signed copy of the authorization to obtain educational records for Corey Johns attached hereto as Exhibit "B."
> [Tab5]

Relator has requested the authorization in order to obtain the administrative file which contains a letter written by Relator to the administration on Corey Johns' behalf during the administrative proceeding at Southern University. This letter which was written by Relator includes facts which support her common law marriage to Corey Johns' father, Brian Johns.

Additionally, Relator requested an authorization to obtain the employment records of Frances Sowell:

> No. 20: A signed copy of the authorization to obtain employment records for Frances Sowell attached hereto as Exhibit "D."
> [Tab5]

Relator has requested records in order to establish that France Sowell, the administrator of Brian Johns' estate, has a strong relationship at the hospital where Brian was taken after the incident. France Sowell's relationship with the hospital gave her the power and ability to exclude Relator from seeing her husband while he was on his deathbed. [Tab2, (Transcript P15,L11-12)]

2

Plaintiffs served their responses and objections on June 5, 2015, over four months after the due date. [Tab5; Tab6] The Plaintiffs' responses included numerous objections to Intervenor Vicki Johns' Requests for Production and Interrogatories. [Tab5; Tab6]

Additionally, Intervenor, Vicki Johns' Second Requests for Production to Plaintiffs Francis Sowell and Corey Johns were propounded on March 27, 2015. The responses were due on April 27, 2015. [Tab7] Plaintiffs responded to the requests on June 11, 2015, over a month and a half late. [Tab8] Again, Plaintiffs objected to the requests for production and did not provide any answers or responsive documents.

On June 16, 2015, Relator filed a Motion to Compel Discovery responses from Plaintiffs Frances Sowell and Corey Johns. The answers to said Interrogatories and Requests for Production are necessary for Relator to properly prepare her case for trial as well as counter attacks on her marriage which have already been made by Plaintiffs. Given Plaintiffs have already contested Relator's common law spouse status in a multitude of ways, Relator needs the information sought to support her common law marriage.

## SUMMARY OF ARGUMENT

Respondent's 's Order Denying Relator's Motion to Compel Discovery Response pursuant to Tex. R. Civ. P. 215.1 (b) was an abuse of discretion by ignoring the Plaintiff's failure to timely and adequately respond to Intervenor's Interrogatories and Intervenor's Request for Production. Relator has no adequate appellate remedy.

## ARGUMENT

**A. Plaintiffs have waived their objections to Relator's discovery requests when Plaintiffs failed to timely assert their objections. Therefore, the court should compel production.**

Mandamus will issue to correct a clear abuse of discretion or a violation of a duty imposed by law when there is no adequate remedy by appeal. *In re Prudential Ins. Co.,* 148 S.W.3d 124, 135-36 (Tex. 2004). This Court determines the adequacy of an appellate remedy by balancing the benefits of mandamus review against its detriments. *Id*. at 136. In evaluating benefits and detriments, this Court considers whether mandamus will preserve important substantive and procedural rights from impairment or loss. *Id.* A trial court abuses its discretion if it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law, or if it clearly fails to analyze or apply the law correctly. *In re Cerberus Capital Mgmt., L.P.,* 164 S.W.3d 379, 382 (Tex. 2005).

Plaintiffs, Frances Sowell and Corey Johns, were served with Relator's First Set of Interrogatories and Requests for Production on January 28, 2015. Pursuant to the Texas Rules of Civil Procedure the party responding to discovery has 30 days from the time of service to respond to written discovery. Tex. R. Civ. P. 196.2; Tex. R. Civ. P. 197.2. As such, Plaintiff's deadline to respond to Relator's Request for Production and Interrogatories would have been March 2, 2015. Plaintiffs failed to timely serve their objections and responses, ultimately serving their responses and objections on June 5, 2015. Plaintiffs were three months late in serving their objections and responses. [Tab5; Tab6] Once Plaintiffs finally responded, their responses included numerous objections to Relator, Vicki Johns', Requests for Production and Interrogatories. [Tab5; Tab6]

Relator then served a Second Request for Production on Plaintiffs on March 27, 2015. [Tab7] Plaintiffs' responses to Relator's Second Request for Production were due on April 27, 2015. [Tab7] Plaintiffs did not respond to Relator's Second Request for Production until June 11, 2015, over a month and a half late. Even though Plaintiffs ultimately responded, Plaintiffs only served objections with no responsive documents to Relator's requests. [Tab8]

As a party resisting discovery the Plaintiffs had an obligation to object to the written discovery at or before the deadline to respond to discovery. Tex. R. Civ. P. 197.2; *Remington Arms Co. v. Canales*, 837 S.W.2d 624, 625 (Tex.1992). Since

5

Plaintiffs did not timely serve their objections to Relator's Requests for Production and Interrogatories they waived their objections. Tex. R. Civ. P. 193.2(e). The only time an objection is not waived is when the responding party (1) obtained an extension of time by agreement or by court order or (2) can show good cause for not timely objection. Tex. R. Civ. P. 193.2(e); *Remington Arms*, 837 S.W.2d at 625; *Hobson v. Moore*, 734 S.W.2d 341 (Tex.1987).

During and over a four month period (January 28, 2015 to June 5, 2015) Plaintiffs failed to request an agreed extended deadline to respond to written discovery from Relator. Additionally, Plaintiffs never attempted to file a motion with the court requesting a modification of the discovery procedures. Furthermore, Plaintiffs failed to show good cause for failing to timely object to Relator's written discovery. In order for a party to be excused from failure to timely respond, there must be a *strict* showing of good cause. *Alvarado v. Farah Mfg.*, 830 S.W.2d 911, 914 (Tex. 1992)(emphasis added).

Upon hearing of Relator's Motion to Compel Discovery responses from Plaintiffs Frances Sowell and Corey Johns, Plaintiff's counsel argued that Corey Johns' educational records were exempt from production as protected by FERPA. [Tab2, (Transcript P18,L9-11)] However, production of Corey Johns' educational records would not be in violation of FERPA as the release of such information is

permitted if in compliance with a judicial order or lawfully issued subpoena.[1]

Furthermore, Corey Johns is a party to the current litigation, as such, can sign an authorization releasing records typically protected by FERPA.

Plaintiffs' counsel also attempted to argue that Plaintiffs were served with written discovery during a time period that Plaintiffs' Plea to the Jurisdiction and Motion for Summary Judgement were pending. [Tab2, (Transcript P20,L8-11)] As such, Plaintiffs wrongfully assumed that pending a ruling on the above mentioned motions that they were excused from responding or even objecting to the discovery served on them. [Tab2, (Transcript P21,L11-13)] In *National Hockey League* the court held that counsel's willful, intentional and callous disregard for responsibilities owed to the Court and to their opponent would certainly not demonstrate good cause. *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639 (1976). Additionally, the court held that if the imposition of such severe sanctions were not warranted by such flagrant bad faith, then there could be no set of facts whereby severe sanctions would ever apply. *Id.*

The good cause exception permits a trial court to excuse a failure to comply with discovery in difficult or impossible circumstances. *Clark v. Trailways, Inc.*, 774

---

[1] FERPA allows the disclosure of otherwise protected student educational records or information, pursuant to a judicial order or lawfully issued subpoena. 34 CFR 99.31(a)(9)(ii)(A)-(B).

S.W.2d 647 (Tex. 1989) (inability to locate a witness despite good faith efforts or inability to anticipate use of witness' testimony at trial might support a finding of good cause). Unlike *Clark*, Plaintiffs in the current case unilaterally decided to not comply with the deadline to respond or object, in flagrant bad faith and with callous disregard for the responsibilities of discovery under the Texas Rules of Civil Procedure. [Tab2, (Transcript P21,L4-10)]

A trial court has discretion to determine whether the party in violation has met the burden of showing good cause, however, the trial court has no discretion to rule in favor of the party in violation without showing of good cause. *Alvarado,* 830 S.W.2d at 914. Plaintiffs failed to present any evidence of difficult or impossible circumstances that would prevent them from timely responding or objecting to Relator's written discovery. If a party resisting discovery fails to present evidence to support an objection or a claim or privilege, that party waives any complaint. *In re Texas Farmers Insurance Exchange,* 990 S.W.2d 337 (Tex. App. Texarkana 1999, original proceeding); *Independent Insulating Glass Southwest, Inc. v. Street,* 722 S.W.2d 798, 802 (Tex. App. - Fort Worth 1987, writ dism'd). See also, Tex. R.Civ.P. 193.4 (a)

Pursuant to the rules of procedure a party may present evidence to support an objection in the form of testimony presented at the hearing, or a response to the motion and/or affidavits served at least seven days before the hearing. Tex. R. Civ.

P. 193.4. Despite this opportunity to present their arguments, Plaintiffs failed to submit a response to Relator's Motion to Compel. Furthermore, Plaintiffs failed to submit affidavits or offer their own testimony in support of their opposition to Relator's Motion to Compel.

Instead, Plaintiffs' counsel acknowledged the deadline to respond and created an inapplicable exception in disregarding the Texas Rules of Civil Procedure. Accordingly, the trial court judge should have found that Plaintiffs were in direct violation of discovery procedures, which waived their right to object to written discovery, furthermore, compelling Plaintiffs to fully respond. Given Plaintiffs complete disregard for the rules, the trial court could reasonably have reached only one decision, granting Relator's Motion to Compel.

As such, Respondent's decision was arbitrary, unreasonable, and an abused his discretion in denying Relator's Motion to Compel discovery responses from Plaintiffs, Frances Sowell and Corey Johns.

**B. Relator has no adequate remedy on appeal as the case would proceed to trial without allowing Relator a sufficient opportunity for discovery of evidence which goes to the heart of her claim.**

Relator does not have an adequate appellate remedy as to the common law cause of action, which is set for trial beginning November 2, 2015. There are facts and circumstances supporting a grant of Relators Motion to Compel Discovery responses from Plaintiffs Frances Sowell and Corey Johns. The legal rights of

9

Relator will be prejudiced by a further denial of Relator's Motion to Compel, to a degree that, there is an abuse of discretion. A denial of discovery going to the heart of a party's case may render the appellate remedy inadequate. *Walker v. Packer,* 827 S.W.2d 833, 843(Tex. 1992). Relator has been denied the opportunity to obtain evidence, including but not limited to Plaintiff, Corey Johns' educational records, Plaintiff, Frances, Sowell's employment records, and correspondence between Brian John's family members during his marriage with Relator, which would result in the exclusion of evidence that goes to the heart of Relator's cause of action as common law wife of decedent.

The answers to said Interrogatories and Requests for Production are necessary for Relator to properly prepare her case for trial as well as counter attacks on her marriage, which have already been made by Plaintiffs. Given Plaintiffs have already contested Relator's common law spouse status in a multitude of ways, Relator needs the information sought to support her common law marriage.

**Requests for Production**

Plaintiffs Frances Sowell and Corey Johns have waived their objections to all requests for production and have refused to answer the following Requests for Production:

No. 9: Any and all copies of investigation documentation, reports and/or memoranda made by or submitted to Plaintiff, as a result of the incident which

has been made the basis of Intervener's lawsuit.

No. 10: Copies of any and all books, documents or other tangible things which may or may not be introduced at trial, but which may have a bearing on Intervener's cause of action and may be used as demonstrative evidence at trial.

No. 13: A signed copy of the authorization to obtain educational records for Corey Johns attached hereto as Exhibit "B."

No. 17: A signed copy of the authorization to obtain cellular phone records for Plaintiffs attached hereto as Exhibit "C."

No. 20: A signed copy of the authorization to obtain employment records for Frances Sowell attached hereto as Exhibit "D."

No. 21: Copy of any and all documents showing that Vicki Johns was placed on notice of any proceedings naming Frances Sowell as the administrator of Brian Johns' estate.

No. 22: Any and all written correspondence between Corey Johns and Brian Johns before the incident which forms the basis of this lawsuit.

No. 23: Any and all written correspondence between Frances Sowell and Brian Johns before the incident which forms the basis of this lawsuit.

No. 24: Any and all written correspondence between Corey Johns and Pam Roberson after the incident which forms the basis of this lawsuit.

No. 25: Any and all written correspondence between Frances Sowell and Pam Roberson after the incident which forms the basis of this lawsuit.

No. 26: Any and all written correspondence between Plaintiffs and Vicki Johns before and after the incident which forms the basis of this lawsuit.

[Tab4]

No. 1: A copy of the cell phone records for Corey Johns from January 1, 2012 to January 1, 2013.

No. 2: A copy of the cell phone records for Brian Johns from January 1, 2012 to January 1, 2013

No. 3: A copy of the cell phone records for Frances Sowell from January 1, 2012 to January 1, 2013.

[Tab8]

## **Interrogatories**

Additionally, Plaintiff Frances Sowell has waived her objections to all Interrogatories and has refused to answer the following Interrogatories:

No. 1: Identify each person either participating in the preparation of the answers to these interrogations or supplying information used in such preparation, and indicate the interrogatories with respect to which he or she was involved.

No. 4: Please state completely and fully all representations, statements, declarations or admissions made by Intervener or any agent, servant or employee of Intervener. Include in your answer when the communication was made, the total verbatim communication and, if that is not possible, then state the detailed substance of the communication, by whom the communication was made, where such communication took place, and all persons present when such communication was made.

No. 5: Please state in full detail each and every contention or denial of the marriage between Vicki and Brian Johnson any claim made the basis of this suit. Include in your answer:

   a. all facts known to you, and all propositions of law that your attorney, or

anyone acting on your behalf or their behalf, which you contend support or corroborate each such denial;

b.  the name, business and residence address, and telephone number of each person known to you who claims to have any knowledge relating to each such denial of any claim; and

c.  the name, business and residence address, and telephone number of the present custodian of any writings in support of each such denial.

No. 12: What documents, photographs or other information do you have that support your contention that Brian Johns and Vicki Johns were not common law married?

[Tab6]

Furthermore, Corey Johns has waived his objections to all Interrogatories and has refused to answer the following Interrogatories:

No. 1: Identify each person either participating in the preparation of the answers to these interrogations or supplying information used in such preparation, and indicate the interrogatories with respect to which he or she was involved.

No. 4: Please state completely and fully all representations, statements, declarations or admissions made by Intervener or any agent, servant or employee of Intervener. Include in your answer when the communication was made, the total verbatim communication and, if that is not possible, then state the detailed substance of the communication, by whom the communication was made, where such communication took place, and all persons present when such communication was made.

No. 5: Please state in full detail each and every contention or denial of the marriage between Vicki and Brian Johnson any claim made the basis of this suit. Include in your answer:

a. all facts known to you, and all propositions of law that your attorney, or anyone acting on your behalf or their behalf, which you contend support or corroborate each such denial;

b. the name, business and residence address, and telephone number of each person known to you who claims to have any knowledge relating to each such denial of any claim; and

c. the name, business and residence address, and telephone number of the present custodian of any writings in support of each such denial

No. 9: What documents, photographs or other information do you have that support your contention that Brian Johns and Vicki Johns were not common law married?

[Tab6]

In *Jampole*, a products liability action, a dispute arose concerning discovery materials including alternate design and assembly documents. *Jampole v. Touchy,* 673 S.W.2d 569 (Tex.1984). The court held that relator in the *Jampole* case did not have an adequate appellate remedy because denial of this discovery would have effectively prevented relator from proving the material allegations of his claim. *Id.* at 576. Additionally, the court expressed that a remedy by appeal in a discovery mandamus is not adequate when a party is required to "try his lawsuit, debilitated by the denial of proper discovery, only to have the lawsuit rendered a certain nullity on appeal…" *Id.* Similarly, if Relator in the present case is denied mandamus relief she would be prevented from discovery of evidence which would assist in developing

the merits of her common law marriage to Brian Johns. Specifically, Relator would be prevented from attaining documents from Plaintiff Corey John's educational records, including the letter she wrote on behalf of Corey Johns stating that she was his stepmother and that he would be living at her and Brian Johns' home after his arrest, around September/October of 2010 and during Relator's common marriage with Brian Johns. [Tab2, (Transcript P14,L12-20)]

Additionally, Relator would be prevented from establishing Plaintiff, Frances Sowell's relationship with the hospital and treating staff where Brian Johns was taken after the explosion. After her initial visit to the hospital on July 17, 2012, Relator was prevented from seeing her dying husband as a result of Plaintiff, Frances Sowell setting a password with hospital staff. Relator requested an authorization to obtain the employment Records of Frances, in order to establish that France Sowell, the administrator of Brian Johns' estate, has a strong relationship at the hospital. Relator intends to show that France Sowell's relationship with the hospital gave her the power and ability to exclude Relator from seeing her husband while he was on his death bed.

Relator would be further deprived of establishing her common law marriage with Brian Johns by denied access to correspondence between Brian Johns' and his family and/or between his family members. Relator has testified to the resentment and hatred she received from Brian Johns' family during their marriage and after

15

Brian's death. [Tab1, (Deposition P135,L7-25;P136,L1-3)] Plaintiffs' previously produced an e-mail sent by Relator to several members of Brian Johns' family, including Plaintiff Frances Sowell, requesting that the family stay out of their relationship and allow them to move on with their lives because they loved each other. [Tab9] This was the only email produced by Plaintiffs in respond to Relator's request for production. Accordingly, Relator has reason to believe that there are various e-mails between Brian Johns' family members that will evince that Relator and Brian Johns maintained a common law marriage after their formal divorce or that they were not aware of a formal divorce. As such, this discovery goes to the heart of establishing the elements of Relator's common law marriage claim, and further denying Relator's discovery of such evidence would prejudice and hinder her ability to support the merits of her claim. Additionally, Relator needs these correspondence and emails between Brian and his family in order to defend against Corey Johns, Frances Sowell and James Johns, Sr.'s wrongful death damages. Apportionment of the wrongful death damages will be determined by the relationship of each individual with decedent, Brian Edward Johns, further justifying Relator's need for such correspondence. [Tab2, (Transcript P24,L5-13)]

Furthermore, Relator agreed at the hearing on Relator's Motion to Compel to narrow the time period for Request for Production No. 22-26 to narrow the request

to correspondence between 2007, the time Brian and Vicki were initially married, until 2012, the time of Brian Johns' death. [Tab2, (Transcript P16,L11-16)]

Finally, remedy by appeal may be inadequate where the trial court disallows discovery and the missing discovery cannot be made part of the appellate record and the reviewing court is unable to evaluate the effect of the trial court's error on the record before it. *Walker v. Packer*, 827 S.W.2d 833, 842 (Tex. 1992). Should Relator be denied mandamus relief, her common law marriage claim would proceed to trial without permitting Relator opportunity for discovery of evidence necessary to prove up her claim or to make part of the appellate record. Therefore, Relator would not have an adequate remedy by appellate review should she be denied mandamus relief on her Motion to Compel Discovery responses from Plaintiffs Frances Sowell and Corey Johns. Ultimately, the denial of a reasonable opportunity to develop the merits of Relator's case would result in a trial that would be a waste of judicial resources.

## CONCLUSION

Respondent's abuse of discretion resulted in the denial of Relator's Motion to Compel. Not one document or answers to Interrogatories requested in Relator's Motion to Compel was ordered to be produced or ordered to be answered by Plaintiffs, despite the fact that Plaintiffs obviously failed to object, respond or answer in a timely manner. The denial of Relator's Motion to Compel is so arbitrary

17

and unreasonable as to constitute a clear abuse of discretion, for which there is no adequate remedy by appeal.

## **PRAYER**

For all the reasons set forth above, Relator, Vicki Johns, respectfully requests that this petition for writ of mandamus be filed and set for hearing or submission, and that this Court grant Relator's petition for writ of mandamus, directing the trial court to withdraw the Order denying Relator's Motion to Compel and to issue an Order Compelling Plaintiffs Frances Sowell and Corey Johns to adequately respond and produce all documents and answer all interrogatories responsive to Relator's Request for Production, Interrogatories and Second Request for Production. . Relator respectfully requests all further relief, both at law and in equity, to which Relator is justly entitled.

**Respectfully submitted**


**BY:  /s/ George K. Farah**
**GEORGE K. FARAH**
**State Bar No.  24040882**
**SARAH C. DIONNE**
**State Bar No. 24072229**
**GUERRA & FARAH, PLLC**
**4101 Washington Ave. 3rd Floor**
**Houston, Texas 77007**
**T:  (713) 529-6606**
**F:  (713) 529-6605**
**Email: gkf@gflawoffices.com**
**Email: scd@gflawoffices.com**
**ATTORNEYS   FOR   RELATOR**
**VICKI JOHNS**


## CERTIFICATATION

Pursuant to Texas Rule of Appellate Procedure 52.3 (j) (i)(3), I hereby certify that I have reviewed the petition and concluded that every factual statement in the petition is supported by competent evidence included in the appendix or record.

/s/ George K. Farah __
George K. Farah

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been delivered in compliance with Texas Rule of Appellate Procedure 9.5 to all counsel of record on this the 27th day of October, 2015.

Rusty Hardin
Bob Wynne
RUSTY HARDIN & ASSOCIATES, LLP
5 Houston Center
1401 McKinney, Suite 2250
Houston, TX 77010
VIA FASCIMILE (713) 652-9800
*Attorneys for Plaintiffs*

Michael L. Brem
SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP
Pennzoil Place – North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
VIA FASCIMILE (713) 228-3510
*Attorney for The Dow Chemical Company*

Darrell A. Apffel
S. Benjamin Shabot
BETTISON DOYLE APFFEL & GUARINO, P.C.
1100 Gulf Freeway, Suite 100
League City, Texas 77573
VIA FASCIMILE (409) 744-9786
*Attorneys for Intervenor James Johns, Sr.*

Mr. Robert S. MacIntyre, Jr.
MACINTYRE MCCOLLOCH STANFILED & YOUNG
2900 Weslayan, Suite 150
Houston, Texas 77027
VIA FASCIMILE (713) 572-2902
*Attorney for Plaintiffs*

_/s/ George K. Farah_____
George K. Farah

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this brief contains 4,395 words (excluding the caption, table of contents, table of authorities, signature, proof of service, certification, and certificate of compliance). This is a computer-generated document created in Microsoft Word, using 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document

/s/ George K. Farah __
George K. Farah

# APPENDIX

Order Granting Intervenor, Vicki Johns', Motion to Compel Discovery Responses in Part………………………………………………………………………………………….1

Amended Order Granting Intervenor, Vicki Johns', Motion to Compel Discovery Responses…………………………………………………………………………………..5

## RELEVANT AUTHORITIES

34 CFR 99.31(a)(9)(ii)(A)-(B)……………………………………….…….……….8

Tex. Govt. Code Sec. 22.221(a) and (b)(1)……………………………….….….…14

Tex. R. Civ. P. 193.2(e)…………………………………………………...............16

Tex. R.Civ.P. 193.4 (a)…………………………………………………….….…18

Tex. R. Civ. P. 196.2………………………………………….………....…….…20

Tex. R. Civ. P. 197.2……………………………………………...….……....21

Tex. R. Civ. P. 215.1 (b)……………………………………………...….…….…..23

**4833-9413-4570, v. 1**

22

255824 sh


NO. 415,980-401


FRANCES SOWELL, INDIVIDUALLY AND )      IN THE PROBATE COURT
AS AN HEIR OF BRIAN EDWARD JOHNS,)
DECEASED, AND AS ADMINISTRATOR   )
OF THE ESTATE OF BRIAN EDWARD    )
JOHNS, DECEASED; COREY JOHNS,    )
INDIVIDUALLY AND AS AN HEIR OF   )
BRIAN EDWARD JOHNS, DECEASED     )
     Plaintiffs,                 )
                                 )      NUMBER ONE (1) OF
JAMES JOHNS, SR.                 )
     Intervenor,                 )
                                 )
VICKI JOHNS, INDIVIDUALLY        )
AND AS AN HEIR OF BRIAN          )
EDWARD JOHNS, DECEASED           )
     Intervenor,                 )
                                 )
VS.                              )
                                 )
THE DOW CHEMICAL COMPANY,        )
ROHM AND HAAS COMPANY, ROHM      )
AND HAAS TEXAS INC., TIM FOX, AND)
JULIO RODRIGUEZ                  )
     Defendants.                 )      HARRIS COUNTY, T E X A S


*************************************************************

ORAL DEPOSITION OF

VICKI JOHNS

JANUARY 9, 2015

Volume 1

*************************************************************



ORAL DEPOSITION of VICKI JOHNS, produced as a witness at the instance of the Defendants, The Dow Chemical Company, Rohm and Haas Company, Rohm and Haas Texas Incorporated, and Tim Fox, and duly sworn, was taken in the above-styled and numbered cause on the 9th of January, 2015, from 10:03 a.m. to 3:33 p.m., before Shanon M. Hair, CSR in and for the State of Texas, reported by machine shorthand, at the offices of Guerra & Farah PLLC, 4101 Washington Avenue, 3rd Floor, Houston, Texas  77007, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.



INDEX

Appearances...............................................5

VICKI JOHNS

    Examination by Mr. Brem..............................7

    Examination by Mr. Wynne............................89

    Further Examination by Mr. Brem....................194

Signature and Changes....................................196

Reporter's Certificate...................................198

EXHIBITS

NO.  DESCRIPTION                                          PAGE

    1.................................................8
        Final Decree of Divorce
    2................................................10
        2010 Calendar
    3................................................35
        Residential Lease
    4................................................44
        Halliburton document entitled "My Personal
        Data"
    5................................................57
        Pearland Medical Clinic record
    6................................................59
        2011 U.S. Individual Income Tax Return
    7................................................62
        08-22-12 letter to Vicki Johns from Debbie
        Border
    8................................................70
        Jefferson Financial, LLC, Irrevocable
        Assignment and Power of Attorney
    9................................................73
        Life Insurance Claim Form, Claimant's
        Statement
    10..............................................115
        2010 W-2
    11..............................................116
        2011 W-2
    12..............................................123
        Certification of Vital Record



INDEX
(Continued.)

EXHIBITS

NO.   DESCRIPTION                                              PAGE

13....................................................136
      Intervenor, Vicki Johns' First Answers to
      Plaintiffs' First Set of Interrogatories
14....................................................138
      10-04-10 Personnel Change Request
15....................................................141
      03-22-11 Personnel Change Request
16....................................................145
      Intervenor, Vicki Johns' Responses and
      Objections to Plaintiffs' First Request for
      Production
17....................................................177
      Plaintiff's Third Amended Notice of Videotaped
      Deposition of Vicki Johns
18....................................................177
      11-18-14 letter to Matthew Mahoney from Bob
      Wynne
19....................................................181
      Copy of Texas Driver License



A P P E A R A N C E S

FOR THE PLAINTIFFS:

        Bob Wynne, Esq.
        RUSTY HARDIN & ASSOCIATES, LLP
        5 Houston Center
        1401 McKinney Street, Suite 2250
        Houston, Texas  77010
        (713) 652-9000, fax (713) 652-9800
        bwynne@rustyhardin.com

FOR THE INTERVENOR, JAMES JOHNS, SR.:

        Benjamin Shabot, Esq.
        BETTISON, DOYLE, APFFEL & GUARINO, P.C.
        6710 Stewart Road, Suite 300
        Galveston, Texas  77551
        (409) 744-9783, fax (409) 744-9786
        bshabot@bdaglaw.com

FOR THE INTERVENOR, VICKI JOHNS, INDIVIDUALLY AND AS AN HEIR OF
BRIAN EDWARD JOHNS, DECEASED:

        George K. Farah, Esq.
        Sarah C. Dionne, Esq.
        GUERRA & FARAH PLLC
        4101 Washington Avenue, 3rd Floor
        Houston, Texas  77007
        (713) 529-6606, fax (713) 529-6605
        gkf@gflawoffices.com
        scd@gflawoffices.com



A P P E A R A N C E S
(Continued.)

FOR THE DEFENDANT, THE DOW CHEMICAL COMPANY; ROHM AND HAAS
COMPANY; ROHM AND HAAS TEXAS INCORPORATED; AND TIM FOX:

        Michael L. Brem, Esq.
        SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP
        Pennzoil Place - North Tower
        700 Milam Street, 10th Floor
        Houston, Texas  77002
        (713) 221-2500, fax (713) 228-3510
        mbrem@sdablaw.com

                                -and-

        Thomas J. Morel, Esq.  (By phone.)
        Michael P. Foradas, Esq.  (By phone.)
        KIRKLAND & ELLIS LLP
        300 North LaSalle Street
        Chicago, Illinois  60654
        (312) 862-3291, fax (312) 862-2200
        thomas.morel@kirkland.com


ALSO PRESENT:

        Jay F. Gibson



                        (10:03 a.m.)

                        VICKI JOHNS,

Having been first duly sworn, testified as follows:

                        EXAMINATION

BY MR. BREM:

        Q.    Ms. Johns, my name is Mike Brem and I'm a lawyer for
The Dow Chemical Company in the lawsuit that the Johns
family -- his father, his mother, his son, and you -- have
brought against Dow Chemical and Rohm and Haas.  I also
represent Rohm and Haas.  Today, we'll -- and I'm sure -- is
this the first time you've done this, given a deposition?

        A.    Yes.

        Q.    Okay.  I only need you to do two things.  One is --
is give a verbal answer because this young woman to my right
and your left is taking down everything we say and, at some
point, "uh-huh" or "huh-uh" might be disagreed about by the
lawyers about whether that was a positive or negative "uh-huh."
The second thing, if you'll do it for me, is to -- is to let me
finish my question, even if you think you know what I'm about
to ask and already know the answer.  And I promise I will try
and let you get your answer completely out before I start
again, okay?

        A.    Okay.

        Q.    At least for my part, this is not going to be like a
deposition you've seen on television.  I'm not going to be



pounding the table.  I'm not going to be yelling at you.  I do want to know what your position is.  I do want to know what facts you say support your position.  And it's going to be not unlike a conversation where I'm asking you pretty pointed questions, frankly, but all I want to know is -- is what you have to say on these subjects.  Is that okay?

A.  Yes.

Q.  All right.  Now, with that said, I'm going to show you some documents as we go along during the day, and I'm going to start off with a document that I'm going to mark as Exhibit 1.  And I have a copy for both you and your lawyer.

(V. Johns Exhibit No. 1 marked.)

Q.  (BY MR. BREM)  I'll give you a second to look at that.

(Reviewing document.)

Q.  (BY MR. BREM)  And, Ms. Johns, you have seen Exhibit 1 before, haven't you?

A.  Yes.

Q.  And this is a divorce decree, isn't it?

A.  Yes.

Q.  And it's a divorce -- it is your divorce from Brian Johns, isn't it?

A.  Yes.

Q.  If we flip back to the next-to-last page, which says at the bottom "Page 8 of 8," that is your signature in the



bottom right-hand side, isn't it?

A.   Yes.

Q.   And it says that you signed it on February the 19th, 2010; is that right?

A.   Yes.

Q.   And you did that, didn't you?

A.   Yes.

Q.   Did you do it in the courtroom in front of the judge?

A.   I think we did it in the law library.

Q.   You did it in the law library?

A.   Right.

Q.   Who was present in the law library when you signed this document on February the 19th, 2010?

A.   Just Brian and myself sitting at a table reading through it and filling out what we thought we needed to fill out.

Q.   Okay.  So, you and -- you and Brian Johns were in the law library and -- just the two of you; is that right?

A.   Yes.

Q.   You filled this document out?

A.   Yes.

Q.   You signed it that day?

A.   Yes.

Q.   With the aim of getting divorced that day; is that right?



A.   Yes.

Q.   All right.  I'm going to -- just to -- because it's hard to keep track of things in the abstract, I've got a 2010 calendar and I'm going to just circle February 19th -- and I've marked it as Exhibit 2 -- so we can kind of keep track of days.

(V. Johns Exhibit No. 2 marked.)

Q.   (BY MR. BREM)  And that was a Friday.  Do you remember it being a Friday?

A.   No.

Q.   Okay.  So, you were at the Brazoria County courthouse in Angleton that day; is that right?

A.   Yes.

Q.   All right.  After you sat in the law library -- or let me ask you a different question.  Before you sat in the law library, had you been in the courtroom with the judge?

A.   No.

Q.   Okay.  So, you did -- you signed this document, the Exhibit 1, the final decree of divorce, before you went into the courtroom and saw the judge; is that right?

A.   Yes.

Q.   You -- once you did that, what did you do next that day?

A.   We asked the lady at the front desk in the library, "What do we need to do now," and she gave instruction.  We went down the hall, asked somebody else for instruction on what to



do next.  They asked if we had all the documents.  We showed them what we had.  Then they instructed us, since we're not doing it with attorneys, that we will have to get a judge to sign it.

And, so, we asked more direction and finally got into a court and -- I think it was -- I'm not sure if he was called a justice of the peace or something.  And we just waited in that courtroom and asked the court clerk, I believe she is, "How do we get this signed?"  And she gave us instruction, told us we can sit there until the end of the court that was going on in that room.  And at the end, then we came up and asked him to -- to sign our divorce decree.

Q.  And the "him" there is the judge?

A.  The judge, yes.

Q.  And do you remember that judge's name?

A.  No, I don't.

Q.  And the judge -- did the judge sign the decree?

A.  Yes.

Q.  And is that the signature that is right above your signature -- your name and signature on the next-to-last page of Exhibit 1?

A.  Yes.

Q.  And you saw the judge do that, right?

A.  Yes.

Q.  And you knew that at that moment, whatever time of



day that was on February the 19th, 2010, that you and Brian Johns were divorced; is that right?

A. If I'm not mistaken, 90 days or 60 days from that date, that it would be -- we will be divorced.

Q. Okay. You thought it would -- you thought you wouldn't be divorced for another 60 days?

A. Right. He told -- the judge told us -- he talked to us first before he signed it because he said -- you know, he just didn't understand the way -- because of the communication we had, that is that what we really wanted to do and did somebody force us to do it and all that, and then he said, "Sixty or 90 days from now, you'll be legally divorced."

Q. And now I'm going to ask a couple of -- I was going to ask those very questions. Did the judge ask you any questions that day when the two of you were standing in front of the judge in the courtroom?

A. Yes.

Q. And what questions, to the best of your recollection, did the judge ask the two of you?

A. One of the questions he asked was did -- did we want a divorce and is there anything -- do -- something to the effect that "Is there anything you can work on before I sign this decree?" And he made the comment that he's never had a couple to come in together without attorneys and be so peaceful and loving toward one another, because we were sitting there,



you know, holding hands and talking and just whatever.  And, so, he questioned that and asked if we were forced to do it, if either one of us was forced to do it.

Q.    And what did you answer to that question?

A.    We told him no, and Brian told him that people don't have to hate each other to get a divorce and spend all that money and --

Q.    Whose idea was it to get divorced?

A.    Our -- our CPS caseworker brought it to my attention that because of my husband's behavior and -- and anger issues, she was now questioning could we keep the child.

Q.    I see.  Did you have a foster child living with you at that time?

A.    Yes.

Q.    And because you had a foster child, you also had a CPS caseworker?

A.    Yes.

Q.    What was the caseworker's name?

A.    We've had at least five.  Felicia -- Felicia works at Arrow.  She actually doesn't work for CPS but she works for the adoption agency through CPS, but Felicia is what I can remember.

Q.    And what was this child's name?

A.    This particular child at the time was Hailey.  I -- I'm sorry.  I stand corrected.  Her name was Jazmine, and I



can't place her last name.  And then she had a baby -- we had two.  The baby sister was Bailey.

Q.    So, you had Jazmine and Bailey; is that right?

A.    Right.

Q.    And they were living with you and Brian as foster children?

A.    Yes, sir.

Q.    And these are not the child that you -- either -- neither of these are the child you ultimately adopted; is that correct?

A.    That's correct.

Q.    All right.  So, let me back up a second.  So, the CPS caseworker told you that she questioned whether or not you could keep the child because of Brian's anger management issues?

A.    Yes, sir.

Q.    And what was that about?  What was going on that the -- that the caseworker questioned whether or not you could keep the foster children?

A.    When you go through CPS to get a child, you have to take parenting classes.  Because Brian was already a parent before, you pretty much couldn't just tell him how to raise a child because he felt like -- "I've been there, done that."

He had a -- an issue walking that line of following their specific rules.  I would always have to wrangle



him back in and -- "We need them in order to get what" -- "you know, our goal, which is adoption.  So, I need you to calm down, let me do the talking, so we can get past this."

Sometimes that worked, sometimes it didn't.

Q.   Okay.  And when you say that you -- you wanted to do the talking, was the talking to the children or to the caseworker?

A.   The caseworker.

Q.   Okay.  So, the caseworker had some questions, for lack of a better term, about Brian's fitness as a parent?  I'll let you describe it however you want.

A.   Okay.

Q.   What were the caseworker's questions?

A.   Brian is very verbal and -- even when they're on the phone with us asking for -- we had to have certain licenses and certain inspections on the house.  He would always dispute it.  No matter what they're asking, he felt like it was unnecessary, because we're financially able to care for these children.  He felt like they were being hard on us -- excuse me -- as a couple when he felt like we're doing a favor for CPS by, you know, fostering these children.

Q.   And, so, what kind of questions did they have?  When I -- when you say they were on the phone, when they were on the phone, this was CPS; is that right?

A.   Yes, sir.



Q.   And what kind of licenses and certain inspections did they want to do that Brian disputed?

A.   You have a book -- they give us a booklet of all the dos and don'ts of foster parenting.  And, for example, we can't get a child a walker.  It's against their policy.  Brian bought it anyway.  When they come over to the house, they look at -- you know, in every room, specifically the child's is where they start.  I told him, "Don't get it."  He got it.  He said he'll just hide it.  He put it under the bed.  Of course, because they look in every closet, every room, they found it.

So, he was always breaking some kind of rule.  It was harmless, but it still was against what they asked us to do.

Q.   Okay.  In addition to the walker, what other kind of rules did Brian break of CPS's or the foster rules?

A.   He would -- he would just debate a lot of -- anything that they -- any precedent that they set, he would -- whether we were in class at the CPS office or if we're on the phone and they're asking for a fire inspection for the home, he felt like -- "Well, what are they" -- "they should" -- "we shouldn't have to pay for that every year."

So, he -- it was -- he should have been used to it, but -- I mean, we -- we had to -- we've gone through this for some years because we've had more than four children in our home.

Q.   Okay.  So, you had children before Jazmine and Bailey?

A.   Yes, sir.

Q.   And who were the children before Jazmine and Bailey?

A.   The first child, her name was Jewel, and I can't -- I can't -- I can't think of the last name.

Q.   Okay.  And how long did you have Jewel?

A.   We had Jewel, I would say, approximately four to six months.

Q.   And what year was that?

A.   She was the very first child.

Q.   Okay.  And what year was that?

A.   Between 2008 and 2009.  We finished our classes in 2008 and I want to say that they placed her in 2009.

Q.   So, you took some classes?

A.   Yes, sir.

Q.   Foster parenting classes?

A.   Yes, sir.

Q.   And were these -- was -- and you -- so, you had Jewel for some months?

A.   Yes, sir.

Q.   And then why did she leave your home?

A.   Because the foster home that she came from, they were not supposed to give her -- pass her on.  They let us babysit her and they never came back for her.  As a foster parent, you



can babysit for another foster parent.

Q. Oh, is that right?

A. Yes, sir.

Q. Okay. So, she was not your official foster child; some other foster parents had you babysit and simply left her with you and never came back?

A. Yes, sir. Yes, sir.

Q. All right. And then -- so -- so, because you weren't -- am I understanding then because you weren't Jewel's official foster parents, they simply took her back?

A. Right.

Q. All right. Then who else?

A. From there, we got Jazmine and then Bailey.

Q. And were they siblings?

A. Yes, but we had Jazmine 18 months before Bailey was born.

Q. Okay. And then what happened -- and that's the -- and those are the children that you had at the time of the divorce; is that right?

A. Yes, sir.

Q. All right. Now, so I don't miss anything, were there any other disputes that Brian had with CPS or the foster home regarding these two children?

A. Brian -- we had Jazmine for 18 months and we were really comfortable -- you know, we got the parenting thing --



our schedules all together so we were comfortable.  Her mom had another baby in jail and the caseworker called -- because when you're a foster parent, you get almost, like, first dibs on the new child.  And Brian actually answered that call and he told them yes without my knowledge.  I wasn't quite ready for two.

And, so, he -- we just -- we went to a picnic, foster care picnic that they throw every so many months, and that's when I met that baby.  They brought her -- the caseworker gave her to me and said, "This is Jazmine's baby sister, Bailey, and Mr. Johns said you guys were taking her home."  So, I was quite surprised, but happy nonetheless, and we took her home from the park.

After a few weeks -- I would say two to three weeks went by, Brian started feeling neglected and felt like the second baby was becoming overwhelming to me, juggling -- you know, being a wife and mom of a toddler, and we both worked full time.  He called the caseworker and said that we -- he wanted to bring Bailey back to foster -- you know, to another home.

And the caseworker called me at work and told me what had happened and she said she was having some concerns because they explained to him first that if they remove Bailey, they would have to take Briley.  Jazmine is her real name.  We just named her Briley.  And, so, I immediately called him.  I was, like, "We'll discuss when I get home," because I was



really upset that he called them.

So, now they're questioning -- if we're not on the same page as parents, then there's -- that's a problem. So, he started cursing -- because I'm on the phone with her at this point when I got home from work. He was cursing. She heard all that and she was, like, "I'm going to have to schedule an appointment because I have to make sure that the kids, for one, are safe. For two, if you guys are now on opposite ends of how many kids you want at one time, then we" -- "you know, we have to do something about that."

Q. Okay.

A. It was too late to fix it.

Q. And that was Felicia? You believe her name was Felicia?

A. That was Felicia, yes, sir.

Q. And she worked for Arrow, a foster came home, a foster agency?

A. Agency, right.

Q. All right. And somehow all of this led up to your decision to get divorced?

A. Yes.

Q. All right.

A. She had to come and take the baby. She talked -- talked with CPS themselves and others -- I'm not sure of all the other people name. They made a decision that if you don't



want one child, you lose the other.  She called me the next -- the -- I don't know how many days later -- and said that they were on their way to my -- to the baby's school to take them both to -- I'm -- I'm sorry.

Q.  And any time you need to take a break, just say so and we'll step out for a second.

A.  Okay.

Q.  If you need to collect yourself, that is perfectly okay.  We're on your schedule.

A.  Okay.  Bailey -- she met us with Bailey.  We took Bailey to Angleton and they took her.  She said she would let us know what they decided about Jazmine, which was the oldest child.  And then a couple days later they called me at work and said, "Okay.  Well, the decision's been made that we're going to keep the children together, so we have to come and get her."

I was completely devastated.  I was crying, just -- just -- it was awful.  And, so, Brian was really angry and really cursing then and told them not to come to his house, just -- it was awful.

Q.  He told the caseworker that?

A.  Yes, sir.  And, so, they went to the school to pick her up.  And, so, I called the school to let them know that -- you know, "It's okay.  Let the baby go with this lady who's coming.  She will have ID."  Brian called my mom.  She came over and -- and was trying to console me.  So, that went -- I



was depressed for several months.

During this time, I was not really happy with Brian at all.  I was upset with Brian and with CPS because I felt like the oldest child was with us for 18 months.  That was established and it shouldn't have been an issue.  But Brian and I just -- I began to resent him.  I was very upset with him.  I just -- I just shut down.  I stopped talking.  I stopped eating.  I lost weight.  I was just -- I was devastated, and it was all his fault.  And he was saying he was sorry, but it's them and -- "We can get another baby.  We're just going to go through a different agency," that he'll make it right.

Meanwhile, Felicia calls to check on me because she knew I was having such a hard time with it.  And she was, like, "Well, you guys need to decide how you guys are going to do this because he has to abide by all our rules," and then that's when she brought up the notebook of things that he didn't do or said and the -- the -- the stroller issue -- I mean, the walker issue.  She just brought all that up.

So, we started talking and she was, like, "Well" -- I said, "Can I just adopt her by myself?"

She said, "Yes, but you're married.  So, if you" -- "you can't adopt by yourself because it's a two-parent home, not a one-parent home."

Because I said, "Well, since he's made it up to this point, can I just go from here forward without him" --



"you-all having to deal with him, just deal with me directly?"

She said, "No, because you guys are married. You're in the same house."  So, then he tried to make amends with them and asked them what could he do and just all this -- he was trying to really make up for it.  And she was, like, "I'm sorry.  You guys are going to have to take a whole other year off.  We can't place another child for a year until you guys take some time and deal with the loss of these children and then decide how you-all want to go forward.  So, that'll be a year."

Well, that was not going to sit well with either of us.  It didn't sit well.  And, so, we were determined we're going to get us a baby right now and -- "What do we need to do?"

She's, like, "As long as you guys are married, you can't" -- "you have" -- "this incident happened, it's of record, so you can't just go around it.  You can't act like that was just, you know, one-time situation."  So, we -- we sat there and talked about it, what -- how could we do it?  We didn't want to go through a private adoption and have to worry -- we discussed it -- surrogacy, private adoption -- and we just weighed all of our options and thought we can get a divorce and I adopt this child.  Then after the adoption, you know, we can just -- because we're still in the same house anyway, we can just get married again.



He's, like, "Well, let's call Felicia and tell her what we're thinking and see what she says."  Of course, she's not going to tell you, yes, go do something wrong or illegal or whatever it was, immoral.

So, of course, she said, "You can't be in the same house."  So, we came up with an idea that we'll get another apartment and just say you don't live here.  We tried -- initially, when CPS was coming to visit and they were going to do the paperwork as me, a single parent, we tried to just hide his clothes -- because we knew they were going to look in the closet, so then we would hide the clothes elsewhere; car, garage, wherever.

That didn't work for long.  Then we tried saying that I would move out and -- but then -- I'm sorry.  When they went -- we initially tried to say that he moved out, but then they wanted to redo my finances and it wouldn't match up with me being able to afford this house on my income alone.  So, we just -- we went through everything we could think of and that's what we came up with.  We had to get into an apartment and use that as an address for me and that baby.

Initially, he stayed there, but then -- whenever there was a CPS visit, but then -- that didn't work for long, so then I went there to the apartment and we tried -- we did it for a while.  It worked, but we knew that wasn't a long-term solution.  Then we started having problems in our marriage and



I left him.  I went to a hotel because I didn't want to stay at the apartment, just anything -- I -- I just needed some time to think and figure out where I wanted to go with -- you know, with my life, with this parenting thing, and I -- you know, we'd talk all the time.

So, I came back home and we decided we were having so many issues that we were going to wait until we get a new house and we'll get a new baby, but we'll go through a different agency.  We moved out -- well, we got evicted from that house because he started having other issues with the guy that owns our house, our landlord.  So, the constable comes one day, we get evicted.  We know we can't get a child now because now there's an eviction.

So, we moved into that apartment that we rented, we stayed there, and we didn't get another -- it took about a year before we could get another baby.  And that's Hailey, which is the current baby.

Q.   Which is the baby that you ultimately adopted.

A.   Yes, sir.

Q.   All right.  So, let me -- when you say you were -- got evicted from the house, is that the house on Castle Pond?

A.   Yes, sir.

Q.   All right.  And that's where you-all were living at the time you were divorced; is that right?

A.   Yes, sir.



Q.   And what issues did Brian have with the landlord that caused you-all to get evicted?

A.   The -- when you move into a rental property, you're not supposed to change anything.  You're just renting it.  My husband wanted it to have a media room.  It did not.  He started doing construction on the house and painting the walls black to make a theater room.  The owner came over, saw that, was extremely upset.

Q.   And this is the Castle Pond address?

A.   Yes, sir.  Then the neighbors would complain about the dog -- I bought Brian a Rottweiler dog and he was big, so he had big poop, and the neighbors would complain about that because -- and -- I'm sorry.  The owner of the property would complain because it was poop all over the back yard, like, Brian wouldn't go clean it up.  And then kids come by the gate, you know, the dog is barking and so he got complaints about it, so he would start coming over more.

Brian just destroyed the garage because of the Yukon.  The garage is short.  The Yukon had a long bed and he backs in to park.  Every day backing in, hitting the wall -- he'd wait until he bumped the wall to stop.  Eventually, the bricks on the other side start coming out.  Landlord was livid and he asked us to move.  He talked to Brian about it, told him he wanted him to pay the damages first.

Brian started cursing him and saying, "As long



as I pay my money, I can do what I want." Brian had changed the landscaping -- so, the man just got to a point where he just got frustrated and he asked us to leave, and Brian said no. He called the constable. Brian started breaking things. And, eventually, constable -- we had to call to get -- go get a U-Hall and move.

Q. What was the landlord's name at Castle Pond?

A. Mr. Gu. I don't know what the first name is. Gu, G-u.

Q. G-u?

A. Uh-huh. This was our third eviction though at that point.

Q. Where else had you been evicted from?

A. Prior to moving to Pearland, we were living in Sugar Land with the baby -- when we first got Briley, Jazmine -- when we first got her, we were living in Sugar Land. And, again, he -- pretty much the same thing at every house. It didn't have a media room. He made one. He -- he -- he put -- punched holes in the walls. One was intentional and one, he just shoved the door and so the knob went through the wall.

So, when the landlord comes to visit, like they do, they saw the damage to the house. And he told me that -- he asked me if I needed help -- because he knew that was a punch through the wall and he asked me if I needed help domestically, you know, because he knew we were having domestic



issues because he would get complaints as well.  And he said, "Well, you can stay here, you and the baby, but Mr. Johns has to go."

So, I told him, "That's my husband.  I can't afford this house without him and I'm not leaving him."  He said he got complaints that the police had been there and that's not what he wanted for his property, he has to leave.

Q.   What was the address of this house?

A.   3126 Aspen Hollow.

Q.   In Sugar Land?

A.   Yes, sir.

Q.   And what was the landlord's name there?

A.   I want to say Mr. Singh, S-i-n-g-h, something like that.

Q.   Okay.  And was there an eviction from another house as well?

A.   Yes, sir.  The --

Q.   What year were you evicted from the Aspen Hollow house in Sugar Land?

A.   I think the Richmond house was 2009, Sugar Land house was 2010 -- I'm sorry.  Probably -- Pearland was 2010.

Q.   And Pearland is Castle Pond?

A.   Right.  Castle Pond was somewhere between 2010/2011 because we moved mid year to the Friendswood house.  So, it was late 2010 or early 2011.  And then a year -- we didn't stay at



those other two -- I don't think it was even a year.  We never made the year lease to any of those, except Castle Pond.

Q.   Let me make -- I'm looking at my notes right here.  So, you -- you lived in Castle Pond at the time of the divorce --

A.   Yes, sir.

Q.   -- and your landlord's name was Gu.

A.   Mr. Gu.

Q.   And that's the house that the constable came in to remove you from.

A.   Yes, sir.

Q.   Before that, you lived in Sugar Land.  Do I have that right?

A.   Yes, sir.

Q.   And Aspen Hollow?

A.   Yes, sir.

Q.   Landlord's name was Singh.

A.   Yes, sir.

Q.   And asked you to leave that house as well?

A.   Yes, sir.

Q.   And before -- I'm having trouble with the house before.  Richmond, did you say?

A.   Yes, sir.

Q.   Okay.  So, you were in Richmond.  What was the address of that house?



A.   I can't recall the address to that one.  It was --

Q.   What was the landlord's name?

A.   I can't recall his name.  He was in Africa but his brother was in that neighborhood, and so that's who we took the rent to.

Q.   Okay.  Why were you asked to leave the house in Richmond?

A.   Same story.  Brian would punch walls.  Brian would pull up the trees from the front yard and plant whatever he wanted to plant.  Brian and the neighbor would get into it about the -- the neighbor's dogs chewing through the gate, wanting Brian to repair the fencing from our dog.  Their dog bit our dog.  It was always some drama going on.  And when the man came over to see the changes that Brian -- this house had a media room, so he didn't have to do that, but he made other changes to the house and punched walls.  Was his outlet, I guess.

And, so, the guy -- Brian questioned, "Why are we giving the rent to you and not to your brother?  I want to see your brother, not the" -- "not the representative of the house."  He and the guy had verbal altercation.

And he said, "Let me talk to your wife."

Brian told him, "Don't no man talk to my wife. You talk to me.  I'm the man of the house."  Guy asked us to leave.



Q.   Do you know that fellow's name?

A.   I don't.

Q.   Okay.  You said a couple times that Brian punched walls.  Did he do this in anger?

A.   Yes.

Q.   So, he would take his fist and hit a sheetrock wall and it would put a big hole in it?

A.   Yes, sir.

Q.   And did he repair those?

A.   Yes, sir.

Q.   So, you --

A.   Well, two of them he repaired.

Q.   Okay.  And when he was angry, was he angry with you?

A.   Sometimes.

Q.   Otherwise -- sometimes he was angry at something else?

A.   Yes, sir.

Q.   For example?

A.   For example -- it could be family, it could be the landlords.  Or, like, if DirecTV calls and says, "This is a courtesy call.  Your bill is due Friday," he would curse them out and he'd be so mad he'd have to hit something.

Q.   Do you think Brian had anger management issues?

A.   Yes, sir.

Q.   Did he ever hit you?



A.   He didn't hit as in punch, but he put his hands on me.

Q.   And what -- what's the difference?

A.   He would push me into a wall or hold me up against a wall or, like, squeeze me.

Q.   And he was more than a foot taller than you?

A.   Yeah.  I'm 5'-6".  He's 6'-8".

Q.   More than a hundred pounds heavier than you?

A.   Two-and-a-half hundred pounds heavier than me.

Q.   All right.  So, let me go all the way back up to the time of the divorce.  Am I understanding what you're telling me is that -- that the two of you decided to get divorced in an effort to either keep the children you had or to be able to adopt new children?

A.   To be able to get a new baby because we -- they wasn't going to give those girls back.  No matter how much we begged and pleaded and made promises, whatever, they wasn't giving them back.

Q.   Okay.  So, you were -- you made the decision to get divorced in an effort to adopt a new child?

A.   Right.

Q.   All right.  So, let me --

A.   By myself.

Q.   By yourself.  That's right.  So, let me -- let me see if I've got this right.  At the very moment that you got



divorced, that you went down to the Brazoria County courthouse, signed Exhibit 1, went to the judge, you were still living at the Castle Pond address?

A.   Yes, sir.

Q.   Hadn't been evicted yet?

A.   No, sir.

Q.   Okay.  And, so, a lot of -- so, you got divorced, you had lost the babies, but you were still living in the Castle Pond address?

A.   Yes, sir.

Q.   At what point in time did you get a second address?

A.   When we got evicted.  We had to have a second address because -- we knew the eviction date --

Q.   Right.

A.   -- but we stayed there until the actual day and hour that the constable came because we were still trying to get approval, so --

Q.   Let me ask a separate question.  While you were living at Castle Pond, you never had two addresses; is that right?

A.   That's correct.

Q.   All right.

A.   Right.

Q.   So, you moved from Castle Pond to where?

A.   From Castle Pond, we moved to a town house at Regency



Square.

Q.   Okay.  Is that Regency Square in Houston or somewhere else?

A.   Houston.

Q.   You know, I have this recollection of Regency Square.  Where is that?

A.   It's Hillcroft and 59.

Q.   It's the same one.  Okay.  Just on the near southwest part of Houston, right?

A.   Uh-huh.

Q.   Okay.

A.   Yes.

Q.   And when did you move there?

A.   The day of that eviction, and I don't remember the date that we got evicted.

Q.   What month?

A.   I don't remember that either.

Q.   Okay.  So, sometime -- when we look at our calendar here though in 2010 that I marked as Exhibit 2, sometime after February 19th that is the date of the divorce decree --

A.   Oh, no.  It was, like, at the end of the year.  We stayed at Castle Pond the whole year --

Q.   Okay.  So, you may --

A.   -- after the divorce.

Q.   Is that right?



A.   Yes.

Q.   Well, let me ask you -- let me look at something then.  I'm going to show you -- in an effort to kind of keep our dates straight, I'm going to show you a document that I marked as Exhibit 3, or that I'm marking as Exhibit 3, and let you take a look at that.

(V. Johns Exhibit No. 3 marked.)

MR. BREM:  George.

MR. FARAH:  Thank you.

(Reviewing document.)

A.   Okay.

Q.   (BY MR. BREM)  And your lawyer is -- is pointing to exactly why I showed you Exhibit 3, because it has a -- a date that I'm -- that is a little different than what you were just describing to me.

A.   Okay.

Q.   So, I want to give you a second to look at that and think about it and I'll ask you some more questions.  You tell me when you're ready.

A.   I'm ready.

(Reviewing document.)

MR. FARAH:  Did you say you're ready?

THE WITNESS:  Yes.

Q.   (BY MR. BREM)  Okay.  I'm sorry.

A.   I'm sorry.



Q.    What I'm showing you is a residential lease for an address in Saxon Hollow Court in Friendswood, Texas.  Do you see that?

A.    Yes.

Q.    And the reason I brought that out right now -- I was going to show it to you later -- is this is a lease by Brian dated in May of 2010.  Do you see that?

A.    Yes.

Q.    Okay.  Did Brian have a second address just a few months after your divorce?

A.    No.  Brian looked at -- we were looking for a house, period.  We didn't -- we didn't have one immediately, so -- we had to get out the day that constable came.  That's where the town home came from.

Q.    You moved to Regency Square then?

A.    Right.

Q.    Okay.

A.    Me, Brian, our dogs physically moved to Regency Square.

Q.    Okay.

A.    Same time, we were still looking for a house because we can't live in an apartment.  We had too much of everything, and then we had the big dog.  So, he was looking for a house.  That is -- this is not a surprise.

Q.    Okay.  Now -- but you didn't move out of Regency



Square until late 2010?

A.   No.  We broke that lease.

Q.   Oh, you broke that lease?

A.   We've broken all of our leases.

Q.   Okay.

A.   But, yes.

Q.   All I'm trying to do, Ms. Johns, is try and get the chronology so I can better understand where we're going.  And I understand that this has now been, you know, almost five years ago and some of this might be a little blurry, so -- but I -- this is -- none of this is tricky.  I'm just trying to get it in the right order.

All right.  At some point, you get evicted from the house on Castle Pond.

A.   Yes, sir.

Q.   You -- from there, the two of you and the dogs moved to an apartment on Regency Square, Hillcroft and the Southwest Freeway.

A.   Yes, sir.

Q.   All right.  Now, that was in -- sometime in 2010.

A.   Right.

Q.   This document seems to say that Brian alone signed a lease on a house that he was going to start living in on June the 4th, 2010, at Saxon Hollow in Friendswood.

A.   Right.



Q.   All right.  Now, did you live in Regency Square --
did you live anywhere after Regency Square but before Brian
leased this place on -- in Friendswood?

A.   We stayed at Regency Square --

Q.   Right.

A.   -- until he got the house in Friendswood.

Q.   Okay.

A.   Then he and Corey moved all of our things from
Regency Square to Saxon Hollow in Friendswood.

Q.   So, Corey participated in moving your and Brian's
stuff from Regency Square to Saxon Hollow?

A.   Yes, sir.

Q.   And this is four or five months after the divorce, or
three or four months.

A.   Right.

Q.   Or --

A.   Or -- we moved in Saxon Hollow on the 4th.  That is
correct.

Q.   Okay.  That's what I'm asking.

A.   Yes.

Q.   So, you -- you broke the lease at Regency Square --

A.   Right.

Q.   -- moved to Saxon Hollow, the two of you; is that
right?

A.   Yes.



Q.   And Corey -- Corey Johns, Brian's son -- who is not your child, right?

A.   Right.

Q.   He had a different mother.

A.   Right.

Q.   What was her name?  Do you know her?

A.   I've never met her.  I have no idea.

Q.   Okay.  So, Corey Johns helped move the two of you to Regency Square.

A.   No.  From --

Q.   Okay.  From Regency Square to Saxon Hollow.

A.   Yes, sir.

Q.   Thank you for correcting me.

A.   Sure.

Q.   All right.  Now, Brian kept the house at Saxon Hollow until the time of his accident, didn't he?

A.   Well, the lease was up and so we were going month to month once the lease was up because we found another house to move to.

Q.   Okay.  And we'll come to that in a minute.

A.   Okay.

Q.   You were going month to month; is that right?

A.   Yes, sir.

Q.   You found another house to move to?

A.   Yes.



Q.   Did you ever lease that house?

A.   Didn't get that far yet.  We went to see it.  He talked to the realtor.  On the next pay date, he was going to give them money, but then the accident happened.

Q.   Okay.  So, he -- so, at least -- and I'm not -- we'll talk about you in a minute.  At least Brian lived in the Saxon Hollow address from the time you-all leased it in June of -- or from the time he leased it in June 2010 up until the time of the accident; is that right?

A.   That's correct.

        MR. FARAH:  Objection.  Form.

Q.   (BY MR. BREM)  And Corey Johns helped -- helped the two of you move from Regency Square to this Saxon Hollow address.

A.   Yes, sir.

Q.   All right.  Now, when you were at Saxon Hollow starting in June of 2010, did you, Vicki Johns, ever have other addresses between that time and the time of the accident?

A.   Did I have other addresses?

Q.   Yes.

A.   Yes.

Q.   Okay.  And what was the first of those other addresses?

A.   Now, you mean addresses that I used or addressed where I lived?



Q.   Well --

A.   Because I used my parent's P.O. box, I used their home address for certain things, and then he and I got -- once we were notified about Hailey, then we got the condo on Holly Hall.

Q.   So, let's take a step back.  When we go back to the divorce decree, which is Exhibit 1, and look at the address below your signature --

A.   Right.

Q.   -- there's a P.O. box.

A.   Yes.

Q.   And is that -- whose P.O. box is that?

A.   My parents'.

Q.   Okay.  And where are -- are your parents in Houston still?

A.   My father passed a month after Brian did, but my mom's in Pearland.

Q.   Your mom's still in Pearland?

A.   Yes.

Q.   And what is your mom's name?

A.   Jeanette Briscoe.

Q.   Okay.  And this was your parents' P.O. box that you just used.

A.   Right.

Q.   Okay.  Now, let's go back to the lease for a second,



which is Exhibit 3.  You see the lease is just in Brian's name, right?

A.    Yes.

Q.    Did you know it was just in Brian's name?

A.    Yes.

Q.    And did you-all move there on June the 4th, 2010?

A.    Yes.

Q.    So, the day it was available, you moved there; is that right?

A.    Yes, sir.

Q.    Let me get you to flip -- way down here in the corner, it says -- gives you the page number.  Says "Page 5 of 14."

A.    Yes.

Q.    At the top, it says that the tenant -- it's talking about who can live there and it only says "Brian Johns" and "Corey Johns."  It does not say "Vicki Johns."  If you're living there with him, why does it say that?

A.    Because Brian and I have so many broken leases, I refused to get -- my credit is now damaged, okay?  And we've talked about this.  The apartment -- we tried to get one and then they denied us because of all the broken leases prior to. I told him going in -- because now we have a history of these broken leases and him getting upset and just tearing it up. They put all those houses on both our socials.



This go-around -- because at this point, I'm learning how it goes.  I told him I wasn't signing that lease.  He's my husband, so it didn't matter where he lived.  I can live there with them.  I was going to live there with him.  So, having my name on there, it didn't change anything.  But for me, I wasn't going to screw up my credit more than we've already done.

Q.    Okay.  So, you made a decision that you were not going to be on the lease --

A.    Exactly.

Q.    -- at Saxon Hollow.

A.    At Saxon Hollow, yes, sir.

Q.    Okay.  Now, let me ask you -- flip back and -- it's -- it's the very last page of Exhibit 3, the lease.  It also identifies people who can have access and it doesn't identify you, does it?  It identifies Brian's mother.

A.    Right.

Q.    And why didn't -- why weren't you even identified as a person who could have access?

A.    I have no idea.

Q.    Okay.  Were you there when Brian did the lease?

A.    No.

Q.    Okay.  He did that --

A.    I was at work, yes.

Q.    You weren't physically there?



A.   No.

Q.   Now, you say you were at work.  Where were you working at that time?

A.   Halliburton.

Q.   And you still work at Halliburton, don't you?

A.   No.  I work at Hess now.

Q.   Oh, you're at Hess now.  When did you move from Halliburton to Hess roughly?

A.   I've only been at Hess two months.

Q.   Okay.  And how -- when did you leave Halliburton?

A.   I got laid off at Halliburton in 2013.

Q.   So, two years ago, or year-and-a-half ago.

A.   Yeah.

Q.   And how long had you been at Halliburton?

A.   Seven years.

Q.   So, kind of 2006/2007 is when you started there?

A.   Yes, sir.

Q.   All right.  In fact, I'm going to show you another document that I'm going to mark as Exhibit 4 that is a Halliburton document.

          (V. Johns Exhibit No. 4 marked.)

Q.   (BY MR. BREM)  I'll give you a second to look at that.

          (Reviewing document.)

Q.   I see you're ready, Ms. Johns.  I'm just waiting on



your lawyer.

MR. FARAH:  Go ahead.

Q.  (BY MR. BREM)  All right.  The very first thing I want to ask you -- this is a document that comes from Halliburton's human resources, I guess; is that right?

A.  Yes, sir.

Q.  And it says -- has an address there, which is 8020 Braesmain, 1710.

A.  Yes, sir.

Q.  When did you live at 8020 Braesmain, 1710?

A.  I signed that lease -- it might have been May because that's where Hailey was -- was given to me, at that address.

Q.  Okay.  And when you say "May," May of what year?

A.  2010.  No.  I take that back.  She was born May 2010. She was three months old.  So, had to be, like, August 2010.

Q.  So, later on in the year?

A.  Yeah, I -- I believe so.

Q.  Okay.  So, 8020 Braesmain is an address that is an apartment that you had that you leased sometime in 2010?

A.  Or 2011, yes, sir.

Q.  What was the name of that apartment?

A.  It was individually owned.  I don't think it had a name.

Q.  Was it, like, a town house?

A.  Yes, sir.



Q.   And we're talking about 8020 Braesmain -- we're talking about that street that runs between Braeswood and South Main over by the Target there, aren't we?

A.   Exactly.

Q.   All right.

A.   Right behind the Target.

Q.   Do you know who your landlord was?

A.   No.  We found him on -- I want to say Craigslist or something, for lease.  That's how we found all these places.

Q.   Oh, on Craigslist?

A.   Craigslist and HAR.com.

Q.   So -- and I see you still kind of puzzling over there, trying to figure out exactly when you leased this place. As you sit here and think about it just a second and give me your best estimate -- and if you come up with a better one later, you can tell me -- of when you leased the 8020 Braesmain, Apartment 1710 address.

A.   I just can't be specific, but I know she was three months old when they brought her, the day they brought her, and she was born May 2010.  So, May, June, July -- I would say August, if I had to guess.

Q.   That makes sense.  So, the child that you ultimately adopted is born -- was born in May of 2010.

A.   Yes, sir.

Q.   And you -- the foster agency brought her to you in



August of 2010; is that right?

A.   Yes, sir.

Q.   And at least by that time you had the 8020 Braesmain address; is that right?

A.   Yes, sir.

Q.   All right.  Now, in between the June 4th, 2010, where Corey Johns helped move the two of you to Saxon Hollow -- you with me --

A.   Uh-huh.

Q.   -- and this -- and this apartment or town -- was it apartment or town house --

A.   Town house.

Q.   -- this town house on Braesmain that you had at least by August of 2010, did you, Vicki Johns, have any other places that you lived?

A.   We went from Regency to Saxon Hollow.  Then when we found out about that baby, I got that apartment at Braesmain and broke that lease.  And then while we were at Saxon Hollow, when I left him, I got Holly Hall, I got another condo on Holly Hall.

Q.   And the Holly Hall condo is east of Reliant Stadium, almost to 288?

A.   Yes.

Q.   All right.  And Holly Hall is the street that actually runs smack into the Reliant Stadium and Astrodome



complex; is that right?

A. Right. Right.

Q. It goes all the way from there over to 288; is that right?

A. Right.

Q. All right. So, let me get the chronology of this again. You -- you moved to Saxon Hollow and then you got an apartment on Braesmain. Do I have that right?

A. Yes.

Q. And then you said, "When I left him," you moved to Holly Hall; is that right?

A. Yes.

Q. So, you left Brian?

A. I've left Brian couple of times.

Q. Okay. And at least on this occasion, it's -- when you -- when you left him, you moved to the Holly Hall address; is that right?

A. Yes.

Q. And when you moved to Holly Hall, that was an address that you had by yourself, but along with Hailey.

A. Yes.

Q. Is that what I'm understanding?

A. Yes.

Q. And about when was that?

A. I -- I can't remember the date. I was -- I can't



remember the date.  I was -- I can't remember that date.  I remember what happened that led up to me leaving, but I can't remember the date.

Q.   Okay.

A.   I'm sorry.

Q.   I'll ask you the month and then I want you to tell me what happened that led up to it.  The year.

A.   The year was 2011.

Q.   Okay.  What led up to it?

A.   Brian and I had -- Brian and I had domestic issues and we both would call the police on one another.  For me, I kind of drew the line when he -- it was enough that we would fight verbally.  I didn't want my daughter to grow up thinking that's how you talk to anybody, specifically to a lady, and I didn't want her hearing all the things that Corey has heard and experienced, and I told him I was leaving.

He didn't want me to.  I called the police and they told me he couldn't make me stay.  This was at Saxon Hollow.  And -- but, initially, I went to my parents'.  Found that apartment, got it.  By that time -- you know, we were still back and forth.  I would -- he would come over there and stay a couple of nights.  I would go back -- he would pack our bags and we'd go back home with him, and it went on back and forth.

Q.   Did you leave him for good at some point?



A.    No.  I never left him for good.

Q.    All right.  So -- and then we'll take a quick break. I want to just make sure I got the chronology so when I'm thinking during the break, I've got it.

The two of you move to the Saxon Hollow address in June of 2010; is that right?

A.    Yes.

Q.    And at least at -- within the next couple of months of that, you got an apartment in your own name, not with Brian; is that right?

A.    That's right.

Q.    At -- on Braesmain.  And that was actually a town house; is that right?

A.    Yes.

Q.    And then at some point, maybe the next year, you left Brian, got an apartment over on Holly Hall, just in your name, too; is that right?

A.    That Braesmain, I think I was there two months max --

Q.    Okay.

A.    -- and went -- you know, he -- we went on back to Friendswood.  Then we had another falling out that I felt like was pretty big, got that apartment.

Q.    On Holly Hall?

A.    We were still having court dates.  We were still going to court for the baby and all that -- that was still



going on, amidst our domestic issues -- and I got that apartment for Holly Hall. And, so --

Q. I got it. And did -- all right. So, you left Braesmain after just a couple of months?

A. Yeah.

Q. Did you break that lease? How did you get --

A. Yes, broke it.

Q. And did the landlord sue you?

A. No. I gave notice. I told him that I was reconciling with my husband and I paid that rent, I paid the reletting fee, and so that didn't count as --

Q. And, so, the landlord was okay with that?

A. Yes, sir.

Q. And you don't remember that landlord's name?

A. No.

Q. All right. And -- and, so, then sometime later, the next year, you rent a place over on Holly Hall. What was the name of that apartment complex?

A. Briarwick, B-r-i-a-r-w-i-c-k, Condominiums.

Q. And they were condos?

A. Yes, sir.

Q. And then did you -- how long did you have that place?

A. All the leases we signed were a year. We just didn't stay in them a year, so --

Q. Okay. In 2011, how long -- did you stay in the -- in



the Briarwick condos on Holly Hall for some period of time?

A. Yeah. We kept that one. We kept that one -- when he -- if he didn't feel like driving all the way back to Friendswood, we'd stay there. And it depends on what his schedule was like when we would stay there together, the three of us and the dogs. We would stay there and then we'd go home.

If we know CPS is coming, then I'd leave Friendswood and come back for that appointment because they're going to check the house. And, so, he'd either wait in the car, park around the corner, or I'll just drive myself, you know, me and the baby, and then we'll just go back. So, we did that for a year.

Q. And did you have the Holly Hall apartment at the time of the accident?

A. Yes. I had -- I had the apartment at the time of the accident, yes.

Q. Okay. I think I've got the chronology now. Let's take a break.

A. Okay.

(Recess from 11:05 a.m. to 11:23 a.m.)

(Ms. Dionne enters.)

Q. (BY MR. BREM) All right. I'm going to go back and ask you about the document that I marked as Exhibit 4, which is the Halliburton HR record.

A. Okay.



Q.   I've only got one question about that, and it's a small one.  It says your original hire date was 1-25-2010, but I thought I remembered you telling me that you had been hired in 2006 or 7.

A.   I came on as a contractor in 2006.

Q.   Oh, I see.  You were a contractor in 2006 --

A.   Right.

Q.   -- and then went full time in --

A.   Exactly.

Q.   I got it.  So, let me see if I can put all this together.  Your position is that the only reason you and Brian ever got divorced was because it was the only way to be able to foster and ultimately adopt a child; is that right?

A.   Yes.

Q.   You would not have gotten divorced other than that?

A.   No, because when it's just the two of us, we could deal with all this.  His -- his anger management issue, we were dealing with it for a couple of years.  When it comes to the baby, when it came to him and -- and his daughter, he was a completely different person.  That's what made coming back always worth it, because of the way he is with her.

Q.   And tell me about that.

A.   Like, his relationship with his daughter?

Q.   What do you mean by that?  You know, he's one way --

A.   He really wanted to be a dad.  He wanted to be a --



he wanted a daughter. Obviously, neither of us have ever had one. And he was very gentle with her. He was very caring. I didn't have to -- with any of the girls, I didn't -- even if I felt overwhelmed, he would just -- it would -- just came natural to him. He was just -- he was just real sensitive with the girls and -- and very patient with the girls.

And bringing it current, with Hailey, he took her -- you know, they would go -- just daddy and daughter, whether it's to the grocery store or wherever. And he would show her off to his teachers from his -- what is it, high school in Texas City? And I'd be calling every five minutes worried. You know, "Make sure you don't leave her in the back seat if you go in the store," just -- because I was just so paranoid when he left without me with our daughter.

And, so, you know, he would -- he would play with her. He was very good with her. She would lay in the door after he would leave, waiting for him to come back from work. She'd lay in the middle of the hallway in the door waiting for her daddy. And he carried her around like a football in one hand. Like, we took her to Kemah a lot because she loves the water, just like he does, and, you know, he would just play with her in the water, just -- he was trying to be the dad he really always wanted to be and didn't -- he's never been a full-time, all day, every day dad. He got that opportunity with Hailey.



Q.   And -- and you say he was different with her or any of the girls than he was otherwise.  How was he otherwise?

A.   Well, I mean -- because, you know, he only had a son.  So, to have a little girl, that changes you.  I don't care how hard you are as a man, having a little girl softens you a little.

Q.   And is Brian a hard man?

A.   He can be.

Q.   Uh-huh.  You -- the stories you were telling me about him redoing the -- the houses and not -- he was a guy who was going to do it his way; is that right?

A.   Yes, sir.

Q.   All right.  Nobody was going to tell him how to do it otherwise?

A.   No, but I tried.

Q.   And, so, did the landlords?

A.   Oh, yeah.

Q.   But he was still going to do it his way?

A.   His way.

Q.   All right.  Let me -- some of the documents I have might make a little more sense to me now that I understand what the situation is.  So, you -- you only got divorced to facilitate your individual ability -- and when I say "your," I'm talking about you, Vicki Johns, individual ability to adopt a child; is that right?



A. Yes.

Q. And that was because if you had stayed together, you'd already been told because of the issues Brian had had, you-all weren't going to be able to.

A. Right. We would have to wait a whole other year.

Q. And, so, your position is that you got divorced, but you always intended to stay together after the divorce. This was just a way to get by the CPS or the adoption agency rules. Is that what I'm understanding?

A. We were together. It was not intended. We were.

Q. Okay. You were together. You -- you -- and you didn't separate until you went to the Holly Hall address sometime in 2011.

MR. FARAH: Objection. Form.

A. Let me clarify that.

Q. (BY MR. BREM) Okay.

A. Holly Hall was our place to go whenever CPS was coming. Remember, our CPS didn't -- situation didn't stop. We just changed agencies. So, coming into this new agency, we already had our plan, and that is whenever they're going to come visit, we go to that apartment. After their visit, we go home.

Q. And when you say you would go to that apartment, that mean -- just you and the baby.

A. I take the baby -- either we go for those couple

hours -- he'd go with us.  He'd stay in the car or, you know, around the corner, however he was going to do it, and --

Q.   So, you -- go ahead.

A.   I'm sorry.  And then we go home, or we would stay the night and get up the next morning and go home.

Q.   And what did you consider home?

A.   Saxon Hollow.

Q.   Okay.  So, your position is the only reason you had either the Braesmain or the Holly Hall addresses is that was a place to go to to present to CPS or the foster agencies as a place that only you and Hailey were living together; is that right?

A.   That's correct.

Q.   Let me show you a document that I'm going to mark as Exhibit 5.

(V. Johns Exhibit No. 5 marked.)

(Reviewing document.)

Q.   (BY MR. BREM)  And you let me know when you're ready Ms. Johns.

A.   I'm ready.

Q.   Okay.  This is -- Exhibit 5 is a document from the Pearland Medical Clinic.  Am I -- what's this about?  What's going on here?

A.   Brian was having health issues off and on -- it would be pee (sic) in his urine and stuff like that -- and so we went



to the doctor to see about that.

Q. And --

A. Ultimately, he had polyps and had to have them removed.

Q. Polyps, like in a colonoscopy?

A. Yes, sir.

Q. Okay. And, so, he had a colonoscopy, he had the polyps removed, and that's what was going on?

A. Yes, sir.

Q. All right. Now, here's what I really want to know: This document is in somebody's handwriting on the first page on the fax cover page. That's not your handwriting, is it?

A. No.

Q. It's dated 1-27-11?

A. Okay.

Q. And it turns back and it has Brian's -- whole bunch of information filled out about Brian. Whose handwriting is that?

A. That's mine.

Q. And why did you fill this out and not Brian?

A. Because of wherever we go, he hands me the clipboard.

Q. That's just the way he did it?

A. Uh-huh.

Q. Okay. And down here at the bottom where there's a signature for Brian A. Johns, that's not his signature, is it?



A.   No, sir.  That's mine.

Q.   You signed for him?

A.   Yes, sir.

Q.   And why did you sign it for him?

A.   Because he asked me to.

Q.   And when I go through all the rest of these signatures on these next several pages, these are you -- this is your handwriting signing his name; is that right?

A.   Yes, sir.

Q.   So, you went with Brian at least on this one occasion, if not more, to the Pearland Medical Clinic and filled out these forms?

A.   Yes, sir.

Q.   I'm going to show you a document that I'm going to mark as Exhibit 6, and it appears to be the front page of your 2011 tax return.

         (V. Johns Exhibit No. 6 marked.)

A.   Uh-huh.

Q.   (BY MR. BREM)  You still have your 2010 tax return?

A.   I believe so.  I don't have it with me.

Q.   Okay.

         MR. BREM:  George, that's something we have asked for and you said you'd supplement with.  Or maybe I should say Sarah.

         (Sotto voce discussion.)



(Discussion off the record at 11:33 a.m.)

Q.    (BY MR. BREM)    The -- if you're like most people, you file your 2011 tax returns sometime in the early part of 2012; is that right?

A.    Correct.

Q.    So, before the accident --

A.    Correct.

Q.    -- but after 2011 is over.

A.    Correct.

Q.    All right.  Here you say on this -- you put your address as the Holly Hall address, Apartment 308.

A.    Yes.

Q.    All right.  Why didn't you put the Saxon Hollow address?

A.    Because, keep in mind, I have to provide all this to CPS.  Our case is still going on.  Brian and I have never filed taxes together from the day we met because he's always either been in foreclosure or garnished wages from the IRS.  So, we could never file together.  This paperwork -- everything I did from 2010 on had to show that I had stability for Hailey.

Q.    And, so, you -- because you had to turn your tax returns over to CPS, you wanted to put a separate address other than Saxon Hollow.

A.    Exactly, because then I've got to show them more documentation, Saxon Hollow, where Brian's name is attached to



Saxon Hollow.

Q. Okay. And I want to talk about something you've just said, which was you've never filed taxes together because he's always been in foreclosure or garnished wages?

A. Right. IRS was garnishing his wages.

Q. And why did the IRS ever garnish his wages?

A. I have no idea what his IRS issue was.

Q. Okay. But you know the IRS was garnishing parts of his wages?

A. Yes. I would go to the IRS building with him -- because they gave him opportunities to straighten out whatever was going on with his taxes. That was the basis of it. He and some guys at Dow, or Rohm and Haas at the time -- somebody there was doing their taxes and they were putting things on there that were not true and the guy got audited or something. So, a couple of people from there, the IRS started garnishing their wages because of the false taxes or something.

Q. But going back, in particular, to Exhibit 6, the reason you put the Holly Hall address and not the Saxon Hollow address is because you had to give this to CPS?

A. Absolutely.

Q. All right. We were talking about the Holly Hall address, and you still had this address at the time of the accident. What about the address at Lakes at 610?

A. I got that after Brian died.



Q.    You moved out of the Holly Hall address and moved to Lakes at 610?

A.    I work -- the Holly Hall apartment and the Saxon Hollow Court, both leases were up at the same time, so we paid month to month for each one.  And we were going to move into the new house, but, you know, the accident happened, so none of that ever took place.  We never got to pay the deposit, I was homeless, so then I went to Lakes at 610.

(V. Johns Exhibit No. 7 marked.)

Q.    (BY MR. BREM)  Okay.  I'm going to show you what I've marked as Exhibit 7, which is a letter from Dow to you.

A.    Uh-huh.

Q.    And, so, by August 22nd, 2012 -- which is only four days after Ms. Johns has passed away; isn't that right?

A.    Yes.

Q.    You were already living at Lakes at 610?

A.    Uh-huh.  That's when I signed my lease over there.

Q.    And, so, that's a place you moved after Holly Hall?

A.    Right.

Q.    Okay.  So, as I go down the -- as I go down the addresses, you were at Castle Pond together.  You got evicted. You moved to Regency Square.  You then moved to the Saxon Hollow address; is that right?

A.    Regency, then Braesmain -- Regency, Saxon Hollow, Braesmain, then Holly Hall, then 9111.



Q.   Okay.  And, so, the -- the Braesmain, the Holly Hall, and the Lakes at 610 addresses were in your name alone; is that right?

A.   Yes.

Q.   The Saxon Hall -- the Saxon Hollow address was in Mr. Johns' name alone.

A.   Correct.

Q.   If I understand what you're telling me, Ms. Johns, if I was going to ask someone other than you to vouch for your story that the only reason you got divorced and the only reason you had these two sets of addresses was because of your foster parenting and adoption situation, who would I go ask other than you?  Who else could say, "Vicki Johns is telling me the truth" -- "telling you the truth when she says that.  I've heard her say it and I've heard Mr." -- "I've heard Brian Johns say it"?

A.   My mom was there to help us with coming up with all the deposits absolutely everywhere we moved because we were moving so frequently.  Well, my parents, both my mom and my father.

Q.   But your father's passed away subsequent.

A.   Right.  My girlfriends.  Only my close ones though. I didn't tell everybody our business, but the two -- my two girlfriends were there with every kid that was ever placed in our homes.  So, they've been to every house we've lived in.



Q.    And what are their names?

A.    Maria Herrera and Lisa -- Lisa Mendoza.

Q.    And do you know -- do you have a phone number before both of them?

A.    Yes, sir.

Q.    Would you give me a phone number for both of them, please?

A.    Absolutely.

Q.    Okay.  Go ahead.  Maria Herrera?

A.    Uh-huh.

Q.    What's her phone number?

A.    Oh, can I look in my phone?

Q.    Oh, you have to look in your phone.  Fair enough.

A.    Can I do that?

Q.    Yeah, please do.

A.    Maria's phone number is (832) 851-3325.

Q.    That's Maria Herrera?

A.    Yes, sir.

Q.    And the other --

A.    She was the children's godmother.

Q.    She was the children's godmother?

A.    Uh-huh.

Q.    Okay.  And who else?

A.    Lisa was also there and around, Mendoza.

Q.    Lisa Mendoza?



A.    Yes, sir.

Q.    And what's her phone number?

A.    Hang on.  I don't have Lisa in here.  Sorry.

Q.    Okay.  If I were to --

A.    Maria can give you Lisa's number.

Q.    Who can?

A.    Maria.

Q.    Okay.  Perfect.  All right.  So, we have your mother. And, obviously, we can get in touch with your mother through you through your lawyers, right?

A.    Sure.

Q.    Okay.  And who else other than your two girlfriends? And when I ask -- when I ask about that, will your mother and your two girlfriends say, "Not only did Vicki tell us this, but we've heard Brian say this before"?

A.    My mom can say that, but the girls only know every house because we called and told them, "Okay.  We live here," they come over.

Q.    Okay.

A.    They were the only two that he liked actually.

Q.    All right.  Anybody other than your mother and these two girlfriends?

A.    Well, all of my friends and family knew of me and Brian, knew where we lived, but he didn't allow -- only Lisa and Maria did he allow to come to our house.  Nobody else he



would let come over.

Q.   So, if I were to ask Lisa or Maria or your mom --

A.   Uh-huh.

Q.   -- they would say, "Yes, I have" -- "I have visited with at the Saxon Hollow address my friend, Vicki Johns, and she was living there with Brian Johns."  Is that --

A.   That just made me think of somebody else --

Q.   Is that --

A.   -- that came to my daughter's birthday party at Saxon Hollow --

Q.   Okay.

A.   -- in 2011.

Q.   And who was that?

A.   May 2011.  Her name is Jamie Ruestle, Ruestle.  I'll spell it for you.  She brought her son over to Hailey's first birthday party, which was May 27th, 2011.  And, yes, she came, you know, to that house -- that house and -- I have a couple of other parents that brought their kids to the party and I have to get all their numbers because I haven't talked to them in a while.  Her last name is R-u-e-s-t-l-e.  She lives in Friendswood.

Q.   All right.  So, if I were to go ask Ms. Mendoza, Ms. Ruestle, or Ms. Herrera whether or not they've been to the Saxon Hollow address and whether or not you were living there with Brian, they would all say, "I have been," and, "She was."



A.    Lisa has never been to Friendswood.

Q.    Okay.

A.    Jamie, yes.  My mom and Jamie are the only two that's been -- that would come out that far to Friendswood.  Jamie already lived out there, so it wasn't an issue for her.

MR. FARAH:  Just to be clear, are you asking for people that have actually visited the house or knew about them living at that house?  I just kind of want to get that clear.

MR. BREM:  Fair enough.

Q.    (BY MR. BREM)  In addition to your mother and these three women, who else would be able to support your story that after your divorce, you and Brian were living together at the Saxon Hollow address?

A.    My sister, Kim Jones, lived in New York at the time.  She sent us Christmas cards and mail to Saxon Hollow Court to Brian and Vicki Johns.  That's specifically what it says on the card.  The police, because they've come to our house and told us both that -- "You guys are married.  You can't make her leave.  She can't make you leave.  You-all work it out."

Q.    We're talking about the Friendswood police?

A.    Yes, sir.

Q.    Okay.

A.    All of my family knew that I lived in Friendswood, but they didn't come out there.  But if you ask them, "Name the cities where she lived," yeah, they could tell you that.



Q.   Okay.  Anybody else?

A.   Brian's -- co-workers from Brian.  One of them lived on the street.  I don't have his -- I don't know his name, but he lived at our corner, but he worked at -- currently -- well, I don't know if he's still there now, but at the time of the accident, he was working there.

Q.   Who was -- what was his name?

A.   Well, Terrance works there, but he's not the one I'm saying that lived on the same -- on the corner of the street that we lived on.

Q.   Okay.

A.   But Terrance worked at Dow.  He would come over and visit us at all of our houses actually.

Q.   What's Terrance's last name?

A.   I believe it's Harris.

Q.   Okay.

A.   He was our realtor.  That's how we found all these houses.

Q.   But he also worked at Rohm and Haas?

A.   If we found something online, then we'll tell him and then he'd get the information and take us to go see them.

Q.   Who was the person that lived down the street?

A.   I don't know that guy's name, but, you know, we spoke to him all the time and Brian said he works on the opposite shift from him, so -- I can't tell you his name.  I don't



remember.

Q. But he lived on Saxon Hollow in Friendswood?

A. No. Saxon Hollow's here --

Q. Uh-huh.

A. -- and his street crosses ours and he lived right there at that corner. So, every time we'd leave, we would wave at him.

Q. And what street was that that he lived on?

A. I can't think of his name. It was Saxon Hollow. It was just -- it just curved around and met another street, but he was right there at that -- right at the curb.

MR. FARAH: Want her to draw it out?

MR. BREM: I'm sorry?

MR. FARAH: Want her to draw it out?

MR. BREM: I think I got it.

Q. (BY MR. BREM) This Rohm and Haas or Dow employee --

A. Dow.

Q. -- lived on the same street as you, just around the bend.

A. Around that bend right there.

Q. But it was Saxon Hollow in Friendswood?

A. I believe that was his address.

Q. Okay. And you don't know that person's name?

A. Uh-huh.

Q. All right.



A.    We just blow and waved.

Q.    Who else other than the people we've talked about so far?  And we've now got Terrance Harris.

A.    So, Terrance and Brandon.  Brandon works with Brian, too.

Q.    Brandon Hubbard?

A.    Yes, sir.

Q.    Okay.

A.    And that was the only two he allowed to come to the house.  Nobody else he would allow to come over.

Q.    Why not?

A.    He just wasn't that social.

Q.    Uh-huh.  Brandon Hubbard's a fellow from maybe New York or someplace like that, from up East somewhere?

A.    I don't know what state Brandon's from, but he works at Dow.

Q.    Okay.

A.    Rohm and Haas.

Q.    Brian ever accuse you of having an affair with Brandon Hubbard?

A.    No, never.

Q.    I'm going to show you a document that I'm going to mark as Exhibit 8.

(V. Johns Exhibit No. 8 marked.)

MR. BREM:  Hand George a copy.



(Reviewing document.)

Q.   (BY MR. BREM)   What is Exhibit 8?

A.   This is a revokable assignment and power of attorney.

Q.   But do you know what it is?

A.   Life insurance?

Q.   Is -- this is your signature about --

A.   Yes.

Q.   -- about the center of the document; is that right?

A.   Yes, sir.

Q.   And you signed it next to a -- a blank that says "Former Wife"; is that right?

A.   Yes.

Q.   Did you read this document before you signed it?

A.   Yes.  It didn't say "Former Wife," that's for sure.

Q.   So, when you signed it, it didn't say that?

A.   No.

Q.   You see the -- it talks about the funeral home cemetery, Mainland Funeral Home, Inc."  What does that -- is this the payment for the funeral?

A.   I have no idea.

Q.   You don't know what this document is?

A.   No.

Q.   So --

A.   This is the only thing I recall that they gave me.

Q.   And who's the "they"?



A.   The funeral home.

Q.   Okay.  The funeral home gave you this document?

A.   Uh-huh.

Q.   And you signed it?

A.   Yes.

MR. FARAH:  The second page or both pages?

A.   Well, I don't remember seeing this front page.

Q.   (BY MR. BREM)  Okay.

A.   I don't remember seeing this, but I do remember seeing this, the second page.  But I -- that is my signature.

Q.   Okay.  That is your signature.  And it says "Former Wife" on both -- that's your signature on the front page, too, right?

A.   Yes, sir.

Q.   That's your -- and --

A.   There is no signature on the back page.

Q.   That's right.  Okay.  And the funeral home gave this to you and you signed it?

A.   Yes, sir.

Q.   All right.  Now, let me ask you a question.

A.   Uh-huh.

Q.   Did you pay any money for the funeral?

A.   No.  I -- when -- I don't know if the representative was from Dow or -- but she told me to go to the cemetery -- she was from the life insurance -- MetLife, I believe -- and to



sign -- and she named the document -- and I can't remember what the document was.  Obviously, it was this.  I'm not sure -- and they would explain -- she explained to me that, you know, I pay for the funeral through the life insurance and then once I sign this -- and Pam also called to explain this to me, too.  Once I sign this, they'll pay for the funeral and then they'll just reimburse me whatever the remaining balance of the life insurance is.

Q.  I got it.  Okay.  I'm going to show you another document that I'm going to mark as Exhibit 9.

(V. Johns Exhibit No. 9 marked.)

MR. WYNNE:  Can I see eight?

THE WITNESS:  Sure.

MR. FARAH:  Same thing.  Why -- is there a reason why the address is redacted in here?

THE WITNESS:  I have no idea.

MR. BREM:  That -- it's the way, I think, Bob got it.

MR. WYNNE:  Subpoenaed from MetLife and they redacted personal information.

MR. FARAH:  All right.

(Reviewing document.)

Q.  (BY MR. BREM)  Ms. Johns, when we look at Exhibit 9 on the first page, the handwritten portions of the first page of Exhibit 9 are in your handwriting, aren't they?



A.    Yes, sir.

Q.    And when we look on the second page, the handwritten portions are in your handwriting and that's your signature at the bottom, correct?

A.    Yes.  Yes, sir.

Q.    When we turn back to the first page and we look at Line 8, you put an X through "Spouse," but you also wrote "ex-spouse," didn't you?

A.    Yes, sir.

Q.    Why did you write "ex-spouse" if you still considered yourself married to Brian Johns?

A.    Because attached was the death certificate and somebody put on the death certificate that I was his ex-wife, and so I put it on there because I had to attach the death certificate.  So, they were going to read it on there anyway and so since everybody after a while start calling me his "ex" everything, I put it on the paperwork, just like the death certificate said.

Q.    All right.  Now, your position is that you lived at the Saxon Hollow address as man and wife up until the tax -- up until the time of the accident.  That's your position, correct?

A.    Yes, sir.

Q.    I'm going to ask you something.  We will mark these if we need to.  Do you recognize this woman?

A.    No.



Q.   I'm going to show you another picture of her do you recognize this woman?

A.   No.

Q.   And I'll show you one last picture of her.  Do you recognize this woman?

A.   No.

Q.   This woman's name is Frankie.  I don't remember her last name, but she claims that she was in a committed relationship with Brian starting in October of 2011 and that they planned to move in together in about 2012, that she was in that relationship up until -- up through the time of the accident.  Did you know that?

A.   No.

Q.   You've never seen that woman?

A.   Never.

Q.   Didn't have any suspicions that Brian was in a relationship other than the one you were in?

A.   Not one.

Q.   Did you go to the hospital after the accident?

A.   Yes.

Q.   Did you talk to Brian in the hospital?

A.   Yes.

Q.   Did he tell you what happened?

A.   Yes.

Q.   What did he tell you?



A.    He told me that he was working on a valve that was supposed to be clear -- a pump that was supposed to be cleared, and when he went to take off the -- a cap or latch or something, it had -- I don't know if the word was "pure cyanide" or something and that it -- when he went to loosen it, it exploded and blew him up in the air.  He landed somewhere and he got up and he was running, screaming.

Q.    And, so, he told you that he was trying to take -- trying to open it and he thought it was cleared; is that right?

A.    Right.

Q.    And that when he went to loosen whatever it was that held it closed, that's --

A.    Right.

Q.    -- that's when he discovered it wasn't cleared?

A.    Right.  Whatever he -- whatever he was doing to the -- the valve or something -- it was supposed to have been clear.  I remember that.  And it -- obviously, it wasn't.  And when he loosened it or the cap was loose or something and -- just exploded.

Q.    And when did you -- when did he tell you this?

A.    In the hospital.

Q.    And -- and I'm -- was it the first day --

A.    Yes, sir.

Q.    -- of the --

A.    First.



Q.   So, you were there the very first day.

A.   Yes, sir.

Q.   Is that the only time you saw Brian in the hospital?

A.   That's the only time I saw him, yes.

Q.   And why didn't you see him more times after that?

A.   Because his mother and family told me that I had no legal right to be there, that she was power of attorney and I'm not welcome there and said a whole lot of things.

Q.   Did you not get along with Brian's mother and sister?

A.   I guess you would have to -- from my perspective, you would have to know somebody in order to get along with them. We didn't know each other.  They -- I met -- he and I got married three months in and there was no time -- like, I didn't meet them prior to.  I met his mom the day we got married.  So, there was never a relationship built.  The few times I've tried to reach out to them, it was very negative, and so I just left it as is.

Q.   You have any reason to -- do you have any reason to know why it was negative?

A.   I have no idea.

Q.   Okay.  Other than the -- and did Brian tell you anything else about the accident other than what you just described to me?

A.   He -- he was very upset.  He was, like, "I want you to sue Dow.  Don't trust anybody from Dow.  Don't trust



Brandon.  He's a company man, so he's going to say whatever they tell him to say.  It's" -- "I knew somebody was going to get hurt.  It just happened to be me," and he was just going on and on.

I was just trying to calm him down and tell him, "Don't worry about all that right now," and so -- that's all he said specifically about Dow.

Q.  And who did you understand Brian to work for at the time of the accident?

A.  You mean company?

Q.  What company?

A.  Dow.

Q.  Dow Chemical?

A.  Yes.

Q.  And why did you think that?

A.  Well, it was Rohm and Haas before it was Dow, because I worked there as well.

Q.  You worked -- you had worked at Rohm and Haas before?

A.  Yes, sir.

Q.  Okay.  Go ahead.

A.  And I know Dow bought Rohm and Haas out --

Q.  When did you work at Rohm and Haas?

A.  -- been out there before.  Oh, it was years.  Want to say I was in college.  It was over 20 years ago.

Q.  But it was your understanding that Brian worked for



Dow Chemical?

A.   Yes, sir.  When I come up to the facility, it says "Dow."

Q.   Other than what Brian told you about how the accident happened, did you talk to anyone else other than your lawyers?

A.   No, sir.

Q.   Has anyone else ever told you what -- why they thought the -- how they thought the accident happened?

A.   No, sir.

Q.   Have you ever talked to Brandon Hubbard about how the accident happened?

A.   We didn't talk about how the accident happened.  He just called me to see if I was okay and he would give me updates on -- on Brian's condition when -- but then after a point, his mom -- Brandon said Brian's mom wouldn't even let him come back, so --

Q.   And Brian told you you couldn't trust Brandon either because he was a company man?

A.   Yes, sir.  They had an on-again/off-again relationship.

Q.   When -- when Brian told you he wanted you to sue Dow, did he tell you why -- why he wanted you to sue Dow?

A.   Brian has always complained about work and I would tell him, "Why don't you go talk to, like, your foreman?"

He would feel like -- "Well, I can't talk to the



foreman. That'll never fix it."

I said, "Okay. Then go above that person." But, you know, there's a way you have to communicate that, but he felt like he wouldn't -- they would never listen to him, so he never did, like, internally discuss the issues that he found around the -- the facility. So, for him, he was just like -- he didn't trust anybody with Dow.

He said they sent him out on that -- you know, they sent him out to work by himself when it's a two-man job; but because of his size, they would always just tell him to go ahead and do it by myself. Well, he didn't like that; but, yet, he still didn't really talk to them about it.

Q. And did he ever tell you what he was worried about that he wanted fixed?

A. Accidents and, like, the lack of training for the new people. There were two new people that started and he would have issues with them putting them on a shift by themselves, you know.

Q. Yeah. But Brian wasn't a new person, right?

A. No. No.

Q. He'd had that job for a long time?

A. Yes, sir.

Q. He knew what he was doing?

MR. WYNNE: Objection. Form.

A. I guess.



Q.    (BY MR. BREM)  Did you think he -- did he --

A.    He knew enough to be there.

Q.    Did he ever tell you that he knew what he was doing, that he knew his job?

A.    I don't think he specifically ever said, "I know exactly what I'm doing every day."

Q.    Okay.  He had had exactly the same job though the whole time you were together correct?

A.    Right.  Right.  I tried to encourage him to apply for other positions, but he wouldn't.

Q.    Did you -- did you -- the two of you attend church together?

A.    Yes, sir.

Q.    And where did you attend church?

A.    The Fountain of Praise.

Q.    The Fountain of Christ?

A.    Of Praise.

Q.    Of Praise?  Where is that?

A.    It's on Hillcroft and Fort Bend Tollway.

Q.    Hillcroft and the Fort Bend Tollway?  And were you a member there?

A.    Yes, sir.

Q.    And was Brian a member there?

A.    Yes, sir.

Q.    And who was the pastor or minister there when you



were -- when you two were going together?

A.    Remus Wright and his wife Mia Wright.

Q.    Remus Wright?

A.    Remus, uh-huh, R-e-m-u-s, Wright.

Q.    Did you and Brian ever go to family events for your family?

A.    Yes, sir, all the time.

Q.    Like for example?

A.    Like, Christmas is huge in our family, so -- it's, like, over a hundred people at my aunt's house in Katy, and Brian would go.

Q.    Your aunt's house in Katy?

A.    Yes, sir.

Q.    What is your aunt's name?

A.    Trina Gray.

Q.    She lives in Katy today?

A.    Yes, sir.

Q.    And, so, if we were to go ask her whether or not Brian to Christmas with you at her house in Christmas of 2011 before the accident, that you-all went there?

A.    Yes, sir.

Q.    Together?

A.    Yes, sir.

Q.    Okay.  Who was your next-door neighbor at Saxon Hollow?  Do you know them?



A.    I don't know their name.  Like, they came over to introduce themselves if we're sitting out in the yard, you know, playing with the baby and -- you know, the guy would come up and said, you know, this is whoever, but I can't remember their names.

Q.    Did you and Brian celebrate any anniversaries?

A.    Yes, sir.

Q.    What anniversary did you celebrate?

A.    Every year, our wedding anniversary.

Q.    Even after you got divorced?

A.    Uh-huh.  We were divorced on paper, but we were still together in every way that husbands and wives are.

Q.    When you and Brian were together in 2000 -- after the divorce in 2010, '11, and the first half of '12, did you have a Facebook account?

A.    No, sir.  I've never had a Facebook account.

Q.    You -- what social media accounts do you have?

A.    I have Twitter and Instagram.

Q.    And how long have you had those?

A.    I just got those in, like, 2013.  My husband had a Facebook.

Q.    I'm sorry?

A.    My husband had one.

Q.    Oh, Brian had a Facebook account?

A.    Yes, sir.



Q.   Ms. Johns, I have some questions about some documents and some answers that I think are incomplete in the written discovery we've sent you, but what I'd like to do is let Mr. Wynne ask his questions first and then we'll go through -- it's kind of administerial.

MR. FARAH:  Could we take, like, a 30-second break?

MR. BREM:  You can take as long a break as you want.

MR. FARAH:  I just -- I think she needs to complete a response to one of your questions.

MR. BREM:  Okay.  Since we're standing up anyway, we'll come back after five or ten --

MR. FARAH:  That's fine.

(Recess from 12:09 p.m. to 12:18 p.m.)

Q.   (BY MR. BREM)  Ms. Johns, I understand you wanted to either clarify an answer or complete an answer, and that's perfectly fine with me because I do want the whole -- the whole -- everything you have to say.  So, it had something to do with when you either first spoke to or heard -- or saw Brian in the hospital?

A.   Right.

Q.   Did you speak to him before?

A.   Before I got to the hospital, yes, sir.

Q.   Okay.  I'm sorry.  That's probably what it was.  So,



how did you speak to him before you got to the hospital?

A.    I was at work when the incident happened and his sister called me and -- to tell me, so --

Q.    His sister, Pam?

A.    Pam, yes, sir.  So, of course, immediately I was screaming and crying and all this and she was trying to console me and asked me am I okay and all that.  So, I -- I called -- my manager came over.  She called my mom.  I left.  In route to the -- after I picked up the baby and my mom, we headed to Galveston, and then my phone rings again.  It was Brian.  So, I was, like, you know, hysterical.  I was, like, "Oh, my God.  Pam said there was an incident at Dow and that you got burned and all this."  He was talking to me, so I was so confused that he was talking.

And, so, he was trying to tell me, "It's okay.  Calm down and drive safely and hurry up and get here."

And I said, "Well, you know, she just told me, so I'm on my way now," and then I saw him after I got there.

Q.    Okay.  On the way to -- when did Brian tell you about how the accident happened, on the phone or when you got there?

A.    When I got there.

Q.    So, is there anything about the phone call on the way down there other than you've told me, it was just him trying to tell you to calm down and be careful?

A.    Right, and make sure that I was coming.



Q.   Anything about the accident other than it had happened in that phone call?

A.   No.

Q.   And then you saw him in the hospital that one time when you got there?

A.   Yeah.  Well, not immediately when I got there.  His mom wouldn't let me in.

Q.   Okay.  And then what happened?

A.   And, so, I went to the waiting room and that's where Pam was and some more people.  I don't know if they were there, you know, with Brian's family or not, but I was just -- me and the baby was talking to Pam and she was just giving us -- giving me her account of what happened and how he got transported there and that she's notified, you know, everybody.

And then she was asking me personal questions about me and Brian and I remember her giving me tissues, stuff like that.  And then the baby started crying, so I took the baby to my mom, who was in another waiting room, and Brian's mom -- so, I was, like, "Well, when can I go in?"

She was, like, "Well, I'm not allowing anybody in there.  He can't have visitors," is what her specific words was --

(Phone ringing.)

(Discussion off the record at 12:21 p.m.)

Q.   (BY MR. BREM)  Okay.  So, you were at the hospital.



You talking -- and Mrs. Sowell, Brian's mother, has told you that he can't have visitors.

A.   Yes, sir.

Q.   Okay.  Then what happened?

A.   So, I just started waiting around.  My mom and I started praying.  Then a couple hours later, she comes -- Ms. Sowell, Frances, came down and said, "Brian wants to see his wife."  And, so, I jumped up, gave my mom the baby, and went straight into the room.  And she went in there with me and she was putting on the -- the protective gear and then she let me into the -- into the room where Brian was.  And he told his mom to step outside, because she stood there, and he told her to -- "Leave me alone with my wife," and then he started telling me what happened.

And, like, I -- I initially went -- soon as I came in, I went to hug him and he was, like, "No, Love, you can't touch me," you know, then he started explaining everything that happened.

Q.   And which is what you told me already?

A.   Yes, sir.

Q.   Any -- anything else other than what you've told me already?

A.   No, sir.

Q.   Okay.  You said Pam also told you what had happened.  What did Pam tell you?



A.   And I can't remember in detail, but I know she was giving me an -- her account of what she's heard from some of the guys that were there and that Brandon -- either Brandon ran out there -- but I'm kind of foggy on those details because I just wasn't -- I was very emotional.  But if I'm not mistaken, she said Brandon ran out there to help him and somebody else with a radio or something, but I don't know that in detail.

Q.   And instead of Brandon, might that be a fellow named Ernest Amie?

A.   I have no idea.

Q.   You just don't know?

A.   I just thought it was Brandon.  I just can't remember.

Q.   You don't have a clear recollection of what Pam told you, but you do know what Brian told you.

A.   Right.

Q.   Okay.  And do we have -- and, so, you talked to him on the phone one time on the way to the hospital, you saw him in the hospital, and that's the only other contact you had?

A.   With him, yes.

Q.   With him.

A.   From that day forward, I was told he was in a coma.

Q.   From that day forward, you -- who told you he was in a coma from that --

A.   Frances.



Q.   So, from kind of --

A.   The second day, I guess --

Q.   Yeah.

A.   -- forward, she said he was in a coma, and then Brandon called me to tell me when he had passed.  Now, I would call, but, you know, they -- they wouldn't tell me anything.

Q.   I believe -- like I said, I will have some other questions, but I'm going to let Mr. Wynne ask his questions now.  As you probably know, he represents Frances Sowell and Corey Johns.

A.   Okay.

          (12:24 p.m.)

                    EXAMINATION

BY MR. WYNNE:

Q.   Good afternoon, Vicki.  My name's Bob Wynne and I represent, like Mike said, Frances Sowell, Corey Johns, and the estate of Brian Johns.  Do you understand that?

A.   Yes, sir.

Q.   And you understand that for this case we're sitting on opposite ends of the table, correct?

A.   Yes.

Q.   All right.  And you know that I'm adverse to you, correct?

A.   I know now.

Q.   Okay.  And I wanted that to be clear so there's no --



A.    Okay.

Q.    -- hard feelings.  First things I want to talk to you about is your daughter, Hailey.  What was her date of birth?

A.    May 27th, 2010.

Q.    And how did you come to get physical custody of Hailey?

A.    I received a call at work from CPS saying that they had a baby that came into care and they wanted to know would we be interested in her.

Q.    And when did that call come in?

A.    I have no idea.

Q.    Okay.

A.    Prior -- like, I can't even tell you the date.

Q.    Okay.  I believe you testified earlier that you took custody of Hailey -- was it June of 2010 or August of 2010?

A.    She was three months old, so -- May, June, July.  So, had to be August 2010, I would say.

Q.    Okay.  You said you received a call from CPS.  Is that Child Protective Services?

A.    Yes, sir.

Q.    State agency?

A.    Yes, sir.

Q.    Had you made an application to them seeking an adoption?

A.    When we -- in 2008 is when we made the application.



Like, you don't keep filling one out.  One is it.  So, we did that in 2008.

Q.  Okay.  So, in 2008, you would have made an application with CPS?

A.  Yes, sir.

Q.  How did you do that?  Was it in person?  Was it electronically?  Was it over the phone?

A.  Yes, sir.  We went to their location on Murworth in Houston.

Q.  What street?

A.  Murworth, M-u-r-w-o-r-t-h.  And we went there and physically filled out an application.  We were interviewed and then they scheduled an appointment for us to come back in and start the parenting classes, which I think was, like, six to eight weeks.

Q.  Okay.  Now, I know at some point in time you adopted Hailey; is that accurate?

A.  Yes, sir.

Q.  Okay.  And you'd had -- prior to the adoption of Hailey, you had had other foster children; is that accurate?

A.  Yes, sir.

Q.  Okay.  How did you make an application or -- strike that.  Let me ask a better question.

How did you seek to get custody of the foster children?



A.    You -- once you fill out the application, you're just in the system, period.  So, then it's a process of -- where they just call you -- whenever a child comes in, they give you their -- like, a short bio and ask you, "Do you guys want them" -- whether it's a boy or girl or -- "Do you want them?  This is their age," and then you just say yes or no.

Q.    Okay.  And, so, in 2008, you and Brian Johns would have went to the CPS facility on Murworth Street in Houston, Texas, and you would have physically filled out a form seeking the custody of either a foster child and/or an adopted child; is that accurate?

A.    Yes, sir.

Q.    Okay.  Do you recall the name of the person you met with or your -- your primary caseworker?

A.    No.  Like I -- we've had about six.

Q.    Okay.  So, between --

A.    Each child had their own caseworker and their own attorney, and so we had to deal with all these people for each child.

Q.    Okay.  And I believe you testified earlier that there was a woman named Felicia that you recall; is that accurate?

A.    Uh-huh.  That's the -- that was Hailey's.

Q.    Okay.  So, Felicia was Hailey's co-worker?

A.    Hailey's and --

Q.    Social --



A.   -- and the other two babies, Briley and Jazmine.
They were out of the Angleton office.  The other kids was out
of Harris County.

Q.   Okay.  Explain that to me.  What do you mean,
Angleton office?  What do you mean, Harris County?

A.   CPS -- children, depending on where -- what county
they were born in, somehow they divide up where the -- what
county represents each kid.

Q.   Okay.

A.   So, we had some kids that was in Harris County, some
was in Brazoria.

Q.   Okay.

A.   I mean -- yeah, Brazoria.  So, it had nothing to do
with, like, where we lived.  That was a state issue.

Q.   Okay.  Well, let's do it this way:  Who was the first
foster child that you, Vicki Johns, ever had custody of?

A.   That would be -- that would be Jazmine.

Q.   Okay.  And what year did you retain custody of her?

A.   That would be 2010.  Let's say 2009.

Q.   Do you know what month?

A.   No.  Can't remember the month.

Q.   Okay.  And how -- what entity or agency provided
Jazmine to you?

A.   CPS brought her to me and Brian's house in Sugar
Land.



Q.   Okay.  And Jazmine lived with you for how long?

A.   Eighteen months.

Q.   Okay.  And was Jazmine out of your custody at the time of the divorce with Brian in February of 2010?

A.   Yeah.  I believe they -- they came and took her maybe at Christmas.

Q.   Christmas of 2009?

A.   Maybe -- 2000 -- wait a minute.  She was with us for 18 months, but they took her --

        MR. FARAH:  Don't guess if you don't know the answer.

        THE WITNESS:  Okay.

A.   Then I don't -- I can't be specific.

Q.   (BY MR. WYNNE)  Okay.

A.   But I know we had her from 18 months --

Q.   Okay.

A.   -- from the Sugar Land address to the Pearland address.

Q.   Who was the second foster child that you had ever gotten custody of?

A.   Bailey.  Pearland house.  That was her sister.

Q.   And Bailey was Jazmine's sister?

A.   Yes, sir.

Q.   What was Jazmine's date of birth?

A.   I can't remember her date of birth.



Q.   Okay.   When you had custody of Jazmine, did you treat her like your own child?

A.   Absolutely.

Q.   Did you love her and honor her and tell the world that she was yours?

A.   Brian and I both did, yes, sir.

Q.   Okay.   What's her date of birth again?

A.   I cannot remember her date of birth.   I've had five foster children.

Q.   Okay.   So, Bailey was -- let's go to Bailey, your second one.   Do you recall when you took possession or custody of Bailey?

A.   I don't remember the date, but it was a picnic.   They brought her to the picnic.   We went home with her.   She was two weeks old.

Q.   And not sure her date of birth, correct?

A.   No.

Q.   Who was your -- when did Bailey get removed from your custody?

A.   It was a few weeks after she was placed with us.

Q.   Okay.   So, she -- you only had custody of her for a short period of time?

A.   Yes, sir.

Q.   Okay.   And she was removed at the same time as Jazmine?



A.   No.

Q.   Okay.

A.   We took Bailey to Angleton.  They came and got Jazmine, I would say, maybe a month later.

Q.   Okay.  And that was the issue about you either take both or you take none?

A.   Yes.

Q.   Okay.  Who was the third foster child you got?

A.   Hailey.

Q.   And you -- you -- you personally took custody of her sometime around August of 2010?

A.   That sounds about right.

Q.   And does she still live with you?

A.   Yes, sir.

Q.   Okay.  Now, from the date that you took custody of Hailey through today, has Hailey lived with you every single day of that time period?

A.   Yes, sir.

Q.   And have you acted and held yourself out as Hailey's mother every single day during that time period?

A.   Yes, sir.

Q.   Okay.  Now, when Hailey was first given -- when custody of Hailey was first given to you, were you declared her mother at that time period?

A.   No.



Q.    Okay.  How long did it take between taking custody and becoming her mother?

A.    Three years.

Q.    Three years?  So, you became Hailey's mother approximately a year after Brian's death?

A.    Right.

Q.    Okay.

A.    Yes.

Q.    You had testified earlier -- referred to Hailey as Brian's daughter.

A.    Correct.

Q.    Do you -- are you making the assertion that Hailey is Brian's legal daughter?

MR. FARAH:  Objection.  Form.  Go ahead and answer.

A.    I'm making the assertion that Brian had -- Hailey had two parents, me and Brian.  Brian was in on it from the beginning up until the day he died.  He considered her his daughter.

Q.    (BY MR. WYNNE)  Okay.  And you had testified, I believe, that Brian was very proud and very happy to be raising a daughter and it was giving him a second chance of being a father.

A.    Absolutely.

Q.    Okay.  As part of that pride and happiness in



having -- of being a father again, did Brian ever take Hailey to his mother or his mother's house to show her off?

A. Yes, we've taken her out there and it didn't go so well, and we left and never came back.

Q. Okay. When did that happen, that incident you're talking about?

A. I don't know the specific date.

Q. Okay. Was it before or -- can you give me any time frame as to which year that occurred in?

A. No. She was barely walking, so -- it was within the first year of her life. I could say that.

Q. Okay. And what happened?

A. Because she was so young, she was, like, learning to say words and she was trying to say words and she said "grandma" or -- something to that effect and Frances didn't like that. She told her, "You call me Frances, just like the other grandkids do."

Q. Okay.

A. And that sent Brian into orbit. He was extremely mad and offended that she would be that mean and negative to a baby.

Q. Okay. And, so, Hailey was trying to call Frances "grandmother."

A. Right.

Q. Frances, for whatever reason, did not like that and



expelled you, Brian, and her granddaughter from her house --

A.   No.

Q.   -- never to be brought again?

A.   No, she did not.

Q.   Okay.  Tell me what happened.

A.   Brian got mad.  Brian started cursing and saying, "If you don't treat my baby with respect, then we will never come here again."  They started having words back and forth.  At the same time, I'm getting the baby's things because I know where this is going and Brian left.  He said, "We will never" -- he told me -- because I was crying.  I was upset.  He said, "We never have to put our daughter through that again."

Q.   Okay.

A.   And, so, we never went back.

Q.   Okay.

A.   She saw her again at the hospital.

Q.   So, from that event through the time of Brian's accident, Hailey would have never interacted with Frances; is that accurate?

A.   Not with Frances, no.

Q.   What about yourself?  From that sort of altercation through Brian's accident, did you ever interact with Frances in any way?

A.   Yes.

Q.   Okay.  And in which ways?



A.   I tried to reach out to her and I went out -- I just showed up one day at her church.  She didn't receive that well. Mr. Frances -- Mr. Sowell, he came over and acknowledged me, and eventually she did, too.  And she was, like, "Why are you here?"

And I said, "I just wanted to surprise you."

And, so, she was upset about it and she said, "Well, I don't have time.  You know, I'm here at church.  I'm the" -- whatever she was.

And, so, Mr. Sowells, he said, "Don't worry about it.  It was a nice gesture."  He said, "Let me take you to dinner."  So, we left church and went to dinner.

Q.   And that -- was that the only time that you had seen Frances or interacted with Frances?

A.   No.  I'd say -- we went out there one Christmas, but that was before the baby.  I've tried many -- I would say at least five times from the time I married Brian until right now to establish something with her.

Q.   What about the third foster child?

A.   Hailey was the third.

Q.   I mean, the fourth, fourth foster --

A.   There was nobody was after Hailey.  Hailey was it.

Q.   I thought you testified there were five.

A.   We had two kids before -- before the two girls that were a sibling unit.  We had two kids, like, in 2008.  We had



one -- we had two, but like I said, one of the foster parents just didn't come back to get their kid.  We were only babysitting.  We were not their guardians.

Q.  Okay.  And those two children, what were their names?

A.  Jewel.  Jewel had a sister Diamond.

Q.  And do you recall what year you took custody of Jewel and Diamond?

A.  I never took custody.  I was only babysitting for a foster parent, parent.

Q.  Okay.  And did you -- in your application with CPS, did that -- did that in any way lead to Diamond or Jewel coming into your, you know, possession?

A.  Once you get licensed as a foster parent, you can babysit any foster child if somebody -- they ask you, "Can we put your guys' name in a database?"  So, if another family needs a babysitter or whatever, they'd contact you.  We said yes, and that's how we got to babysit Jewel.

Q.  And you became -- you were licensed as a foster parent?

A.  Yes, sir.

Q.  And when did you get that license?

A.  In 2008.

Q.  Was that in connection with the application process?

A.  Yes, sir.

Q.  Okay.  You talked a little bit about your residential



history earlier in the deposition and I want to see if I can wrap my hands around it.  In February of 2010, at the time of the divorce, you were living at -- do you have Exhibit 1?

MR. FARAH:  That's the divorce decree?

MR. WYNNE:  Yeah.

Q.  (BY MR. WYNNE)  Okay.  Prior at the time of the divorce decree, you and Brian had been living at Castle Pond Court?

A.  Yes, sir.

Q.  Okay.  And then I believe at some point after the divorce decree was entered, you and Brian moved to the Saxon Hollow address?

A.  No.  From Castle Pond in Pearland, we moved to Regency, 73-something Regency Square.

Q.  Okay.  And after Regency, that's when you moved to Saxon Hollow.

A.  Hollow, yes, sir.

Q.  Okay.  And then there was a brief period where you had lived at the Braes -- Braesmain?

A.  Yes, sir.

Q.  Okay.  And did you sign a lease for the Braesmain address?

A.  Yes.  Yes, sir.

Q.  Okay.  And then from Braesmain, did you move into Holly Hall?



A.    Then -- yeah.  Yes.

Q.    And at some point, you also -- did you relocate back into Saxon Hollow?

A.    I never -- I never moved all of my belongings out of Saxon Hollow.

Q.    Okay.

A.    That was never the case.

Q.    Okay.  And I think you testified that the Braesmain residence and the Holly Hall residence were merely, you know, sham residences so you could get custody of --

MR. FARAH:  Objection.  Form.

Q.    (BY MR. WYNNE)  -- another foster child -- I mean, of Hailey?

A.    Of Hailey.

Q.    Okay.  What -- in the Braesmain -- in the Braesmain residence, how many rooms were there?

A.    There were two.

Q.    Okay.  And who -- did you and Brian sleep in one room?

A.    Right, and Hailey slept in the other.

Q.    And Hailey slept in the other?

A.    Uh-huh.

Q.    What -- how often would you stay at the Braesmain address as opposed to the Saxon Hollow address?

A.    We only -- the initial day when they brought Hailey



there, we stayed overnight and then went back home the next day, home to Saxon Hollow.  And then whenever CPS was going to visit -- they only visited that -- one more time after they brought the baby, and then we let that one go.

Q.   Okay.  So, for Braesmain, you actually spent time there on two separate days only, the day that Hailey was brought --

A.   Right.

Q.   -- and the one day that CPS came to visit --

A.   Right.

Q.   -- correct?

A.   Yes, sir.

Q.   And at no other point in time would you or Brian or Hailey have lived there or slept there or spent any time there; is that correct?

A.   That's correct.

Q.   Okay.  So, be fair to say the vast majority, if not the entirety of your residential life, was -- from February of 2010 through the time of Brian's death was spent at the Saxon Hollow address?

A.   Well, plus those places in between, right?

Q.   All right.

A.   Is that --

Q.   Let's go to the Holly Hall one.

A.   Okay.



Q.    How often did you sleep at Holly Hall?

A.    Any time that CPS -- well, I can't say "any time." There were occasions when we would sleep there.  There were occasions when he would go there when he was going to go right back to work.  So, it just depends on whatever was going on with us at the time --

Q.    Okay.

A.    -- when our next appointment was.  Sometimes, like I said, he would just sit in the parking lot.  We'd wait for that little visit to be over, then we'd go home.

Q.    Okay.  And, so, the Holly Hall address was used similarly to the Braesmain address in that you would only go there either periodically or -- intermittently or for CPS-related purposes.

A.    Yes.

Q.    Okay.  Now, Hailey was born in May of 2010.

A.    Right.

Q.    And, so, at the time of Brian's death in August of 2012, she would have been slightly over two years old.

A.    Yes, sir.

Q.    Okay.  I have twin two-year-old daughters and I have a five-year-old son and I'm going to ask you some questions based on my experience and see if your experience with little kids are the same.  Little kids, especially infants and toddlers, they come with a lot of equipment.  Do you agree with



that?

A. Yes.

Q. They come with cribs, correct?

A. Yeah.

Q. They come with those -- you know, those bouncy toys. That's sort of all over the place.

A. Uh-huh.

Q. Is that a "yes"?

A. Yes.

Q. Sometimes kids write on the walls. Have you had that in your experience?

A. At four.

Q. When you were having a child, did you have formula?

A. When she was a baby, yes.

Q. What about diapers?

A. Yes.

Q. Okay. If someone were to walk into my house, they would very clearly see that kids live there. For the time period that you were living at Saxon Hollow, if someone were to walk into that house at any point in time on any day in that time period, would they have seen and known that a child was living there?

A. Yes, if they go to the child's room or to her play area.

Q. Okay. And where was the play area?



A.   Between the -- where our dinette table was in the front room, where the computer room is, we would set space over there for her and then, like, her toys and then that first closet downstairs.  And then, of course, upstairs was her room.

Q.   Okay.  Do you know what, you know, binkies or pacifiers are?

A.   Uh-huh.

Q.   Did you use those with Hailey?

A.   Yes.

Q.   Did those ever sort of get, you know, just strewn all about the place?

A.   We bought pacifiers on a regular basis because they're always getting lost somewhere.

Q.   Okay.  The period from February of 2010 to the date of Brian's accident, can you point to or do you specifically recall any night that you did not spend with Brian?

A.   Do I recall any night I've never --

Q.   Yeah.

        MR. FARAH:  Objection.  Form.

A.   -- that I didn't spend with Brian?

Q.   (BY MR. WYNNE)  Yeah.  If we're going from February 2010 --

A.   Yes.

Q.   -- to July of 2012 --

A.   Yes.



Q.   -- were there any nights in that time period that you did not sleep with Brian?

A.   Yes, sir.

Q.   Okay.  How many?

A.   Quite a few.  Brian worked overnights.

Q.   He worked overnights?

A.   So, if he's at work, we're not sleeping together.

Q.   Okay.

A.   At the same time, there were nights when I left him, when the police asked him to leave so he couldn't sleep there. And vice versa.  I've -- I've left.

Q.   The -- the periods that you left because of the police, do you recall the time frame of those?

A.   No.

Q.   Okay.  You mentioned that you had called police on Brian and that Brian had called the police on you.

A.   Yes, sir.

Q.   What police departments, you know, every single one, whether it's -- every law enforcement office, whether it's constable, sheriff, police?

A.   Sugar Land police, Pearland police, Pearland constable, and Friendswood police, Friendswood constable.

Q.   And when did you move out of the Saxon Hollow address?

A.   There was no specific address (sic).  Whenever I got



mad, we had a falling-out and I felt like I couldn't just be in his presence or if I called the police to leave, whatever that day was, that's when it happened.

Q. Okay.

A. Like, there was no -- there was no -- like, I didn't pack all my things to leave. I just got mad, grabbed my keys, grabbed the baby, and I'm out.

Q. Okay. At -- you don't live there today, correct?

A. No.

Q. Okay. At some point in time, it no longer became your permanent residence; is that accurate?

A. Yes, sir.

Q. What was that date?

A. The day Brian died.

Q. Day Brian died?

A. Yes, sir.

Q. Okay. What about the day of his accident? Where were you when you got the news that Brian was injured?

A. At work.

Q. Okay. Where -- and did you get that news the day of the accident?

A. Yes, sir.

Q. Okay. What time of day was it?

A. I have no idea.

Q. And did you immediately go to the hospital?



A.   Yes, sir.

Q.   When you left the hospital, where did you go that night and sleep?

A.   To my mom's, my parents'.

Q.   Okay.  Did you ever return to the Saxon Hollow address after the date of Brian's accident?

A.   I didn't return to the Saxon Hollow, no.

Q.   Okay.  Wasn't all of your stuff there?

A.   Yes.

Q.   What happened to your stuff?

A.   Pam and her brothers put it in storage, Public Storage in Pearland.

Q.   Okay.  And when did they do that?

A.   I have no idea what date they did it, but they had to do it before the end of the month because our lease was up.

Q.   By the end of July of 2012?

A.   Yes.

Q.   Let's see.  What exhibit was the lease agreement?

          MR. FARAH:  Three.

Q.   (BY MR. WYNNE)  The landlord on Exhibit 3, Po-Chen Chen --

A.   Uh-huh.

Q.   -- did you ever meet or talk to that individual at any point in time?

A.   I didn't go -- I went out there to drop off the rent,



but I didn't talk to her because she had the little box there you just put your money in at the house.

Q.   Okay.  Did you ever -- at any point in time ever speak to her?

A.   No.

Q.   Okay.  There's another individual listed as a landlord named Janice Sun, or Sun.  Did you at any point in time ever speak to her?

A.   No.

Q.   At the time period that you were living at Saxon Hollow as your permanent address, what type of vehicle did you drive?

A.   A Mercedes and a BMW and the Yukon.

Q.   Okay.  And would those cars have been parked outside that house, that residence --

A.   Yes, sir.

Q.   -- on a regular basis?

A.   Yes, sir.

Q.   Okay.  What is your relationship with Corey like, Corey Johns?

A.   Up until the day of the accident, it was a great relationship and we communicated.  He spent time with our daughter.  He went on family picnics -- me, him, his baby, and Brian -- with my -- my biological family.  So, until the day that I got to the hospital, I didn't know that had changed.



Q.    Okay.  How did you communicate with Corey?

A.    On the phone, pick him up whenever he wanted to come over.  We would feed him.  We would go to see him in Southern University.  And then when he got into trouble at Southern and was kicked out of school, Brian and I borrowed money from my mom -- my parents to go get him out of jail.

Q.    Okay.  And did you ever e-mail with Corey?

A.    No.

Q.    Okay.  Any reason why you didn't e-mail with him?

A.    Why would I e-mail with him?  He would call me on the phone or I'd call him on the phone.

Q.    Okay.  So, he never sent you e-mails, you never sent him e-mails?

A.    No, sir.

Q.    What about Brian?  Did you ever e-mail with Brian?

A.    I don't recall e-mailing because we talk on the phone.  When he's at work, he calls me on his work phone.  So, I don't recall us e-mailing each other.

Q.    Let me ask you very specifically.

A.    Sure.

Q.    Can you point to a single specific instance between 2010 and 2012 where Brian Johns ever sent you a single e-mail?

A.    I have no idea.

Q.    Okay.

A.    I can't pinpoint one.



Q.    Could you pinpoint a single e-mail that you sent to Brian Johns in that same time period?

A.    Have no idea.

Q.    Okay.  Did you -- do you have the same e-mail address now that you had in 2010?

A.    No, sir.

Q.    Do you still have access to those accounts?

A.    No, sir.

Q.    From the -- from 20 -- from 2009 through the present, identify every e-mail address for me that you've had.

A.    I can't because I don't remember them all.  The ones I do remember that I currently use is vicki.johns@aol and then missvicki40@gmail and Hotmail.

Q.    And when did you get each of those?

A.    I'm sorry.  And there was one for Yahoo!, but I don't remember the -- like, the first part at Yahoo!, but I know I had a Yahoo!.

Q.    And when did you get those?

A.    I think Gmail -- Gmail came out in 2010 or '11 or something.  Whenever it started becoming popular is when I got.

Q.    Okay.

A.    But I had Yahoo!, like, in college, so --

Q.    Okay.  Did you -- in this case, you were sent discovery requests.  Did you go and look through any of your e-mails to see whether you had sent e-mails to Brian or vice



versa?

A.   No, because I know I didn't.

Q.   Okay.  Did you ever have any e-mail correspondence with Brian's family?

A.   Never.

Q.   Okay.  I believe -- after Brian's accident, you moved in with your parents?

A.   Yes.  Well, I moved in with my parents until I got approval for that apartment, which was maybe a couple of days.

Q.   You got a what for what?

A.   Until I got approval for an apartment --

Q.   Okay.

A.   -- which was 9111 Lakes at 610.

Q.   Okay.  And that address, the -- it's the Lakes address.  What's the name of it?

A.   9111 Lakes at 610 Drive.

Q.   Okay.  And, so, you moved into that --

A.   Right.

Q.   -- after Brian's death?

A.   Yes, sir.

Q.   Did you ever live there before Brian's death?

A.   No, sir.

Q.   Did you ever visit there before Brian's death?

A.   My sister lived over there.

Q.   Okay.  Would you ever list your sister's address as



your permanent address?

A.   No.

Q.   What about during the time period that you alleged to be married to Brian?  Would you have ever listed the -- that Lakes address as your permanent residence?

A.   No, because I didn't even know -- that's my stepsister and I didn't know her address.  I just knew where she lived.

Q.   Okay.

MR. WYNNE:  What exhibit are we on?

THE REPORTER:  Next is ten.

MR. WYNNE:  Okay.  Can we mark this one as ten?

(Discussion off the record at 12:57 p.m.)

(V. Johns Exhibit No. 10 marked.)

Q.   (BY MR. WYNNE)  Ms. Johns, you have in front of you what has been marked as Exhibit 10 to your deposition; is that accurate?

A.   Yes.

Q.   And do you see that this is a W-2 from Halliburton for the year 2010?

A.   Yes.

Q.   And do you see that your address is listed as the Lakes Drive address?  Do you see that?

A.   Yes, I see that.

Q.   How can that possibly be true if what you just told



us under oath is also true?

A.    That's what I would like to know because my lease shows when I moved over there, which is when Brian was deceased.

Q.    Okay.  Do you think maybe Halliburton just got that one mistaken?

A.    No, because I still worked at Halliburton.  I didn't get laid off at Halliburton.  I was still employed there.

Q.    Okay.

A.    So, of course, I changed my address whenever I moved.

Q.    Well, then let's go to your 2011 W-2.

MR. WYNNE:  Mark that Exhibit 11, please.

(V. Johns Exhibit No. 11 marked.)

(Sotto voce discussion.)

Q.    (BY MR. WYNNE)  You have in front of you what's been marked as Exhibit 11 to your deposition; is that correct?

A.    Yes, sir.

Q.    And it's a 2011 W-2 from Halliburton; is that correct?

A.    Yes, sir.

Q.    And you see that it is also -- your address is also listed as the 911 Lakes address?

A.    Yes, sir.

Q.    Any explanation for why that is?

A.    Have no idea.



Q.   Okay.

MR. WYNNE:   And what was the -- the funeral home exhibit?

(Discussion off the record at 12:59 p.m.)

A.   Let me make sure I'm clear.  When Brian had his accident, our lease was up.  That's when I got this apartment.  So, then these addresses and dates of -- going from 20 -- the whole time he was in the hospital.  So, all of that, I did live here because that was after, you know, the incident, not after the death.  That was after the incident.

Q.   (BY MR. WYNNE)  I'm not sure what you -- could you explain to me what you just said?

A.   I moved -- okay.  On -- with our lease at Saxon Hollow -- remember, that lease was up at the time of the incident.  The lease was up and we were paying month to month.  When he had the incident, then I no longer had anywhere to live.  That's when I went and applied at this apartment.  So, I was still at Halliburton and still -- so, that -- so, this address would be correct.  After Brian's accident, I had a new home.

Q.   Okay.  Brian was not dead in 2010, correct?

A.   Exactly.

Q.   And Brian was not dead in 2011, correct?

A.   Right.

Q.   So, you would not have lived at that address during



those time periods.

A.   I got this apartment after that lease in Holly Hall and that house was up.  My lease showed that date, so I -- so, this should be -- 2011 should be -- because he got hurt in 2012.  Then I'm -- I'm stumped because I just don't know -- my lease is for 20 -- I want to say 2011-2012.

Q.   It's confusing as to why Halliburton would have sent you your W-2s on these years to an address that you had never been to and lived at, correct?

A.   Correct.

Q.   And my question's real simple:  Any -- do you have any explanation or understanding as to how that -- that could have happened?

A.   No.  I need to check -- I would -- I would honestly ask my sister if I -- if I used her -- because she lived there before I did.

Q.   Okay.

A.   Not same apartment, but she lived there.

Q.   Okay.  And I want to ask you about some other documents while you were at Halliburton.

A.   Okay.

Q.   Or, actually, let's -- let's go to Exhibit 8 before we go to the other Halliburton documents.  Was it your testimony earlier that at the time you signed Page 1 of Exhibit 8, that the information "Former Wife" was not there?



A.   No, and neither was Pam's name at the bottom of the form.

Q.   Pam who?

A.   It says "Pam" at the bottom.  I'm assuming that's Brian's sister.

Q.   Okay.  That Bates labeling?  Okay.  I put that there, okay, for discovery purposes.  So --

A.   Okay.

Q.   -- I can explain that one.  Was -- you see how your signature is sandwiched between your name and the relationship blank?  Do you see that?

A.   Yes.

Q.   Was your name there at the time you signed?

A.   I don't remember this document.  Regardless of what's on it, I don't remember this one.  I only remember the second page.

Q.   Okay.

A.   I do admit that is my signature.

Q.   And you see how Page 1 is notarized?

A.   Yes.

Q.   Do you recall signing this in front of a notary and then the notary stamping it?

A.   No.  I remember signing papers for the funeral home. Whether they were notaries or not, I have no idea.

Q.   Can I see Page 2 of Exhibit 8?



Now, Page 2 of Exhibit 8, at the top, do you see how your relationship is listed as -- is it former wife or former spouse?

A.   Yes.

Q.   Okay.  At the time that that was given to you, was that former spouse/former wife designation on the form?

A.   No, and I didn't type that.

Q.   Okay.  So, someone put -- put that on -- you were given a different version of that document without that piece of information on it?

A.   Yes.  I was given a copy of the -- this funeral home purchase agreement that his family had already filled out.  All I had to do was go sign.  That's what Pam told me on my way.  When I got there, I'm on the phone with Dow.  They told me, "If you sign it, you're saying that you'll let them pay for the funeral and you get the remaining balance through the mail."

Q.   Okay.

A.   So, in detail and all this notary -- they told me sign this saying -- they explained to me what it was.  I signed that.

Q.   Okay.  And -- and the truth is, had you seen the designation of former spouse or seen the designation as ex-wife, you would have immediately said something and done something to correct that, correct?

A.   Yes.  I was offended by it and I asked her, "Why are



they saying that I'm his ex-wife?"  And she reminded me that that's what the family filled out, and so it's just a continuation of what they had already done.  They -- they --

Q.    Time out.  Time out.

A.    I'm sorry.

Q.    You testified earlier that the "Former Wife" wasn't on the sheet at the time you got it.

A.    Right.

Q.    Now you're testifying that you were offended when you saw it?

A.    I've seen it on letters that Dow sent me and I've seen it at the funeral home.  That's what I'm saying.  This document was from the funeral home, and I told them -- just like in the obituary, they put "Former" and I made them take that out.

Q.    Okay.

A.    She's saying because they got the copy of the death certificate and they acknowledged me as his ex-spouse, that's why this is on here.  I didn't put it on there.  They did that.

Q.    Okay.

A.    These are two different fonts.  Whoever typed it added that on there.

Q.    Do you see the date that it's notarized?

A.    October 5th, 2012?  Oh, I'm sorry.

Q.    August 22nd, 2012?



MR. FARAH:  On the first page.

THE WITNESS:  Oh, he said notarized.  I was looking at the stamp.  That's -- it was notarized on this date.  It was signed on that date.

MR. FARAH:  That's the expiration of notary.  We don't know when it was notarized.

THE WITNESS:  Right.

Q.  (BY MR. WYNNE)  So, is it -- is it your testimony that because "ex-wife" or "divorced" or something was -- was written on the death certificate, you just decided to, you know, roll with that and allow -- allow people to -- to describe your relationship as such?

A.  People choose to describe my relationship however they see it.  I know what I was to Brian.  He knows what was to me.  That's the way we carried ourselves.  They are -- when I got there, the funeral home is telling me from his family's perspective, period.  The minute I walked in, "Oh, we heard about you."  So, they were already prepared.  They already had all of this typed out.  Whole funeral was planned.  All they needed me to do was sign it.

Q.  Okay.  What -- did you go in and sign that on August 22nd, 2012?

A.  I don't know what day I got to Texas City.

Q.  But at -- when was Brian's funeral?

A.  His funeral was -- he died on the 17th.  It was --



the funeral dates -- I just can't even think of it right now. I -- I don't know.

Q. Can -- can I see Exhibit 8 for a second?

A. Sure. Sorry.

Q. I'll show you what we'll mark as --

THE REPORTER: Twelve.

Q. (BY MR. WYNNE) -- 12 to your deposition. I'll give you the highlighted one for the record.

(V. Johns Exhibit No. 12 marked.)

Q. (BY MR. WYNNE) And, Miss Vicki, you have in front of you what's been marked as Exhibit 12 to your deposition, correct?

A. Yes.

Q. And it's a copy of Brian's death certificate, correct?

A. Yes, sir.

Q. And do you see under Paragraph 8, Marital Status At the Time of Death?

A. Yes, sir.

Q. And it's marked as divorced?

A. Yes, sir.

Q. Is that -- is that the notation that sort of allowed you or permitted you or enticed you to just mark or not raise an objection to being listed as the ex-wife or the ex-spouse?

A. Repeat that question.



Q.   You mentioned earlier that you had seen a copy of the death certificate -- that everything was laid out for the funeral home and you saw it and you said because it's marked as divorced, you just went along with it.

A.   I have a divorce decree, so I didn't have to go along with the -- the death record.  I know that on paper we were divorced.  We did it.  We went in there with our plan and did it.  So, what offended me is because all of these people who we -- who I called to for help, none of them was there.  When I was being abused, they were not there.  When I called his mom to come help me or take care or talk to her son, she was, like, "You married him.  That's your problem."  All of this was even after the divorce, okay?

None of these people came to my rescue.  None of these people helped me and my husband raise our baby.  They didn't contribute to anything.  So, for them not to acknowledge all the stuff I dealt with with that entire family was offensive to me and hurt me.

MR. WYNNE:  Okay.  I'm going to object as nonresponsive.

Q.   (BY MR. WYNNE)  I think my question was a little bit different.  When --

MR. FARAH:  Can we take a break?

MR. WYNNE:  Yeah.

(Recess from 1:11 p.m. to 1:36 p.m.)



Q.    (BY MR. WYNNE)  In connection with either the foster children or Hailey, did you ever go through an adoption agency?

A.    No.

Q.    Okay.  Everything was done through the state?

A.    Through CPS and -- I want to say -- it's another agency.  Some family ministries which is where the kids came from from Angleton.

Q.    Okay.  Do you recall --

A.    But it's not -- I don't think it's a state agency. They just work with the state, work with CPS.

Q.    Sitting here today, do you recall the name of that entity?

A.    Arrow Family and Child Ministries.

Q.    A-r-r-o-w, Arrow?

A.    Yes, sir.

Q.    Okay.  And where are they located?

A.    Their headquarter's in Spring and my location was in Angleton.

Q.    Okay.  And did you have a contact or specific point person in dealing with Arrow?

A.    There were, like, four individuals that I dealt with on a regular basis because one was for the licensing, one was the caseworker -- her name was Diona Lassiter.  She was Hailey's caseworker.

Q.    Okay.  Besides Ms. Lassiter, names of any other



individuals that you -- that you can recall who were employed by Arrow who assisted or did anything in connection with the adoption or foster kids?

A. The managing attorney was Felicia Hall, and I don't remember the other two case workers' names.

Q. Okay. For your Castle Pond Court residence, do you have copies of any leases for that residence?

A. No, just the lien that's on my credit report, the lien that's on our credit report.

Q. There's an address in Nightshade Crest Lane.

A. Uh-huh.

Q. Did you live there with Brian?

A. Maybe two weeks.

Q. And when do you think you would have lived there with him?

A. It was in foreclosure and we spent, like, two weeks packing up the house because he had to be out at a certain time or something. He owned that house with another lady.

Q. Okay. So, there wouldn't be any type of lease agreement or anything --

A. No. No.

Q. The Braesmain Drive address --

A. Uh-huh.

Q. -- do you have a lease agreement for that residence?

A. I don't have a physical one, but one does exist.



Q.   At any point in time, did you have a physical copy?

A.   Yes, sir.  Yes, sir.

Q.   Just disposed of it over the course of time?

A.   Right.

Q.   Okay.  The Regency Square address, do you have a --

A.   Same situation.  I never keep leases from one place to the next.

Q.   Okay.  Holly Hall?

A.   Same situation.

Q.   And Saxon Court?

A.   Yeah.  Don't have a least.  First time I saw that one.

Q.   For the Saxon Hollow Court address, did you have a key to it?

A.   Yes, sir.

Q.   And did you have access to it?

A.   Yes, sir.

Q.   One of the -- in -- sort of in response to, I think, probably every request for production that I sent, you had made a statement that Brian's family prevented you from going into that address.

A.   Right.

Q.   Is that accurate?

A.   That's absolutely accurate.

Q.   Okay.  I want you to explain to me the timing of that



and then sort of how it happened and -- go.

A.    The day of the incident when I was leaving, Brian told me what he wanted me to bring him back the next day. Before I could get from Galveston to the Astrodome area, which was my parents' house at the time, Frances called me to tell me not to come back, that I wasn't welcome, she has power of attorney over him, and that Corey's going to be staying at the house.  They had had the locks changed and they had -- you know, she had supporting documents to say that even if I went out there, that the police would be waiting for me.

Q.    Okay.

A.    And I believed everything she told me.

Q.    So, that morning -- say, the immediate morning before the accident, you lived at Saxon Hollow, correct?

A.    Yes, sir.

Q.    Unfettered access to it.

A.    Right.  The house alarm --

Q.    Your belongings were there.

A.    Yes.

Q.    Your daughter's belongings were there.

A.    Yes, sir.

Q.    Basically, the majority, if not the entirety, of all our possessions in the world were at that house?

A.    No.  That's incorrect.

Q.    Okay.  Well, what was there as opposed to what wasn't



there?

A.   Hailey had a crib at my house, the apartment, and Saxon -- my parents' house, Saxon Hollow, and the apartment. Everywhere that we spend time, she -- we all had clothes there.

Q.   Okay.

A.   From toys to diapers to whatever we needed for her, of course, we had to have the exact same things at my parents' house because, you know, she'd go there, babysitting and all that.  So, we had -- that's why it wasn't -- like, we had enough at those places.

Q.   Okay.  Now, you had -- you've called the police before on people, including Brian.

A.   Yes, sir.

Q.   You're essentially telling us that your husband's family has forcibly prevented you from living in your own home; is that accurate?

A.   That's accurate.

Q.   Did you call the police?

A.   No.  They told me the police would be waiting for me when I get there.

Q.   Not my question.  Did you call the police?

A.   No, sir, I did not call the police.

Q.   Did you tell anyone about what was happening?

A.   My family.

Q.   Okay.  Which ones?



A.   Every -- my sisters, my parents, which is my mother and my father, just everybody.  So, then -- I have two brothers, two stepbrothers, and so we told them, just everybody.  They knew how difficult the family has been over time and was at this time.

Q.   Okay.  And you never returned to the hospital?

A.   No.

Q.   Okay.

A.   Well, incorrect.  I went -- I went back the next day and she told me that, you know, I -- well, they told me I didn't have a password.  You have to have a password either to come there physically or to -- to even call to get a status and they wouldn't give me the -- of course, they didn't give me the password.

Q.   The family?

A.   Right.

Q.   Did you make any record or report to personnel at the hospital?

A.   No.  I never got to see a nurse or a doctor or anything.  Nobody would take any anything from me.

Q.   Okay.

A.   Anything.

Q.   Did you make any effort to talk to a nurse or doctor --

A.   Absolutely.  On the phone when they were telling me



that I can't get access and I'm telling them who I am, I was, like, "What proof do you have that I'm not?  Because you don't" -- well, I was assuming they didn't know us, but obviously they did.

Q.   Okay.

A.   And they said she had documentation, so --

Q.   And, so, for that month that Brian's in the hospital, you never saw him after the first --

A.   Never saw or talked to him again.

Q.   And did you ever set foot back in the hospital, make an effort to go and see your -- your dying husband?

A.   No.

Q.   Okay.  And you never contacted the police or any law enforcement, correct?

A.   Contact the police or law enforcement --

Q.   Well, you're married to an individual.  People are keeping you from seeing him as he's dying.

A.   Because they have one thing that I don't have -- well, I have, too, and that's my -- that divorce decree and her -- what -- I just said the word -- power of attorney.  My common sense tells me what a power of attorney is.  They have that.  That's his mom.  Police can't change that.

Q.   But did you do anything to fight it or contest it?

A.   Oh, I called -- I contested it with them, with the family.  And then -- and keep in mind, I am not only



traumatized but now I'm having to deal with this baby by myself, so my emotions are everywhere and I'm trusting these people. They're call me, the family, asking me all these different things, saying that they're taking care of this and they're taking care of that. Anything Pam asked me, I gave her access to. What she didn't know passwords for, I gave her to take care of all of that because I knew emotionally I couldn't handle any of it.

Q.   Okay.

A.   So -- you know.

Q.   Who is your cell phone provider?

A.   Now it's -- now it's Verizon.

Q.   Okay. At the time of Brian's accident, who was your cell phone provider?

A.   Have no idea. I've -- we've had them all; Sprint, Verizon, Boost, T-Mobile. We've had them all.

Q.   And, so, if I wanted to gather your cell phone records, I would have to basically go to every single mobile provider to get them?

A.   Exactly. You know that number. I think it'll tell you the -- like, who the provider was for that specific number.

Q.   What's the reason you had -- you've switched providers a lot?

A.   Because I was being harassed and threatened by his family.



Q.   By Brian's family?

A.   Yes, sir.

Q.   When?

A.   From day one they've been -- "day one" meaning the day I married him up until the day he was -- well, even after he was buried, I was still getting calls saying that I've upset the family.  And cousins was calling me and saying what they were going to go to me and my daughter.

Q.   Okay.

A.   So, I changed my number and I left the state.

Q.   Okay.  You left the state?

A.   The state.  I moved to Colorado.

Q.   When did you move to Colorado?

A.   Right after we buried Brian.

Q.   Okay.  I want you to name for me every specific number of Brian's family that you ever felt intimidated, threatened, harassed you, or was antagonistic to you in any way?

A.   Some of them I didn't know that was calling my phone.  They only told me that they were related.  But the ones that I spoke to was -- Pam was always, always first in calling me and threatening me and telling me what they're going to do and what kind of cousins that they have that I don't know -- these people are this, this, and that.  And Pam's husband also called me.  Corey called me saying that's his daddy's stuff.



Specifically, he was talking about the Yukon.

Q.   Okay.  I want to separate this out.

A.   Okay.

Q.   We have the day of Brian's accident in July of 2012.

A.   Right.

Q.   All right.  Before that date, name for me every member of Brian's family that harassed you, intimidated you, pressured you, or did anything to you that you thought was untoward or unkind or you didn't like.

A.   Pam first and foremost.

Q.   Before Brian's accident?

A.   Before we even got married, she came to Brian's house on Nightshade Lane that he was living in.  He was at work and she came and knocked on the door.  I don't know how she found out he had a girlfriend because I never met them.  But the other sister lived three doors down, so obviously they were paying attention.

And she came over there -- very first time I ever met her -- and when I opened the door, she pushed it in and said -- walked past me, said, "Where's my brother?"  And I'm like a deer in the headlights.  I was so shocked.  She and her children came in and she walked around the house, questioned me about her brother.

At the same time, he happened to call, and then he was cursing and yelling.  He told her, you know, "You don't



come to my house when I'm not there," and he told her to get out, and she did.

Q.   Okay.  Was that the only time prior to Brian's accident that Pam did something that you didn't like?

MR. FARAH:  Objection.  Form.

A.   That I didn't like?

Q.   (BY MR. WYNNE)  Yeah, or that you felt was intimidating, harassing, or unjustified.

A.   She's always had a -- a downgrading comment to say whenever she did see me, which might have been -- I can't even say once a month, but whenever -- the few times that I was around their family, it was always something, whether it was my -- my weight, something.

Q.   So, every time you ran across Pam, she bad-mouthed you?

A.   Absolutely.

Q.   And that was before Brian's accident?

A.   Yes.

Q.   And after his accident?

A.   Absolutely.

Q.   Okay.  Let's talk about someone other than Pam. Anyone besides Pam in Brian's family that you felt intimidated, harassed?

A.   His mother was always very stern and mean, and obviously to my baby as well.  And when she came to visit our



house and the day we got married, he and Brian -- she and Brian literally got in a verbal cursing match at the courthouse. It was just awful.

Q. Where did you get married?

A. The courthouse in Houston.

Q. Okay. And what was the date?

A. June 7th, I believe.

Q. June 7th of what year?

A. 2007.

Q. Okay. Let me hand you what we'll mark as Exhibit 1 -- or Exhibit --

THE REPORTER: Thirteen.

Q. (BY MR. WYNNE) -- 13 to your deposition. And you can use this as the original, and this is for Mike.

MR. WYNNE: And, Benji, you can look on with me if you need to.

MR. SHABOT: Okay. Thank you.

(V. Johns Exhibit No. 13 marked.)

Q. (BY MR. WYNNE) Miss Vicki, you have in front of you what's been marked as Exhibit 13 to your deposition. Do you see that?

A. Yes.

Q. And do you see that these are your responses to interrogatories that I sent to your attorney?

A. Okay.



Q.    Okay.  And do you agree with my --

A.    Yes.

Q.    -- my viewpoint of it?  And does the -- is the information in here true and correct?

A.    It appears that way, yes.

Q.    Okay.  I want to look at Interrogatory No. 1.

A.    Okay.

Q.    Okay.  Interrogatory 1's broken down into three parts.  Do you see that?

A.    Uh-huh.

Q.    Part A asks the date on which you and Brian agreed to be married.  And you see your answer was:  "The day the divorce was finalized"?

A.    I see it.  I don't understand why that was the answer to --

Q.    Well, do you disagree with that answer?

A.    -- when did we -- "On which date did you and Brian agree to be married?"

Q.    And you can read the entire question because it's saying --

A.    Right.

Q.    -- after your divorce on February 19th, 2010, the date on which you and Brian agreed to be married.

A.    Right.

Q.    Do you agree with that?



A.    Yeah.  Like, we didn't set a date saying when we were going to be married.  We were still married.

Q.    So, you got a divorce on February 19th.

A.    Right.  And went home and cooked dinner.

Q.    And, so, what was the purpose of even going?

A.    Our adoption.  That was it.  That's what we were --

Q.    So, it was in furtherance of the adoption scheme.

A.    Absolutely.

Q.    Okay.  So, you represented to a court in the State of Texas that you were no longer married to Brian Johns, correct?

A.    Yes.

Q.    You represented to your employer that you were no longer married to Brian Johns; is that correct?

A.    I don't know if I --

        MR. FARAH:  Objection.  Form.

A.    -- told my employer that --

Q.    (BY MR. WYNNE)  Well, did you give --

A.    -- because it's not like they asked.

Q.    Okay.  I'll mark Exhibit 14.

        (V. Johns Exhibit No. 14 marked.)

        (Reviewing document.)

Q.    (BY MR. WYNNE)  And do you have Exhibit 14 in front of you?

A.    Yes, I do.

Q.    And do you see the date of this document appears to



be October 4th, 2010?

A. Yes.

Q. Okay. And you see on the second page it says your permanent address?

A. I used my parents' address --

Q. Okay.

A. -- right.

Q. And that -- that's not correct. You were not living with your parents at that time.

A. Right.

Q. Your permanent residence was the Saxon Hollow --

A. Right.

Q. Okay. So, you misrepresented where you were living to your employer.

MR. FARAH: Objection. Form.

A. I didn't misrepresent it. All of my -- I've told you before, all of my -- I use my parents' address for many things in my life, the P.O. box and that -- Brian and I had mail that goes to my parents' house. So --

Q. (BY MR. WYNNE) Was your parents' address your permanent residence as October 2010?

A. It's --

MR. FARAH: Objection. Form.

A. It was my permanent residence because Brian and I move all the time. I want to make sure I don't miss any mail,



so everything that -- I was even served at my parents'. And I didn't live there, but that's where service went.

Q. (BY MR. WYNNE) Okay. Let me ask you this: Would -- do you think there's any document in Halliburton's employment or personnel file regarding you that would indicate that your residence was the Saxon Hollow address?

A. Yes, because I've changed my -- every time we moved somewhere, I would change it to make sure I didn't miss something.

Q. Well, wouldn't that sort of tip off CPS as to the scheme that you and Brian were running?

A. No, because they don't have to --

MR. FARAH: Objection. Form. Go ahead.

A. They don't have to check your address. They didn't need anything from my job. They already knew where I worked and how much I made.

Q. (BY MR. WYNNE) So, they --

A. What they needed is where you are right now, physical -- I need a physical place to come to, a roof, to see that this baby has shelter, that this baby has all her needs met at this address in your name.

Q. So, they didn't go and look to see whether you were employed or not?

A. No. Once they verify your employment in 2008, unless you tell them, "I no longer work there," they wouldn't have a



reason to.

Q.   Okay.

        MR. WYNNE:   This one for the official record.

        (Sotto voce discussion.)

        (V. Johns Exhibit No. 15 marked.)

Q.   (BY MR. WYNNE)   And you have what's been marked Exhibit --

        THE REPORTER:   Fifteen.

Q.   (BY MR. WYNNE)   -- 15 in front of you; is that correct?

A.   Uh-huh.   Isn't that the same document?

Q.   I don't believe so.   Is it dated March 22nd, 2011, at the top?

A.   Yes.

Q.   Okay.

A.   Oh, okay.   Yes.

Q.   Okay.   So, this is a document from Halliburton dated March 22nd, 2011, correct?

A.   Yes.

Q.   And you see on the second page your permanent address?

A.   Uh-huh.

Q.   It's listed as the Holly Hall address now?

A.   Right.

Q.   Okay.   And, so, you're representing to your employer



that that's your permanent address, correct?

A. Yes.

Q. And that statement -- that representation is inaccurate.

MR. FARAH: Objection. Form.

A. It's the same situation. It didn't matter what address I give my employer. CPS had -- it doesn't matter -- long as they had an address to come see the baby, that was it. It doesn't matter how many times -- they didn't actually know how many times we moved. They only get what I give them, what I show them, what I tell them. That what's they verify.

With my job, every time I changed a phone number, I'd give it to Halliburton so they can always reach me. That's just -- that's common practice. If I want to make sure that I get something they're going to send me, I'm going to give them the next address. They don't have all my addresses, but they have quite a few, but that's --

Q. (BY MR. WYNNE) Okay. And Halliburton should have that Saxon Hollow address down in Friendswood?

A. Yes.

Q. Okay. Would --

A. I don't know --

Q. Would CPS check with the federal government your tax returns to see what you're identifying your address as?

MR. FARAH: Objection. Form.



A.    I have no idea --

Q.    (BY MR. WYNNE)  Okay.

A.    -- but they've never asked for them.

Q.    I'm just saying -- so, you seem to indicate you knew what CPS would ask for from your employer.  Did you have the same understanding as to what they would ask for from the federal or state government?

A.    Yes, sir.  They've never asked.  So, do they require it, obviously not because they've never asked for it.

Q.    Okay.  Now, you filed tax returns in the year 2010, 2011, 2012, 2013, correct?

A.    Yes.

Q.    Did you prepare them yourself?

A.    No.

Q.    Who prepared them for you?

A.    Whatever tax service that is at Fiesta.

Q.    At where?

A.    Fiesta.  I used to go to Jackson Hewitt and then I start going to Fiesta.

Q.    Okay.  So, someone at Fiesta or someone at Jackson Hewitt would have prepared your tax returns for the time period 2009 through 2013?

A.    Yes.

Q.    Okay.  Did you -- were you honest with the CPA who prepared your tax returns?



A. To my knowledge, I was honest. I gave everything she asked for.

Q. I noticed in your tax returns that you -- you marked yourself as head of household with qualifying person.

A. Right.

Q. Do you know what that means?

A. That means nobody else can claim you as a dependent.

Q. Did you know that that means that you're representing to the United States government that you're unmarried?

A. No.

Q. Did you know that that's what head of household means?

A. No. I -- just the definition I gave you, that that means nobody can claim me as a dependent and carry me on their taxes. I'm claiming and carrying myself. That was my understanding.

Q. Where did that understanding come from?

A. From me reading the document.

Q. Okay. So, you read the tax return and you saw somewhere that said that you can claim head of household if no one else is claiming you?

A. Yeah. Do we have a W-4? That is pretty much what it says.

Q. Okay. Because I printed out some IRS documents and I can show those to you that seem to indicate your understanding



is absolutely incorrect.  Did you do any independent research or did you talk to the accountant who prepared these?  Where does that understanding come from?

A.    It come from the very first time I ever filled out one, I read the question, I checked whatever box I thought was appropriate.

Q.    Okay.

A.    And it's the way I've always lived.

(V. Johns Exhibit No. 16 marked.)

MR. WYNNE:  And this is Exhibit 16?

THE REPORTER:  (Moving head up and down.)

Q.    (BY MR. WYNNE)  Okay.  Vicki, you have in front of you what has been marked as Exhibit 16 to your deposition; is that accurate?

A.    Yes.

Q.    And these are requests for production that I sent to you through your lawyer.  You understand that?

A.    Yes, sir.

Q.    And in response to these requests for production, you produced the Exhibit A, Exhibit B, and Exhibit C, and they're attached there.  You can look at them, I believe.

A.    Okay.  Okay.

Q.    Okay.  Do you have any other documents in your possession that would indicate that you and Brian had agreed to be informally married besides these documents?



A.    No.  We didn't write it down on anything.  It -- it was what we were living.  There was no -- we didn't need a document to tell us how to be --

Q.    Okay.

A.    -- together.

Q.    So, if a judge or jury wanted to know what documents you had, they could look at Exhibit A, B, and C and know that that's it.

A.    I mean, if that's their interpretation, sure.

Q.    What's your interpretation?

A.    I don't need a document to agree to be with anybody.

Q.    Okay.  Let's look at Exhibit A.  And these are your -- a page from your tax return.

A.    Yes, sir.

Q.    Do you have copies of your full tax returns from the year 2011?

A.    I don't know if I have the entire packet.

Q.    Okay.  Well, you had the first page, correct?

A.    Yes.

Q.    Okay.  Did you just have the first page?

A.    I -- I -- I had boxes of just paper, so I'm just going in there looking.  I saw 2011, I pulled that.  I saw the page for 2012, I pulled that.  So, I don't know if -- all those other pages, which one it goes to, just the folder.

Q.    So, you went -- in response to these requests for



production, you went and did a diligent search for all documents that would be responsive to this, correct?

A.    Right.  Yes, sir.

Q.    And in response to that, it was Exhibit A, B, and C, and nothing else, right?

A.    I think there were some other things.

MR. FARAH:  We have some other things she's given us, so we'll supplement discovery with that.

Q.    (BY MR. WYNNE)  Would you have any problem signing authorization for me to get your tax returns from the IRS?

A.    Can I ask why -- what else do you need to know other than what -- what's on here?  What would the purpose be?

Q.    Because --

A.    Am I allowed to ask that?

Q.    I think I -- probably should address that question to George.  I feel like I'm going to do it anyway --

(Simultaneous discussion.)

MR. FARAH:  Probably going to --

Q.    (BY MR. WYNNE)  -- so it's probably not even worth talking about.

MR. FARAH:  Yeah.  We'll discuss it later on, yeah

THE WITNESS:  Sorry.

Q.    (BY MR. WYNNE)  All right.  On your 2011, the single page that you produced, your address is Holly -- your home



address is Holly Hall, Apartment 308.

A.   Yes, sir.

Q.   Okay.  And you put that there sort of in furtherance of your and Brian's scheme to adopt a child?

MR. FARAH:  Objection.  Form.

A.   No.  The way I file my taxes had absolutely nothing to do with adoption at all.

Q.   (BY MR. WYNNE)  Okay.

A.   Brian had tax problems.  I was not -- I work hard for, you know, my -- I file my taxes individually.

Q.   I'm simply asking you about the address.  I don't care --

A.   Oh, okay.  No.

Q.   -- the money, the wages.  I'm really just looking at 2750 Holly Hall, Apartment 308.

A.   Okay.  Yes, sir, that was for the adoption.

Q.   You told the federal government -- you represented to the federal government that that was your primary address, correct?

A.   I told them that that was an address where I resided with that child.

Q.   Okay.  If we were to look through your tax returns, would there be anything to indicate that you and Brian were living together as husband and wife?

A.   Other than what we see on this paper?  I don't know.



I mean, I -- to me, this -- this sums it up.

Q. Well, I -- I look at this paper and I see the address and it's not the same as Brian's.

A. Okay.

Q. I look at the paper and I see head of household and you have to be unmarried to file that. And, so, I look at this and I don't see anything that would support you being married to Brian. Do you see something in Exhibit A that would support you being married to Brian?

A. I don't look at my tax return the way you do because I don't have the --

Q. Not my question.

MR. WYNNE: Objection. Nonresponsive.

Q. (BY MR. WYNNE) It's a very -- much more smaller set question. Is there anything in Exhibit A that you can point to me, say, "This supports the fact that I was married with Brian and living in the same household"?

A. No.

Q. When did you leave the -- the 911 Lake of -- that address?

A. The minute the psychiatrist released me from counseling, I -- I broke that lease. I notified them that I was leaving the state.

Q. Okay. What psychiatrist?

A. I have no idea. I was in counseling from the time



Brian got hurt until whenever I left the state.

Q.    What's his or her name?

A.    Donna Lucco.  I think it's L-u-c-c-o.

        MR. FARAH:  We have her info.  We'll supplement RFDs with that.

        MR. WYNNE:  Okay.

        MR. FARAH:  We just got all that this week, so --

        MR. WYNNE:  Okay.

Q.    (BY MR. WYNNE)  Have you seen any other mental health providers in connection with what happened to Brian other than Dr. or Ms. Lucco?

A.    Donna, and Dr. Giray as well.  One was a psychiatrist and one was a psychologist.

Q.    Who -- and when did you start seeing them?

A.    That Monday after Brian got hurt, approximately.

Q.    Let's go back to -- what exhibit was the interrogatories?  Was that --

        MR. FARAH:  I think I --

        MR. SHABOT:  Thirteen.

        MR. FARAH:  Thirteen.

Q.    (BY MR. WYNNE)  Thirteen.  Let's go back to Exhibit 13.  You see in response to Interrogatory No. 1 you identify Houston, Texas, Harris County courthouse, as the place where you and Brian Johns agreed to be remarried -- agreed to be



married.

A. Right.

Q. Okay. Are you talking about your original marriage from 2007 or are you talking about the informal marriage that you're alleging in this case?

A. My original marriage.

Q. Okay. Well, let's talk about C, any witnesses to your agreement with Brian Johns to be remarried.

A. Nobody knew that we were divorced. His family did not know that. I told them that the day of his incident. I told Pam in the hospital -- what do you call that -- waiting room that we were divorced. She was asking me all these questions and, of course, you know, I was crying and all that and I was, like -- you know, she was offering her services because she knew the insurance, she worked at AIG, she knew all these things that I did not know.

And, so, I told her, "You can take care of it for me because I can't" -- "I can't deal with all that." That was just too much. And, so, I told her in that conversation that Brian and I was divorced.

And she was, like, "What? When?" That's when -- so, she's the only person that knew. Then, of course, it -- she told everybody from that point. But my family, none of them knew that we were legally divorced, nobody. No friends, nobody. Even his family did not know until he got



hurt.

Q.   Okay.  So, from that period from February 2010 or actually from 2007 when you-all went down to the Harris County courthouse --

A.   Right.

Q.   -- and got married --

A.   Right.

Q.   -- through the time of Brian's accident in July of 2012 --

A.   Yes, sir.

Q.   -- it's your testimony that not a single person knew that you-all had gotten divorced?

A.   Exactly.  That's what I'm telling you.

Q.   Okay.  You have a -- you list a name Alicia K. Franklin, family adoption attorney.  Who is that?

A.   The attorney that handled the adoption.

Q.   For who?

A.   For Hailey.

Q.   Okay.  Was she your lawyer?  Was she Brian's lawyer?  Was she you-all's lawyer?

A.   She was my -- my attorney.

Q.   Okay.  And when did you hire her?

A.   I don't know.  I don't remember.

Q.   Was it while Brian was alive?

A.   I'm not sure when that intervention was, if it was



after Brian passed away or not.

Q.   Okay.  And the reason I'm asking is because you identified her as a witness to your agreement with Brian Johns to be remarried.

A.   Right, because I asked her, "How do we" -- "how do we do the" -- "once my adoption with Hailey is" -- "you know, is consummated, then how do we get Brian on the birth certificate?  Like, what" -- "what is our process?  Is it just a matter of a paper he'll sign or whatever," and that's what I asked her.

Q.   Okay.  And was that during Brian's lifetime or after his lifetime?

A.   So, it had to be while he was alive, I believe.

Q.   And did Brian --

A.   I just -- I don't remember the day.  I'm sorry.

Q.   I know you don't remember the day.  You -- in your rog responses, you named a single person by their actual name who could support your position.  That person is Alicia K. Franklin.

A.   Okay.

Q.   So, I'm asking what knowledge does Alicia have that would support your claim to informal marriage?

A.   She know everything I've told her about me and Brian and the baby.  That's what she knows.

Q.   Did Brian ever meet her?

A.   I can't remember if he met her or not.



Q.    Interrogatory No. 3, which -- is it your testimony or your position in this case that not a single member of Brian's family and friends or your family and friends knew that you had actually went down to the courthouse and got an official divorce decree?

A.    To my knowledge, not one.  I told his family.

Q.    Okay.  Same thing with your family and your friends?

A.    Right.  They didn't know.

Q.    Not a single one of them knew?

A.    Not to my knowledge.  None of them knew.

Q.    So, would it be fair to say that it's your position that you never held yourself out as informally married; you held yourself out to the world -- your family, your friends, and everyone -- as you were married in 2007 and you were still married, legally and on paper, at the time of Brian's death?

A.    Yes, sir.

        MR. FARAH:  Objection.  Form.

Q.    (BY MR. WYNNE)  What's the answer?

A.    Yes.  I considered -- like, I've never used the word "informally" and all of that.  We were married.

Q.    Yeah.  And you never told a soul that you were divorced.

A.    I told Pam.

Q.    Prior to Brian's accident.  Let's -- yeah.

A.    Oh, no, prior to his accident.



Q. You never told a single human being that you were -- you had gotten a divorce.

A. That's incorrect. My CPS worker. Because, remember, I had to show her that I left him so I can move forward with this adoption, and that would be Felicia.

Q. Now, at the time of the -- what I'll call the paper divorce or the February 2010 divorce, I believe you testified earlier the reason you were getting divorced was so that you could adopt a child.

A. Yes, sir.

Q. And that was because the -- CPS or the caseworker was making you and Brian have -- have to sit out or wait a year before you could adopt a child if you were still married.

A. Their issue was, yes, we need to take some time -- because of our domestic issues, they had to go back then and reevaluate because now we're on two different pages about how many children.

Q. Okay.

A. Once they removed that -- those babies, that put questions in their head if we were ready and should we -- should they continue to let us keep these children. So, it was a ripple effect once the girls were removed, so we had to make a decision right away. We have to salvage this, and I can't lose another baby.

Q. Okay. And, so, that's why you went and got the



divorce.

A.    Absolutely.

Q.    And then in -- after that, you went and told Felicia, the caseworker, that you had gotten a divorce and you wanted a child yesterday.

A.    I asked her before we went and got the divorce, "So can" -- "what if he just leave the house?"  We tried to make it work where he didn't have to leave the house.

And she was, like, "Well, no, because, you know, we still going to come there and you're telling me what you guys are considering and I" -- "I cannot tell you you can do that."

Q.    Okay.

A.    And, so, he and I had to make a personal decision.

Q.    And, so, the personal decision that you-all had to make was get divorced and then start the scheme so you can get the child together or live together as husband and wife but just wait a year before you can get a child again.

MR. FARAH:  Objection.  Form.

A.    We knew and he -- he knew that when it came down to the business of following what they asked us to do, he couldn't guarantee that he wouldn't go off on a rampage again, and we could not risk that again.  We lost two children because of it. We were not going to do that a third time.

Q.    (BY MR. WYNNE)  Okay.  Prior to Brian's death, did he



ever take any steps to become the legal father of Hailey?

A.　He couldn't until I -- I didn't even have legal steps.

Q.　Okay.　And, so, you knew that once Hailey came into your custody, you would have to wait three years to adopt her?

A.　No, I didn't.　There is no time frame on adoption. It depends on how your case goes and what her biological parents -- if they finish their classes -- we've been through this with all these different parents.　Any way the wind blows is how that case will go.　It just happened to end up being three long years.

Q.　Did you-all ever think how about we just follow the rules that CPS has set forth --

A.　No.　I was --

MR. FARAH:　Objection.　Form.

Q.　(BY MR. WYNNE)　-- and wait 12 months and then we adopt a child?

A.　No, sir.　That was not an option.　I did not want to lose another child.　I've been through too much for us to conceive.　When we couldn't do it, the minute we decided we were adopting, full swing ahead.

Q.　Okay.　During the -- from 2007, the date you went down to the courthouse and got married to Brian, through the date of his death, did you ever have any sexual relationship with any human being?



MR. FARAH:  Objection.  Form.

Q.   (BY MR. WYNNE)  Other than Brian.

A.   From the time we got married until the time he died?

Q.   Yeah.

A.   No, sir, never.

Q.   Okay.  And I'm talking -- and this is going to be maybe inappropriate.  I'm going to try not to make it -- oral, vaginal, anal, digital, any type of intercourse or sexual act.  Did you engage in any sexual act with any human being other than Brian during the time period you were married?

A.   No, sir.

MR. FARAH:  Objection.  Form.

Q.   (BY MR. WYNNE)  What's the answer?

A.   No.

Q.   Okay.

MR. FARAH:  Digital?

MR. WYNNE:  (Indicating.)

A.   Never heard of --

MR. FARAH:  Oh, okay.  Oh, digit -- okay.

A.   Oh, I didn't get that.  I'm sorry.  I didn't understand.

MR. WYNNE:  I thought it sounded better than hand.

A.   Oh, no.

MR. WYNNE:  That's what I was --



MR. FARAH: Sorry. I'm naive.

THE WITNESS: Me, too.

Q. (BY MR. WYNNE) I note in your interrogatory responses you say you started a romantic relationship with a gentleman named Marvin Dave in January of 2013.

A. Yes, sir.

Q. Is -- is that accurate?

A. Yes, sir.

Q. Do you still have a romantic relationship with that gentleman today?

A. No, sir.

Q. Okay. When did your relationship cease?

A. When I left the state.

Q. Okay. And when did you leave the state?

A. Whatever day the counselor cleared me, I -- I was already packed up because I knew it was coming. The end of that weekend, my daughter and I hit the road.

Q. Okay.

A. But, I mean, I told him prior to.

Q. Can you give me sort of as -- with any type of accuracy the time period when you would have left the State of Texas?

A. It was June 2013.

Q. And when did you return to the State of Texas?

A. Christmas 2 -- 2013 or -- or the beginning of '14.



I --

Q.   Okay.  So, you had winter of '13 or --

A.   Yeah.

Q.   Late '13, early '14?

A.   We were gone six to nine months, something like that.

Q.   Okay.  And the reason you moved to Colorado was because you were being hounded by Brian's family?

A.   Absolutely.  I wanted to get away from all this.

Q.   Is there any reason other than Brian's family why you left the State of Texas?

A.   No.

Q.   Okay.  And they were so, I guess, aggressive or demeaning or --

A.   And harassing.  They had all my personal information.

Q.   And what did they do to harass you?

A.   Call me, threaten me.  It would be things on my car. I've never had that problem until all this happened.  Now all of a sudden, my car is getting keyed or my tires would be uninflated.  It was just all kind of -- all of a sudden, things happening.  And then, of course, the phone calls was through the night.  It was bad.

Q.   Okay.  And, so, they were -- they were harassing you 24/7.

A.   And asking me for things, yes.

Q.   Did you ever seek any assistance from law



enforcement?

A.   No.  All I have to do is stop answering the phone.

Q.   Okay.

A.   Well, I -- I rephrase that.  Yes, I called the police because they took the vehicles and everything.  And when I tried to contact Pam about where are all the belongings, you know, they just wasn't trying to release anything, and so the police called me when they got the vehicle.

Q.   And you -- you named Pam as someone who was specifically harassing you.

A.   Yes, sir.

Q.   Who else besides Pam -- I know you mentioned Frances, and she was sort of mean or rude to you.  Did she harass you?

A.   No.  Ms. Frances did not harass me.

Q.   Who else besides Pam do you believe harassed you?

A.   Pam, Corey, and Pam's husband.  I don't know his first name.

Q.   Jeff?

A.   Jeff.

Q.   Okay.

A.   Yeah.

Q.   So, Pam, Jeff, and Corey are sort of the culprits?

A.   And then I kept hearing other girls calling saying they were cousins, but I don't know who they were.

Q.   Girls were calling you?



A.    Yeah, when -- they were saying that they were his cousins from down South.

Q.    Do you know that to be -- know their relationship one way or the other?

A.    No, I don't.

Q.    Now, you mentioned that there were two co-workers, I believe, Brandon Hubbard and -- was it Terrance -- and those were the only co-workers that Brian ever let inside you-all's house?

A.    Yes, sir.

Q.    No other co-workers --

A.    No.

Q.    -- were -- ever came inside your house?

A.    No.

Q.    Okay.  Do you know any of Brian's other co-workers?

A.    Only by name.

Q.    Okay.  Have you ever met an individual named George Goffney?

A.    No.

Q.    Okay.  Were you ever at a Super Bowl party where George Goffney was at that Super Bowl party with you?

A.    I don't know George Goffney.

Q.    You wouldn't know one way or the other?

A.    No.

Q.    Okay.  You know, you showed us -- we went over



earlier in the deposition that physical that you attended at the Pearland clinic with -- with Brian.

A.   Yes, sir.

Q.   Any other doctor visits that you can recall that you attended with Brian?

A.   He had something removed on -- he had foot surgery, podiatrist, and I again filled out the information.  I think we put that doctor's name on that form, too, because it asked any other injuries or something that he had.  It was on there, too.

Q.   Yeah.  On one of those forms, there's two doctors listed.

A.   Right.  Right.

Q.   Would those be the only two doctors that you ever went with Brian with to see?

A.   No.  Our primary care was Dr. Kenneth Stanley, and Brian went and got physicals from him.

Q.   Okay.  Kenneth Stanley?

A.   Yes, sir.

Q.   And do you know his address?

A.   Yes, sir.

Q.   And is he still your primary care physician?

A.   Yes, sir.

Q.   Okay.

A.   I don't have his address, but would you like the phone number?



Q.    Yeah, if you don't mind.

A.    (713) 436-8501.

Q.    Now, from the date of the February 2010 divorce through Brian's death, did Brian ever go with you to any of your medical providers?

A.    Dr. Stanley was our joint primary care.

Q.    Okay.

A.    And then we went to a Dr. -- I had a hysterectomy in 2010, August 2010; and, of course, Brian took me, Brian stayed with me, Brian took me home.  And I can't remember my doctor's name, the surgeon's name that did it.  And then we went to see a fertility doctor, but, you know, I can't remember which doctor it was.  And then we saw a marriage counselor, if that's considered a doctor, too.

Q.    And those were all people you would have seen with Brian --

A.    Yes, sir.

Q.    -- after the -- the February 2010 divorce?

A.    Yes, sir.

Q.    Okay.  Is there a way for you to -- after the deposition is over, whether look through records, to identify the doctor who performed the hysterectomy?

A.    Yes, sir.

Q.    Okay.  The fertility doctor, do you think there's a way for you to get that individual's name and contact?



A.   Yes, sir.

Q.   Okay.

A.   I can.

Q.   The marriage counselor, do you know that individual's name and contact information?

A.   No, sir.  I know where his office is.  I just don't know if he's still there, but he's --

Q.   Okay.  Where is --

A.   It's in Pearland.

Q.   Pearland?  Do you know the address or --

A.   It's at County Road 90 and 518.

Q.   Repeat that, please?

A.   County Road 90 and 518.

Q.   Okay.  Okay.

A.   And Dr. Stanley is in that same medical facility.

Q.   Okay.  And sort of -- I'm not familiar with Pearland. So, 90 and 578, do they intersect, have four corners?

          MR. FARAH:  578 or 518?

A.   518.

Q.   (BY MR. WYNNE)  518.  I'm sorry.

A.   Yes, sir.

Q.   Which corner?

A.   If you're coming from 288 headed south and you exit 518, you turn left.  And maybe three blocks down at a red light, that's the corner of County Road 90 and 518.



Q.   Okay.  Do you know the -- this may be too much detail.  Do you know whether it's northwest corner, northeast, southwest, or southeast?  Because I'm not sure -- okay.

(Sotto voce discussion.)

Q.   (BY MR. WYNNE)  Is it -- do you know whether it's the -- the Pearland Center for Couples and Families?  Does that sound familiar?

A.   Yes, that sounds familiar.  But, I mean, I see these signs every day, so I don't know if that was the exact one.

Q.   Okay.  What about a woman named Cindy Dalmolin?

A.   No.  It was a guy.

Q.   Okay.  A man?

A.   Yes.

Q.   Okay.  Earlier in the deposition you testified that Brian put his hands on you.  Do you recall that?

A.   Yes, sir.

Q.   And I think you testified also that Brian never struck you; is that accurate?

A.   Yes.

Q.   Okay.  Is it -- is it your position that Brian put his hands on you in a physical manner on a common or sort of routine basis?

A.   I wouldn't say routine, no.

Q.   Okay.  Over the period -- you know, you allege that you were married for five years or so.



A.   Yes, sir.

Q.   How many times do you think Brian put his hands on you in a way that you thought was inappropriate?

A.   It just depended on the situation.  I can't give you, like, a number.

Q.   Okay.

A.   Because sometimes it wasn't on me, but he hit the wall next to my head or something.

Q.   And I'm not ask -- do you think it was more than ten?  And the reason I'm asking is I tend to remember every time I've been punched or pushed around and I'm not sure if you're the same way and so I want to know what specificity you can give me as to these incidents, because they obviously are not very positive reflections of my client.

A.   Everyone that knows Brian knows that he has a temper, period.

Q.   Okay.  Who else besides you knows that Brian physically put his hands on you?

A.   I told -- called his mother directly.

Q.   Okay.

A.   She told me he was my problem.

Q.   Who else besides Brian's mom?

A.   My sister.  She was there one of the --

Q.   She witnessed it?

A.   Yes, sir.



Q.   Okay.   What's her name?

A.   Dana.

Q.   What's her last name?

A.   Walker.

Q.   Okay.   And when was that incident that Dana witnessed?

A.   When she came in, it was over.   She knew something had happened because I was crying and he was standing over me.  She didn't see it because his back was to her.

Q.   Where was it?

A.   And, so, then he let me go and she got closer.   It was in the kitchen at the house.

Q.   What house?

A.   The Rich -- Richmond house, I believe.

Q.   Okay.   Was she there before the altercation took place?

A.   Yes.

Q.   Okay.   And then the altercation took place and she came in in the immediate aftermath of it?

A.   She was actually coming into -- we were in the back yard.   She was coming into the house to go to the bathroom.

Q.   Okay.

A.   And you have to pass through the kitchen to get there.

Q.   So, you had told Frances about Brian's -- what I will



call inappropriate behavior.  You told Frances.

A.    Yes.

Q.    You told your sister?

A.    Yes.

Q.    Who else?

A.    That's it.

Q.    Okay.  And for any of those incidents, did you -- I guess you did file -- you -- you made police reports?

A.    Yes.

Q.    And you made police calls?

A.    Yes.

Q.    Okay.  And how long did that behavior -- or did that behavior persist for the entirety of your marriage to Brian?

A.    No.  I would say that it was off and on.  It just depends on what he was feeling or going through.

Q.    Okay.  Did you ever give any thought to the fact that maybe you and Brian shouldn't be married?

A.    No.

Q.    Why not?

A.    Because we're committed to each other.  We've -- he said no matter what.  Sometimes it was for better, sometimes for worse.

Q.    And did you say no matter what?

A.    I did say no matter what.  I just -- when it came to the baby, you know, I had to really think about it because, you



know, her -- her safety came first.

Q.   Okay.  Well, you obviously didn't need Brian to adopt the child.

A.   I didn't know that at the time.

Q.   You didn't know that?

A.   No.  I didn't know they allow you to adopt as a single parent.  I'd never pursued adoption before, so all this was new to us.

Q.   Well, then why did you get divorced and tell your caseworkers that you were divorced?

A.   I didn't know it until then.  I'm saying prior to any of this.

Q.   Okay.  If you could adopt a child in February of 2010 and you knew in that time period you didn't have to be married to adopt a child, why would you willingly get into a marriage with someone that was physically abusive to you?

A.   Because he was my husband.  We were already married. We didn't -- we've been married.  We've been living as married. We had problems like anybody else.  We tried to fix them. We've tried to stay committed, period.  Had nothing to do with the baby.  It was about our marriage.  The baby was just going to make it better --

Q.   And that was the --

A.   -- in our eyes.

Q.   That -- get a baby, that'll improve things?



A.    Get a baby because we wanted to be parents.  We were working on our communication issues as a couple, period.

Q.    Okay.  How did you first come to get information regarding Brian's life insurance policy, his disability policy, and the various other insurance policies covering his life?

A.    I received a phone call from Dow.

Q.    Okay.  And do you recall the -- the timing of that in connection with Brian's death?

A.    No.

Q.    Okay.  Do you know whether it was the day of, the day after?

A.    Have no idea.

Q.    Okay.  You knew about it before you went to the funeral home, correct?

A.    They -- that's when I got notified.  I was on my way to the funeral home.

Q.    Okay.  So, you were already on your way to the funeral home.

A.    No.  They called me at work --

Q.    Okay.

A.    -- explained who they were.  They were from Dow or MetLife or whatever she said.  And she was saying that -- "You are his primary beneficiary and we need you to go to the funeral home."  She gave me the address, told me what form that they had waiting for me and -- and that was it.  And, so, I



left work and -- to go do that.

Q.   Okay.  So, the day someone from Dow called you up to tell you about the insurance benefits was the same day that you went to the funeral home?

A.   I believe so.

Q.   Okay.

A.   And then the -- yeah, that they would send something in the mail, but for me to go to the funeral home.

Q.   Okay.  And -- and the letter they sent you in the mail referred to Brian as your ex-husband, correct?

A.   Yes.  It says -- yeah.  It says "ex-husband."

Q.   And what exhibit is that?

A.   Seven.

Q.   Okay.

A.   Or C.

Q.   And it refers to Brian as your ex-husband not just in one place but in a whole number of places in that document, correct?

A.   I only see it on the top line, but if you say so.

Q.   Well, we can read it and look and it'll show what it shows.  Did you ever contact anyone, either at Dow or with the insurance company, to let them know that they had designated your relationship with Brian incorrectly?

A.   No.  They told me they had -- she told me that she had already spoken to his sister, Pam, and Pam gave her my



direct number.  So, she already knew when she called me.

Q.  And --

A.  She didn't address me that way.  It just said that on the letter.

Q.  Okay.  After you got the letter, did you make a contact and say, "Hey, you're calling me 'ex-wife' or 'ex-husband'" -- or 'ex-spouse.'  That's just not accurate"?

A.  No, sir.  I did not question it or -- or even address it.

Q.  Can I see Exhibit 7?  The name on the back of Exhibit 7 is Debbie Border.  Is that the person you spoke to?

A.  I don't remember.

Q.  Okay.  Do you know one way or the other the name of the person you spoke with?

A.  No.

Q.  You said right around the time of Brian's accident or death, you and Brian were preparing to move into a house together.

A.  Yes, sir.

Q.  What was that house?

A.  I don't have the address.  Terrance showed us at least -- between four or five houses.  We narrowed it down to three and then Brian was just going to make the final decision on which one because, you know, we went and saw all of them.

Q.  Okay.  And do you know Terrance's last name?



A.    Harris.

Q.    Harris.  And he works at Dow or Rohm and Haas?

A.    Yes, sir.

Q.    And he was also your realtor?

A.    Yes, sir.

Q.    And how long had he been your realtor?

A.    I have no idea.

Q.    Okay.  And how did you communicate with Terrance?

A.    Brian did.  Brian works with him, so --

Q.    Okay.  Did you ever directly communicate with Terrance?

A.    No, only when Terrance come to the house.  It's us that he's talking to.

Q.    Okay.

A.    And when we -- the workout (sic), it's us.

Q.    I know you testified earlier and I'd seen some records to -- in furtherance that would support this that indicated your father died in the August/September 2012 time period.

A.    Yes.

Q.    And I saw some records that indicated that you were assisting your mother in the aftermath of that.  Is that correct?

A.    Yes.

Q.    Okay.  What did you do to help your mother out in the



time period after your father died?

A.   I was just there, like, just feeding her and just consoling her.

Q.   Okay.  Did -- did your mother or you ever go hire an attorney to administer your father's estate?

A.   No, because our family didn't have those issues. That was his wife.  She'd do it.  She'd get everything.  She'd do everything.  It wasn't -- like, there was no separation.  It was, like, common sense that that's his wife.  I mean, you know, it was never -- nobody ever challenged anything, so --

Q.   So, to the extent you know, they never went down to courthouse to probate a will, to administer an estate, anything to that extent?

A.   No, sir.  They've never done that.

Q.   Did you ever come to know or find out that Brian Johns' estate was being administered in probate court?

        MR. FARAH:  Objection.  Form.

A.   You mean when I got served?

Q.   (BY MR. WYNNE)  No.  You said when you got served. What's -- what service are you talking about?

A.   I got served by a constable -- well, he left the paper at my mom's house -- that Corey was suing me for the life insurance.

Q.   Okay.  And I'm talking about something different. Did you know that Brian -- that his family had his estate go



down to probate court and have his heirship determined, to have letters of administration?  Did you know that?

A.    No, sir.

Q.    Is today the first time you're ever hearing that?

A.    Yes, sir.

Q.    Okay.  Were you aware that in the lawsuit with you -- between you and Corey, that you had been -- your deposition had been noticed several times?  Were you aware of that?

A.    That my deposition had been noted?

Q.    Noticed.  You know how you're here for a deposition today?

A.    Okay.

Q.    The way we start this is we set up notices between the attorneys and you show up.

A.    Okay.

Q.    Were you aware that you were supposed to be deposed in -- in that lawsuit?

A.    I don't know what "deposed" means.

Q.    What you're doing here today.

A.    Oh, no.

Q.    Okay.  No one ever told you that?

A.    No.

Q.    Okay.

MR. WYNNE:  Mark this as whatever the next exhibit is.



(V. Johns Exhibit No. 17 marked.)

Q.   (BY MR. WYNNE)  Exhibit 17, had you ever seen that before today?

A.   No.

(Discussion off the record at 2:49 p.m.)

MR. WYNNE:  Mark that as whatever the next one is.

MR. BREM:  Eighteen.

MR. WYNNE:  Eighteen.

(V. Johns Exhibit No. 18 marked.)

(Reviewing document.)

Q.   (BY MR. WYNNE)  Now, Exhibit 18 are discovery requests that were sent by me.  Have you ever seen those?

A.   Not this.

Q.   Okay.

A.   I thought that's what these were.

Q.   Okay.  So, no one ever gave those to you or showed those to you or asked you to fill out information in regards to that?

A.   No.

MR. WYNNE:  Okay.  Let's take a break.

MR. FARAH:  Okay.

(Recess from 2:50 p.m. to 3:07 p.m.)

(Mr. Gibson leaves.)

Q.   (BY MR. WYNNE)  Vicki, do you have a copy of your



driver's license on you?

A. Yes.

Q. May I see it?

A. Yes.

Q. And you were issued this on November 8th, 2013?

A. I guess. Yeah. It was issued --

Q. Okay.

MR. WYNNE: George, could we get a copy of that? It doesn't have to be right now or in the deposition, but -- okay. Perfect. And then we'll mark the copy of the license as --

THE REPORTER: Nineteen.

MR. WYNNE: -- 19.

Q. (BY MR. WYNNE) At the time that you and Brian had entered into the February 2010 divorce, did you know that you would be going right back to the same house and living the exact same lifestyle?

A. Yes.

Q. Okay. I think the divorce decree is Exhibit 1.

A. Yes.

Q. And if you look on, I guess, Page 7 of 8 at the bottom, it lists the date that you and Brian would be separated as February 22nd, 2010, three days after the divorce.

A. Okay.

Q. Okay. Why did you write 2-22-10 as the date of



separation?

A.   I have no idea.

Q.   Okay.

A.   We were just reading it and we would ask each other, "What should we put here?"  And that's how we did the whole thing.

Q.   And, so, if you were to look at -- at Page 7 -- and there's one about Brian on Page 5 that lists February 22nd, 2010, as the date of separation as well.  And -- and is it fair to say there's -- you can't recall or think of what the specific reason, if there was one, why you listed the date of separation three days after the divorce?

A.   Right.

Q.   Okay.  But if you look at this, it would indicate that both you and Brian intended to still live in the same address simply for three days, not years; is that accurate?

MR. FARAH:  Objection.  Form.

A.   You said if I -- if I read that, I would -- give it to me again.

Q.   (BY MR. WYNNE)  Okay.  And, so --

A.   Sorry.

Q.   -- the divorce decree was signed and executed on February 19th, 2010.

A.   Okay.

Q.   Do you agree with that?



A.    Yes.

Q.    And then it's noted in multiple places in the divorce decree that you and Brian would not be separated until February 22nd, 2010, three days after the divorce decree; is that accurate?

A.    (Moving head up and down.)

Q.    And, so, in the divorce decree, it's acknowledged that you are going to continue to live in the same address, just for a much shorter duration than -- than you're testifying to today.

A.    Yes.

Q.    Okay.

MS. DIONNE:    Is this going to be okay or do you need --

MR. WYNNE:    I don't need the face.

Q.    (BY MR. WYNNE)  I know what you look like.

MS. DIONNE:    Okay.

Q.    (BY MR. WYNNE)  And Brian was not your first marriage?

A.    No.

Q.    Okay.  You had a prior marriage to Terrance -- how do you pronounce the middle name?

A.    Lenole.

Q.    Lenole Robinson?

A.    Right.



Q.   Okay.  When did you get divorced from Mr. Robinson?

A.   I have no idea.  We were 18.

Q.   Oh, so, you were 18?

A.   Right.

Q.   How long had you been married to him prior to the divorce?

A.   How long have -- to --

Q.   How long was the length of your marriage to Mr. Robinson?

A.   We lived together maybe a month and then he went home.

Q.   Okay.  And how did you get married?  Was it at the courthouse with Mr. Robinson?

A.   Right, in Dallas.

Q.   Okay.  What about the divorce?  Was it go to the courthouse?

A.   I don't remember --

Q.   Okay.

A.   -- but I know we are divorced.

Q.   Yeah.  Did you live with Mr. Robinson at all post-divorce?

A.   No.  He -- no, no, not post-divorce.

Q.   Okay.  I'm just going through my notes right now. This is just to see whether I have any more questions.

                (V. Johns Exhibit No. 19 marked.)



Q.   (BY MR. WYNNE)  At the time of Brian's accident and subsequent death, did you still love him?

A.   Yes.

Q.   Did -- and you still viewed him as your husband in all respects?

A.   Yes, sir.

Q.   And was he a good and loving father to Hailey?

A.   Yes.

Q.   Okay.  And his anger issues that you had mentioned before, had you and him been working those out over time?

A.   Yes, sir.

Q.   Had you forgiven him for that?

A.   Oh, yes, sir.

Q.   And would you agree with me that it would be unfair for someone who didn't know you or didn't know Brian to hold against either of you your past relationship if you had worked it out?

A.   Yes.

MR. WYNNE:  Do you have any other questions, Mike?

MR. BREM:  I do not.

MR. WYNNE:  Okay.  Do you?  Because I was going to pass to someone else while I review my records, but --

MR. SHABOT:  Want to take a short break?

MR. WYNNE:  Yeah.  We're on -- I mean, might as

well stay here.  I'm going to be two minutes, if that.

Q.   (BY MR. WYNNE)  When did you start working at Hess?

A.   November -- November the 5th or something like that, this year.

MR. FARAH:  Or 2014?

THE WITNESS:  2014, yes.

Q.   (BY MR. WYNNE)  Okay.  And where -- where is Hess located?

A.   14 -- 1501 McKinney, Downtown Houston.

Q.   Oh, you're right next to me.

A.   I just saw that on something.

Q.   I think earlier in your deposition you testified that Brian referred to himself as your husband in the presence of your mother.

A.   Uh-huh.

Q.   Is that accurate?

A.   Yes.

Q.   Okay.  Was that the only person that you're aware of that you saw Brian refer to himself as your husband in front of?

A.   At those doctors --

MR. FARAH:  Objection.  Form.  Go ahead.

A.   At those doctors' offices when they were trying to explain what his issue is and what steps they wanted to take to rectify his situation, he would say, "Can you explain it to my



wife?"

Q.   Okay.

A.   So --

Q.   Anyone else besides doctors and your mom?

A.   Whenever he introduced me to somebody if we're somewhere, "This is my wife, Vicki."

Q.   Okay.  Would you say that everyone he introduced you to --

A.   Yeah.  Yes, sir.

Q.   -- he referred to you as his wife?

A.   As my wife, yeah.

Q.   Okay.  And that was after that February 2010 divorce?

A.   Right.

Q.   Can you give me any specific names?

A.   Those doctors, Jeanette Briscoe, my mom, just, like, a lot of people.  Terrance, the guy that works with him, of course, and Brandon.  Just anybody, like, we're having a conversation with or he's talking to, "This is my wife this, my wife that."  He never called me by my name.  It was always "my wife" or "my love."

Q.   Okay.  You seemed to indicate early in the deposition that Brian was responsible for each of the times you had gotten evicted from apartments during your marriage.  Did -- do you feel like you had anything to do, however great or however small, with why you and him were evicted?



A.   We were evicted from the houses because Brian damaged the homes.  So, to answer your question, no, I was never responsible for our evictions.

Q.   Okay.

A.   Each one of the owners would ask me to stay because I explained to them I couldn't afford this house on my salary.

Q.   Okay.

A.   And the fact that I wasn't fixing to leave my husband.

Q.   Do you think that's kind of an odd question to ask some -- a wife, if we --

A.   Well, because he knew --

Q.   -- kick your husband out, but you stay?

A.   He knew of the domestic issues.  He know that's why the hole was in the wall.

Q.   Okay.

A.   So, he asked was I okay and do I -- do he need to call some -- you know, he was really trying to know if -- he needed to know if he wanted -- if I needed a safe way out.

Q.   Yeah.

A.   Do you know what I mean?

Q.   Okay.  And how -- how soon after punching a hole would it be fixed, if ever?

A.    I don't know how soon, but we went to Home Depot and bought the stuff and he fixed it.



Q.    Okay.  What are the names of the individuals, if any, besides you and Brian who would have physically seen the holes in the wall?

A.    Nobody.

Q.    Okay.  It would --

A.    Just -- well, the owners.

Q.    The landlords and you two.

A.    Yes.  Right.  Yes.

Q.    And you said Brian had a Facebook account?

A.    Yes, sir.

Q.    Do you recall generally when he would have obtained that Facebook account?

A.    I have no idea.  Somebody told me and I questioned him about it.

Q.    Okay.  I don't have a Facebook account.  My wife does.  The truth is I spend significant time on her Facebook account looking at pictures and whatnot.  Did you ever do that with Brian?

A.    No.

Q.    Okay.

A.    I didn't -- he hid it from me.

Q.    Okay.

A.    Somebody saw him on Facebook and then they mentioned it in a conversation.  Then I asked him about it.

Q.    Okay.



A.    So, then was forthcoming and showed it, but --

Q.    And did he show you his Facebook account?

A.    Yeah.  Like, I saw pictures of -- of Corey, me and the baby --

Q.    Okay.

A.    -- stuff like that.

Q.    Was there anything on his Facebook account that you saw that you were upset about or angry about?

A.    No, because I didn't scan it.  I -- I just happened to look over his shoulder.  He showed me -- once I realized he wasn't trying to hide it, it wasn't of interest to me.

Q.    Did you ask him why he had a Facebook account and why he didn't tell you about it?

A.    I just asked, "Why you didn't tell me?"  Not that I care because I just -- he loves the computer.  I don't -- I do it at work.  That's enough.

Q.    And what was his reasoning for not telling you?

A.    I have -- I don't remember.

Q.    Okay.  When you went to the hospital after Brian's accident, did you ever sign into any logbook or identify yourself or leave a record that you were there, a contemporaneous written record that you were there?

A.    I don't remember signing anything.

Q.    Okay.  And did you ever communicate with any of Brian's doctors?



A.   No, sir.

Q.   Did you ever get any portion of the life insurance proceeds on Brian's life?

A.   No, sir.

Q.   Were you aware that $25,000 was supposed to go to you through a temporary restraining order or a temporary injunction --

A.   No.

Q.   -- entered in that case?

A.   No, sir.

Q.   No one ever told you --

A.   No one ever told me.  I've never seen a document.

Q.   You never got a check?

A.   Never.

Q.   Okay.  And were you aware that there's a final judgment against you in Corey's favor where you owe Corey $60,000?

A.   Why would I owe -- no, to answer your question.  Why would I owe him some money?

Q.   For attorneys fees and the 25,000 that went to you.  No one ever told you that?

A.   No.

Q.   Are you aware that you've had that judgment against you for about a year and a half --

A.   No.  I'm not aware of anything like that.



Q.   -- and that he executed on?

A.   No.

Q.   Okay.  What control did you have over Brian's funeral, meaning the ceremony, the -- the programs, any of it?

A.   It was already done.  Every detail was already done by his sister when I got there.

Q.   Okay.

A.   All I had to do was sign the -- the portion that life -- MetLife told me to sign.  It was already -- they already had them printed.  When I -- she showed me what the family came up with and I immediately saw that my name was nowhere on it.  They had a thank-you on the back to Vicki Johns and I was, like, "Let me make sure I'm understanding what Dow was telling me and what you-all showing me.  If I'm paying for my husband's funeral, why wouldn't" -- "my name not be on here?  Like, even if it was an error that the funeral home is making, then fix it."

     So, then they reprinted the obituary --

Q.   Yeah.

A.   -- and --

Q.   And that's what I was -- that was -- is that the only exercise of power, control, or authority that you exhibited during the -- the funeral process?

A.   To my knowledge.

Q.   And the reason I'm asking is it's my understanding



that there were two separate sort of funeral programs or two separate obituaries.

A.   There was supposed to only be one.  They had one -- because, remember, they've excluded me.  When Dow calls me and say, "There's been a situation.  We just got our documentation. You are the beneficiary.  We need you to go out there" -- when I got there, the obituary's already done.  Only thing they had to do was have the service.  They had everything done.

Q.   Okay.

A.   So, I had them to cancel the -- well, at least that's what they told me they were going to do.  But, again, they let me know where they were in support of his family, but they did -- because I told the lawyer -- I said I wouldn't sign this so that he assured me that he would change it.  So, I didn't know that the other one still existed.

Q.   Okay.  Did the funeral home or the -- the financial entity, Jefferson Financial or whatever up there -- did they ever come back to get reimbursement from you for -- for -- for the cost of the funeral?

A.   No.  I --

Q.   And I'll tell you, the reason I'm asking is after the life insurance case was resolved, they tried to get me to pay back those funeral sums and I wasn't -- and I told them no, and I wanted to see whether they'd ever came after you or you had repaid those.



A.   No.  First thing, I didn't know how much the funeral cost, so -- I don't know who Jefferson Financial is.  I -- I signed a paper at the funeral home.  There was no financial person there.

Q.   Okay.

A.   So, I'm clueless to what you're telling me.

Q.   Okay.  Trina Gray, that's the name of your aunt?

A.   Yes, sir.

Q.   And she's the -- the individual that has the -- the family Christmas party each year?

A.   Yes, sir.

Q.   Between 2007 and Christmas of 2011, did Brian go to each and every one of those family Christmas parties?

A.   Not each and every one, no.  He went to about three.

Q.   Okay.  And do you know which years he went?

A.   I think the dates are on the photos.

Q.   Okay.  And do you still have access to those photos?

A.   Some of them, yes.

Q.   Have you made any effort or attempt to acquire those photos?

A.   Uh-huh.  I've already given them to my lawyers.

Q.   Okay.  You have -- you mentioned a Twitter account, the Instagram account.

A.   Uh-huh.

Q.   Any other electronic media accounts or websites or



services you've ever used?

A.   Have -- I said Instagram and Twitter.  The one where you're looking at people to talk, Skype.

Q.   Skype?

A.   I don't know the password or anything, but I used to have Skype.

Q.   Okay.  Anything else?

A.   And there's a new one.  I don't know.  My sister calls me on video -- something.  I don't know what it's called.

Q.   FaceTime or --

A.   No.  I don't have an iPhone.  It's something like Insta -- I mean, like Skype, but it's called something different.

Q.   Okay.  Is it a program where you can type information about yourself and, you know, show everybody or is it merely a program where you can get on --

A.   It's Google -- Google -- GoogleTime or something?

Q.   Is it -- is it a program similar to, like, Skype or just --

A.   Yeah.

Q.   Realtime communication, face to face?

A.   Right.  Right.  Exactly.

Q.   Not something that you would put information about yourself on.

A.   No.  No.  No.



Q.   Okay.  Obviously, based off your testimony, you and Brian had some issues over the course of your marriage.

A.   Yes, sir.

Q.   Even with those, how would you characterize Brian Johns as a human being?

A.   Brian was a very sweet person.  He was very -- he was a great provider for his family.  He was -- he was very strong and protective.  Like, if we're out somewhere and -- you know how people want to come up to you and touch your baby's face?  He was -- "Don't touch my baby."  He just wouldn't even let people touch her.  He was just that protective of her, but he was so gentle.

Q.   And was he protective of you to third parties?

A.   Absolutely.  Absolutely.

Q.   And, so, the issues you talked about with Brian were simply issues that he had with you as a result of your marital relationship.

A.   Right.  He --

MR. FARAH:  Objection.  Form.

A.   Brian had -- for some reason, he held -- like, he even thought that his siblings were -- the girls were jealous of him because their husbands couldn't be as good as he was, but that's his -- that was him.  They never treated him like that.  I don't know why he felt so strongly about that.  And I would -- he'd say I would defend them instead of him.



Q.   (BY MR. WYNNE)  Uh-huh.

A.   I just tell you when you're right or when you're wrong.  That's what I'm supposed to do.  I didn't sugarcoat with him.  When he was wrong or disrespectful to somebody, I would tell him that.  Cursing out his sisters, that's not what you're supposed to do.  So, he felt like I was, you know, taking their side.

Q.   Okay.  And if you were going to sort of, 30 seconds or less, paint a picture of Brian Johns as a husband, father, worker, human being, what would you say about him?

A.   He was committed in all those areas.  He had anger issues in all those areas, but at the same time, he -- he acknowledged them and was trying to work on them.  He knew -- he knew when he made a mistake.  He was learning to admit them and apologize for them.  So, he was really trying to make amends.  He really, really, really was trying.

Q.   Okay.  I don't think I have any other questions for you, so I'll pass.

(3:33 p.m.)

FURTHER EXAMINATION

BY MR. BREM:

Q.   I have two.  You said earlier that you knew you had been served in a lawsuit brought by Corey Johns.

A.   Yes.

Q.   You knew that, right?



A.   Yes.

Q.   Did you not know that you lost that lawsuit?

A.   No, I didn't know that.

Q.   Did you -- do you know that the court awarded Corey Johns $60,000 against you?

A.   No.

Q.   That's all I have.  Thank you.

A.   Okay.

MR. WYNNE:  And no other questions from me.

MR. SHABOT:  I don't have any.

MR. FARAH:  We'll reserve all our questions for the time of trial.  Thank you.

(Deposition concluded at 3:33 p.m.)



CHANGES AND SIGNATURE

PAGE        LINE        CHANGE                    REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

        I, VICKI JOHNS, have read the foregoing deposition
and hereby affix my signature that same is true and correct,



except as noted above.

_____

VICKI JOHNS

THE STATE OF _____)

COUNTY OF     _____)

Before me, _____, on this day personally appeared VICKI JOHNS, known to me (or proved to me under oath or through _____) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, _____.

_____

NOTARY PUBLIC IN AND FOR

THE STATE OF _____



NO. 415,980-401

FRANCES SOWELL, INDIVIDUALLY AND )    IN THE PROBATE COURT
AS AN HEIR OF BRIAN EDWARD JOHNS,)
DECEASED, AND AS ADMINISTRATOR    )
OF THE ESTATE OF BRIAN EDWARD     )
JOHNS, DECEASED; COREY JOHNS,     )
INDIVIDUALLY AND AS AN HEIR OF    )
BRIAN EDWARD JOHNS, DECEASED      )
      Plaintiffs,                 )
                                  )    NUMBER ONE (1) OF
JAMES JOHNS, SR.                  )
      Intervenor,                 )
                                  )
VICKI JOHNS, INDIVIDUALLY         )
AND AS AN HEIR OF BRIAN           )
EDWARD JOHNS, DECEASED            )
      Intervenor,                 )
                                  )
VS.                               )
                                  )
THE DOW CHEMICAL COMPANY,         )
ROHM AND HAAS COMPANY, ROHM       )
AND HAAS TEXAS INC., TIM FOX, AND)
JULIO RODRIGUEZ                   )
      Defendants.                 )    HARRIS COUNTY, T E X A S

                    REPORTER'S CERTIFICATION
                    DEPOSITION OF VICKI JOHNS
                         JANUARY 9, 2015

     I, Shanon M. Hair, Certified Shorthand Reporter in and for the State of Texas, hereby certify to the following:

     That the witness, VICKI JOHNS, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

     That the deposition transcript was submitted on _____, 2015, to the witness or to the attorney for the witness for examination, signature and returned to me by _____, 2015;

     That the amount of time used by each party at the deposition is as follows:

          MICHAEL L. BREM, ESQ. - 1:55
          BOB WYNNE, ESQ. - 2:27



That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Bob Wynne, Esq., Attorney for the Plaintiffs;

Benjamin Shabot, Esq., Attorney for the Intervenor, James Johns, Sr.;

George K. Farah, Esq., and Sarah C. Dionne, Esq., Attorneys for the Intervenor, Vicki Johns, Individually and as an Heir of Brian Edward Johns, Deceased.

Michael L. Brem, Esq., Thomas J. Morel, Esq., and Michael P. Foradas, Esq., Attorneys for the Defendants, The Dow Chemical Company, Rohm and Haas Company, Rohm and Haas Texas Incorporated, and Tim Fox.

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this 15th day of January, 2015.

_____
SHANON M. HAIR, Texas CSR 6513
Expiration Date: 12/31/15
ESQUIRE DEPOSITION SOLUTIONS
Firm Registration No. 03
1001 McKinney, Suite 560
Houston, Texas 77002
(713) 524-4600



FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on _____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to Michael L. Brem, Esq., Custodial Attorney;

That $    is the deposition officer's charges to the Defendants, The Dow Chemical Company, Rohm and Haas Company, Rohm and Haas Texas Incorporated, and Tim Fox, for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on _____ and filed with the Clerk.

Certified to by me this _____ day of _____, 2015.


_____
SHANON M. HAIR, Texas CSR 6513
Expiration Date:  12/31/15
ESQUIRE DEPOSITION SOLUTIONS
Firm Registration No. 03
1001 McKinney, Suite 560
Houston, Texas  77002
(713) 524-4600



NO. 415,980-401

FRANCES SOWELL, INDIVIDUALLY AND *    IN THE PROBATE COURT
AS AN HEIR OF BRIAN EDWARD JOHNS,*
DECEASED, AND AS ADMINISTRATOR   *
OF THE ESTATE OF BRIAN EDWARD    *
JOHNS, DECEASED, COREY JOHNS,     *
INDIVIDUALLY AND AS AN HEIR OF    *
BRIAN EDWARD JOHNS, DECEASED,     *
                                *
VS.                           *       NUMBER ONE (1) OF
                                  *
THE DOW CHEMICAL COMPANY,        *
ROHM AND HAAS COMPANY,           *
ROHM AND HAAS TEXAS INC., TIM    *
FOX, AND JULIO RODRIGUEZ        *   HARRIS COUNTY, TEXAS

NO. 415,980

IN RE: THE ESTATE OF          *    IN THE PROBATE COURT OF
                              *
BRIAN EDWARD JOHNS,            *    HARRIS COUNTY, T E X A S
                              *
DECEASED                    *    COURT NUMBER (1) ONE

INTERVENOR'S MOTION TO COMPEL AND CPS'S
MOTION TO QUASH SUBPOENA HEARING

         Came to be heard on this the 24th day of
September, 2015, Intervenor's Motion to Compel and CPS'S Motion
to Quash Subpoena Hearing, in the above-entitled and numbered
cause, and all parties appeared in person and/or being
represented by Counsel of Record, before the Honorable Loyd
Wright, Judge Presiding.

               VOLUME _1_ OF _1_

            O R I G I N A L

APPEARANCES

ATTORNEY FOR THE BRIAN EDWARD JOHNS' ESTATE AND FRANCES SOWELL, INDIVIDUALLY AND AS ADMINISTRATOR, AND COREY JOHNS, INDIVIDUALLY:

                Mr. Robert P. Wynne
                State Bar No. 24060861
                Mr. Rusty Hardin
                State Bar No. 08972800
                1401 McKinney, Suite 2250
                Houston, Texas 77010-4000
                Telephone:  713-652-9000

ATTORNEY FOR DEFENDANTS, THE DOW CHEMICAL COMPANY, ROHM AND HAAS COMPANY, AND ROHM AND HAAS TEXAS INCORPORATED:

                Laura Jones
                State Bar No. 0787500
                700 Milam, 10th Floor
                Houston, Texas 77002-2810
                Telephone:  713-221-2500

ATTORNEY FOR INTERVENOR, VICKIE JOHNS:

                Juan Luis Guerra
                State Bar No. 24031407
                George Farah
                State Bar No. 24040882
                Sarah Crystal Dionne
                State Bar No. 24072229
                4101 Washington Ave., 3rd Floor
                Houston, Texas 77007-5635
                Telephone:  713-529-6606

                Jason Ostrom
                State Bar No. 24027710
                6363 Woodway, Suite 300
                Houston, Texas 77057-1714
                Telephone:  713-863-8891

THE COURT: Let's have announcements.

MR. WYNNE: Bob Wynne on behalf of the Estate of Brian Johns, Corey Johns and Francis Johns, the Plaintiffs in the case.

MS. YOUNG: Bobbie Young. I was subpoenaed to be here and I filed a Motion to Quash the Subpoena seeking a court order.

THE COURT: Okay.

MS. DIONNE: Sarah Dionne on behalf of the Intervenor, Vickie Johns.

MR. OSTROM: Jason Ostrom on behalf of Vickie Johns.

MR. FARAH: George Farah and behalf of Vickie Johns.

MR. GUERRA: Juan Guerra on behalf of Vickie Johns.

MS. JONES: Laura Jones on behalf of Defendants.

MR. WYNNE: Rusty Hardin is also on behalf of the Plaintiffs as well, Your Honor.

THE COURT: Okay. So we have a Motion to Compel Discovery Responses.

MR. WYNNE: I figure it makes some sense that since the last time we have been here there has been some progress made and some of the issues have been narrowed down and the immediate thing we are here for is two motions, so if

you don't mind, I would like to give you a little bit of where we are in the case.

So, as you know, Brian Johns died as a result of an industrial accident back in August of 2012 and that led to a lawsuit against his employer and the other owners-operators of the industrial facility down in Deer Park. In addition to the three parties that I represent, the Estate, Brian's mother and brother's adult son, Brian's ex-wife filed a claim against the Defendants and Brian's father filed a claim. All the claimants have settled all the claims against the Defendants and we are just waiting to paper up some documents on that and so really the only issue -- live issue that's left for the Court or left for a jury trial or any resolution is the issue of the allocation of the settlement proceeds between the five beneficiaries and then, two, whether the ex-wife is, as she purports to be, the common-law marriage of Brian at the time of his death. And that's really the two issues and what we have narrowed down. And I expect sooner rather than later all that paperwork will be done and we will back in front of the Court to get an approval in the heirship proceeding.

As far as the two motions today, one of which applies to Ms. Bobbie Young, who is an attorney, what we have discovered through the course of this lawsuit is that the ex-wife at the time before -- maybe a year or so before Brian's death to about six or seven or eight months after Brian's death

had a separate adoption proceeding and a separate intervention proceeding in a parental termination case in this Court, not in Probate One but in Harris County. In that case, she legally took the exact opposite position, under oath, that she takes in this lawsuit. There she says, and you have to say this is a matter of law, that I'm not married, I don't live with Brian Johns, and I have no agreement with him to be married, and, in fact, this child that I'm seeking to adopt in no way, shape or form lives or has any connection to Brian Johns. Now, four years later when there is money on the table, the ex-wife takes the exact opposite position, and not just with respect to herself, but with respect to the child who is not even actually adopted until seven months after Brian died. And so one of the things that we are trying to do in proving that up for a summary judgment on judicial estoppel, because frankly, Judge, you can't swear under oath on Monday that the sky is blue and then swear under oath on Tuesday that the sky is red and get away with it. So what we want to do is prove up the lies in a court of law. Part that have is, we want the discovery record where Ms. Johns swears under oath to these facts so that we can come in here and prove them up, show them to the Court, and hopefully get this case resolved sooner rather than later so we don't have to spend too much more time in the jury trial. So that's the basis of the motion against Ms. Young to get those records and the relevance of it.

At the same time, the ex-wife has filed a Motion to Compel against my clients. And basically what she is seeking is, this isn't one of those fishing expeditions, this one of those let's dredge the lake and just see what we can find. For instance, there is a couple of things I understand that we are really in dispute about. The first one is she wants the employment records from Brian's mother. From a substantive standpoint, I'm not sure what Brian's employment records have to do with whether Vickie was married to Brian, whether they held themselves out, whether they lived together. And to make matters even more drastic, Judge, Francis Sowell is 70-something years old, I don't think she has worked since 1996, which is twenty years before Brian died, so I don't see how that is any way possibly relevant to this case. Then they asked for Cory, the son's college education records. Again, I'm not sure what a 25-year-olds college transcripts and college education records have anything to do with whether this woman lived with Brian, agreed to be married or held their self out to be married. And then the last category of documents that are really at issue is the ex-wife says, I want every piece of correspondence between Brian and his son, between Brian and his mom, and between Brian's mom and son, for the entire course of their life in regards to -- with no limitation on subject matter. Just by their very nature those requests are simply overbroad, Judge. And I have a 2003 case from the

Texas Supreme Court that says that right on point. And so what we are asking, Judge, is we would like you to deny Ms. Young's Motion to Quash, allow us -- and give a signed order that provides her coverage under the law, allows us to get the documents that I think are going to dispose of this case finally in a very neat fashion, and then I would ask that you would deny their Motion to Compel because educational records, employment records, and every piece of correspondence between people over the course of forty years simply isn't relevant to were they married, did they live together, and that they held themselves out to be married. So that's the position. And I will turn it over to opposing counsel.

THE COURT: All right, thank you.

MS. YOUNG: Judge, I am Bobbie Young. I'm the attorney who was attorney ad litem for the child that was adopted in that CPS case. I filed a motion requesting that the subpoena be quashed and not have to turn those records over under Texas Family Code Section 251.201 they are confidential. I can't turn them over without a court order.

And aside from that, I'm also asking for attorney's fees, the cost of my drafting this motion and being here today. And I do have an order for however the Judge decides.

THE COURT: Okay. So you filed your Motion to Quash Subpoena and you attached an order. Is that -- do you

have something different than what was attached for me to deal with?

MS. YOUNG: No, Your Honor. If the Order on Motion to Quash is there, then that's the Order that I would ask you to review.

THE COURT: Okay. Well, I guess you would agree that if I -- I guess perhaps if I quash the subpoena, you might be entitled to your fees. But if I order the records turned over, then you probably wouldn't be. I mean, you just you brought this to the Court's attention because of the statute that requires you to not release those kind of documents except without a court order or without a court order?

MS. YOUNG: Your Honor, I brought it to the Court's attention for that reason. But because I'm a solo practitioner and I had to take time out to file this motion, it would be my obligation to file this motion, I understand that --

THE COURT: That's true, I understand.

MS. YOUNG: It is taking time away from me as an attorney to have to deal with this. I couldn't negotiate without --

THE COURT: And so what would you say -- did you include anything about your fees?

MS. YOUNG: I did not, Your Honor. But if the Court would like to hear some testimony from me, I would do so.

I think it took me about a couple of hours to talk to everybody involved, including the court where the orders were entered with regard to the adoption and to the county attorney and through my own separate research, because I want to be cooperative with the Court and with counsel but I have to do it under the law. So it did take me at least two hours to do that. My hourly rate is $300 per hour.

**MR. HARDIN:** Your Honor, if the Court issues the subpoena, we would agree to pay the attorney's fees, as I understand it, is $600, and that might take that issue off the Court's table.

**THE COURT:** Okay. And do you, for your side of it, do you have a proposed order?

**MR. WYNNE:** We do. It's basic as it can be, saying the Motion to Quash is denied. Part of the problem is like, before we got here, Judge, we actually had this phone call where we said we would agree to pay. We modified the subpoena to comply with the requests to switch it to the discovery file as opposed to the whole file, so the thought that, hey, Ms. Young has to come down because of something that we did and we weren't compliant, I mean --

**MS. YOUNG:** I didn't mean to imply that.

**THE COURT:** No, I understand. I think it's, to me, it's just the normal process of trying to get this issue before the Court.

MS. YOUNG: Right.

THE COURT: I don't view it in any other way. I think everybody is doing their job in other words.

MS. YOUNG: That's all.

THE COURT: So, if you do have a proposed order, I can either work off of --

MR. WYNNE: Judge, I know she had the proposed order. I think it just basically gives you the option of being sustained or denied, granted or denied.

THE COURT: Right.

MR. WYNNE: What I would suggest is, we just circle -- if you are going to deny the Motion to Quash, have her turn over the documents with the understanding of the agreement on the record that we will pay the $600 for it, I think we can just circle "denied" and "denied", and have it signed today to get this going.

THE COURT: Well, I will make the decision right after I go off the bench. I will look at it. I don't think I need until tomorrow. But I will look at it and make sure I understand everything about the relief requested and both parties will know something by four PM.

MS. YOUNG: And Your Honor, if I'm ordered to turn the documents over, if I could have a time certain in which to do that, and also, I have a case across the street that they are waiting for me on.

**THE COURT:** I will do that. And you can be excused and I will give you a time certain. Any thoughts on the timing of it if I agree with you?

**MR. WYNNE:** It depends on how voluminous it is, so if it's not much --

**THE COURT:** By the way, is there a further response to all of this?

**MR. FARAH:** We are on the Motion to Compel, Your Honor. Plus, we weren't even put on notice of this motion.

**MS. YOUNG:** I didn't know about them at all.

**MR. FARAH:** This is the first time we are hearing about all of this right now.

**THE COURT:** So nobody else wants to speak up about the issue that we are talking about right now?

**MR. OSTROM:** Well, the problem is, Your Honor, we don't know if those records have any relation to Ms. Johns. And to the extent there is something we need to assert, we have not seen those.

**THE COURT:** Okay.

**MR. OSTROM:** So right now we are left with this subpoena to compel that we have not been afforded notice of and so we really don't know what the next step is going to be after these documents are produced. Apparently, they want to use them for a summary judgment. Maybe we have an objection to them, maybe we don't. We don't know right now.

MR. WYNNE: Judge, here is the problem with that, I mean, your client's discovery response is that you have an obligation to produce and you haven't, so we are having to subpoena third parties to get them. So if you will simply tell your clients ex-lawyer who has the right to the file to turn over the entire file, then there is no need to subpoena anyone, because it's her works. So it's a little -- sir, I'm a little taken aback by the fact that --

THE COURT: Well, if I order the records turned over, I will instruct everybody to have a copy of what's been turned over.

MR. FARAH: And Judge, we have tried to get these records.

THE COURT: Whether or not you should have a copy or not, I will order that turned over so everybody is on the same page about what's out there.

MR. OSTROM: Thank you, Your Honor.

MS. YOUNG: May I be excused?

THE COURT: Yes, you may. So what do we have left, your Motion to Compel?

MR. FARAH: He kind of presented our Motion to Compel for us, Mr. Wynne did, but I would like to present it from our perspective.

THE COURT: He is good at that, isn't he? Takes the ball and just runs with it.

**MR. FARAH:** Sure. But if you look at the Motion to Compel, Mr. Wynne is going past the most important part of our Motion to Compel. We served them with discovery on January 28th, 2015. The responses were due on February 28th, 2015. We didn't get the responses until June 5th, 2015. So under the Texas Rules of Civil Procedure, they waived all objections and privileges because they didn't respond timely, so whatever objections he has are not valid at this point. And that's our main position, Your Honor.

**THE COURT:** But your theory is, parties get a divorce, and then somehow in that interim time before death there is a common-law marriage, right?

**MR. FARAH:** They get divorced and that same day are common-law married until his death. They go home together after --

**THE COURT:** Okay. Then so there is some, I don't know, buyer's remorse probably doesn't -- there is some remorse about it and that very day they somehow agreed to be married again?

**MR. FARAH:** It's not remorse, they planned ahead of time because of the adoption process.

**THE COURT:** Oh, there was some adoption process to this. I guess all I'm saying is, all I'm trying to get at is, are you asking for records prior to the divorce? Are all of these records post formal divorce? I mean, I was thinking I

was nearing something that you were going back in time to point to when it doesn't seem to be relevant to a common-law marriage.

MR. WYNNE: So for Brian's mother who --

THE COURT: Hang on. Go ahead and let him finish.

MR. WYNNE: I was trying to explain.

MR. FARAH: I know he wants to do it all but, let's go request by request, okay? The educational records for Corey Johns, okay? We are specifically -- we can make our request more specific and I discussed it with Bob before this hearing, we are specifically requesting information on an administrative hearing that he was part of at Southern University where he was kicked out of Southern University for a crime he allegedly committed and what we are trying to find is my client you wrote a letter on their clients' behalf, saying that she was the stepmother of this individual or Corey Johns, and that she would make sure that he would stay out of trouble and that they were living in her and Brian's Johns' home, and so an on and so on. So that letter is post the divorce and very much relevant as to the elements of a common-law marriage. Because if there is this letter that she presented to the Court that says he is going to be living with me and his father in our home and I'm his stepmother, that's very much relevant to the common-law issue. So I don't see why that would not be

discoverable.

THE COURT: All right.

MR. FARAH: Especially since they blew the deadline to file their objections and to respond by four months.

THE COURT: Well, I'm not saying it is or not. I haven't decided. I'm just trying to hash it out.

MR. FARAH: I know that. I just wanted to remind you of that. And then we got -- so then we have got No. 17, or sorry, No. 20, a signed copy of the authorization to obtain employment records for Francis Sowell who is the Administrator of the Estate. Well, okay, in this case, there is testimony and evidence that Mrs. Sowell planted a password at the hospital so that certain people couldn't come in and out of the hospital to visit Brian. Well, my client said that she tried to go visit her husband. But because she didn't have -- they didn't give her the password, she could not get past the desk to go see her husband and talk with him and meet with him. And we are trying to establish, which we have a reason to believe, that she has strong relationship at that hospital that gave her that power to exclude Vickie from seeing her husband while he is on his death bed. And that's very much relevant because at trial they are going to argue that she didn't even come and try to see her husband at the hospital while he is being treated for these serious burns, which is absolutely

untruthful and we think those records are relevant as to Mrs. Francis Sowell's credibility. I mean, in her deposition, 26 pages to try and identify her work history, she was avoiding every question. She would not give me the information to straightforward questions like, where did you work? Give me all the hospitals you worked at as a nurse. What capacity did you work? And she was completely evasive. So we reason to believe that she is not being cooperative and hiding something that we think is relevant in this case. And that was No. 20, Your Honor, Request No. 20, which is in the Motion to Compel.

And then we have Request 22 through 26. And we can narrow this down. We did ask for broad requests but we can narrow it down from the period of time that Vickie and Brian first got married in 2007 until his death in 2012, a five-year period, of e-mails between the family members and these requests. And I will tell you why that's important. Brian and Vickie were legally married for three years and in those three years there was complete resentment and hatred towards Vickie from the family while they were legally married. So from the beginning, she was not welcome in the Johns family. And she had to fight and fight and fight to show that she was part of this family. And there is an e-mail that she wrote to the family asking them to stay out of her and Brian's relationship, to let them live their lives and be peaceful and happy and move on with their lives. That was the only e-mail produced by the

Plaintiffs in this case. We believe that there was e-mails going back and forth between the family members after receiving this e-mail. And other e-mails that will show that Brian and Vickie were married or that they didn't know Brian and Vickie were divorced. And we think that's relevant to some of the elements to establish a common-law marriage.

So, you know, we can narrow the scope. Instead of any and all for infinity, from 2007 to 2012, I have no problem doing that. And that's it, Your Honor. That's all we got.

THE COURT: Anybody else?

MR. WYNNE: May I calmly respond, Judge?

THE COURT: Sure. I have never seen you any other way.

MR. WYNNE: I appreciate that.

THE COURT: I don't know if that's true, but go ahead.

MR. WYNNE: What I would like to do is address a little bit of each of these things, because I just don't agree with many of the things that were just said. The education records Mr. Farah referenced an administrative proceeding at Corey's school, there is nothing in this entire record that supports that statement. In fact, in Ms. John's deposition we asked her about it and the only thing she said was that after Corey got into trouble at school I went with Brian to pick him

up. Well, guess what? Corey has been deposed twice in this case and he said the exact same thing. In fact, I have the deposition and I can show you that everything matches and there is not a single shred of testimony about some letter. And truthfully, if there was a letter, how come no one can tell us who it was sent to, when it was sent, you know, why doesn't she have a copy of this if it was from 2010 or 2011? She has no information about this letter except what her counsel says now. So what we are going to do, what they are proposing is, Judge, this young man has protected federal rights under FERPA to these educational records. This woman who has got a claim for money, her lawyer says that there is a letter, so now, Judge, issue a subpoena directed by the State of Texas to an institution in the State of Louisiana that's protected by federal FERPA law so we can get what? A letter that no one has any details about. So I would say that that goes straight to the heart of a fishing expedition.

The employment records of Mrs. Sowell, again, she has been deposed twice in this case. She was asked these exact questions. In her deposition, I have that right here, Judge, I will show it to you as well, she was asked, "Did you know anyone at the hospital before Brian got there when he was injured? No." What she testified is that she worked with a famous burn doctor, Dennis Blocker, down in Galveston, in the late 70's and 80's. That's it. That's her connection. Oh,

and by the way, Dr. Blocker, he died in 1984, and the hospital she worked at shut down in 1996. So again, like this secret password, she was asked about all that in deposition. She said the hospital gave her a password and she gave it to her kids because that's who she needed to give it to. I'm not sure this nefarious plot to keep someone out is coming from, but in any event, there is just simply no relevance to those.

And then in the correspondence, there is only one piece of correspondence that our client has that in any way came from Ms. John's, Vickie Johns, or that references her. We produced it. In their deposition they were asked, it seems Vickie had no presence at all in this family, and Corey Francis says, yeah, that's right, she didn't, we just didn't even know she existed. And what is most important is, it's funny because Vickie Johns, the ex-wife, hasn't produced a single piece of correspondence between the family. I mean, she has not produced a single e-mail between her and her purported husband over the course of three years. Not a single letter. Not a single phone call. Not a single text. Nothing. And so what she is trying to do is say, well, I can't find anything even though I was married to him for four years so y'all must have something, so give me everything under the sun. I mean, there is no time limitation. There is no subject matter limitation. And frankly, when you look at the volume of stuff that we have produced, and we have given them seven authorizations, they

didn't even know what Brian's bank accounts were, his employment records. We identified it for them and signed authorizations giving it to them. The only the two authorizations that we had a problem with were employment records from 20 years ago and educational records from a young man that had nothing to do with this case.

And so, Judge, they talk about this waiver argument, and so I want to address that on two bases. We were in here for the first six months of this year arguing about the Plea to the Jurisdiction and our Motion for Summary Judgment. They had asked for discovery during that same time period and I had told them that we were not putting anyone up for depositions or producing discovery until that is ruled on. When that was ruled on, we immediately produced all our documents and we turned over our stuff, and so under that waiver there is a clear exception for a great cost. I think if there is ever a case for that, it's this one.

And then secondly, if you will notice, I believe that the exhibits, the discovery exhibits filed by his ex-wife are not signed in the record. Under Rule 191.3, the Court cannot enforce an unsigned discovery piece of evidence. So whatever it is, it's unenforceable at this point. And so there is a ton of grounds to simply deny this. And it is not as if they haven't deposed the people or gotten the documents that really are relevant, cellular phone records, bank accounts,

things that would show what the nature of the relationship was. So at that point, Judge, I will pass.

**THE COURT:** All right.

**MR. FARAH:** Judge, just because there are pending motions doesn't give him the unilateral right to hold off on actual discovery. Okay? He could have asked for a Rule 11 Agreement. There is several ways you can handle that. He can't just say, look, let's wait until after these motions are heard and we get a ruling and then we will answer your discovery that we sent you four or five months ago. It doesn't work like that.

Second, these authorizations he was talking about, we just got these authorizations four weeks ago, because we have to call them and e-mail them and ask them for these authorizations over and over and over again, and finally they decided, all right, we will send you these authorizations a few weeks before this Motion to Compel here. This was nine months after we sent out the Request for Production for these authorizations. And now they are trying to make it seem like they have been willing advocates in this case, producing documents. They have been contesting this thing since January. These were due in February and now we are in September. He can't unilaterally state we are not going to ask for these until after the motion, after our motions are ruled on.

On some of those other points, we are not asking

for subpoena. Why not give us an authorization and we will look at the records from the hospital, the son's records from the hospital? And give us an authorization and we will go get the administrative records from the administrative hearing at Southern University in Baton Rouge. We have a right to discovery to prove up our case. It's our burden of proof and we can't prove up our case without evidence, and they are preventing us from us getting that very evidence. And that's all we are asking, Judge. We are just asking for the opportunity to get the evidence to prove our case. I pass.

**THE COURT:** All right. I will just look at it and probably come up with a definitive response by tomorrow afternoon.

**MR. WYNNE:** Judge, what I would like to do is I would like to hand you copies of Corey Johns' deposition where it's marked where he is talking about the educational administrative incident in connection with Vickie showing up, Vickie Johns' deposition that corroborates one hundred percent Corey's deposition, and then also Francis Sowell's deposition marked where it shows where she is talking about specifically saying, under oath, that I haven't been working since '96, and I didn't know anyone at this hospital at the time we got there, and talking about how she got the password and what she did with it, which I think almost conclusively rebuts a lot of those arguments, Judge.

THE COURT: Do you care if I have that? I have already heard that but it's just part of what I'm going to look at as I look through these requests and whether I ought to grant the Motion to Compel in certain respects or all respects or not.

MR. OSTROM: Your Honor, I think the only concern I have about this is that we are taking the word of an interested witness. Those people are who we are going to depose and, yeah, they may have deposed in their deposition or testify at trial, they may have deposed in their deposition we knew nothing about an administrative hearing, but it sure in the hell would be interesting that when we get those records that there was, in fact, an administrative hearing and he lied under oath. The jury is going to hear about that --

MR. WYNNE: Whoa, whoa, don't call my client a liar.

MR. OSTROM: So that's the point. They can say whatever they want to say. But we have a right to verify that through third parties, through other institutions, through e-mails that they say, well, this was all about Johns. Well, there may be an e-mail that doesn't mention, quote, Johns, or Vickie Johns, and it's just between son and mother complaining about the Decedent's choice of women. You know, we are not -- it's not incumbent upon us to figure out exactly the phraseology that's in there. That's part of the discovery

process, so I'm not sure how this stuff is relevant to a decision on whether, you know, this is something that's discoverable or not. I think the questions are in the scope.

The other thing that wasn't mentioned is that, you know, ultimately there will be a trial if the Court doesn't grant some summary judgment one way or the other, ultimately, there will be a trial about apportionment of damages that goes to the relationship, the relationship all of these individuals had with the Decedent and their relationship amongst each other. And the jury is going to hear all that. And I think this, the e-mails, and the -- and what they -- what she did for the family or didn't do for the family all becomes relevant at that stage. So I think there is really kind of two parties. We are looking at the common-law spouse, but once you get past that, you are going to try a case on proportionment and relationship. And all of that evidence is going to be contained in the same group of documents.

MR. HARDIN: What authority do you have the authority to compel somebody to turn over federally FERPA protected material, because it's not about the issue of the subpoena over there or going that process, they want to take a shortcut and have you compel us to have a student's records turned over, and I'm not sure how they get there.

THE COURT: Yeah, that's an interesting argument. There have been other instances where, you know, a

state court judge is essentially being asked to potentially violate what federal statutes would tell him or her.

MR. HARDIN: Right. And so for that reason also, we would ask the Court to deny it. If they want to try to get it, they could always go through to trying to subpoena on a third party or so, something that, as Mr. Wynne has said repeatedly, we can't find any evidence that it ever happened. Part of the reason for all of these authorizations that we have even given them for stuff that we don't even believe is discoverable was to try to keep our trial date, because they threatened to come in and ask for a continuance if we didn't sign these authorizations that allowed them to get this.

As you know, we were ready to go to trial in the fall of last year, back when Dow was still in it. They have intervened and the Court, as I understand, granted it and my memory is the trial was moved to May. Now we are in November and this family, this has been going on for quite awhile, and so we have been trying to do anything. That's why I stand up and volunteered to pay her attorney's fees. We are trying to do everything we can to make sure we hold that trial date for this family has been waiting a couple of years, and to ask this Court to compel us to violate -- to turn over federally protected material when there is absolutely no showing that is relevant to anything. Keep in mind what he just said, that even if there had been such an administrative hearing, it had

nothing to do as to whether she was the common-law spouse. They want to compel -- they want to know about a letter that she wrote. They haven't even shown how it would ever be admissible. A self-serving letter establishing one of the party's legal position in the litigation is not admissible. It's hearsay. It's not an admission of a party opponent. It doesn't come in. What they are asking you for is to compel us to give up certain rights so they can go see if there is an inadmissible letter that they can find. There is no evidence that it even exists. So we would respectfully ask -- he has given them on seven, I think, from nine authorizations. We drew the line with this one and a woman that has not worked for twenty years. They have absolutely no evidence from any source, forget that our client has denied it per se, but they have no evidence from any source that previous employment that ended some twenty years ago at a hospital that no longer exists is somehow relevant to her current claim that she resumed a common-law marriage after they dissolved the legal marriage.

At the end of the day, it's going to turn out to be a fraudulent claim that really subjects her to criminal prosecution, and so to have the trial delayed or us giving up certain FERPA protected rights in order to basically keep stretching out what is going to be determined a fraud on the Court. If the Court remembers, you lingered very hard on it as did the magistrate on this issue there has already been a

determination in another court in another proceeding she was not married. There was no common-law marriage. And we urge that, obviously, that that was the law of the case and that was it. The Court decided to grant the Bill of Review and that's how we are in this place to begin with. So now a woman who has been found not to be common-law married has now come up with these different claims and as an attempt to prove it wants us to give up federally protected rights and wants a state judge to order us to give up those rights in another state. With all that said and done, we respectfully ask to not be compelled to sign these authorizations. We will have to figure out, all right, what do we do? Do we give in on that or do we take that up on appeal and lose our trial setting? That's the Hobson's choice that we have got. And I guess what we could do is, we could refuse to comply with the order and you could find us in contempt and then that contempt would be the only thing we could appeal or we could look to a mandamus. But in any of those situations we lose our trial setting. And that's the most valuable thing to us right now. So we would respectfully ask the Court to deny the motion.

**THE COURT:** All right.

**MR. FARAH:** Judge, the only one holding them back from this trial setting is themselves. We sent this discovery back in January. They should have responded in February and we could have resolved these but they keep holding

back. All of these objections and privileges that they are talking about are gone. All they had to do was answer the discovery in thirty days. These are all gone.

Second of all, Corey is a party to this litigation. As a party to this litigation, he has a responsibility to hand over documents that are requested from him in his prosecution of his claims and he can hand over an affidavit or authorization to get his own records. There is no subpoena required. He has the right to his own records. If he signs the authorization, we can get those records. This is not my first case where I had to get educational records for a student. This is not a novel issue. That's all I have to say. Thank you.

THE COURT: All right, I will let y'all know something by tomorrow afternoon. Anything further?

MR. WYNNE: No. Thank you.

MR. FARAH: Thank you, Your Honor.

MR. HARDIN: Thank you, Judge.

THE COURT: Thank you.

C E R T I F I C A T E

COUNTY   OF   HARRIS   *
STATE   OF   TEXAS   *

I, Donald G. Pylant, Official Court Reporter in and for Probate Court No. 1 of Harris County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record truly and correctly reflects the exhibits, if any, admitted, tendered in an offer of proof or offered into evidence by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is __$203.00__ and will be paid by __Guerra & Farah, PLLC__.

Given under my hand and seal of office this the __5th__ day of __October__, 2015.


/s/Donald G. Pylant_____
Donald G. Pylant, C.S.R.
Official Court Reporter
in and for the County of
Harris and the State of
T E X A S.

Certification No. 668   Exp. Date: 12-31-2016
Probate Court No. One 201 Caroline Street, 6th fl.
Houston, Texas 77002 (713) 368-6692

CAUSE NO. 415,980-401

| | |
|---|---|
| FRANCES SOWELL, INDIVIDUALLY AND AS AN HEIR OF BRIAN EDWARDS JOHNS, DECEASED, AND AS ADMINISTRATOR OF THE ESTATE OF BRIAN EDWARD JOHNS, DECEASED; COREY JOHNS, INDIVIDUALLY AND AS AN HEIR OF BRIDAN EDWARD JOHNS, DECEASED, Plaintiffs, | ) IN THE DISTRICT COURT ) ) ) ) ) ) ) ) ) ) ) |
| JAMES JOHNS, SR. Intervenor, | ) ) ) |
| VICKI JOHNS, INDIVIDUALLY AND AS AN HEIR OF BRIAN JOHNS, DECEASED Intervenor | ) NUMBER ONE (1) OF ) ) ) ) |
| VS. | ) ) |
| THE DOW CHEMICAL COMPANY, ROHM AND HAAS COMPANY, ROHM AND HAAS TEXAS INC., TIM FOX, AND JULIO RODRIGUEZ Defendants. | ) ) ) ) ) ) HARRIS COUNTY, TEXAS |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

COREY J. JOHNS

MAY 19, 2015

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORIGINAL

ORAL AND VIDEOTAPED DEPOSITION OF COREY J. JOHNS, produced as a witness at the instance of the INTERVENOR, VICKI JOHNS, and duly sworn, was taken in the above-styled and numbered cause on the 19th of May, 2015, from 2:07 p.m. to 3:36 p.m., before Mona S. Whitmarsh, CSR, in and for the State of Texas, reported by machine shorthand, at the law offices of Rusty Hardin & Associates, L.L.P.; 5 Houston Center, Suite 2250; Houston, Texas, pursuant to the Texas Rules of Civil Procedure and the provisions stated on the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFFS:
    Mr. Bob Wynne
    RUSTY HARDIN & ASSOCIATES, L.L.P.
    5 Houston Center
    1401 McKinney Street, Suite 2250
    Houston, Texas  77010
    713-652-9000
    713-652-9800 (fax)
    bwynne@rustyhardin.com


FOR THE DEFENDANTS:
    Mr. Michael L. Brem
    SCHIRRMEISTER DIAZ-ARRASTIA BREM L.L.P.
    Pennzoil Place - North Tower
    700 Milam Street, 10th Floor
    Houston, Texas  77002
    713-228-3510
    713-228-3510 (fax)
    mbrem@sdablaw.com

Mr. Thomas J. Morel (via phone)
KIRKLAND & ELLIS
300 North LaSalle Street
Chicago, Illinois  60654
312-862-3291
312-862-2200 (fax)
thomas.morel@kirkland.com


FOR THE INTERVENOR, VICKI JOHNS:
    Mr. George K. Farah
    GUERRA & FARAH, P.L.L.C.
    4101 Washington Avenue, 3rd Floor
    Houston, Texas  77007
    713-529-6606
    713-529-6605 (fax)
    gkf@gflawoffices.com


VIDEO TECHNICIAN:
    Mr. Andrew Jones
    BWA VIDEO
    281-764-8622


ALSO PRESENT:
    Mr. John Dessalet
    RUSTY HARDIN & ASSOCIATES, L.L.P.

    Ms. Pamela Roberson

INDEX

                                                    PAGE

Appearances....................................    2

Stipulations...................................    5

COREY J. JOHNS
      Examination by Mr. Farah...........    6
      Examination by Mr. Brem...........   51

      Reexamination by Mr. Farah........   67
      Reexamination by Mr. Brem.........   82

      Reexamination by Mr. Farah........   86

Signature and Changes..........................   88

Reporter's Certificate.........................   90

THE VIDEOGRAPHER: We are on the record. Today's date is May 19th, 2015. The time is 2:06 p.m. This is the beginning of the deposition of Mr. Corey Johns.

Can I have all the attorneys identify themselves for the record.

MR. WYNNE: Bob Wynne, plaintiffs.

MR. FARAH: George Farah, intervenor, Vicki Johns.

MR. BREM: Mike Brem, B-r-e-m, defendants The Dow Chemical Company; Rohm and Haas Texas, Incorporated; Rohm and Haas Company.

And on the phone is my co-counsel Tom Morel, M-o-r-e-l, representing the same parties.

THE VIDEOGRAPHER: Will the court reporter, please, swear in the witness.

COREY J. JOHNS, having been first duly sworn, testified as follows:

THE REPORTER: Are there stipulations?

MR. FARAH: Per the Rules.

MR. WYNNE: The only thing I would say is Corey has already given one deposition in this case. It is my understanding that the only things he is going to talk about today are the issues related to Ms. Johns' claims.

To the extent that the issues sort of creep beyond that, I am going to instruct the witness not to answer. Opposing counsel don't have to agree to that. I am just letting them know that that's what I am going to do.

THE REPORTER: Signature of the witness?

MR. WYNNE: Yes.

MR. FARAH: At this time I would like to invoke the rule on Ms. Pam Roberson being in the room.

MR. WYNNE: She is here on the behalf of the estate. Her mother is not doing well, and she is here to report to the administrator.

MR. FARAH: Okay.

EXAMINATION

BY MR. FARAH:

Q    Mr. Johns, can you, please, state your name for the record.

A    Corey Johns.

Q    And what's your relation to Brian Johns?

A    He is my father.

Q    And what's your relation to Ms. Roberson?

A    She is my aunt.

Q    Okay. And do you remember providing deposition testimony in this case prior to today?

A    Can you repeat the question?

Q   Do you remember providing deposition testimony in this case prior to today?

A   Yes.

Q   And that was back in August of last year? Does that sound right?

A   I am not sure the exact date.

Q   Okay.  But if I were to tell you it was August 11th of last year, that doesn't seem unusual to you?

A   No, not unusual, no.

Q   I am looking here at the transcript from that deposition so that's why I have that information.

A   All right.

Q   Okay?

So I am going to try and not be redundant and go over the same questions that Mr. Brem went over in that deposition.  Okay?

A   Cool.

Q   Now, this is your second crack of giving testimony in a deposition.  So as you are well aware, when I ask you a question, we are going to need a verbal response so the court reporter can take that down.

So if's is a "yes," "yes."  If it's a "no," "no."  Because if you just nod your head or if you go "uh-huh" or "huh-uh," it doesn't really come out well on

the transcript.

Do you understand that?

A    Yes.

Q    Okay.  And you understand here that you are under oath?  You understand that?

A    Yes.

Q    Do you know what it means to be under oath?

A    Yes.

Q    Okay.  So where do you live now?

A    Baton Rouge, Louisiana.

Q    And what is your address in Baton Rouge, Louisiana?

A    3225 Victoria Drive, Apartment 2019; zip code 70805.

Q    Okay.  And how long have you lived at that address?

A    For a year.

Q    One year?

A    Yes.

Q    Okay.  So when did you move in there?

A    When?

Q    Uh-huh.  What -- what month?

A    June of last year.

Q    Okay.  Okay.  And then prior to living there, where did you live?

A     I stayed at 2308 Scenic Gardens Avenue, Baton Rouge; zip code 70807.

Q     And how long were you there for?

A     Two years.

Q     So that would be from 2012 to 2014?

A     Yes.

Q     And then prior to that address, where did you live?

A     On campus.

Q     Okay.  And which campus is that?

A     Southern University.

Q     And how long did you live on campus at Southern University?

A     From 2007 until 2010.

Q     Okay.  It seems like we have a two-year gap. Where did you live between 2010 and 2012?

A     Here in Houston.

Q     Okay.  So when did you move to Houston?

A     When did I move back to Houston?

Q     Yeah.

A     Fall of 2010.

Q     And what month was that?

A     I am not sure in what month exactly.

Q     September?  October?  You have no idea?

A     I am not sure.  I don't remember.

Q    Well, where did you -- when you moved here, where did you live?

A    I lived with my mom.

Q    Okay.  And where did your mother live, or where did she live at the time?

A    7700 Creek Bend Drive, Apartment No. 1; Houston, Texas; zip code 77071.

Q    So that was in fall 2010 you moved there?

A    Uh-huh.

Q    And then how long did you live there for?

A    Until I went back in 2011.

Q    So you only -- you stayed from 2010 to 2011 in Houston, correct?

A    Yes.

Q    Okay.  And then you went back to Baton Rouge --

A    Correct.

Q    -- in 2012?

A    2011.

Q    2011.

A    Fall of 2011.

Q    So fall of 2011, where did you live?

A    I stayed with friends.  Not too sure of what the address was.

Q    Was it one friend, or did you bounce around

from place to place?

A      It was two brothers.  They were roommates.

Q      **What are their names?**

A      Joseph Robbins and Stephen Robbins.

Q      **Joseph and Stephen.  Robbins?**

A      Correct.

Q      **Do you have their phone number?**

A      I do.

Q      **Can I have that, please?**

A      Joseph's number is area code 225-276-9336.

Q      **Okay.  Stephen?**

A      Steve's number is also area code 225-328-7355.

Q      **All right.  So you currently live in Baton Rouge.**

        **Did you graduate from Southern in December?**

A      No.  I graduated in May of this year.

Q      **Congratulate -- you just graduated.**

A      Yes.

Q      **Congratulations.**

A      Thank you.

Q      **What did you graduate in?**

A      Rehabilitation studies.

Q      **All right.  So how old were you when you first moved to Baton Rouge?**

A      18 maybe.

Q    So was that right after high school?

A    Yes.

Q    Okay.  Am I to understand you went to Westbury High School?

A    Yes.

Q    Where is Westbury High School at?

A    Here in Houston.

Q    What part of town?

A    Southwest.

Q    Okay.  And who did you live with when you went to Westbury?

A    My mom.

Q    Okay.  Have you always lived with your mother?

A    Yes.

Q    So you lived with your mother for 18 years before you went to college?

A    Yes.

Q    And I don't mean to insult you by asking you this question, but it's standard to ask these questions in depositions:  Have you ever been arrested for anything?

A    Yes.  Yes.

Q    Yes?  Okay.

And when were you arrested?

A    2010.

Q  What were you arrested for?

A  Possession of marijuana.

Q  And where were you arrested?

A  Southern University.

Q  And what happened with that case?

A  It was dismissed.

Q  Okay.  And who was your attorney in that case?

A  I don't even know.  I only remember his last name, Jabbari.  I don't remember his first name.

Q  Was that the only time that you have ever been arrested?

A  Yes.

Q  How far along in the proceedings did it go?  Did you go to trial?

A  No.  Pretrial diversion.

Q  Pretrial diversion?

A  Yes.

Q  Okay.  And to get to that pretrial diversion, did you need anybody to sign off or represent your interests in any way?

A  What do you mean?

Q  Did you have to have, like, your mother or your aunt or somebody represent that they would make sure that you would stay out of trouble or anything like that?

A    Not that I remember. I am not sure.

Q    **No?**

A    I don't know. Not sure.

Q    **You are not sure?**

A    Not sure.

Q    **Okay. Who is the main person that -- from your family that you spoke with when you were going through that process?**

A    I guess it would be my mom.

Q    **Your mom?**

A    Uh-huh.

Q    **What's your mother's name?**

A    Nicole McClinton.

Q    **And does she live at the same address?**

A    Yes.

Q    **Okay. And what's her phone number?**

A    Area code 832-725-8794.

Q    **So now that we have got some background, you live with your mother; and then you also spent most of your recent years in Baton Rouge.**

**How often did you visit your father?**

A    It would be frequent visits sometime when I come home. I can't really pinpoint exactly how long of an extent, but sometime when I come home.

Q    **And did you have set visitation, or was it**

just --

A    No.

Q    -- you know, whenever you had time to see him or when he had time to see you?

A    Whenever I had time.

Q    Okay.  So from the point you were at Southern until the point of his unfortunate death, you would visit him when you had the opportunity to make time for each other; is that correct?

A    Correct.

Q    Okay.  Did you ever live with your father at the time you were in college?

A    No.

Q    Okay.  Do you know all the addresses your father lived at while you were in college?

A    No.

Q    Okay.  Do you know any of the addresses your father lived at while you were in college?

A    3827 Saxon Hollow.

Q    Where is that located?

A    Friendswood.

Q    Okay.  So you know the Saxon Hollow address in Friendswood, right?

A    Correct.

Q    Okay.  Do you know any other places your

father lived?  Cities?

    A    No.

    Q    At all?

    A    No.

    Q    That's the last address you knew he lived at?

    A    Yes.

    Q    Okay.  Do you know when he moved to that address?

    A    No.

    Q    Okay.  Did you help him move to that address?

    A    No.

    Q    Do you know who helped him move to that address?

    A    No.

    Q    Do you know who moved with him to that address?

    A    No.

    Q    Do you know why he moved to that address?

    A    No.

    Q    Did your dad ever talk to you about situations in his life where he would have to move from house to house?

    A    No.

    Q    Okay.  Do you know anything about your father's financial history before his passing?

A    No.

Q    Okay.  Well, what kind of relationship did you have with your father?

A    A typical father-son relationship.

Q    Can you give me an example?  Give me some examples.

A    I mean, we would call each other up whenever. I mean, we had a good standing relationship.  I don't know how you want me to explain it.

Q    Okay.  So, I mean, like, you would just pick up the phone and talk to each other --

A    Oh, yeah.

Q    -- once in a while?

A    Yeah.

Q    Okay.  You would visit each other once in a while?

A    Yeah.

Q    Okay.  After -- let me ask it this way:  Were your mother and father ever married?

A    No.

Q    Did your father ever marry?

A    Yes.

Q    Okay.  How many times did he marry?

A    Two, twice.

Q    Okay.  And who were the two women that he

married?

    A    Michelle Johns and Vicki Johns.

    Q    Okay.  And when did he -- when did he and Michelle Johns get married?

    A    I don't know.

    Q    You don't know?

    A    No.

    Q    Okay.  Do you know what years they were married?

    A    No.

    Q    Do you know how long they were married?

    A    No.

    Q    Did Michelle have other children, any children of her own?

    A    Yes.

    Q    She did?

    A    Yes.

    Q    Did you know her children?

    A    Yes.

    Q    Okay.  And who are her children?

    A    Kenya.

    Q    Kenya...

    A    Don't know her last name.

    Q    And how did you know Kenya?

    A    She lived with Michelle and my father during

the time, I guess, of their marriage.

Q    Okay.  And, I mean, do you have any idea what years those were?

A    No.

Q    No?  Okay.

Were you in high school still?

A    No.

Q    You were in college?

A    No.

Q    You were in elementary school?

A    Elementary, maybe middle school.

Q    Okay.  So it was early on in your life.

A    Yeah.

Q    How old are you?  I mean, how -- when were you born?

A    '89.

Q    '89?

So you are saying you were probably in middle school -- or elementary, middle school?

A    Correct.

Q    So, like, early Nineties -- I mean, sorry -- early 2000s?

A    Possibly, yes.

Q    Yeah?  Okay.

Do you continue to maintain a relationship

with Michelle?

A    No.

Q    Kenya?

A    No.

Q    Okay.  When was the last time you spoke with Michelle or Kenya?

A    It will be probably the funeral of my father's death.

Q    Okay.  And so how did you come to speak with Michelle and Kenya?

A    They were at the funeral.

Q    Michelle was at the funeral?

A    Yes.

Q    Okay.  And Kenya was at the funeral, too?

A    Yes.

Q    Had you spoken with them before the funeral?

A    No.

Q    Okay.  Did you speak to them at the funeral?

A    Yes.

Q    And what did you communicate or what was discussed at the funeral with Michelle and Kenya?

A    Oh, they just was giving their condolences.

Q    Okay.  Did you ask how they found out or why they were there?

A    No.

Q    No?

Do you know how they found out or why they were there?

A    No.

Q    Okay.  So let's go to the second marriage.  Vicki Johns, correct?

A    Uh-huh.

Q    Do you know when they got married?

A    No.

Q    Okay.  Do you know where they got married?

A    No.

Q    Did you go to their -- the wedding?

A    No.

Q    Had you met Vicki before your -- Vicki and your dad got married?

A    Yes.

Q    Okay.  And how did you meet Vicki before -- when did you meet Vicki?

A    Can't pinpoint exactly, when exactly; but I met her through my father.

Q    Okay.  And how is that?  Did he invite you over for dinner and she was is there, or how did it work out?

A    I really don't know.

Q    Okay.  Do you remember what you guys discussed

when you first met her?

A    No.

Q    I'm assuming it was here in Houston when you first met her?

A    Yes.

Q    Was it at his home, or was it at a restaurant?

A    I really don't know.

Q    Was that -- did you only meet Vicki one time before he got married to her?

A    No.

Q    Okay.  You met her a couple of times?

A    Yeah.

Q    Okay.  And that's when you would obviously go visit your father?

A    Uh-huh, yes.

Q    What was your impression of Vicki when you first met her?

A    I didn't have one.

Q    So when Vicki and your dad got married, why didn't you show up to the wedding?

A    Because I didn't know about it.

Q    You weren't invited to the wedding?

A    No.

Q    Okay.  Your dad didn't call you and tell you he was getting married?

A    No.

Q    Your grandmother didn't call you to tell you?

A    No.

Q    Did your grandmother show up to the wedding?

A    I don't know.

Q    Okay.  Do you know if your aunt showed up to the wedding?

A    I don't know.

Q    Did your aunt tell you they were going to get married?

A    No.

Q    Okay.  So after they got married, after your dad and Vicki got married, do you know what year that was?

A    No.

Q    You have no idea?  Okay.

Do you know where they lived after they got married?

A    No.

Q    Did you ever visit them while they were married?

A    I would say, "no."

Q    Okay.  Did you ever have a relationship with Vicki, like talk to each other on the phone?

A    No.

Q    Okay.  You never called and asked her for something, or she never called and asked you for anything?

A    No.

Q    What was your phone number at the time that they were married?

A    I don't know.

Q    Okay.  Do you know what your phone number was from 2000 -- from 2007 to 2012?

A    No, because my number changed throughout those years.

Q    Okay.  Do you -- okay.  Have you always had the same providers, cell phone providers?

A    No.

Q    Do you remember the cell phone providers you have been with?

A    From?

Q    From the first time you got a cell phone.

A    I can name a couple.

Q    All right.  Who have you been with before?

A    Sprint, T-Mobile, Verizon.

Q    Is that it?

A    That's it.

Q    Do you remember the phone numbers you had for each provider?

A    No.

Q    What is your current phone number?

A    832-492-5355.

Q    Did you have Vicki's e-mail address?

A    No.

Q    Did she have your e-mail address?

A    I don't know.

Q    Okay.  You never communicated with Vicki via e-mail?

A    No.

Q    Did you ever communicate with your dad via e-mail?

A    No.

Q    Did your dad have an e-mail address?

A    I don't know.

Q    Had you ever helped your dad and Vicki move from home to home?

A    No.

Q    Never?

A    Never.

Q    Do you know any of the addresses where Vicki and Brian lived?

A    No.

Q    Do you know any of the cities where they lived?

A    Houston.

Q    You just know Houston in general?

A    Yes.

Q    When you were arrested, did Vicki ever write a letter on your behalf?

A    Not to my knowledge, no.

Q    You are not aware of a letter she wrote on your behalf to the prosecutors to allow you to get deferred?

A    No.

Q    Would you be shocked if they have a letter from her?

A    Yeah.

Q    Okay.  Would you have a problem with me speaking to your defense attorney about that case?

MR. WYNNE:  Yes.  He is not waiving his attorney-client privilege, and you are not permitted to talk to his attorney.

MR. FARAH:  Okay.

Q    (BY MR. FARAH) Did your dad or Vicki ever go down to Baton Rouge to help you during the time you were arrested?

A    They came to pick me up.

Q    Pick you up when?

A    When I got out of jail.

Q    Okay.  Who bonded you out?

A    The finances came from numerous places so I wouldn't know.

Q    What numerous places did the finances come from?

A    I mean, numerous people.  I mean, I had family members.  My grandmothers on both sides gave money, and my peers collected money.

Q    Okay.  What was your bond, do you remember?

A    I don't know.

Q    So you had numerous people put in money for your bond and then it was Vicki and your dad that came and picked you up?

A    Yes.

Q    Okay.

A    Not from the jail but from the school.

Q    Explain that to me.  What do you mean "not from the jail but from the school"?

A    When I got out of jail, a friend of mine picked me up.  And once I went through the process of getting put out of school, that's when my father came to pick me up from school.

Q    I see.  So your -- they didn't pick you up after you were arrested and bonded out.

A    Right.

Q    They picked you up after you had officially
been -- so you got kicked out of school; is that
correct?

A    Correct.

Q    And was there an administrative proceeding to
get that -- for that to happen?

A    Yes.

Q    Okay.  So they picked you up after that
administrative proceeding?

A    Yes.

Q    What year was that?

A    2010.

Q    That was in 2010?

A    Yes.

Q    What month in 2010 was that?

A    Don't know.

Q    Was it --

A    It was in the fall.

Q    Fall like September, October?

A    Somewhere between that time, yes.

Q    So September, 2010, Vicki and your dad go down
to Baton Rouge to pick you up, correct?

A    Uh-huh, yes.

Q    And they brought you back to Houston?

A    Yes.

Q    And who did you stay with when they brought you back to Houston?

A    I stayed with my father for about a day, and then I went back to my mom's house.

Q    So when you stayed with your father for that one day, where were you -- where were they living?

A    Saxon Hollow.

Q    They were living at Saxon Hollow in 2010?

MR. WYNNE:  Wait, wait.  I'm going to object.

You are saying, "they" and I'm -- he has never testified that there was a "they" living anywhere in September of 2010.

Q    (BY MR. FARAH) Okay.  So in September of 2010, your dad was living at Saxon Hollow.

A    Yes.

Q    And you stayed with him for that one night.

A    Yes.

Q    Okay.  Did Vicki Johns stay with you that one night?

A    No.

Q    Okay.  So where did Vicki go?

A    I don't know.

Q    Okay.  So they drove you back over here, and did they -- did your dad drop off Vicki somewhere --

A     No.

Q     -- or did he take her to Saxon Hollow?

A     I -- I don't remember.

Q     Okay.  So you don't remember if she stayed or she didn't stay?

A     I know she didn't stay, but you asked me if she got dropped off or did she go.  I don't know.  I don't remember that part.

Q     Well, did -- okay.  So how do you know she didn't stay?

A     Because I knew she wasn't there.

Q     Okay.  So at some point it would make sense that she had to have been dropped off somewhere; is that correct?

A     I guess so.

Q     Okay.  And you don't remember her being dropped off anywhere?

A     No.

Q     Okay.  You just remember her not being at Saxon Hollow the day they drove you back from Baton Rouge; is that correct?

A     Correct.

Q     So you stayed there at the Saxon Hollow address for one day and then where did you go after that?

A    Back to my mom's house.

Q    **Okay. How long did you stay at your mom's house?**

A    Until I went back to school.

Q    **And that was back in 2011?**

A    2010.

MR. WYNNE:  He is asking when you went back to school --

Q    **(BY MR. FARAH) When you went back.**

A    Oh.

MR. WYNNE:  -- not when you left school.

A    Oh, I went back in 2011, fall of 2011.

Q    **(BY MR. FARAH) Okay. That's right. Trying to get the time on that.**

**So you stayed with your mom for about a year?**

A    Correct.

Q    **And how many times did you see your father within that one year?**

A    I don't know.

Q    **Did you see your father --**

A    Yes.

Q    **-- often?**

**Okay. When would -- like, how -- when would you see him? Christmas? Ballgames?**

A    It would be on unscheduled weekends.

Q    And what would you do?  Would you go to his house?

A    Yes.

Q    And what would you do at his house?

A    Chill.

Q    What does that mean, to "chill"?

A    Relax, hang out.

Q    Watch TV?

A    Yeah.

Q    Did you guys barbecue?

A    We could.  It's possible, yes.

Q    Okay.  Did you guys have family over?

A    No.

Q    No?  Just the two of you?

A    Yes.

Q    You would just hang out?

A    Yes.

Q    Was Vicki Johns ever there?

A    No.

Q    You don't remember her being there?

A    No.

Q    You don't remember, or she wasn't?

A    I don't remember, no.

Q    Okay.  Did your grandmother ever show up over there?

A    I don't remember, no.

Q    Would you ever go with your grandmother to visit your father?

A    Can you repeat the question for me?

Q    Would you ever go with your grandmother to visit your father?

A    Would I ever go with my grandmother --

Q    Uh-huh.

A    -- to visit my father?

Q    Uh-huh.

A    No.

Q    Well, did you -- when you were there, did your grandmother ever stop by while you were there visiting your father?

A    No.

Q    Okay.  What kind of hobbies did you and your dad have together other than chilling?

A    What do you mean "hobbies"?

Q    Did you guys go to football games?  Baseball games?  Basketball games?  Did you go to dinner together?  What did you guys do?

A    I mean, we probably would go out to, like, a bar or something.  I don't know.  Go eat.  I don't know.

Q    So all the times that you would visit him, you would either hang out at home or go hang out at a bar?

A    Yeah.  Or, I mean -- I really don't know, man.

MR. WYNNE:  Remember, there is no time constraints so if you need to think about it, think about it.

Q    (BY MR. FARAH) We will go to another question. Think about it, and we will come back to it.  Okay?

Do you have the same -- do you have your dad's phone number that he had at the time that he passed?

A    Do I have it now?

Q    Uh-huh.

A    No.

Q    Okay.  Do you know what his phone number was?

A    No.

Q    Did you ever have his phone number memorized?

A    No.

Q    Who would have that information as to what your father's phone number was?

A    I don't know.

Q    Okay.  Did you and your dad ever text?

A    Yes.

Q    Okay.  What would you and your dad text about?

A    Just to check in.

Q    Okay.  Did your dad ever send you money?

A    Yes.

Q    How would he send you money?

A    Bank account.

Q    Would he send you a check, or he transferred it to you?

A    I guess transfer.

Q    Okay. What bank did you have when your dad was alive?

A    Chase.

Q    Okay. Do you know the bank account number?

A    My bank account number?

Q    Uh-huh.

A    Yes.

Q    Is it the same bank account?

A    Yes.

Q    We will get -- I will discuss getting that information with your attorney later on.

        After your dad and Vicki got married, what was your impression or opinion about Vicki?

A    I didn't have one.

Q    Okay. Did she ever treat you poorly or badly?

A    No.

Q    Okay. What was your impression about her personality and how she was?

A    I didn't have one.

Q    Okay. How many times do you think you have actually sat down and had a conversation with Vicki?

A     I don't know.

Q     **Ten times?  Five times?**

A     I don't know.

Q     **More than 50?**

A     I don't know.

Q     **You don't have any idea?**

A     No.

Q     **Okay.  How many times have you talked to your dad about Vicki?**

A     Probably none.

Q     **Okay.  How did you find out about your dad's incident, the incident that happened with your dad?**

A     My grandmother called me.

Q     **Where were you when your grandmother called you?**

A     At my mom's house.

Q     **So you were here in Houston?**

A     Yes.

Q     **Okay.  So the incident happened in 2012, right?**

A     (Witness nodding head up and down.)

Q     **So you weren't in Baton Rouge at the time?**

A     No.

Q     **Were you here for, like, summer break or something?**

A    Yes.

Q    And -- okay.  So what did you do when you found out about the incident?

A    I was currently going to summer school here in Houston, but she called me at an hour -- early hours throughout the day.  So I went back to sleep, you know, woke up and went to class.  Then after I went to class, I went to the hospital.

Q    All right.  So your grandmother called you at what time?

A    Between the hours of 2:00 and 5:00 in the morning.

Q    And what did she tell you?

A    She told me my dad was involved in an accident at work.

Q    And what did she tell you about the accident and the incident?

A    She didn't discuss anything about the accident.

Q    Did she tell you where he went or where he was being treated at?

A    Yes.

Q    Where did she tell you he was being treated at?

A    UTMB in Galveston.

Q    Okay.  And so she told you that your dad was at UTMB Galveston, and then you went to school the next day?

A    Uh-huh.

Q    Okay.  And then after school, you -- that's when you drove down to Galveston?

A    Correct.

Q    Who did you go with?

A    Myself.

Q    Okay.  And when you -- about what time do you think you arrived that next day or that...

A    I don't know.  Had to have been in the afternoon sometime, after --

Q    What was your school schedule like?  What time would you have been out that day?

A    Probably from 9:30 to 10:30 where I had class; and after that, I was done.

Q    So you probably left Houston the late morning before you went to Galveston; is that correct?

A    The afternoon sometime.

Q    Okay.  So you didn't go straight after class?

A    Yeah.

Q    You did?

A    Yeah.

Q    Okay.  So you drive down to Galveston.  You

arrive at -- was it the burn unit down there at UTMB?

A    I don't remember.

Q    How did you know where to go?

A    I linked up with my grandmother or family.

Q    So, then, you show up at the hospital, correct?

A    Correct.

Q    And who was there that you recognized when you showed up?

A    It would be my grandmother.

Q    Who else?

A    That's all I remember.

Q    Okay.  And then did you have a chance to speak with your father?

A    At that time?

Q    At any time after that.

A    Yeah.

Q    When did you speak to your father?

A    While he was in the room, in the hospital.

Q    Okay.  And what did you and your father talk about?

A    I don't remember.

Q    Do you remember what your father looked like?

A    Yeah.

Q    Was he bandaged up?

A    Uh-huh, yes.

Q    How many times do you think you spoke with your father?

A    I don't know.

Q    And we can take a break at any moment if you want to take a break.

A    I'm good.

Q    Okay.  Did you talk to your father about your feelings for him or his feelings for you?

A    No.

Q    Did any of that stuff come up?

A    No.

Q    What was your impression of your father's condition at the times you saw him?  What were you told about his condition?

A    What was I told, or what was my impression?

Q    Well, that's a good point.

Let's get what were you told about his condition?

A    I don't remember.

Q    What was your impression about his condition?

A    Horrible.

Q    Okay.  Horrible and -- can you explain that a little further?

A    He looked bad, and I could tell he was in

pain.

Q    Who else was in the room with you when you would speak with your father?

A    Just me and him.

Q    Where was your grandmother when you spoke with him?

A    I don't know.

Q    Okay.  And this is something I need to find out.  So when you would -- was there, like, security there that would -- would they let more than one person in at a time, or what was the procedure in place?

A    I don't know the procedure, but security was not there.

Q    Okay.  Could anybody just walk in and meet with him or --

A    No.

Q    How did you get in and out?

A    They had a special room and you had to be buzzed in and you had to have a password to get in.

Q    And who gave you the password and --

A    My grandmother.

Q    So your grandmother is the only one who had that password?

A    I guess, yes.

Q    Didn't your grandmother work there at the burn

unit for a number of years?

A     I don't know.

Q     You don't know?

A     No.

Q     Okay.  So, then, after -- so how many days did you stay at that hospital while your dad was in there?

A     I would go every day.

Q     You would go every day?

A     Yes.

Q     So every -- you would stay there all day long and get there in the morning or get -- walk me through that.

A     I would go to class.  After I got out of class, I would go down to the hospital, stay at the hospital until whatever hours, and then leave and go back home or to his home.

Q     Why were you going to his home?

A     I moved in after the accident.

Q     Why did you move in?

A     Because there was responsibilities at the house that needed to be taken care of, and he asked me to go to the house.

Q     Okay.  And what kind of responsibilities did you need to take care of at the house?

A     Feed the dogs, feed the fish, turn the lights

on in the fish tank, turn the lights off in the fish tank, take care of the house, watch the house.

Q    Feed dog, feed fish, clean the fish tank.  You said turn on the lights?

A    I didn't say, "clean the fish tank."  I said turn the lights on and off of the fish tanks.

Q    Okay.  What else did you do?

A    Watched over the house.

Q    Okay.  What were the names of his dogs?

A    Max and Coy.

Q    Max and Coy.  Okay.  How long did you stay at that house?

A    Until my dad passed.

Q    Okay.  And then -- and then what happened?  Where did you move to then?

A    Went back to Baton Rouge.

Q    Is that when school started again?

A    Yes.

Q    So did you ever -- did you ever see Vicki Johns at the hospital?

A    At the hospital?

Q    Yes.

A    Yes.

Q    Okay.  And what day did you see Vicki Johns at the hospital?

A    I don't remember what day.

Q    And did Vicki speak with your father?

A    Yes.

Q    Okay.  Did you find it unusual that Vicki was speaking to your father?

A    No.

Q    Do you know how Vicki found out that -- of the incident?

A    No.

Q    Do you know how long Vicki stayed there that day?

A    No.

Q    Do you remember who Vicki showed up with?

A    I believe her mom and a child.

Q    Had you met her mom before?

A    Yes.

Q    Okay.  Had you met the child before?

A    Yes.

Q    Okay.  When had you met the child before?

A    Can you repeat that?

Q    When had you met the child before?

A    I don't remember.

Q    Okay.  But if you would have met that child, it would have been with Vicki; and your dad would have been around, correct?

A    Correct.

Q    How many times had you seen that child?

A    I don't know.

Q    Okay.  When Vicki -- did you and Vicki have any -- any words at the hospital, anything negative at the hospital that happened between you?

A    No.

Q    No?  Okay.

Did Vicki ever -- did you ever see Vicki again after that one time you saw her?

A    No.

Q    Do you know why she never came back?

A    No.

Q    Okay.  When you were staying at your dad's hospital, did you -- did you notice that there was women's clothing there or female's clothing there at the home?

A    At the hospital?

Q    No.  At the house.

A    No.

Q    At the Saxon Hollow house.

A    No.

Q    Did Vicki ever try and gain access to that house?

A    No.

Q    Okay.  Did Vicki ever try and contact you to get -- to try and get stuff out of that house?

A    No.

Q    Okay.  How did you get the keys for that house?

A    Got the keys from whoever had my father's keys.

Q    Okay.  And you are saying your father told you to go stay at the house for him?

A    Yes.

Q    Do you remember if your dad and Vicki ever got divorced?

A    Say what?

Q    Do you remember if your dad and Vicki ever got divorced?

A    Do I remember?

Q    Uh-huh.

A    I remember hearing about it, yes.

Q    How did you hear about that?

A    Don't know.  Don't remember.

Q    Who did you hear about it from?

A    I don't remember.

Q    When did you hear about it?

A    I don't remember.

Q    You just remember hearing that there was a

divorce?

A    (Witness nodding head up and down.)

Q    Okay.  Did you call up your dad and ask your dad about that?

A    No.

Q    Did you call and see if he was okay?

A    What do you mean?

Q    Like, after the divorce, did you call and see if he was okay after the divorce?

A    No.

Q    Do you think that would be unusual to call and see if he was okay after the divorce?

A    Yeah.

Q    Why?

A    It's none of my business.

Q    Was -- I mean, is -- is your dad's relationship with other women, was that ever your business?

A    Not really, no.

Q    Had you ever considered it to be your business?

A    No.

Q    Okay.  Did you know the details of his relationships with woman?

A    With women?

Q    Yeah.

A    What do you mean?

Q    Like do you know the details of his relationships with women, whether it be his wives or his girlfriends?

            MR. WYNNE:  Objection, form.

            You can answer.

A    What do you mean "details"?

Q    (BY MR. FARAH) Well, I mean, for example, when he was married to Michelle --

A    Uh-huh.

Q    -- do you know, you know, where they lived? How long they lived there?  When they were having problems or when they weren't having problems?  Did you know all that information?

A    No.

Q    Did you know that about Vicki and your dad?

A    No.

Q    Where they lived?

A    No.

Q    When they were having problems?

A    No.

Q    When they weren't having problems?

A    No.

Q    Do you know what your dad's feelings for Vicki

were?

A    No.

Q    Do you know what Vicki's feelings for your dad were?

A    No.

Q    Do you know what your dad thought about Vicki?

A    No.

Q    Do you know what Vicki thought about your dad?

A    No.

Q    When did you -- when did you think that your dad and Vicki were no longer married?

A    I don't know.

Q    Do you remember?

A    No.

Q    Were you in Baton Rouge or in Houston?

A    I really don't know.  Of the divorce or what?

Q    Yeah.  When they got divorced, do you remember where you were living?

A    Could have been Baton Rouge.

Q    It could have been or...

A    It could have been.

Q    Okay.  Do you know where the papers were filed for the divorce?

A    No.

Q    Okay.  Do you know the circumstances

surrounding the divorce?

A    No.

Q    Okay.  Do you know if your dad wanted to have children?

A    Yes.

Q    You knew or he did want to have children?

A    I knew.

Q    You knew what?

A    That he wanted to have children.

Q    Okay.  Do you know that Vicki couldn't have children?

A    No.

Q    Did you ever find that out at any point, that she couldn't have children?

A    No.

Q    Did you ever know that your dad couldn't have children?

A    No.

Q    Have you learned now that your dad couldn't have children?

A    No.

Q    But the only thing you know is he did want children?

A    Yes.

        MR. FARAH:  All right.  I might have some

more questions, but I think at this time I will pass the witness.

Mike, do you have any?

MR. BREM:  I do.

MR. WYNNE:  Man, I thought we would be out of here in under an hour.

EXAMINATION

BY MR. BREM:

Q    Mr. Johns, good to see you again and congratulations on graduation.

A    Thank you.

Q    I have a number of questions that are going to kind of bounce around because I don't want to ask you the same things that Mr. Farah just asked you.

Did I understand correctly that after the administrative proceeding, after you were arrested in Baton Rouge, your father and Vicki picked you up?

A    Correct.

Q    And they brought you back to Houston; is that right?

A    Correct.

Q    All right.  Focusing on that time frame, which is sometime in the fall of 2010; is that right?

A    Correct.

Q    Were they still married then?

A    I don't know.

Q    Had you learned -- did you learn that they were divorced before or after that event?

A    The event of them picking me up?

Q    Right.

A    After.

Q    You didn't -- you didn't know until after that event that they got divorced at some point; is that right?

A    Correct.

Q    So it didn't seem unusual to you for them to show up and pick you up in the fall of 2010 because you didn't know that they were formally divorced the preceding February?

A    I'm going to say I don't know.

Q    You don't know?

A    No, I don't know.

Q    If I told you that -- and there are court documents, this isn't in real dispute -- that your dad and Vicki Johns were formally divorced in Brazoria County in February of 2010, that's the first time you learned that fact?

A    Can you repeat that?

Q    Yes.  And let me be careful here.  I don't want you to tell me anything that you have learned from

your lawyers. Okay?

A    Uh-huh.

Q    Because that's privileged, and I am not entitled to know that. I don't want you to tell me anything you have learned from your grandmother because she is also a party to this lawsuit and that's privileged and I am not entitled to know that.

Are you okay with me so far?

A    Uh-huh.

Q    Your aunt is not a party to the lawsuit so if your source of information is your aunt, that's a different matter; and you can tell me.

Now, I am going to ask you -- I am going to go back to that moment in the fall of 2010 when they picked -- when you had this administrative proceeding and they picked you up and brought you back to Houston. Are you with me there?

A    Uh-huh.

Q    I am going to take you back to February of 2010 when the Brazoria County court documents say they were formally divorced. You didn't know that at that time?

A    I don't know.

Q    You don't know one way or the other?

A    Right.

Q    You didn't learn that they were divorced until after they picked you up in Baton Rouge in the fall of 2010?

A    Right.

Q    That's -- so you -- I am going to be -- I want to be clear about that.  You didn't learn that your father and Vicki Johns got divorced until after the administrative proceeding following your arrest in 2010; is that right?

A    Correct.

Q    So when they picked you up in the fall of 2010 in Baton Rouge, for all you knew, they were still married; is that right?

A    I guess so, yes.

Q    Now, let me go back.  I want to start asking you about some questions -- some places that they lived.

     Did you ever visit your father and Vicki Johns in a house that they lived in in Richmond, Texas?

A    No.

Q    Did you ever know that they lived in a house in Richmond, Texas?

A    No.

Q    Did you ever visit your father and Vicki Johns in a house that they lived in together on a street called Aspen Hollow in Sugar Land, Texas?

A     Repeat the address.

Q     Yes.

      I don't know the actual number; but the street name is Aspen Hollow in Sugar Land, Texas?

A     No.

Q     You have never been to that address?

A     No.

Q     Did you ever visit your dad and Vicki Johns when they lived on a street called Castle Pond in Pearland, Texas?

A     Yes.

Q     Yes?

A     Yes.

Q     When you went to the Castle Pond address, were they still married?

A     I -- I don't know.

Q     Were they living there together at that time?

A     I don't know.

Q     Okay.  You went to see your father and he lived on Castle Pond; is that right?

A     Correct.

Q     You didn't know whether he was living with Vicki Johns there one way or the other?

A     Correct.

Q     You don't know if they were married --

A    No.

Q    -- when they -- when he was on Castle Pond; is that right?

A    Right.

Q    How many times did you go to the Castle Pond address?

A    I am not sure.

Q    Okay.  More than ten?

A    No.

Q    More than five?

A    I don't know, no.

Q    You don't know?

A    No.

Q    Did you ever visit your father when he lived in an apartment in Regency Square in Houston, Texas?

A    No.

Q    Did you know that he lived in an apartment in Regency Square in Houston, Texas?

A    No, sir.

Q    And I am going to be real specific about something that Mr. Farah asked you.  Did you help your father and Vicki Johns move from an apartment in Regency Square in Houston, Texas, to a house in Saxon Hollow in Friendswood in June of 2010?

A    No.

Q    You had no part in that?

A    No.

Q    Did you ever help your father move from one address to another at any point in time?

A    No.  Excuse me.

Q    Did you -- and I don't have any idea of the time frame of this location.  Did you ever visit your father when he lived in a house on Nightshade Crest Lane?

A    I -- that's not familiar to me, no.

Q    Did you ever know that your father lived in a house on Nightshed -- Nightshade Crest Lane?

A    I am not familiar with that address, no.

Q    So I am clear here, the only two locations that you remember going to where your father lived were Castle Pond in Pearland; is that right?

A    Uh-huh.

Q    And -- is that a "yes"?

A    Yes.

Q    And I am not trying to be ugly.  I am trying to get it right for the court reporter.

A    Yeah, yes.

Q    And Saxon Hollow in Friendswood; is that right?

A    Yes.

Q     All right.   Now, let's talk about Saxon Hollow in Friendswood.   When -- how many times prior to the accident had you been to the house in Friendswood on Saxon Hollow?

A     I am not sure.

Q     You certainly had been there the one night after they picked you up in Baton Rouge; isn't that right?

A     Correct.

Q     Was it more than that one time?

A     Yes.

Q     More than five times?

A     It is possible, yes.

Q     More than ten?

A     It's possible.

Q     In the times when you went to the house on Saxon Hollow in Friendswood, was Vicki Johns living there?

A     I don't know.

Q     You don't know whether she was or she wasn't?

A     Right.

Q     When you looked around the house, did it look like her stuff was there?

A     No.

Q     It did, or it did not?

A    It did not.

Q    Okay.  At the house on Saxon Hollow, was there any baby stuff like a crib or baby toys or a baby walker, anything like that?

A    Not that I saw, no.

Q    Did you know that your father and Vicki Johns fostered two children with the idea of adopting them named Bailey, with a B, and Jazmine with a Z?

A    No.

Q    Did you ever -- did your father ever tell you that they had -- that they were fostering two children with the idea of adopting them?

A    No.

Q    Do you know anything at all about Bailey or Jazmine?

A    What do you mean?

Q    Had you ever seen them?

A    I believe the Bailey.  I believe that might be the child's name that I met.

Q    Now, let me -- let me see if I can clear this up.

     There is both a Bailey --

A    Uh-huh.

Q    -- and a Haley.

A    Okay.  Well, now, I don't know about a Bailey.

Q    Okay.  Haley comes along sometime in 2012. Bailey was a year or two or three before that.  Does that -- and when I say, "2012," that is around the time of the accident.

A    Right.

Q    All right.  The child that you met, was that before or after your father's unfortunate accident?

A    It was before.

Q    It was before?

A    Yes.

Q    How much before?

A    Be about a year before maybe.

Q    Okay.

A    A year or two before.

Q    And who did you understand Bailey to be?

A    I don't know.

Q    How did you come to meet Bailey?

        MR. DESSALET:  You mean Haley?

        MR. BREM:  No.  I mean Bailey.

A    Yeah.  That -- you threw a curve on Bailey/Haley, but I am not sure which one it was.

Q    (BY MR. BREM) Okay.

A    But...

Q    The child that you met a year or two before your father's accident --

A     Uh-huh.

Q     -- how did you come to meet that baby?

A     I went over with my father to Vicki's apartment.

Q     So you went to an apartment with your father that Vicki had?

A     Yes.

Q     Before the accident?

A     Yes.

Q     And where was that apartment?

A     It was in Houston off of Holly Hall.

Q     Over by Reliant Stadium?

A     Yes.

Q     And why were you and your father going to Vicki's apartment after -- at that time?

A     I didn't know why.

Q     Okay.  Did you believe your father and Vicki Johns to be married or divorced at that time?

A     I don't know.

Q     Didn't know one way or the other?

A     No.

Q     You knew they had separate addresses, though; is that right?

A     Correct.

Q     And there was a -- and how old a child was it

that you met when you went to that Holly Hall address?

A    It was an infant, I guess, a baby.

Q    And can you tell me whether you believe that baby's name was Haley or Bailey?

A    That, I don't know.

Q    Okay.  I am going to -- I am going to assume for a second that that's Haley.  Did you ever know that your father and Vicki Johns fostered two children who were different ages -- one was an infant, one was a few years' old -- named Bailey and Jazmine?

A    I only knew of an infant.

Q    I'm sorry?

A    I only knew of an infant.

Q    Okay.  The infant that you met sometime a year or two prior to your father's accident?

A    Correct.

Q    Let me give you a summary of what Vicki Johns testified to here and tell me what you know about that, if anything.  Okay?

A    Uh-huh.

Q    Vicki Johns -- I am going to try to be as neutral as possible.

Vicki Johns testified that she and your father got divorced in February of 2010 because CPS would not allow them to foster or adopt any children, but that

they always intended to remain as husband and wife in spite of the formal divorce.

Q   Do you know anything about that at all?

A   No.

Q   Did your father ever tell you anything like that?

A   No.

Q   How did you learn that your father and Vicki Johns were ultimately divorced?

A   I don't remember.

Q   I'm sorry?

A   I don't remember exactly.

Q   Did you learn that your father and Vicki Johns were divorced before or after his accident?

A   Before.

Q   Do you know how long before?

A   No.

Q   Do you believe that your father and Vicki Johns were living together in the Saxon Hollow house in Friendswood?

A   No.

Q   You don't believe they were?

A   No.

Q   Tell me every reason that you believe that that you can think of today.

A    Because at one point in time, I was staying there; and she wasn't there.

Q    And that's the night after you were picked up in Baton Rouge, or is that another time?

A    This would be around the time of the accident.

Q    Around the time of the accident?

A    Yes.

Q    And when you say, "around the time," you are talking about before or after?

A    After.

Q    After.  All right.

Other than that time, had you stayed in the house any other time?

A    Maybe for a weekend.  Not just one weekend, but some weekends.

Q    And in those weekends, was Vicki Johns staying there?

A    No.

Q    We are talking about Saxon Hollow -- the Saxon Hollow address in Friendswood; is that right?

A    Correct.

Q    When you and I met the last time and I was asking you questions, you told me that after the accident, you spent every night at the Saxon Hollow address.

Do you remember that?

A    Uh-huh.

Q    And that's true, right?

A    Correct.

Q    When you were staying every night for those 30 awful days at the Saxon Hollow address, was any of Vicki's stuff in the house?

A    No.

Q    Were there -- was there any stuff for a baby?

A    No.

Q    Was there anybody's stuff there other than your dad's and whatever you brought from Baton Rouge?

A    No.

Q    And I want to be clear about a fact.  When your father and Vicki picked you up in Baton Rouge after the administrative proceeding and you-all came back to Houston, she did not spend the night in the Saxon Hollow house --

A    No.

Q    -- that night?

A    No.

Q    I don't believe I have any more questions for you, although your lawyer or Mr. Farah might ask one that makes me think of something else.

A    All right.

MR. BREM: But if we can all take a break so I can run to the restroom, I would appreciate it.

MR. FARAH: Yeah, let's take a break.

THE VIDEOGRAPHER: Off the record at 3:06.

(RECESS FROM 3:06 P.M. TO 3:16 P.M.)

THE VIDEOGRAPHER: On the record at 3:16.

Q    (BY MR. BREM) Mr. Johns, one of the first things you told Mr. Farah was that you lived in Houston for some number of months between the fall of 2010 and sometime in 2011; is that right?

A    Yes.

Q    And your father was living at the Saxon Hollow address at that time?

A    I believe so.

Q    And did you ever go over there?

A    Yeah.

Q    And when you went over to the Saxon Hollow address during the months that you were living in Houston between the fall of 2010 and 2011, was Vicki Johns there when you went to visit?

A    No.

Q    Not one time?

A    Not that I remember, no.

MR. BREM: No further questions.

REEXAMINATION

BY MR. FARAH:

Q      Did you ever -- have you ever had an opportunity to e-mail with -- or correspond or e-mail with Michelle or Vicki or your father?

A      No.

Q      Okay.  Have you ever corresponded via e-mail with your -- any of your father's girlfriends?

A      No.

Q      Ever?

A      What do you mean?

Q      Like have you ever -- have your father's girlfriends or wives ever sent you an e-mail and you responded back or vice versa?

A      At one point, yes.

Q      Okay.  Who is that?

A      That would be Francis Cologne.

Q      Who is Francis Cologne?

A      Was one of my father's girlfriends.

Q      And when we say, "girlfriends," you mean like they had a relationship together?

A      Yes.

Q      Okay.  And do you have Francis' phone number?

A      Yes.

Q      What's her phone number?

A    Area code 832-264-9386.

Q    Okay.  And how many times have you met Ms. Cologne?

A    Numerous times.

Q    Numerous times?

A    Yes.

Q    Okay.  Was she at the hospital when your -- after your dad's incident?

A    I don't remember.

Q    You don't remember if she was there?

A    No.

Q    Okay.  And it's interesting that -- why have you e-mailed with her, but you don't e-mail with your father or his previous wives?

A    You said --

Q    How did that turn about?

A    You said at any point have I e-mailed.  Yes, I have.  You didn't ask me what point.

Q    Okay.  What point?

A    It would have been after the accident.

Q    Okay.  Why did you e-mail?

A    I don't remember.

Q    Okay.  And did she reach out to you, or did you reach out to her?

A    I don't remember.

Q    Okay.  Do you have those e-mails?

A    No.

Q    What did you do with those e-mails?

A    They are probably gone.

Q    Okay.  So the only time you ever corresponded with anybody that your father was in a relationship was after this incident?

A    Yes.

Q    And that was Francis Cologne?

A    Via e-mail.

Q    Via e-mail.

A    Yes.

Q    Okay.  And you are not sure if she was at the hospital.

A    I am not sure.

Q    Okay.  Would you -- how long were they dating?

A    I don't know.

Q    How did you come to start talking to her and speaking with her?

A    I met her through my father.

Q    Okay.  Walk me through the times you have met her.  How did you come to meet her?

A    I believe it might have been at the actual house where I met her for the first time.

Q    Uh-huh.

A    He introduced me to her, and that was it.

Q    **All right.  What do you know about her?**

A    She is a nice person.  She is from New York.

Q    **Uh-huh.**

A    She is, I believe, Latino or Puerto Rican. She is from Brooklyn, and she likes the Yankees.

Q    **She likes the --**

A    And she has a daughter.

Q    **And she has a daughter?**

A    Yes.

Q    **Did you meet her daughter?**

A    Yes.

Q    **What's her daughter's name?**

A    I don't remember.

Q    **And you don't know how long her and your father were dating?**

A    No.

Q    **Do you know when they started dating?**

A    No.

Q    **Do you know:  Did they ever end-date their relationship, or did it continue on?**

A    Can you repeat that?

Q    **Did their relationship ever end before his -- before the incident?**

A    Oh, no.

Q    How do you know that?

A    Because we talked frequently.

Q    So you talked to Francis Cologne frequently.

A    Yeah.

Q    But you don't -- you never talked to Vicki frequently.

A    No.

Q    You never talked to Michelle frequently.

A    No.

Q    Why Francis?  Why did you want -- why did you and her talk frequently?

A    I don't know.  Just natural chemistry, I guess.  I don't know.

Q    What's your e-mail address?

A    I have two e-mail addresses.  My yahoo is coroj89@yahoo.com.  My Gmail is corey, C-o-r-e-y, jjohns89@gmail.com.

Q    coreyjjohns?

A    Yes.

Q    When you stayed at your father's house after the incident, were there any vehicles there?

A    Yes.

Q    What vehicles were there?

A    A Mercedes and a GMC.

Q    Had you seen those vehicles before?

A    Yes.

Q    And the GMC, was it a Tahoe or...

A    I think it was a Yukon.

Q    Yukon?  Yukon?  Okay.

What kind of Mercedes?

A    S600.

Q    Okay.  And whose names were those vehicles under?

A    I don't know.

Q    You don't know?

A    No.

Q    And those vehicles stayed there the entire time that you were staying at that house?

A    Yes.

Q    Did you drive those vehicles?

A    Did I drive them?

Q    Uh-huh.

A    Yes.

Q    Which vehicles did you drive?

A    Both.

Q    Both of them?  Okay.

Now, you mentioned that you went with your dad one time with Vicki to the Holly Hall apartment, correct?

A    Correct.

Q   About what type -- about what year was that?

A   Either 2010 or 2011.

Q   Okay.  And you said you don't remember why you guys were at the apartment?

A   I mean, once I got to the apartment, I saw why we were there; but prior to, I did not know why we were going.  '

Q   Well, why did you see you were there once you got to the apartment?

A   Repeat that.

Q   What did you see to realize why you were there when you finally got to the apartment?

A   Because there was another person there, a case worker.

Q   Okay.  So it was your dad, the case worker, and Vicki?

A   And a child.

Q   And the child?

A   Correct.

Q   Do you remember the child's name?

A   No.

Q   Was that Haley?

A   It was either Haley or Bailey.

Q   But it was an infant?

A   Correct.

Q      Okay.  And so you guys walked -- do you remember walking in?

A      Yes.

Q      What did you do after you walked in?

A      Me and my dad sat on the couch and --

Q      Okay.

A      -- watched the -- there was a playoff game on at the time.

Q      Which playoff game was it?

A      The Bulls and the Hawks.

Q      Bulls and Hawks, 2011.

A      Or 2010.

Q      Who was at home, the Hawks or the Bulls?

A      The Bulls.

Q      The Bulls were at home?

A      Yes.

Q      Okay.  So you sit down and watch the game, and then what happens?

A      Vicki and the other man were talking in the kitchen area or whatever.  After he left, we left.

Q      You don't -- what kind of case worker was this?

A      I don't know.

Q      So why did you -- so you and your dad showed up and you sat down and watched the game?  Why did he

have to be there if he was going to just watch the game?

A    I don't know.

Q    Did they ask him any questions?

A    No.

Q    Did they ask you any questions?

A    No.

Q    You just knew there was a case worker talking with Vicki?

A    Uh-huh.

Q    Did you find it unusual that you and your dad were at that apartment with Vicki?

A    Did I find it unusual?

Q    Uh-huh.

A    Yes.

Q    Did you ask your dad about it?

A    No.

Q    Did you ask your dad why Vicki was in an apartment?

A    No.

Q    Did you ask your dad why -- who this child was that Vicki had?

A    No.

Q    How was your dad's relationship with --

A    Excuse me.

Q    That's all right.

How was your dad's relationship with his family, with your -- with his mother?

A     I guess good standing would be the right way to answer that.  I don't know.

Q     Did you know -- I mean, he ever talk to you about his relationship with his mother?

A     I mean, he loved her.

Q     Uh-huh.

A     I don't know how you want me to answer that.

Q     Well, did your dad ever have any -- did you -- have you ever been a witness to any disputes between your dad and your mother?

A     No.

Q     Okay.

A     My mother or my grandmother?

Q     Oh, sorry.  His mother, your grandmother.

A     No.

Q     Okay.  What was your dad's relationship like with his sister?

A     The same way.  I mean, good standing.  I don't know how to answer that.  There wasn't any problems, any disputes, if that's what you mean.

Q     Okay.

A     If that's what you are asking me, no, no problems.  I mean, typical family.

Q    Okay.  Did you -- how many times have you been to Ms. Roberson's house for Thanksgiving?

A    For Thanksgiving?

Q    Uh-huh.

A    None.

Q    How about Christmas?

A    Maybe a few as a child.

Q    But none recently?

A    No.  We spent Thanksgiving at my grandmother's house.

Q    Which grandmother?  Your dad's mother?

A    Yes.

Q    So all Thanksgivings would be at your grandmother's house?

A    Yes.

Q    Ms. Frances Sowell's house?

A    Yes.

Q    Did I say it right, "Sowell"?

A    Sowell.

Q    Sowell?

And at those Thanksgivings your dad would show up?

A    Yes.

Q    Did Vicki show up with him at those Thanksgivings?

A    Not that I remember, no.

Q    Vicki didn't show up to any Thanksgivings at Ms. Sowell's house ever?

A    Not that I can remember.

Q    From the day they met until he passed, you never remember her being there?

A    Not that I can remember.

Q    Okay.  Do you know why?

A    No.

Q    You didn't find that unusual?

A    No.

Q    Had you ever gone to any Christmases or Thanksgivings with Vicki Johns' family?

A    No.

Q    Okay.  Had you ever met any of Vicki Johns' family?

A    Yes.

Q    Who have you met from Vicki Johns' family?

A    Her mother, her sister, her niece, and two of her nephews.

Q    Do you know their names?

A    No.

Q    Okay.  Had you ever spent any holidays with her mother and her sister and...

A    No.

Q    Okay.  Would you say that you guys spent --
from the time that your dad married Vicki until the time
of his passing, did you spend every Thanksgiving at your
grandmother's house?

A    No.

Q    No?
Was Ms. Roberson at your grandmother's house
on Thanksgivings?

A    Say what?

Q    Was Ms. Roberson at your grandmother's house
on Thanksgivings?

A    Yes.

Q    Okay.  So for Thanksgivings, that was kind of
your grandmother's deal, correct?

A    Correct.

Q    What would you do on Christmases?  Where would
you spend Christmases?

A    Some years I would go to my father's.  Some
years I would stay with my mother's side of the family.

Q    Okay.  And when you would go with your father,
where would you go with him?  To his house or would it
be to his mother's or -- where would you spend that
time?

A    It varies from -- either to his house or to my
grandmother's house, yes.

Q    Okay.  And during the period of time that your dad met Vicki until his death, was Vicki Johns ever at these Christmases or Thanksgivings?

A    I am not sure.

Q    You don't remember, or you don't know?

A    I don't remember.

Q    Okay.  She could have been or she couldn't have been.  You just don't remember?

A    Right.

Q    Okay.  And that's for Christmas, right?

A    Right.

Q    The same for Thanksgiving or you don't --

A    Not for Thanksgiving.

Q    For sure you know she wasn't at your grandmother's for Thanksgiving?

A    For sure.

Q    Okay.  What was your -- your -- Vicki Johns' relationship with your grandmother?

A    I don't know.

Q    Okay.  Did -- your grandmother never had anything to say about Vicki at all?

A    Not to me.

Q    No?  You never overheard her say anything about Vicki?

A    No.

Q       Have you ever overheard anybody in your family say anything negative about Vicki?

A       No.

Q       Or positive about Vicki?

A       No.

Q       Including your father?

A       Correct.

Q       It was just like she wasn't there.

A       Hey, you said it.  I didn't.

Q       When you were in the apartment, did your dad ever hold that child that Vicki had?

A       No.

Q       No?

        Did your dad ever tell you who that child was?

A       No.

Q       Did your dad ever tell you he was a foster parent at any point?

A       No.

Q       If you can pin -- I know you can't -- I know it's going to be hard to pinpoint a day; but if you could pinpoint a month and year when you realized that Vicki and your dad weren't married, what month and year would that be?

A       I can't pinpoint.  Can't pinpoint.

Q       Were they married -- okay.

Were they married in 2012?

A    I don't know.

Q    Were they married in 2011?

A    I don't know.

Q    Were they married in 2010?

A    I don't know.

MR. FARAH:   No further questions.

REEXAMINATION

BY MR. BREM:

Q    Mr. Johns, I have a few more; and I want to make sure that I understand a few things you just said. When you and your father went to the Holly Hall apartment, what you were just talking about, did your father have a key?  Did he just open the door?

A    No.

Q    Did he -- how did y'all get in?

A    She opened the door for us.

Q    Y'all knocked?

A    Yes.

Q    And did you -- when you were there, did you have the sense that your father had any clothes there, was staying there at all?

A    No.

Q    Let me get the chronology down of the women that you know about in your father's life.

Michelle?

A   Uh-huh.

Q   And then Vicki and then Francis; is that right?

A   You are talking -- you are asking me period or just the names that we know of?

Q   Well, I'm asking you the order of it.

A   Oh, yes.

Q   So there was Michelle first; is that right?

A   Right.

Q   And then Vicki?

A   Uh-huh.

Q   And then you know about Francis?

A   Right.

Q   Do you know anybody else between Vicki and Francis?

A   Yes.

Q   Who else do you know about?

A   I know of a Stacyg17.

   Johnson.

Q   Stacy Johnson?  Okay.

   And anybody else?

A   No.

Q   So you know about Stacy Johnson and then Francis Cologne; is that right?

A    Correct.

Q    All right. When did you -- when did you learn that your father had a relationship with Francis Cologne? When was the first time you learned that?

A    I can't pinpoint an actual date or time.

Q    Was your father in a relationship with Francis Cologne at the time of the accident?

A    Yes.

Q    Did you understand him to consider her his girlfriend at the time of the accident?

A    Yes.

Q    Can you say how long that relationship had been going on prior to the accident?

A    To my knowledge, maybe a year.

Q    So your father had had a relationship with Francis Cologne something like a year prior to the accident?

A    Correct.

Q    If your father was having a relationship with Francis Cologne for something like a year before the accident, was he also having any kind of relationship with Vicki Johns?

A    It's possible.

Q    It's possible?

A    Uh-huh.

Q    You just don't know one way or the other?

A    Right.

Q    Did you know -- well, let me ask you specifically:  Are you aware that during the time he was having a relationship with Francis Cologne, whether or not he was also having a relationship with Vicki Johns?

A    No.  I never physically or visually saw Vicki at that time.

Q    Okay.  So after you first met Francis Cologne, did you ever see your father with Vicki Johns again?

A    No.

Q    Now, am I right that Stacy Johnson is before Francis?

A    Around the same time.

Q    Around the same time?

A    Uh-huh.

Q    And then your father was having a relationship at the same time as Francis with Stacy Johnson; is that right?

A    Yes.

Q    So kind of a year before the accident?

A    Yes.

Q    So your father had two girlfriends at the time of the accident?

A    Yes.

Q    And during that time, if he was having a relationship with Vicki Johns, you are unaware of it; is that right?

A    Correct.

MR. BREM:  No further questions.

REEXAMINATION

BY MR. FARAH:

Q    So your dad was seeing two women at the same time?

A    Could have been more but, yeah.

Q    And why do you say it could have been more?

A    Because I -- after the accident, I met with -- not met with, but spoken with a couple of women that told me so.

Q    Okay.  Do you know if between 2010 and 2000 -- I'm sorry -- 2007 and 2010 your dad was having relationships with multiple women?

A    That, I don't know.

Q    Okay.  Those women that you spoke to, do you know the name of those women you spoke to?

A    Of the other women?

Q    Yeah.

A    There was another Stacy, and there was a Jennifer.

MR. BREM:  I didn't hear the last one's

name.

THE WITNESS: Jennifer.

MR. FARAH: Another Stacy and a Jennifer.

Q   (BY MR. FARAH) And did you -- did you have any idea of the timeline in which they were dating your father?

A   No.

Q   Is it possible that this other Stacy and Jennifer could have been dating your father at the same time he was married to Vicki?

A   I can't say.

Q   Do you know if your father was dating anybody while he was married to Vicki?

A   No, I don't know.

Q   You don't know?

A   No.

MR. FARAH: No further questions.

MR. BREM: I don't think I have a single one.

MR. WYNNE: I am going to reserve all of mine until the time of trial. I like when people say that. I usually just say, "nothing."

THE VIDEOGRAPHER: Off the record at 3:36, ending deposition of Mr. Corey Johns.

(DEPOSITION CONCLUDED AT 3:36 P.M.)

CHANGES AND SIGNATURE

WITNESS NAME: _____

DATE OF DEPOSITION: _____

PAGE LINE          CHANGE                    REASON

_____

_____

No.

Changes

I, COREY J. JOHNS, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_Cory Je_
COREY J. JOHNS

THE STATE OF _Louisiana_
~~COUNTY~~ OF _East Baton Rouge_
PARISH

Before me, _Harold W. Isale_, on this day personally appeared COREY J. JOHNS, known to me (or proved to me under oath or through _Texas Driver's License_) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _16th_ day of _June_, _2015_.

_Harold W. Isadore_
NOTARY PUBLIC IN AND FOR
THE STATE OF _Louisiana_
COMMISSION EXPIRES: _"at Death"_



HAROLD W. ISADORE
NOTARY PUBLIC
NOTARY #59634
STATE OF LOUISIANA
My Commission is
for Life

CAUSE NO. 415,980-401

FRANCES SOWELL,                  ) IN THE DISTRICT COURT
INDIVIDUALLY AND AS AN           )
HEIR OF BRIAN EDWARDS            )
JOHNS, DECEASED, AND AS          )
ADMINISTRATOR OF THE             )
ESTATE OF BRIAN EDWARD           )
JOHNS, DECEASED; COREY           )
JOHNS, INDIVIDUALLY AND          )
AS AN HEIR OF BRIDAN             )
EDWARD JOHNS, DECEASED,          )
        Plaintiffs,              )
                                 )
                                 )
JAMES JOHNS, SR.                 )
        Intervenor,              )
                                 )
VICKI JOHNS, INDIVIDUALLY        ) NUMBER ONE (1) OF
AND AS AN HEIR OF BRIAN          )
JOHNS, DECEASED                  )
        Intervenor               )
                                 )
VS.                              )
                                 )
THE DOW CHEMICAL COMPANY,        )
ROHM AND HAAS COMPANY,           )
ROHM AND HAAS TEXAS INC.,        )
TIM FOX, AND JULIO               )
RODRIGUEZ                        )
        Defendants.              ) HARRIS COUNTY, TEXAS


REPORTER'S CERTIFICATION
DEPOSITION OF COREY J. JOHNS
MAY 19, 2015


I, Mona S. Whitmarsh, Certified Shorthand Reporter

in and for the State of Texas, hereby certify to the

following:

That the witness, COREY J. JOHNS, was duly sworn by

the officer and that the transcript of the oral

deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted on ___6-4-15___ to the witness or to the attorney for the witness, for examination, signature and return to me by ___6-24-15___;

That the amount of time used by each party at the deposition is as follows:

Mr. Farah    00:58        Mr. Wynne    00:00

Mr. Brem     00:20        Mr. Morel    00:00

That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

Mr. Bob Wynne, Counsel for Plaintiffs,

Mr. Michael Brem and Mr. Thomas Morel, Counsel for Defendants,

Mr. George Farah, Counsel for Intervenor, Vicki Johns;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Further certification requirements pursuant to Rule 203 of TRCP will be certified to after they have occurred.

Certified to by me this ___ of ___, 2015.

Mona S. Whitmarsh
Texas CSR No. 3986
Expiration Date:  12/31/15

Stratos Legal Services, L.P.
Firm Registration No. 484
4295 San Felipe, Suite 125
Houston, Texas  77027
713.481.2180

FURTHER CERTIFICATION UNDER RULE 203 TRCP

The original deposition was/was not returned to the deposition officer on ____6·22·15____;

If returned, the attached Changes and Signature page contains any changes and the reasons therefor;

If returned, the original deposition was delivered to _George K. Farah_, Custodial Attorney;

That $612.61 is the deposition officer's charges to the Intervenor, Vicki Johns, for preparing the original deposition transcript and any copies of exhibits;

That the deposition was delivered in accordance with Rule 203.3, and that a copy of this certificate was served on all parties shown herein on and filed with the Clerk.

Certified to by me this _1st_ day of _July_, 2015.

_Mona S. Whitmarsh_
Mona S. Whitmarsh
Texas CSR No. 3986
Expiration Date: 12/31/15

Stratos Legal Services, L.P.
Firm Registration No. 484
4295 San Felipe, Suite 125
Houston, Texas 77027
713.481.2180

| | | |
|---|---|---|
| FRANCES SOWELL, INDIVIDUALLY AND AS HEIR OF BRIAN EDWARD JOHNS, DECEASED, AND AS ADMINISTRATOR OF THE ESTATE OF BRIAN EDWARD JOHNS, DECEASED; COREY JOHNS, INDIVIDUALLY AND AS AN HEIR OF BRIAN EDWARD JOHNS, DECEASED *Plaintiffs,* | § § § § § § § § § § § § | IN THE PROBATE COURT |
| JAMES JOHNS, SR. *Intervener,* | § § § § | NUMBER ONE (1) OF |
| VICKI JOHNS, INDIVIDUALLY AND AS AN HEIR OF BRIAN EDWARD JOHNS, DECEASED *Intervener* | § § § § § § | |
| V. | § § | |
| THE DOW CHEMICAL COMPANY, ROHM AND HAAS COMPANY, ROHM AND HAAS TEXAS, INC., TIM FOX, AND JULIO RODRIGUEZ *Defendants.* | § § § § § § | HARRIS COUNTY, TEXAS |

CAUSE NO. 415980-401

| | | |
|---|---|---|
| ESTATE OF | § | IN THE PROBATE COURT |
| BRIAN EDWARD JOHNS, | § | NUMBER ONE (1) OF |
| DECEASED | § | HARRIS COUNTY, TEXAS |

## INTERVENOR, VICKI JOHNS' FIRST REQUEST FOR PRODUCTION TO PLANTIFFS FRANCES SOWELL AND COREY JOHNS



EXHIBIT

A

TO: Plaintiffs, Corey Johns and Francis Sowell, by and through their attorneys of record, Rusty Hardin and Bob Wynne, Rusty Hardin & Associates LLP, 5 Houston Center, 1401 McKinney, Suite 2250 Houston, TX 77010.

COMES NOW, Intervener, Vicki Johns, and files this, her First Request for Production to Plaintiffs, Corey Johns, and Francis Sowell, hereby requests that Plaintiffs produce for Intervener's inspection, photocopying or reproduction of the records, documents and items listed in this request for production. *.PURSUANT TO RULE 193.7 THIS REQUEST WILL FURTHER SERVE AS ACTUAL NOTICE THAT THE PLAINTIFF INTENDS TO USE PRODUCED DOCUMENTS AGAINST YOU IN PRETRIAL PROCEEDINGS AND AT TRIAL. ACCORDINGLY, YOUR PRODUCTION OF A DOCUMENT(S) IN RESPONSE TO THIS REQUEST AUTHENTICATES THE DOCUMENT(S) FOR USE AGAINST YOU IN ANY PRETRIAL PROCEEDING OR AT TRIAL UNLESS YOU OBJECT TO THE AUTHENTICITY OF ANY PRODUCED DOCUMENT(S) WITHIN THE TIME LIMITS AND AS PARTICULARLY SET OUT IN TEX.R.CIV.P 193.7, FROM THE DATE OF SERVICE OF THIS NOTICE.*

Respectfully submitted,

BY: _____
GEORGE K. FARAH
State bar No. 24040882
SARAH C. DIONNE
State bar No. 24072229
GUERRA & FARAH, PLLC
4101 Washington Ave., 3rd Floor
Houston, Texas 77007
T: (713) 529-6606
F: (713) 529-6605
Email: gkf@gflawoffices.com
Email: scd@gflawoffices.com

ATTORNEYS FOR INTERVENOR
VICKI JOHNS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been delivered in compliance with Tex.R.Civ.P. 21 & 21a to all counsel of record on this the 28th day of January, 2015.

Rusty Hardin
Bob Wynne
RUSTY HARDIN & ASSOCIATES, LLP
5 Houston Center
1401 McKinney, Suite 2250
Houston, TX 77010
VIA FASCIMILE (713) 652-9800
*Attorneys for Plaintiffs*

Michael L. Brem
SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP
Pennzoil Place – North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
VIA FASCIMILE (713) 228-3510
*Attorney for The Dow Chemical Company*

Darrell A. Apffel
S. Benjamin Shabot
BETTISON DOYLE APFFEL & GUARINO, P.C.
1100 Gulf Freeway, Suite 100
League City, Texas 77573
VIA FASCIMILE (409) 744-9786
*Attorneys for Intervenor James Johns, Sr.*

Mr. Robert S. MacIntyre, Jr.
MACINTYRE MCCOLLOCH STANFILED & YOUNG
2900 Weslayan, Suite 150
Houston, Texas 77027
VIA FASCIMILE (713) 572-2902

_____
George K Farah

## DEFINITIONS AND INSTRUCTIONS

1. DOCUMENT or DOCUMENTATION refers to any paper, book, record, letter, memorandum, contract, agreement, invoice, receipt, canceled check, telegram, manual, newsletter, announcement, catalogue, diary entry, calendar, bulletin, tape, disk, partial or complete reports on or transcriptions of telephone or other conversations, accounting entry, financial calculation, drawing, sketch, or other similar materials which contain any verbal, graphic or pictorial information.

2. PERTAINING, PERTAINING TO, or PERTAINING THERETO means commenting upon, including, concerning, containing, regarding, discussing, reflecting, relating to, relevant to, used in connection with, embodying or evidencing and should be construed in the broadest sense of the word.

3. Production of Documents

   All documents and things described in this request are required to be produced. No part of the documents should be removed, destroyed, or concealed. In determining which documents and things you are required to produce, you should carefully read and comply with the definitions and instructions incorporated herein by reference.

4. Lost or Destroyed Documents

   If it is claimed that any document or thing has been lost or destroyed, for each such document or thing state the circumstances relating to the loss or destruction of each such document or thing, the approximate date of loss or destruction and a reasonably complete description of the contents of said document, file, or thing.

5. Accuracy of Information

   If you do not have accurate production of or information with respect to any Request for Production or any part thereof, state and give your best estimate as to the matter inquired about.

## INTERVENOR, VICKI JOHNS' FIRST REQUEST FOR PRODUCTION TO PLAINTIFFS, FRANCES SOWELL AND COREY JOHNS

1. All photographs taken in connection with Intervener's cause of action in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Plaintiff's behalf.

2. All photographs taken of the scene of the accident or the surrounding area of the scene of the accident in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Plaintiff's behalf.

3. All photographs taken of Intervener which may be in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Defendant's behalf.

4. All pictures, motion pictures, movies, films, or photographic material of any kind taken of Intervener which are in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Plaintiff's behalf.

5. All pictures, motion pictures, movies, films, or photographic material of any kind concerning the scene, products or the events and happenings made the basis of the lawsuit taken before, during or after the accident in question which are in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Plaintiff's behalf.

6. All written statements made by the Intervener in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Plaintiff's behalf.

7. All oral statements made by Intervener which were either recorded or taped on an electronic device or recorder which are in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Plaintiff's behalf.

8. A copy of all documents filed with any state, county, city, federal or governmental agency, institution or department containing information about Intervener which are in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Plaintiff's behalf.

9. Any and all copies of investigation documentation, reports and/or memoranda made by or submitted to Plaintiff, as a result of the incident which has been made the basis of Intervener's lawsuit.

10. Copies of any and all books, documents or other tangible things which may or may not be introduced at trial, but which may have a bearing on Intervener's cause of action and may be used as demonstrative evidence at trial.

11. Any and all contents belonging to Brian Johns which found in his DOW work locker after

the incident which forms the basis of this lawsuit.

12. A signed copy of the authorization to obtain medical records Brian Johns attached hereto as Exhibit "A."

13. A signed copy of the authorization to obtain educational records for Corey Johns attached hereto as Exhibit "B."

14. Any and all photographs of Vicki Johns in the possession of Plaintiffs.

15. A copy of the rental agreement for the storage facility which was rented to store Vicki and Brian Johns' belongings after the incident which forms the basis of this lawsuit.

16. All belongings of Vicki Johns in the possession of Plaintiffs which were taken from her home located at 3827 Saxon Hollow Ct., Friendswood, Texas 77546 after the incident which forms the basis of this lawsuit,

17. A signed copy of the authorization to obtain cellular phone records for Plaintiffs attached hereto as Exhibit "C."

18. Copy of any and all documents supporting Frances Sowell's authority to act as the administrator of Brian Johns' estate.

19. A copy of the power of attorney signed by Brian Johns authorizing Frances Sowell to act on Brian Johns' behalf after the incident which forms the basis of this lawsuit.

20. A signed copy of the authorization to obtain employment records for Frances Sowell attached hereto as Exhibit "D."

21. Copy of any and all documents showing that Vicki Johns was placed on notice of any proceedings naming Frances Sowell as the administrator of Brian Johns' estate.

22. Any and all written correspondence between Corey Johns and Brian Johns before the incident which forms the basis of this lawsuit.

23. Any and all written correspondence between Frances Sowell and Brian Johns before the incident which forms the basis of this lawsuit.

24. Any and all written correspondence between Corey Johns and Pam Roberson after the incident which forms the basis of this lawsuit.

25. Any and all written correspondence between Frances Sowell and Pam Roberson after the incident which forms the basis of this lawsuit.

26. Any and all written correspondence between Plaintiffs and Vicki Johns before and after the incident which forms the basis of this lawsuit.

27. A copy of Plaintiffs' driver's license.

4825-8230-7873, v. 1

| | | |
|---|---|---|
| FRANCES SOWELL, | § | IN THE PROBATE COURT |
| INDIVIDUALLY AND AS HEIR OF | § | |
| BRIAN EDWARD JOHNS, | § | |
| DECEASED, AND AS | § | |
| ADMINISTRATOR OF THE ESTATE | § | |
| OF BRIAN EDWARD JOHNS, | § | |
| DECEASED; COREY JOHNS, | § | |
| INDIVIDUALLY AND AS AN HEIR | § | |
| OF BRIAN EDWARD JOHNS, | § | |
| DECEASED | § | |
| *Plaintiffs,* | § | |
| | § | NUMBER ONE (1) OF |
| JAMES JOHNS, SR. | § | |
| *Intervener,* | § | |
| | § | |
| VICKI JOHNS, INDIVIDUALLY | § | |
| AND AS AN HEIR OF BRIAN | § | |
| EDWARD JOHNS, DECEASED | § | |
| *Intervener* | § | |
| | § | |
| V. | § | |
| | § | |
| THE DOW CHEMICAL COMPANY, | § | HARRIS COUNTY, TEXAS |
| ROHM AND HAAS COMPANY, | § | |
| ROHM AND HAAS TEXAS, INC., | § | |
| TIM FOX, AND JULIO RODRIGUEZ | § | |
| *Defendants.* | § | |

---

| | | |
|---|---|---|
| ESTATE OF | § | IN THE PROBATE COURT |
| BRIAN EDWARD JOHNS, | § | NUMBER ONE (1) OF |
| DECEASED | § | HARRIS COUNTY, TEXAS |

**INTERVENOR, VICKI JOHNS' FIRST SET OF INTERROGATORIES TO PLAINTIFF COREY JOHNS, INDIVIDUALLY AND AS HEIR OF BRIAN EDWARD JOHNS, DECEASED**

**TO:** Plaintiff, Corey Johns, by and through his attorneys of record, Rusty Hardin and Bob Wynne, Rusty Hardin & Associates LLP, 5 Houston Center, 1401 McKinney, Suite 2250, Houston, TX 77010.

Please take notice that pursuant to Rules 192 and 197 of the Texas Rules of Civil Procedure, Intervenor, serves the attached interrogatories to be propounded to Plaintiff, Corey Johns.

You are hereby instructed to answer the following interrogatories separately, fully, in writing, and under oath if required by Rule 197.2(d) of the Texas Rules of Civil Procedure. The answers shall be served upon the undersigned counsel within 30 days after the service of these interrogatories.

Your failure to make timely answers or objections may subject you to sanctions as provided in Rule 215 of the Texas Rules of Civil Procedure.

Furthermore, demand is made for the supplementation of your answers to these interrogatories as required by Rule 193.5 of the Texas Rules of Civil Procedure.

Respectfully submitted,

BY: _____
GEORGE K. FARAH
State Bar No. 24040882
SARAH C. DIONNE
State Bar No. 24072229
GUERRA & FARAH, PLLC
4101 Washington Ave., 3rd Floor
Houston, Texas 77007
T: (713) 529-6606
F: (713) 529-6605
Email: gkf@gflawoffices.com
Email: scd@gflawoffices.com

ATTORNEYS FOR INTERVENOR
VICKI JOHNS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been delivered in compliance with Tex.R.Civ.P. 21 & 21a to all counsel of record on this the 28th day of January, 2015.

Rusty Hardin
Bob Wynne
RUSTY HARDIN & ASSOCIATES, LLP
5 Houston Center
1401 McKinney, Suite 2250
Houston, TX 77010
VIA FASCIMILE (713) 652-9800
*Attorneys for Plaintiffs*

Michael L. Brem
SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP
Pennzoil Place – North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
VIA FASCIMILE (713) 228-3510
*Attorney for The Dow Chemical Company*

Darrell A. Apffel
S. Benjamin Shabot
BETTISON DOYLE APFFEL & GUARINO, P.C.
1100 Gulf Freeway, Suite 100
League City, Texas 77573
VIA FASCIMILE (409) 744-9786
*Attorneys for Intervenor James Johns, Sr.*

Mr. Robert S. MacIntyre, Jr.
MACINTYRE MCCOLLOCH STANFILED & YOUNG
2900 Weslayan, Suite 150
Houston, Texas 77027
VIA FASCIMILE (713) 572-2902

George K Farah

## Definitions and Instructions

A.    "You" and "Your": The terms "you" and "your" shall mean Plaintiff, Corey Johns, and all other persons or entities acting or purporting to act on Plaintiff, Corey Johns's behalf, whether authorized or not.

B.    "Person": The term "person" shall include individuals, and every type of entity, whether formed for business purposes or not.

C.    "Documents": The term "documents" shall mean writings of every type and from any source, including originals and non-identical copies thereof, that are in your possession, custody, or control or known by you to exist. This would include documents sent outside your organization to any source as well as documents intended for internal use.

The term also includes communications not only in words, but in symbols, pictures, sound recordings, films, tapes, and information stored in, or accessible through, computers or informational storage or retrieval systems, the term also includes codes and programming instructions and other materials necessary to understand such systems.

The term includes, but is not limited to: calendars, checkbooks, agendas, agreements, analyses, bills, invoices, records of obligations and expenditures, corporate bylaws and charters, correspondence, diaries, files, legal documents, financial documents including balance sheets and profit and loss statements, letters, memoranda recording telephone or in-person conferences, manuals, books, press releases, purchase orders, records, schedules, memos of interviews, evaluations, written reports of tests or experiments, public relations releases, telegrams, teletypes, work papers, drafts of documents, and all other writings whose contents are related to the subject matter of the discovery request.

D.    If you claim a privilege or exemption from discovery for any of the material, please state the specific ground for each privilege or immunity claimed, in order that the Intervener can determine the merit of the objection.

E.    "Identify" or "Identification":

    1.    As to a person: When used in a reference to a person or individual, the terms "identify" or "identification" mean to state his/her full name, address, and telephone number.

    2.    As to an entity: The terms "identify" or "identification" when used in reference to an entity such as a corporation, partnership or association, means to state the name of the entity, its business address, telephone number, and name of its chief executive officer.

3.    As to a document: When used in reference to a document, the terms "identify" or "identification" shall include the following:

   a.    A title, heading or caption of such document.

   b.    The date appearing on such document; or if no date appears, the approximate date on which the document was prepared.

   c.    A general description of the document; or if no name appears, the approximate date on which the document was prepared.

   d.    The name of the person who signed the document or a statement that it was unsigned.

   e.    Name of the person or person who prepared the document.

   f.    Name of the person or persons to whom the document was addressed and to whom the document was sent.

   g.    The physical location of the document.

## INTERVENOR, VICKI JOHNS' FIRST SET OF INTERROGATORIES TO PLAINTIFF, COREY JOHNS

1. Identify each person either participating in the preparation of the answers to these interrogations or supplying information used in such preparation, and indicate the interrogatories with respect to which he or she was involved.

**ANSWER:**

2. State the Style, Court and Cause number of any lawsuit you have been a party to and the final disposition of said suit.

**ANSWER:**

3. Have you, your agents, investigators or attorneys or anyone acting on your behalf obtained a written or recorded statement of any kind, report or memorandum, whether recorded stenographically transcribed, oral or otherwise from any person related to this case? If so, please identify the individual from whom the statement was taken and the date the statement was taken. If so, then please also indicate your willingness to allow Intervener to inspect and copy or photograph the same.

**ANSWER:**

4. Please state completely and fully all representations, statements, declarations or admissions made by Intervener or any agent, servant or employee of Intervener. Include in your answer when the communication was made, the total verbatim communication and, if that is not possible, then state the detailed substance of the communication, by whom the communication was made, where such communication took place, and all persons present when such communication was made.

**ANSWER:**

5. Please state in full detail each and every contention or denial of the marriage between Vicki and Brian Johnson any claim made the basis of this suit. Include in your answer:

   a. all facts known to you, and all propositions of law that your attorney, or anyone acting on your behalf or their behalf, which you contend support or corroborate each such denial;

   b. the name, business and residence address, and telephone number of each person known to you who claims to have any knowledge relating to each such denial of any claim; and

   c. the name, business and residence address, and telephone number of the present custodian of any writings in support of each such denial.

**ANSWER:**

6. When were you first made aware that Vicki Johns and Brian Johns had filed for divorce?

**ANSWER:**

7. Do you intend to attempt to impeach Intervener, or any employee, agent, representative, attorney or any other natural person or business or legal entity associated in any way with or acting or purporting to act for or on behalf of Intervener, with evidence of a criminal conviction, if any, as described in Rule 609 of the Texas Rules of Evidence? If so, please describe in detail such evidence, giving name of accused, nature of conviction and charges on which convicted, year of conviction and whether or not parole has been successfully completed or pardon granted.

**ANSWER:**

8. Please state your educational history from high school until the date of the incident which forms the basis of this lawsuit. Please include institution names and dates of attendance.

**ANSWER:**

9. What documents, photographs or other information do you have that support your contention that Brian Johns and Vicki Johns were not common law married?

**ANSWER:**

10. How many times did you speak to Vicki Johns at the hospital were Brian Johns was being treated for his injuries on July 17, 2012? What did you discuss?

**ANSWER:**

11. Who contacted you regarding the incident which caused Brian Johns' injuries on July 17, 2012?

**ANSWER:**

12. Please list any criminal convictions, felony or misdemeanor, occurring in the last ten (10) years (excluding traffic offenses). Include the offense or which you were convicted, and date and place of such conviction.

**ANSWER:**

CAUSE NO. 415980-401

| | | |
|---|---|---|
| FRANCES SOWELL, | § | IN THE PROBATE COURT |
| INDIVIDUALLY AND AS HEIR OF | § | |
| BRIAN EDWARD JOHNS, | § | |
| DECEASED, AND AS | § | |
| ADMINISTRATOR OF THE ESTATE | § | |
| OF BRIAN EDWARD JOHNS, | § | |
| DECEASED; COREY JOHNS, | § | |
| INDIVIDUALLY AND AS AN HEIR | § | |
| OF BRIAN EDWARD JOHNS, | § | |
| DECEASED | § | |
| *Plaintiffs,* | § | |
| | § | NUMBER ONE (1) OF |
| JAMES JOHNS, SR. | § | |
| *Intervener,* | § | |
| | § | |
| VICKI JOHNS, INDIVIDUALLY | § | |
| AND AS AN HEIR OF BRIAN | § | |
| EDWARD JOHNS, DECEASED | § | |
| *Intervener* | § | |
| | § | |
| V. | § | |
| | § | |
| THE DOW CHEMICAL COMPANY, | § | HARRIS COUNTY, TEXAS |
| ROHM AND HAAS COMPANY, | § | |
| ROHM AND HAAS TEXAS, INC., | § | |
| TIM FOX, AND JULIO RODRIGUEZ | § | |
| *Defendants.* | § | |

---

CAUSE NO. 415980-401

| | | |
|---|---|---|
| ESTATE OF | § | IN THE PROBATE COURT |
| BRIAN EDWARD JOHNS, | § | NUMBER ONE (1) OF |
| DECEASED | § | HARRIS COUNTY, TEXAS |

**INTERVENOR, VICKI JOHNS' FIRST SET OF INTERROGATORIES TO
PLAINTIFFS FRANCES SOWELL, INDIVIDUALLY AND AS HEIR OF BRIAN
EDWARD JOHNS, DECEASED, AND AS ADMINISTRATOR OF THE ESTATE OF
BRIAN EDWARD JOHNS, DECEASED**

**TO:** Plaintiffs, Frances Sowell, by and through her attorneys of record, Rusty Hardin and Bob Wynne, Rusty Hardin & Associates LLP, 5 Houston Center, 1401 McKinney, Suite 2250, Houston, TX 77010.

Please take notice that pursuant to Rules 192 and 197 of the Texas Rules of Civil Procedure, Intervenor, serves the attached interrogatories to be propounded to Plaintiff, Frances Sowell.

You are hereby instructed to answer the following interrogatories separately, fully, in writing, and under oath if required by Rule 197.2(d) of the Texas Rules of Civil Procedure. The answers shall be served upon the undersigned counsel within 30 days after the service of these interrogatories.

Your failure to make timely answers or objections may subject you to sanctions as provided in Rule 215 of the Texas Rules of Civil Procedure.

Furthermore, demand is made for the supplementation of your answers to these interrogatories as required by Rule 193.5 of the Texas Rules of Civil Procedure.

Respectfully submitted,

BY: /s/ George K. Farah
GEORGE K. FARAH
State Bar No. 24040882
SARAH C. DIONNE
State Bar No. 24072229
GUERRA & FARAH, PLLC
4101 Washington Ave., 3rd Floor
Houston, Texas 77007
T: (713) 529-6606
F: (713) 529-6605
Email: gkf@gflawoffices.com
Email: scd@gflawoffices.com

ATTORNEYS FOR INTERVENOR
VICKI JOHNS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been delivered in compliance with Tex.R.Civ.P. 21 & 21a to all counsel of record on this the 28th day of January, 2015.

Rusty Hardin
Bob Wynne
RUSTY HARDIN & ASSOCIATES, LLP
5 Houston Center
1401 McKinney, Suite 2250
Houston, TX 77010
VIA FASCIMILE (713) 652-9800 and
CMRRR #7012 3050 0002 1200
*Attorneys for Plaintiffs*

Michael L. Brem
SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP
Pennzoil Place – North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
VIA FASCIMILE (713) 228-3510 and
CMRRR #7012 3050 0002 1200
*Attorney for The Dow Chemical Company*

Darrell A. Apffel
S. Benjamin Shabot
BETTISON DOYLE APFFEL & GUARINO, P.C.
1100 Gulf Freeway, Suite 100
League City, Texas 77573
VIA FASCIMILE (409) 744-9786 and
CMRRR #7012 3050 0002 1200
*Attorneys for Intervenor James Johns, Sr.*

Mr. Robert S. MacIntyre, Jr.
MACINTYRE MCCOLLOCH STANFILED & YOUNG
2900 Weslayan, Suite 150
Houston, Texas 77027
VIA FASCIMILE (713) 572-2902 and
CMRRR #7012 3050 0002 1200

George K Farah

## Definitions and Instructions

A.     "You" and "Your": The terms "you" and "your" shall mean Plaintiff, Frances Sowell, and all other persons or entities acting or purporting to act on Plaintiff, Frances Sowell's behalf, whether authorized or not.

B.     "Person": The term "person" shall include individuals, and every type of entity, whether formed for business purposes or not.

C.     "Documents": The term "documents" shall mean writings of every type and from any source, including originals and non-identical copies thereof, that are in your possession, custody, or control or known by you to exist. This would include documents sent outside your organization to any source as well as documents intended for internal use.

The term also includes communications not only in words, but in symbols, pictures, sound recordings, films, tapes, and information stored in, or accessible through, computers or informational storage or retrieval systems, the term also includes codes and programming instructions and other materials necessary to understand such systems.

The term includes, but is not limited to: calendars, checkbooks, agendas, agreements, analyses, bills, invoices, records of obligations and expenditures, corporate bylaws and charters, correspondence, diaries, files, legal documents, financial documents including balance sheets and profit and loss statements, letters, memoranda recording telephone or in-person conferences, manuals, books, press releases, purchase orders, records, schedules, memos of interviews, evaluations, written reports of tests or experiments, public relations releases, telegrams, teletypes, work papers, drafts of documents, and all other writings whose contents are related to the subject matter of the discovery request.

D.     If you claim a privilege or exemption from discovery for any of the material, please state the specific ground for each privilege or immunity claimed, in order that the Intervener can determine the merit of the objection.

E.     "Identify" or "Identification":

    1.     As to a person: When used in a reference to a person or individual, the terms "identify" or "identification" mean to state his/her full name, address, and telephone number.

    2.     As to an entity: The terms "identify" or "identification" when used in reference to an entity such as a corporation, partnership or association, means to state the name of the entity, its business address, telephone number, and name of its chief executive officer.

3. As to a document: When used in reference to a document, the terms "identify" or "identification" shall include the following:

   a. A title, heading or caption of such document.

   b. The date appearing on such document; or if no date appears, the approximate date on which the document was prepared.

   c. A general description of the document; or if no name appears, the approximate date on which the document was prepared.

   d. The name of the person who signed the document or a statement that it was unsigned.

   e. Name of the person or person who prepared the document.

   f. Name of the person or persons to whom the document was addressed and to whom the document was sent.

   g. The physical location of the document.

## INTERVENOR, VICKI JOHNS' FIRST SET OF INTERROGATORIES TO PLAINTIFF, FRANCES SOWELL

1. Identify each person either participating in the preparation of the answers to these interrogations or supplying information used in such preparation, and indicate the interrogatories with respect to which he or she was involved.

**ANSWER:**

2. State the Style, Court and Cause number of any lawsuit you have been a party to and the final disposition of said suit.

**ANSWER:**

3. Have you, your agents, investigators or attorneys or anyone acting on your behalf obtained a written or recorded statement of any kind, report or memorandum, whether recorded stenographically transcribed, oral or otherwise from any person related to this case? If so, please identify the individual from whom the statement was taken and the date the statement was taken. If so, then please also indicate your willingness to allow Intervener to inspect and copy or photograph the same.

**ANSWER:**

4. Please state completely and fully all representations, statements, declarations or admissions made by Intervener or any agent, servant or employee of Intervener. Include in your answer when the communication was made, the total verbatim communication and, if that is not possible, then state the detailed substance of the communication, by whom the communication was made, where such communication took place, and all persons present when such communication was made.

**ANSWER:**

5. Please state in full detail each and every contention or denial of the marriage between Vicki and Brian Johnson any claim made the basis of this suit. Include in your answer:

   a. all facts known to you, and all propositions of law that your attorney, or anyone acting on your behalf or their behalf, which you contend support or corroborate each such denial;

   b. the name, business and residence address, and telephone number of each person known to you who claims to have any knowledge relating to each such denial of any claim; and

   c. the name, business and residence address, and telephone number of the present custodian of any writings in support of each such denial.

**ANSWER:**

6. When were you first made aware that Vicki Johns and Brian Johns had filed for divorce?

**ANSWER:**

7. Do you intend to attempt to impeach Intervener, or any employee, agent, representative, attorney or any other natural person or business or legal entity associated in any way with or acting or purporting to act for or on behalf of Intervener, with evidence of a criminal conviction, if any, as described in Rule 609 of the Texas Rules of Evidence? If so, please describe in detail such evidence, giving name of accused, nature of conviction and charges on which convicted, year of conviction and whether or not parole has been successfully completed or pardon granted.

**ANSWER:**

8. Please state your educational and employment history from high school until the date of the incident which forms the basis of this lawsuit.

**ANSWER:**

9. Please state the name and phone number of every employee you personally know who worked at the Blocker Burn Unit at UTMB on July 17, 2012.

**ANSWER:**

10. Who drafted the power of attorney that Brian Johns signed giving you power of attorney over Brian Johns' personal and financial affairs?

**ANSWER:**

11. Who witnessed Brian Johns signing the power of attorney giving you power of attorney over Brian Johns' personal and financial affairs?

**ANSWER:**

12. What documents, photographs or other information do you have that support your contention that Brian Johns and Vicki Johns were not common law married?

**ANSWER:**

13. How many times did you speak to Vicki Johns at the hospital were Brian Johns was being treated for his injuries on July 17, 2012? What did you discuss?

14. Who contacted you regarding the incident which caused Brian Johns' injuries on July 17, 2012?

**ANSWER:**

15. What is the name and location of the storage facility which was rented to store personal property found in the home located at 3827 Saxon Hollow Ct., Friendswood, Texas 77546 after Brian Johns' death?

**ANSWER:**

16. Identify those persons who were notified that you were acting as the administrator of the estate of Brian Johns? Identify the manner of notification.

**ANSWER:**

17. Please explain whether you removed or altered any social media sites pertaining to or relating to Brian Johns. If so, please identify the process for removal or alteration, and if altered, what changes did you make?

**ANSWER:**

4826-0714-6529, v. 2

| | | |
|---|---|---|
| FRANCES SOWELL, INDIVIDUALLY AND | § | IN THE PROBATE COURT |
| AS AN HEIR OF BRIAN EDWARD JOHNS, | § | |
| DECEASED, AND AS ADMINISTRATOR | § | |
| OF THE ESTATE OF BRIAN EDWARD | § | |
| JOHNS, DECEASED; COREY JOHNS, | § | |
| INDIVIDUALLY AND AS AN HEIR OF | § | |
| BRIAN EDWARD JOHNS, DECEASED, | § | |
| *Plaintiffs*, | § | |
| | § | |
| JAMES JOHNS, SR., | § | |
| *Intervenor*, | § | |
| | § | NUMBER ONE (1) OF |
| VICKI JOHNS, INDIVIDUALLY | § | |
| AND AS AN HEIR OF BRIAN | § | |
| EDWARD JOHNS, DECEASED, | § | |
| *Intervenor*, | § | |
| | § | |
| vs. | § | |
| | § | |
| THE DOW CHEMICAL COMPANY, | § | |
| ROHM AND HAAS COMPANY, | § | |
| ROHM AND HAAS TEXAS INC., TIM | § | |
| FOX, AND JULIO RODRIGUEZ | § | HARRIS COUNTY, TEXAS |

## PLAINTIFFS FRANCES SOWELL AND COREY JOHNS' OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION FROM INTERVENOR VICKI JOHNS

TO: Counsel of record for Intervenor Vicki Johns, George K. Farah and Sarah C. Dionne of Guerra & Farah, PLLC, 4101 Washington Avenue, 3rd Floor, Houston, Texas 77007.

Pursuant to the Texas Rules of Civil Procedure, Plaintiffs Frances Sowell and Corey Johns respond to Intervenor Vicki Johns' Requests for Production.



EXHIBIT

B

Respectfully submitted,

RUSTY HARDIN & ASSOCIATES, LLP

Rusty Hardin
State Bar No. 08972800
Bob Wynne
State Bar No. 24060861
1401 McKinney Street, Suite 2250
Houston, Texas 77010
Telephone: (713) 652-9000
Facsimile: (713) 652-9800

Robert S. MacIntyre, Jr.
State Bar No.: 12760700
MacIntyre McCulloch Stanfield & Young
2900 Weslayan, Suite 150
Houston, Texas 77027|
Telephone: (713) 572-2900
Facsimile: (713) 572-2902

ATTORNEYS FOR PLAINTIFFS

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on June 5, 2015, he served a copy of Plaintiffs Frances Sowell and Cory Johns' Objections and Responses to Requests for Production from Intervenor Vicki Johns pursuant to Rule 21a:

Michael L. Brem
Briana J. Bassler
Schirrmeister Diaz-Arrastia Brem LLP
Pennzoil Place – North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
mbrem@sdablaw.com
bbassler@sdablaw.com

Darrell A. Apffel
S. Benjamin Shabot
Bettison Doyle Apffel & Guarino, P.C.
1100 Gulf Freeway, Suite 100
League City, Texas 77573
DApffel@bdaglaw.com
BShabot@bdaglaw.com

George K. Farah
Sarah C. Dionne
Guerra & Farah, PLLC
4101 Washington Ave., 3rd Floor
Houston, Texas 77007
gkf@gflawoffices.com
scd@gflawoffices.com
gab@gflawoffices.com

_____
Bob Wynne

3

## PLAINTIFFS' OBJECTIONS AND RESPONSES TO
## REQUESTS FOR PRODUCTION FROM INTERVENOR VICKI JOHNS

**REQUEST FOR PRODUCTION NO. 1:** All photographs taken in connection with Intervenor's cause of action in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Plaintiff's behalf.

**RESPONSE:** Plaintiffs object to this request as vague, ambiguous, overbroad and not reasonably calculated to lead to admissible evidence. Subject to these objections, Plaintiffs will produce all documents and materials previously produced to Defendants in this matter. Likewise, Plaintiffs refer Intervenor to the materials produced by Defendants. In addition, please see documents attached.

**REQUEST FOR PRODUCTION NO. 2:** All photographs taken of the scene of the accident or the surrounding area of the scene of the accident in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Plaintiff's behalf.

**RESPONSE:** To the extent that photographs of the scene of the accident or the surrounding area of the scene of the accident exist, they were produced among and between Plaintiff and Defendants. Plaintiffs will produce copies of the photographs that they produced to Defendants. Likewise, Plaintiffs will produce all documents and materials that were previously produced to Defendants in this matter. Plaintiffs refer Intervenor to the materials produced by Defendants.

**REQUEST FOR PRODUCTION NO. 3:** All photographs taken of Intervenor which may be in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Defendant's behalf.

**RESPONSE:** Plaintiffs have no photographs of Intervenor.

**REQUEST FOR PRODUCTION NO. 4:** All pictures, motion pictures, movies, films, or photographic material of any kind taken of Intervenor which are in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Plaintiff's behalf.

**RESPONSE:** Plaintiffs have no pictures, motion pictures, movies, films, or photographic material of any kind taken of Intervenor.

**REQUEST FOR PRODUCTION NO. 5:** All pictures, motion pictures, movies, films, or photographic material of any kind concerning the scene, products or the events and happenings made the basis of the lawsuit taken before, during or after the accident in question which are in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Plaintiff's behalf.

**RESPONSE:** Plaintiffs will produce all documents and materials previously produced to Defendants in this matter. Plaintiffs refer Intervenor to all materials produced by Defendants.

4

**REQUEST FOR PRODUCTION NO. 6:** All written statements made by the Intervenor in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Plaintiff's behalf.

**RESPONSE:** Other than Intervenor's responses to written discovery and deposition testimony, Plaintiffs have no written statements made by Intervenor.

**REQUEST FOR PRODUCTION NO. 7:** All oral statements made by Intervenor which were either recorded or taped on an electronic device or recorder which are in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Plaintiff's behalf.

**RESPONSE:** Other than Intervenor's deposition testimony, Plaintiffs have no recorded or taped oral statements made by Intervenor.

**REQUEST FOR PRODUCTION NO. 8:** A copy of all documents filed with any state, county, city, federal or governmental agency, institution or department containing information about Intervenor which are in the possession, constructive possession, custody or control of Plaintiff, Plaintiff's attorney or anyone acting on Plaintiff's behalf.

**RESPONSE:** Other than the information contained in the pleadings and court filings in the ongoing litigation, as well as the information contained in the pleadings and court filings in the lawsuit between Corey Johns and Vicki Johns, Plaintiffs have no responsive documents. Plaintiffs refer Intervenor to the docket sheet for these matters.

**REQUEST FOR PRODUCTION NO. 9:** Any and all copies of investigation documentation, reports and/or memoranda made by or submitted to Plaintiff, as a result of the incident which has been made the basis of Intervenor's lawsuit.

**RESPONSE:** Plaintiffs object to this request as it violates the attorney-client privilege, the work product doctrine, and the Texas Rules of Civil Procedure. Subject to these objections, Plaintiffs refer Intervenor to the documents previously produced by Defendants.

**REQUEST FOR PRODUCTION NO. 10:** Copies of any and all books, documents or other tangible things which may or may not be introduced at trial, but which may have a bearing on Intervenor's cause of action and may be used as demonstrative evidence at trial.

**RESPONSE:** Plaintiffs object to this request as it is overbroad, burdensome, harassing and not reasonably calculated to lead to the discovery of admissible evidence. Further it seeks the production and identification of plaintiffs' attorney work product and information relating to trial strategy. Plaintiffs will identify their trial exhibits in accordance with the Court's Scheduling Order and the Texas Rules of Civil Procedure.

**REQUEST FOR PRODUCTION NO. 11:** Any and all contents belonging to Brian Johns which found in his DOW work locker after the incident which forms the basis of this lawsuit.

**RESPONSE:** Plaintiffs do not have possession of any contents of the DOW work locker belonging to Brian Johns.

**REQUEST FOR PRODUCTION NO. 12:** A signed copy of the authorization to obtain medical records for Brian Johns attached hereto as Exhibit "A."

**RESPONSE:** *See* attached.

**REQUEST FOR PRODUCTION NO. 13:** A signed copy of the authorization to obtain educational records for Corey Johns attached hereto as Exhibit "B."

**RESPONSE:** Plaintiffs object to this request as it is overbroad, burdensome, harassing, not reasonably calculated to lead to the discovery of admissible evidence, and an unnecessary invasion of privacy.

**REQUEST FOR PRODUCTION NO. 14:** Any and all photographs of Vicki Johns in the possession of Plaintiffs.

**RESPONSE:** Plaintiffs do not have any photographs of Vicki Johns, thus there are no responsive documents.

**REQUEST FOR PRODUCTION NO. 15:** A copy of the rental agreement for the storage facility which was rented to store Vicki and Brian Johns' belongings after the incident which forms the basis of this lawsuit.

**RESPONSE:** Vicki Johns had no possessions in the storage facility, thus there are no responsive documents. Plaintiffs, however, are producing the invoice for the rental agreement with PODs.

**REQUEST FOR PRODUCTION NO. 16:** All belongings of Vicki Johns on the possession of Plaintiffs which were taken from her home located at 3827 Saxon Hollow Ct., Friendswood, Texas 77546 after the incident which forms the basis of this lawsuit.

**RESPONSE:** Vicki Johns had no possessions in the home of Brian Johns located at 3827 Saxon Hollow Court, Friendswood, Texas 77546, thus there are no responsive documents to this request.

**REQUEST FOR PRODUCTION NO. 17:** A signed copy of the authorization to obtain cellular phone records for Plaintiffs attached hereto as Exhibit "C."

6

**RESPONSE:** Plaintiffs object to this request as it is overbroad, burdensome, harassing, not reasonably calculated to lead to the discovery of admissible evidence, and an unnecessary invasion of privacy.

**REQUEST FOR PRODUCTION NO. 18:** Copy of any and all documents supporting Frances Sowell's authority to act as the administrator of Brian Johns' estate.

**RESPONSE:** *See* Order Authorizing Issuance of Letters of Administration dated March 6, 2013.

**REQUEST FOR PRODUCTION NO. 19:** A copy of the power of attorney signed by Brian Johns authorizing Frances Sowell to act on Brian Johns' behalf after the incident which forms the basis of this lawsuit.

**RESPONSE:** Plaintiff Frances Sowell was never given a power of attorney to act on Brian Johns' behalf after the incident.

**REQUEST FOR PRODUCTION NO. 20:** A signed copy of the authorization to obtain employment records for Frances Sowell attached hereto as Exhibit "D."

**RESPONSE:** Plaintiffs object to this request as it is overbroad, burdensome, harassing, not calculated to lead to the discovery of admissible evidence, and an unnecessary invasion of privacy.

**REQUEST FOR PRODUCTION NO. 21:** Copy of any and all documents showing that Vicki Johns was placed on notice of any proceedings naming Frances Sowell as the administrator of Brian Johns' estate.

**RESPONSE:** Plaintiffs object to this request because Plaintiffs are not in a position to explain Intervenor's personal knowledge or lack thereof. Plaintiffs, however, inform Intervenor that an Attorney ad Litem was appointed to represent the interests of any potential heirs.

**REQUEST FOR PRODUCTION NO. 22:** Any and all written correspondence between Corey Johns and Brian Johns before the incident which form the basis of this lawsuit.

**RESPONSE:** Plaintiffs object to this request as vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 23:** Any and all written correspondence between Frances Sowell and Brian Johns before the incident which forms the basis of this lawsuit.

**RESPONSE:** Plaintiffs object to this request as vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 24:** Any and all written correspondence between Corey Johns and Pam Roberson after the incident which forms the basis of this lawsuit.

**RESPONSE:** Plaintiffs object to this request as vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 25:** Any and all written correspondence between Frances Sowell and Pam Roberson after the incident which forms the basis of this lawsuit.

**RESPONSE:** Plaintiffs object to this request as vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence.

**REQUEST FOR PRODUCTION NO. 26:** Any and all written correspondence between Plaintiffs and Vicki Johns before and after the incident which forms the basis of this lawsuit.

**RESPONSE:** Plaintiffs object to this request as vague, overbroad, and not reasonably calculated to lead to the discovery of admissible evidence. Subject to this objection, please see the e-mail from Vicki Johns dated January 7, 2009.

**REQUEST FOR PRODUCTION NO. 27:** A copy of Plaintiffs' driver's license.

**RESPONSE:** *See* attached.

| | |
|---|---|
| FRANCES SOWELL, INDIVIDUALLY AND §<br>AS AN HEIR OF BRIAN EDWARD JOHNS, §<br>DECEASED, AND AS ADMINISTRATOR §<br>OF THE ESTATE OF BRIAN EDWARD §<br>JOHNS, DECEASED; COREY JOHNS, §<br>INDIVIDUALLY AND AS AN HEIR OF §<br>BRIAN EDWARD JOHNS, DECEASED, §<br>*Plaintiffs,* §<br> §<br>JAMES JOHNS, SR., §<br>*Intervenor,* §<br> §<br>VICKI JOHNS, INDIVIDUALLY §<br>AND AS AN HEIR OF BRIAN §<br>EDWARD JOHNS, DECEASED, §<br>*Intervenor,* §<br> §<br>vs. §<br> §<br>THE DOW CHEMICAL COMPANY, §<br>ROHM AND HAAS COMPANY, AND §<br>ROHM AND HAAS TEXAS INC. § | IN THE PROBATE COURT<br><br><br><br><br><br><br><br><br><br>NUMBER ONE (1) OF<br><br><br><br><br><br><br><br>HARRIS COUNTY, TEXAS |

**PLAINTIFF FRANCES SOWELL, INDIVIDUALLY AND AS HEIR OF
BRIAN EDWARD JOHNS, DECEASED, AND AS ADMINISTRATOR OF THE ESTATE
OF BRIAN EDWARD JOHNS, DECEASED ANSWERS AND OBJECTIONS
TO FIRST SET OF INTERROGATORIES FROM
INTERVENOR VICKI JOHNS**

TO:     Counsel of record for Intervenor Vicki Johns, George K. Farah and Sarah C. Dionne
of Guerra & Farah, PLLC, 4101 Washington Avenue, 3rd Floor, Houston, Texas
77007.

Pursuant to the Texas Rules of Civil Procedure, Plaintiff Frances Sowell responds to

Intervenor Vicki Johns' First Set of Interrogatories.



**EXHIBIT**

**C**

Respectfully submitted,

RUSTY HARDIN & ASSOCIATES, LLP

Rusty Hardin
State Bar No. 08972800
Bob Wynne
State Bar No. 24060861
1401 McKinney Street, Suite 2250
Houston, Texas 77010
Telephone: (713) 652-9000
Facsimile: (713) 652-9800

Robert S. MacIntyre, Jr.
State Bar No. 12760700
MacIntyre McCulloch Stanfield & Young
2900 Weslayan, Suite 150
Houston, Texas 77027|
Telephone: (713) 572-2900
Facsimile: (713) 572-2902

ATTORNEYS FOR PLAINTIFFS

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on June 5, 2015, he served a copy of Plaintiff Frances Sowell's Answers and Objections to First Set of Interrogatories from Intervenor Vicki Johns pursuant to Rule 21a:

Michael L. Brem
Briana J. Bassler
Schirrmeister Diaz-Arrastia Brem LLP
Pennzoil Place – North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
mbrem@sdablaw.com
bbassler@sdablaw.com

Darrell A. Apffel
S. Benjamin Shabot
Bettison Doyle Apffel & Guarino, P.C.
1100 Gulf Freeway, Suite 100
League City, Texas 77573
DApffel@bdaglaw.com
BShabot@bdaglaw.com

George K. Farah
Sarah C. Dionne
Guerra & Farah, PLLC
4101 Washington Ave., 3rd Floor
Houston, Texas 77007
gkf@gflawoffices.com
scd@gflawoffices.com
gab@gflawoffices.com

Bob Wynne

**PLAINTIFF'S ANSWERS AND OBJECTIONS TO**
**FIRST SET OF INTERROGATORIES FROM**
**INTERVENOR VICKI JOHNS**

**INTERROGATORY NO. 1:** Identify each person either participating in the preparation of the answers to these interrogations or supplying information used in such preparation, and indicate the interrogatories with respect to which he or she was involved.

**ANSWER:** Plaintiff Frances Sowell objects to this interrogatory as overbroad, harassing and seeks the disclosure of privileged materials under the attorney-client privilege and work product doctrine. Subject to these objections, Frances Sowell answered these interrogatories with the help Corey Johns, Pamela Roberson and her attorneys.

**INTERROGATORY NO. 2:** State the Style, Court and Cause number of any lawsuit you have been a party to and the final disposition of said suit.

**ANSWER:**

The current lawsuit and related probate matters, Cause Numbers 415,980 and 415,980-401 filed and pending in the Probate Court Number One of Harris County, Texas. The probate matter, Cause No. 415,980 was disposed by a Final Judgment Declaring Heirship.

**INTERROGATORY NO. 3:** Have you, your agents, investigators or attorneys or anyone acting on your behalf obtained a written or recorded statement of any kind, report or memorandum, whether recorded stenographically transcribed, oral or otherwise from any person related to this case? If so, please identify the individual from whom the statement was taken and the date the statement was taken. If so, then please also indicate your willingness to allow Intervenor to inspect and copy or photograph the same.

**ANSWER:** Plaintiffs have obtained recorded statements of Brian Johns, George Goffney, Ernest Amie, Joe Herman, Russell Taylor, and Mr. Braun.

**INTERROGATORY NO. 4:** Please state completely and fully all representations, statements, declarations or admissions made by Intervenor or any agent, servant or employee of Intervenor. Include in your answer when the communication was made, the total verbatim communication and, if that is not possible, then state the detailed substance of the communication, by whom the communication was made, where such communication took place, and all persons present when such communication was made.

**ANSWER:** Plaintiff Frances Sowell objects to this interrogatory as overbroad, harassing and calling for legal conclusions and not reasonably calculated to lead to admissible evidence. Further this interrogatory response requires a narrative answer which is better suited for a deposition.

4

**INTERROGATORY NO. 5:** Please state in full detail each and every contention or denial of the marriage between Vicki and Brian Johnson (sic) any claim made the basis of this suit. Include in your answer:

a. All facts known to you, and all propositions of law that your attorney, or anyone acting on your behalf or their behalf, which you contend support or corroborate each such denial;

b. The name, business and residence address, and telephone number of each person known to you who claims to have any knowledge relating to each such denial of any claim; and

c. The name, business and residence address, and telephone number of the present custodian of any writings in support of each such denial.

**ANSWER:** Plaintiff Frances Sowell objects to this interrogatory as overbroad, harassing and calling for legal conclusions and not reasonably calculated to lead to admissible evidence. Further this interrogatory response requires a narrative answer which is better suited for a deposition.

**INTERROGATORY NO. 6:** When were you first made aware that Vicki Johns and Brian Johns had filed for divorce?

**ANSWER:** Plaintiff Frances Sowell cannot recall an exact date on which she became aware that Vicki Johns and Brian Johns had filed for divorce but it was prior to the 2012 accident that injured Brian Johns. Plaintiff Frances Sowell does have personal knowledge that on more than one occasion, Brian Johns "just wanted out" of his marriage with Intervenor Vicki Johns.

**INTERROGATORY NO. 7:** Do you intend to attempt to impeach Intervenor, or any employee, agent, representative, attorney or any other natural person or business or legal entity associated in any way with or acting or purporting to act for or on behalf of Intervenor, with evidence of a criminal conviction, if any, as described in Rule 609 of the Texas Rules of Evidence? If so, please describe in detail such evidence, giving name of accused, nature of conviction and charges on which convicted, year of conviction and whether or not parole has been successfully completed or pardon granted.

**ANSWER:** At this time, based upon the responses to written discovery and deposition testimony provided by Vicki Johns, Plaintiffs do not intend to offer impeachment evidence relating to criminal convictions.

**INTERROGATORY NO. 8:** Please state your educational history from high school until the date of the incident which forms the basis of this lawsuit. Please include institution names and dates of attendance.

**ANSWER:** Central High School, 1950-1955; Galveston College 1972-1974.

**INTERROGATORY NO. 9:** Please state the name and phone number of every employee you personally know who worked at the Blocker Burn Unit at UTMB on July 17, 2012.

**ANSWER:** None.

**INTERROGATORY NO. 10:** Who drafted the power of attorney that Brian Johns signed giving you power of attorney over Brian Johns' personal and financial affairs?

**ANSWER:** I was never given a power of attorney over Brian Johns' personal and financial affairs.

**INTERROGATORY NO. 11:** Who witnessed Brian Johns signing the power of attorney giving you power of attorney over Brian Johns' personal and financial affairs?

**ANSWER:** *See* Answer to No. 10 above.

**INTERROGATORY NO. 12:** What documents, photographs or other information do you have that support your contention that Brian Johns and Vicki Johns were not common law married?

**ANSWER:** Plaintiff Frances Sowell objects to this interrogatory as overbroad, harassing, calling for a legal conclusion and not reasonably calculated to lead to admissible evidence. Likewise this interrogatory calls for a narrative answer which is better suited for a deposition. Subject to these objections, please see all documents produced in discovery and all information identified in discovery.

**INTERROGATORY NO. 13:** How many times did you speak to Vicki Johns at the hospital were (sic) Brian Johns was being treated for his injuries on July 17, 2012? What did you discuss?

**ANSWER:** None.

**INTERROGATORY NO. 14:** Who contacted you regarding the incident which caused Brian Johns' injuries on July 17, 2012?

**ANSWER:** Brian Johns contacted me regarding the incident which caused his injuries on July 17, 2012.

**INTERROGATORY NO. 15:** What is the name and location of the storage facility which was rented to store personal property found in the home located at 3827 Saxon Hollow Ct., Friendswood, Texas 77546 after Brian Johns' death?

**ANSWER:** PODS, Gulf Storage Partners, LP, 9325 East 33rd Street, Indianapolis, Indiana 46235

**INTERROGATORY NO. 16:** Identify those persons who were notified that you were acting as the administrator of the estate of Brian Johns? Identify the manner of notification.

**ANSWER:** The Order appointing Plaintiff Frances Sowell is a public document that is readily available to the general public. Accordingly, Plaintiff Frances Sowell cannot reasonably answer this interrogatory. Plaintiff Frances Sowell knows that her attorneys have notice, as do all the parties and attorneys in this matter. Likewise, multiple members of Plaintiff Frances Sowell's family know that she acts as the administrator. In addition, W. Ross Jones served as the Attorney ad Litem in the probate proceeding and has knowledge of this information. Finally, the court and court personnel are aware of this fact.

**INTERROGATORY NO. 17:** Please explain whether you removed or altered any social media sites pertaining to or relating to Brian Johns. If so, please identify the process for removal or alteration, and if altered, what changes did you make?

**ANSWER:** I never removed or altered anything on any social medial sites pertaining to or relating to Brian Johns.

7

| | | |
|---|---|---|
| FRANCES SOWELL, INDIVIDUALLY AND | § | IN THE PROBATE COURT |
| AS AN HEIR OF BRIAN EDWARD JOHNS, | § | |
| DECEASED, AND AS ADMINISTRATOR | § | |
| OF THE ESTATE OF BRIAN EDWARD | § | |
| JOHNS, DECEASED; COREY JOHNS, | § | |
| INDIVIDUALLY AND AS AN HEIR OF | § | |
| BRIAN EDWARD JOHNS, DECEASED, | § | |
| *Plaintiffs,* | § | |
| | § | |
| JAMES JOHNS, SR., | § | |
| *Intervenor,* | § | |
| | § | NUMBER ONE (1) OF |
| VICKI JOHNS, INDIVIDUALLY | § | |
| AND AS AN HEIR OF BRIAN | § | |
| EDWARD JOHNS, DECEASED, | § | |
| *Intervenor,* | § | |
| | § | |
| vs. | § | |
| | § | |
| THE DOW CHEMICAL COMPANY, | § | |
| ROHM AND HAAS COMPANY, AND | § | |
| ROHM AND HAAS TEXAS INC. | § | HARRIS COUNTY, TEXAS |

## PLAINTIFF COREY JOHNS, INDIVIDUALLY AND AS HEIR OF BRIAN EDWARD JOHNS, DECEASED ANSWERS AND OBJECTIONS TO FIRST SET OF INTERROGATORIES FROM INTERVENOR VICKI JOHNS

TO: Counsel of record for Intervenor Vicki Johns, George K. Farah and Sarah C. Dionne of Guerra & Farah, PLLC, 4101 Washington Avenue, 3rd Floor, Houston, Texas 77007.

Pursuant to the Texas Rules of Civil Procedure, Plaintiff Corey Johns responds to Intervenor Vicky Johns' First Set of Interrogatories.

Respectfully submitted,

RUSTY HARDIN & ASSOCIATES, LLP

/s/ *Bob Wynne*

Rusty Hardin
State Bar No. 08972800
Bob Wynne
State Bar No. 24060861
1401 McKinney Street, Suite 2250
Houston, Texas 77010
Telephone: (713) 652-9000
Facsimile: (713) 652-9800

Robert S. MacIntyre, Jr.
State Bar No.: 12760700
MacIntyre McCulloch Stanfield & Young
2900 Weslayan, Suite 150
Houston, Texas 77027|
Telephone: (713) 572-2900
Facsimile: (713) 572-2902

ATTORNEYS FOR PLAINTIFFS

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on May 18, 2015, he served a copy of Plaintiff Cory Johns' Answers and Objections to First Set of Interrogatories from Intervenor Vicki Johns pursuant to Rule 21a:

Michael L. Brem
Briana J. Bassler
Schirrmeister Diaz-Arrastia Brem LLP
Pennzoil Place – North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
mbrem@sdablaw.com
bbassler@sdablaw.com

George K. Farah
Sarah C. Dionne
Guerra & Farah, PLLC
4101 Washington Ave., 3rd Floor
Houston, Texas 77007
gkf@gflawoffices.com
scd@gflawoffices.com
gab@gflawoffices.com

Darrell A. Apffel
S. Benjamin Shabot
Bettison Doyle Apffel & Guarino, P.C.
1100 Gulf Freeway, Suite 100
League City, Texas 77573
DApffel@bdaglaw.com
BShabot@bdaglaw.com

/s/ *Bob Wynne*

_____
Bob Wynne

## PLAINTIFF'S ANSWERS AND OBJECTIONS TO FIRST SET OF INTERROGATORIES FROM INTERVENOR VICKI JOHNS

**INTERROGATORY NO. 1:** Identify each person either participating in the preparation of the answers to these interrogations or supplying information used in such preparation, and indicate the interrogatories with respect to which he or she was involved.

**ANSWER:** Plaintiff Corey Johns objects to this interrogatory as overbroad, harassing and seeks the disclosure of privileged and confidential attorney-client work product and communications. Based upon the foregoing objections, Corey Johns answered these interrogatories with the help of his attorneys.

**INTERROGATORY NO. 2:** State the Style, Court and Cause number of any lawsuit you have been a party to and the final disposition of said suit.

**ANSWER:**

1) Corey Johns. vs. Vicki H. Johns, Cause No. 2012-63783 filed in the 80th Civil District Court of Harris County, Texas. The case was disposed by the attached Amended Final Judgment and Permanent Injunction.

2) The current lawsuit and related probate matters, Cause Numbers 415,980 and 415,980-401 filed and pending in the Probate Court Number One of Harris County, Texas. The probate matter, Cause No. 415,980 was disposed by the attached Final Judgment Declaring Heirship.

**INTERROGATORY NO. 3:** Have you, your agents, investigators or attorneys or anyone acting on your behalf obtained a written or recorded statement of any kind, report or memorandum, whether recorded stenographically transcribed, oral or otherwise from any person related to this case? If so, please identify the individual from whom the statement was taken and the date the statement was taken. If so, then please also indicate your willingness to allow Intervenor to inspect and copy or photograph the same.

**ANSWER:** Plaintiffs have obtained recorded statements of Brian John's and Dow Employees George Goffney, Ernest Amie, Joe Herman, Russell Taylor, and Mr. Braun.

**INTERROGATORY NO. 4:** Please state completely and fully all representations, statements, declarations or admissions made by Intervenor or any agent, servant or employee of Intervenor. Include in your answer when the communication was made, the total verbatim communication and, if that is not possible, then state the detailed substance of the communication, by whom the communication was made, where such communication took place, and all persons present when such communication was made.

**ANSWER:** Plaintiff Corey Johns objects to this interrogatory as overbroad, harassing and calling for legal conclusions. Further this interrogatory response requires a narrative answer which is better suited for a deposition. Plaintiff Corey Johns is currently scheduled to be deposed on Tuesday,

4

May 19, 2015. Subject to the forgoing objections, Plaintiff Corey Johns reserves the right to supplement this interrogatory.

**INTERROGATORY NO. 5:** Please state in full detail each and every contention or denial of the marriage between Vicki and Brian Johnson (sic) any claim made the basis of this suit. Include in your answer:

    a.    All facts known to you, and all propositions of law that your attorney, or anyone acting on your behalf or their behalf, which you contend support or corroborate each such denial;

    b.    The name, business and residence address, and telephone number of each person known to you who claims to have any knowledge relating to each such denial of any claim; and

    c.    The name, business and residence address, and telephone number of the present custodian of any writings in support of each such denial.

**ANSWER:** Plaintiff Corey Johns objects to this interrogatory as overbroad, harassing and calling for legal conclusions. Further this interrogatory response requires a narrative answer which is better suited for a deposition. Plaintiff Corey Johns is currently scheduled to be deposed on Tuesday, May 19, 2015. Subject to the forgoing objections, Plaintiff Corey Johns reserves the right to supplement this interrogatory.

**INTERROGATORY NO. 6:** When were you first made aware that Vicki Johns and Brian Johns had filed for divorce?

**ANSWER:** Plaintiff Corey Johns cannot recall an exact date on which he became aware that Vicki Johns and Brian Johns had filed for divorce but it was prior to the 2012 accident that injured Brian Johns.

**INTERROGATORY NO. 7:** Do you intend to attempt to impeach Intervenor, or any employee, agent, representative, attorney or any other natural person or business or legal entity associated in any way with or acting or purporting to act for or on behalf of Intervenor, with evidence of a criminal conviction, if any, as described in Rule 609 of the Texas Rules of Evidence? If so, please describe in detail such evidence, giving name of accused, nature of conviction and charges on which convicted, year of conviction and whether or not parole has been successfully completed or pardon granted.

**ANSWER:** At this time, based upon the responses to written discovery and deposition testimony provided by Vicki Johns, Plaintiffs do not intend to offer impeachment evidence relating to criminal convictions.

**INTERROGATORY NO. 8:** Please state your educational history from high school until the date of the incident which forms the basis of this lawsuit. Please include institution names and dates of attendance.

**ANSWER:**

2004 -2007 Westbury High School, Houston, TX
2007- 2010 Southern University, Baton Rouge, LA
2011-2015 Southern University, Baton Rouge, LA
2009 HCC Central Campus Summer semester (3 semester hours)
2012 HCC Central Campus Summer semester (6 semester hours)

**INTERROGATORY NO. 9:** What documents, photographs or other information do you have that support your contention that Brian Johns and Vicki Johns were not common law married?

**ANSWER:** Plaintiff Corey Johns objects to this interrogatory as overbroad, harassing and is nothing more than a fishing expedition.

**INTERROGATORY NO. 10:** How many times did you speak to Vicki Johns at the hospital were (sic) Brian Johns was being treated for his injuries on July 17, 2012? What did you discuss?

**ANSWER:** None

**INTERROGATORY NO. 11:** Who contacted you regarding the incident which caused Brian Johns' injuries on July 17, 2012?

**ANSWER:** My Grandmother, Frances Sowell, contacted me about the incident.

**INTERROGATORY NO. 12:** Please list any criminal convictions, felony or misdemeanor, occurring in the last ten (10) years (excluding traffic offenses). Include the offense of which you were convicted, and date and place of such conviction.

**ANSWER:** None

CAUSE NO. 415980-401

| | | |
|---|---|---|
| FRANCES SOWELL, INDIVIDUALLY AND AS HEIR OF BRIAN EDWARD JOHNS, DECEASED, AND AS ADMINISTRATOR OF THE ESTATE OF BRIAN EDWARD JOHNS, DECEASED; COREY JOHNS, INDIVIDUALLY AND AS AN HEIR OF BRIAN EDWARD JOHNS, DECEASED *Plaintiffs,* | § § § § § § § § § § § § § § | IN THE PROBATE COURT |
| JAMES JOHNS, SR. *Intervener,* | § § § § | NUMBER ONE (1) OF |
| VICKI JOHNS, INDIVIDUALLY AND AS AN HEIR OF BRIAN EDWARD JOHNS, DECEASED *Intervener* | § § § § § § | |
| V. | § § | |
| THE DOW CHEMICAL COMPANY, ROHM AND HAAS COMPANY, ROHM AND HAAS TEXAS, INC., TIM FOX, AND JULIO RODRIGUEZ *Defendants.* | § § § § § | HARRIS COUNTY, TEXAS |

---

CAUSE NO. 415980-401

| | | |
|---|---|---|
| ESTATE OF | § | IN THE PROBATE COURT |
| BRIAN EDWARD JOHNS, | § | NUMBER ONE (1) OF |
| DECEASED | § | HARRIS COUNTY, TEXAS |

### INTERVENOR, VICKI JOHNS' SECOND REQUESTS FOR PRODUCTION TO PLANTIFFS FRANCES SOWELL AND COREY JOHNS

EXHIBIT

D


TO: Plaintiffs, Corey Johns and Francis Sowell, by and through their attorneys of record, Rusty Hardin and Bob Wynne, Rusty Hardin & Associates LLP, 5 Houston Center, 1401 McKinney, Suite 2250 Houston, TX 77010.

COMES NOW, Intervener, Vicki Johns, and files this, her Second Request for Production to Plaintiffs, Corey Johns, and Francis Sowell, hereby requests that Plaintiffs produce for Intervener's inspection, photocopying or reproduction of the records, documents and items listed in this request for production. *.PURSUANT TO RULE 193.7 THIS REQUEST WILL FURTHER SERVE AS ACTUAL NOTICE THAT THE PLAINTIFF INTENDS TO USE PRODUCED DOCUMENTS AGAINST YOU IN PRETRIAL PROCEEDINGS AND AT TRIAL. ACCORDINGLY, YOUR PRODUCTION OF A DOCUMENT(S) IN RESPONSE TO THIS REQUEST AUTHENTICATES THE DOCUMENT(S) FOR USE AGAINST YOU IN ANY PRETRIAL PROCEEDING OR AT TRIAL UNLESS YOU OBJECT TO THE AUTHENTICITY OF ANY PRODUCED DOCUMENT(S) WITHIN THE TIME LIMITS AND AS PARTICULARLY SET OUT IN TEX.R.CIV.P 193.7, FROM THE DATE OF SERVICE OF THIS NOTICE.*

Respectfully submitted,

BY: _____
GEORGE K. FARAH
State bar No. 24040882
SARAH C. DIONNE
State bar No. 24072229
GUERRA & FARAH, PLLC
4101 Washington Ave., 3rd Floor
Houston, Texas 77007
T: (713) 529-6606
F: (713) 529-6605
Email: gkf@gflawoffices.com
Email: scd@gflawoffices.com

ATTORNEYS FOR INTERVENOR
VICKI JOHNS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been delivered in compliance with Tex.R.Civ.P. 21 & 21a to all counsel of record on this the 27th day of March, 2015.

Rusty Hardin
Bob Wynne
RUSTY HARDIN & ASSOCIATES, LLP
5 Houston Center
1401 McKinney, Suite 2250
Houston, TX 77010
*Attorneys for Plaintiffs*

Michael L. Brem
SCHIRRMEISTER DIAZ-ARRASTIA BREM LLP
Pennzoil Place – North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
*Attorney for The Dow Chemical Company*

Darrell A. Apffel
S. Benjamin Shabot
BETTISON DOYLE APFFEL & GUARINO, P.C.
1100 Gulf Freeway, Suite 100
League City, Texas 77573
*Attorneys for Intervenor James Johns, Sr.*

Mr. Robert S. MacIntyre, Jr.
MACINTYRE MCCOLLOCH STANFILED & YOUNG
2900 Weslayan, Suite 150
Houston, Texas 77027

George K Farah

DEFINITIONS AND INSTRUCTIONS

1. DOCUMENT or DOCUMENTATION refers to any paper, book, record, letter, memorandum, contract, agreement, invoice, receipt, canceled check, telegram, manual, newsletter, announcement, catalogue, diary entry, calendar, bulletin, tape, disk, partial or complete reports on or transcriptions of telephone or other conversations, accounting entry, financial calculation, drawing, sketch, or other similar materials which contain any verbal, graphic or pictorial information.

2. PERTAINING, PERTAINING TO, or PERTAINING THERETO means commenting upon, including, concerning, containing, regarding, discussing, reflecting, relating to, relevant to, used in connection with, embodying or evidencing and should be construed in the broadest sense of the word.

3. Production of Documents

   All documents and things described in this request are required to be produced. No part of the documents should be removed, destroyed, or concealed. In determining which documents and things you are required to produce, you should carefully read and comply with the definitions and instructions incorporated herein by reference.

4. Lost or Destroyed Documents

   If it is claimed that any document or thing has been lost or destroyed, for each such document or thing state the circumstances relating to the loss or destruction of each such document or thing, the approximate date of loss or destruction and a reasonably complete description of the contents of said document, file, or thing.

5. Accuracy of Information

   If you do not have accurate production of or information with respect to any Request for Production or any part thereof, state and give your best estimate as to the matter inquired about.

## INTERVENOR, VICKI JOHNS' SECOND REQUEST FOR PRODUCTION TO PLAINTIFFS, FRANCES SOWELL AND COREY JOHNS

1. A copy of the cell phone records for Corey Johns from January 1, 2012 to January 1, 2013.

2. A copy of the cell phone records for Brian Johns from January 1, 2012 to January 1, 2013.

3. A copy of the cell phone records for Frances Sowell from January 1, 2012 to January 1, 2013.

| | |
|---|---|
| FRANCES SOWELL, INDIVIDUALLY AND § | IN THE PROBATE COURT |
| AS AN HEIR OF BRIAN EDWARD JOHNS, § | |
| DECEASED, AND AS ADMINISTRATOR § | |
| OF THE ESTATE OF BRIAN EDWARD § | |
| JOHNS, DECEASED; COREY JOHNS, § | |
| INDIVIDUALLY AND AS AN HEIR OF § | |
| BRIAN EDWARD JOHNS, DECEASED, § | |
| *Plaintiffs,* § | |
| § | |
| JAMES JOHNS, SR., § | |
| *Intervenor,* § | |
| § | NUMBER ONE (1) OF |
| VICKI JOHNS, INDIVIDUALLY § | |
| AND AS AN HEIR OF BRIAN § | |
| EDWARD JOHNS, DECEASED, § | |
| *Intervenor,* § | |
| § | |
| vs. § | |
| § | |
| THE DOW CHEMICAL COMPANY, § | |
| ROHM AND HAAS COMPANY, AND § | |
| ROHM AND HAAS TEXAS INC. § | HARRIS COUNTY, TEXAS |

## PLAINTIFFS FRANCES SOWELL AND COREY JOHNS' OBJECTIONS AND RESPONSES TO SECOND REQUESTS FOR PRODUCTION FROM INTERVENOR VICKI JOHNS

TO:   Counsel of record for Intervenor Vicki Johns, George K. Farah and Sarah C. Dionne of Guerra & Farah, PLLC, 4101 Washington Avenue, 3rd Floor, Houston, Texas 77007.

Pursuant to the Texas Rules of Civil Procedure, Plaintiffs Frances Sowell and Corey Johns respond to Intervenor Vicki Johns' Second Requests for Production.



EXHIBIT

E

Respectfully submitted,

RUSTY HARDIN & ASSOCIATES, LLP

Rusty Hardin
State Bar No. 08972800
Bob Wynne
State Bar No. 24060861
1401 McKinney Street, Suite 2250
Houston, Texas 77010
Telephone: (713) 652-9000
Facsimile: (713) 652-9800

Robert S. MacIntyre, Jr.
State Bar No.: 12760700
MacIntyre McCulloch Stanfield & Young
2900 Weslayan, Suite 150
Houston, Texas 77027|
Telephone: (713) 572-2900
Facsimile: (713) 572-2902

ATTORNEYS FOR PLAINTIFFS

2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on June 11, 2015, he served a copy of Plaintiffs Frances Sowell and Cory Johns' Objections and Responses to Intervenor Vicki Johns' Second Requests for Production pursuant to Rule 21a:

Michael L. Brem
Briana J. Bassler
Schirrmeister Diaz-Arrastia Brem LLP
Pennzoil Place – North Tower
700 Milam Street, 10th Floor
Houston, Texas 77002
mbrem@sdablaw.com
bbassler@sdablaw.com

George K. Farah
Sarah C. Dionne
Guerra & Farah, PLLC
4101 Washington Ave., 3rd Floor
Houston, Texas 77007
gkf@gflawoffices.com
scd@gflawoffices.com
gab@gflawoffices.com

Darrell A. Apffel
S. Benjamin Shabot
Bettison Doyle Apffel & Guarino, P.C.
1100 Gulf Freeway, Suite 100
League City, Texas 77573
DApffel@bdaglaw.com
BShabot@bdaglaw.com

_____
Bob Wynne

3

## PLAINTIFFS' OBJECTIONS AND RESPONSES TO
## SECOND REQUESTS FOR PRODUCTION FROM INTERVENOR VICKI JOHNS

**REQUEST FOR PRODUCTION NO. 1:** A copy of the cell phone records for Corey Johns from January 1, 2012 to January 1, 2013.

**RESPONSE:** Plaintiffs object to this request as it is overbroad, burdensome, harassing, not reasonably calculated to lead to the discovery of admissible evidence, and an unnecessary invasion of privacy.

**REQUEST FOR PRODUCTION NO. 2:** A copy of the cell phone records for Brian Johns from January 1, 2012 to January 1, 2013.

**RESPONSE:** Plaintiffs object to this request as it is overbroad, burdensome, harassing, not reasonably calculated to lead to the discovery of admissible evidence, and an unnecessary invasion of privacy.

**REQUEST FOR PRODUCTION NO. 3:** A copy of the cell phone records for Frances Sowell from January 1, 2012 to January 1, 2013.

**RESPONSE:** Plaintiffs object to this request as it is overbroad, burdensome, harassing, not reasonably calculated to lead to the discovery of admissible evidence, and an unnecessary invasion of privacy.



"pamela roberson "
&lt;pmlroberson@yahoo.com&gt;

01/07/09 01:05 PM

| Please respond to |
| "pamela roberson" |
| &lt;pmlroberson@yahoo.com&gt; |

To &lt;pam_Roberson@Aigag.com&gt;

cc

bcc

Subject FWD:New Year - New Outlook

History     This message has been forwarded.

---

Sent from my Verizon Wireless LGVX10000 device.

------Original Message------
From: Vicki Johns &lt;Vicki.Johns@Halliburton.com&gt;
To:
&lt;pmlroberson@yahoo.com&gt;,&lt;circol_k@yahoo.com&gt;,&lt;jbris3@att.net&gt;,&lt;sowellfrances@yahoo.com&gt;,&lt;renetta.roquemore@ftbend.k12.tx.us&gt;,
 &lt;dh82@tmw.com&gt;
Cc: &lt;coryjohns89@yahoo.com&gt;,&lt;mercedes4vj@yahoo.com&gt;
Date: Wed, Jan 7, 1:02 PM -0600
Subject: New Year - New Outlook


Hello family, Brian & I have decided to write you all regarding this
past year & the future.This year we will celebrate our 2nd year Wedding
anniversary.We are very happy & we are totally committed to one
another.Last year we dealt with alot of unnecessary stress from those
that are suppose to be closet to us , "OUR FAMILY".All of you are
supposed to be Christians & we have all grown up in church yet some of
us don't treat one another like Christians.On both sides of our families
there has been unnecessary Stress & unwanted ADVICE as to how our (Brian
& Vicki's) home,kids,finances,communication,trust personal buisness
should be run according to YOU! Most communication is ALWAYS
NEGATIVE.....for our mother's, you have taught us the old saying (if you
don't have nothing good or nice to say,don't say nothing) Unfortunately
we have forgotten that along the way .Life is hard enough to get thru
from day to day but we have experienced so much drama from some of
you,it has to stop, thats why we have chosen to stay to ourselves.The
majority of our famililes are women,and with the exception of one of my
sisters Kim, all of us women have been married or is married.You
personally know how it feel to have in-laws.You are one or have been
one.How does yourmother-in law,sis in law,brother in law,father in law
TREAT YOU,ACKNOWLEDGE YOU,RESPECT YOU (or lack thereof) Do they
constantly discuss in your presence your ex-girlfriends,wives or
boyfriends ? How many of you have done that to me & Brian.Have we EVER
brought up your ex's or your previous baby mama's or daddy's or even
your spouses ex baby mama's or daddy's - NO WE HAVEN'T BECAUSE WE
RESPECT EVERYONE & THEIR MARRIAGES.Give us a break.Brian & I are
together,happily, get over it and ACCEPT IT,IT "AIN'T gonna change"He &
I have definately kept in alot of things we have wanted to say to you
our family members on both sides for all the negative things some of you
have done and said to our faces & behind one of our backs,but we jointly
are here to tell you from now on regardless of who you are, your
behavior & disrespect is no longer acceptable.The most important thing

is that we love each other,thats it, as our family that should be all
you care about,not petty things & comments like "we are up under each
other too much or all the time" How ignorant is that? We like each
other,we are extremely attracted to each other,we are in love,why does
that make some of you annoyed or is it JEALOUSY.If we choose to breathe
for one another,thats our buisness,it works for us,maybe if some of you
pay more attention to your own SPOUSE & and try some of our techniques
you will have a much better relationship & want to be around your spouse
more.We rarely hear from most of you except the occassional email
forward,how about spending some quality time with us.Some of you make
excuses as to why you haven't come to visit but we are expected to come
to you,thats a 2-way street.We are only surrounding ourselves with
positive people (friends,family) we want to raise our children in such
an atmosphere,give us that chance,stop telling us every step to make
according to you & your path,GOD DID not ordain you as his helper or
overseer to his kingdom.We are intelligent adults & we want to share our
lives with you ALL.Let us make our own decisions,and raise our children
as WE see fit.To my family, always respect my husband,to love me is to
love & accept him .To Brian's family the absolute same thing.To love him
is to respect & accept me.If anyone would like to address this letter
with us ,please feel free to call or come by anytime.Since we are all
adults,I figured I didnt have to put individual names to every
statement, as all of you read this letter you know what part pertains to
you as an individual.................Sincerely, Brian & Vicki Johns

------------------------------------------------------------------------
This e-mail, including any attached files, may contain confidential and
privileged information for the sole use of the intended recipient.  Any
review, use, distribution, or disclosure by others is strictly prohibited.  If
you are not the intended recipient (or authorized to receive information for
the intended recipient), please contact the sender by reply e-mail and delete
all copies of this message.

**Subject:** Fw: Hey B do you still want me to get...

**From:** bxlatina2569@yahoo.com (bxlatina2569@yahoo.com)

**To:** bxlatina2569@yahoo.com;

**Date:** Friday, July 20, 2012 7:08 PM

------ SMS Text ------
To: 18324055436
Sent: Jul 17, 2012 5:34 PM
Subject: Hey B do you still want me to get...

Hey B do you still want me to get Koi?
Sent on the Sprint® Now Network from my BlackBerry®

Subject:    Fw: koi gets a cut tomorrow at 1:30

From:      bxlatina2569@yahoo.com (bxlatina2569@yahoo.com)

To:        bxlatina2569@yahoo.com;

Date:      Friday, July 20, 2012 7:07 PM


------ SMS Text ------
From: 8324055436
Received: Jul 16, 2012 12:37 PM
Subject: koi gets a cut tomorrow at 1:30

koi gets a cut tomorrow at 1:30
Sent on the Sprint® Now Network from my BlackBerry®

**Subject:** Fw: u up

**From:** bxlatina2569@yahoo.com (bxlatina2569@yahoo.com)

**To:** bxlatina2569@yahoo.com;

**Date:** Friday, July 20, 2012 7:07 PM

------ SMS Text ------
From: 8324055436
Received: Jul 14, 2012 10:03 PM
Subject: u up

u up
Sent on the Sprint® Now Network from my BlackBerry®

| | |
|---|---|
| Subject: | [No Subject] |
| From: | francis colon (bxlatina2569@yahoo.com) |
| To: | coryjohns89@yahoo.com; |
| Date: | Tuesday, June 19, 2012 7:46 AM |

Hey Boo!,

your poster has been ordered and should be here within 1-2 weeks.. I always keep a promise..

But I need to know what t shirt you want? is it a New York or Yankee t shirt and what size would you like? I also found a blue and white Yankee hoodie.. Well just let me know what you would like..

*Francis Colon*⊛

Subject: Catalog Favorites Order Confirmation

From: Catalog Favorites (orders@catalogfavorites.com)

To: bxlatina2569@yahoo.com;

Date: Sunday, November 27, 2011 6:34 PM

# Thank you for ordering from Catalog Favorites.
Your order number is J0055542.

If we can be of any further assistance please email us at help@catalogfavorites.com or call toll free 1-877-754-7430.

Sincerely,

Catalog Favorites

## Order Number: J0055542

**Bill To:**
FRANCIS COLON
13126 KINGSMILL DRIVE
SUGARLAND, TX 77478

**Ship To:**
FRANCIS COLON
13126 KINGSMILL DRIVE
SUGARLAND , TX 77478

| Qty | Description | Total |
| --- | --- | --- |
| 1 | Personalized Man Cave Sign **BRIAN'S** | $34.95 |

| | |
| --- | --- |
| **Merchandise Total:** | $34.95 |
| **Shipping & Handling:** | $9.50 |
| **Sales Tax:** | $0.00 |
| **Order Total:** | $44.45 |

**\*\*\*\* NOTICE: This order qualifies for a FREE STANDARD SHIPPING REBATE just for trying FreeShipping.com! Click to claim\*\*\*\*\***

Enamel Silverplate Glass Heart
Letter Pendant 18in
$14.98 $5.99
60 % OFF

Hairstylists Plaque
$14.95

| | |
|---|---|
| Subject: | Koi is japanese |
| From: | francis colon (bxlatina2569@yahoo.com) |
| To: | coryjohns89@yahoo.com; |
| Date: | Wednesday, November 2, 2011 8:33 PM |

Japanese Version  ( I'll stick to this version of Koi..)

Koi (恋) means "love." And by "love," it can mean a crush or between couples. Usually, the term isn't used between married couples.

You wouldn't actually call someone 恋 (koi), but a girlfriend/boyfriend can be referred to as koibito 恋人. But then once again, you wouldn't actually call someone that. It's the same as how we wouldn't call our boyfriends/girlfriends...boyfriend/girlf...

Good luck :)

English version of  ( COY) (koi)*adj.* **coy·er, coy·est**

**1.** Tending to avoid people and social situations; reserved.

**2.** Affectedly and usually flirtatiously shy or modest. See Synonyms at shy[1].

**3.** Annoyingly unwilling to make a commitment

## *Francis Colon'*

**Subject:** homes

**From:** francis colon (bxlatina2569@yahoo.com)

**To:** coryjohns89@yahoo.com;

**Date:** Saturday, October 29, 2011 5:35 PM

Prices are going from high to low on the list $2000. all the way to $1599. Let me know what you think?

http://search.har.com/engine/12608-Cobble-Springs-Dr-Pearland-TX-77584_HAR67664468.htm

http://search.har.com/engine/2404-Fastwater-Creek-Ct-Pearland-TX-77584_HAR4903430.htm

http://search.har.com/engine/3114-S.-Webber-Pearland-TX-77584_HAR63468830.htm

http://search.har.com/engine/2407-Black-Canyon-Ln-Pearland-TX-77584_HAR35641814.htm

http://search.har.com/engine/2638-Martinec-Dr-Pearland-TX-77584_HAR79601020.htm my favorite so far

http://search.har.com/engine/1104-Lake-Shore-Dr-Pearland-TX-77581_HAR97320481.htm you will like the floors

http://search.har.com/engine/3812-N.Pin-Oak-Pearland-TX-77582_HAR25940064.htm this has one big ass master bedroom

*Francis Colon'*

Subject: Parfum1.com Order Confirmation

From: Parfum1.com Order Processing (orderprocessing@parfum1.com)

To: bxlatina2569@yahoo.com;

Date: Thursday, October 13, 2011 12:59 PM

 **Parfum1** *.com*

------------------------------------------------------------------------

## Order Confirmation

------------------------------------------------------------------------

Hi Franis Colon,

**Thank you for shopping at Parfum1.com**
Your order has been received and is being processed.
We will send you another email once your order has shipped.
Your order will ship within 1-2 BUSINESS days after the date you placed your order.

We will contact you shortly if any difficulties occur during the processing of your order.
As a reminder: an improper billing or shipping address may delay your order.

------------------------------------------------------------------------

## Order Summary

------------------------------------------------------------------------

**Email Address:** bxlatina2569@yahoo.com
**Phone:** 8325671571

**Shipping Address:**
Brian E. Johns
3827 Saxon Hollow Court
Friendswood, TX 77546
United States

**Shipping Method:** Standard
**Estimated Delivery Time:** 2-8 Business Days
Estimated delivery time is calculated AFTER your order ships.
Your order will ship in 1-2 BUSINESS days after the date you placed your order.

**Gift Message:**
Happy 1 Month Anniversary Looking forward to many more months and years together Love Frankie

**Billing Address:**
Franis Colon
13126 Kingsmill Drive

Sugarland, TX 77478
United States

**Payment Details:**
Type: MasterCard
Name: Franis Colon
XXXXXXXXXXXXX3978
12/2013

**Order Details:**

| Item # | Item | Brand | Cost | Quantity |
|--------|------|-------|------|----------|
| MCAL03135 | Eternity Men Eau De Toilette Spray 3.3oz for Men | Calvin Klein | $43.00 | 1 |

Items: $43.00
Coupon: $4.30
Shipping: $5.95
Order Total: $44.65

-------------------------------------------------------------------------------

For any inquires regarding your order, you must provide us with the email address you used when placing your order.

Once again, thank you for shopping at Parfum1.com.
Please visit us again soon for great prices on your favorite designer fragrances, bath and body products, and beauty accessories.
www.parfum1.com

Parfum1.com
3000 47th Ave., 4th Floor, Long Island City, NY 11101
Contact Us: 866.727.3861, info@parfum1.com

Brian Edward Johns


I, Francis Colon met Brian E. Johns on September 17, 2011 through a friend on facebook. We continued to date and in the month of October of 2011, we decided to make our relationship exclusive with each other, And as time passed I got to know his son Corey Johns, met his mother Mrs. Francis Sowell and other family members including his two dogs Max and Koi. I would spend my weekends at his home (3827 Saxon Hollow Court, Friendswood, TX 77546). Our relationship continued and we were talking about our future together and moving into his home in the month of September 2012 when we completed a year in our relationship. Then that tragic day in July of 2012, when I received a phone call from his sister Pam Johns-Roberson telling me that Brian was in a terrible accident at work and that he was in the ICU at UTMB Hospital in Galveston. That phone call changed my life forever. My 11 months with Brian were amazing and I was privileged to have been able to spend and enjoy the last 11 months of Brian's life with him.

## HIPAA AUTHORIZATION TO DISCLOSE PROTECTED HEALTH INFORMATION

TO:

Physician, Provider or Facility Name:
Street Address:
City, State, Zip:
Phone Number:

PATIENT:

| | |
|---|---|
| Patient Name: | Brian E. Johns |
| Social Security Number: | XXX-XX-____ __ |
| Date of Birth: | 02/26/1967 |
| Date(s) of Service: | 02/10/2012 to 08/13/12 |

PERSON/ENTITY TO WHOM RECORDS SHALL BE RELEASED:

| | |
|---|---|
| Name of Attorney: | George K. Farah |
| Firm: | Guerra & Farah, PLLC |
| Street Address: | 4101 Washington Ave., 3rd Floor |
| City, State, Zip: | Houston, Texas 77007 |
| Phone Number: | 713-529-6606 |
| Fax Number: | 713-529-6605 |

I, *Frances Sowell* hereby authorize the release of information to Guerra & Farah, PLLC from the medical records pertaining to me. This release applies to any information governed by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

The information will be used or given out for the purposes of handling the attorney's or law firm's duties in the investigation and possible litigation of claims in which I am involved. This authorization is initiated at my request and the health information will be disclosed at my request. Information used or disclosed pursuant to this authorization may be subject to re-disclosure or shared by the persons or organizations receiving the information and no longer protected.

Guerra & Farah, PLLC is permitted to receive the information and is hereby appointed as my attorney[s]-in-fact/representative[s] for the limited purpose of obtaining and using any and all information the releasing persons or organization may have concerning treatment or services rendered to the undersigned for any reason, whether inpatient or outpatient, including but not limited to:

Face sheet;
Intake, history, and physical;
Emergency room notes (handwritten and/or typed);
EKG, Holter monitor, Echo, and PFT;
Lab/pathology results and reports;
Results of summary testing;



EXHIBIT
A

Operative report;
Radiology records, X-rays, MRIs and related notes and reports;
Consultation notes and reports;
Charts, progress notes, case notes, nurse's notes, and dictation;
Opinions, diagnoses, prognoses, and treatment plans;
Orders;
Statements and/or bills;
Dental records, notes, reports, summaries, and treatment plans;
Medication summary, pharmaceutical records including but not limited to date of prescription, prescribing physician, name of drug, dosage and amount dispensed; AND

Any other medical information regarding any treatment, including documents to and from other health care providers, attorneys, insurance companies, etc.

Furthermore, any of medical providers and their agents and representatives are authorized to discuss my physical and mental condition with Guerra & Farah, PLLC and Guerra & Farah, PLLC's agents and representatives.

I understand that my records are confidential and cannot be disclosed without my written authorization, except when otherwise permitted by law. I understand that the specified information to be released may include: history, diagnosis, and/or treatment of drug or alcohol abuse, mental illness, or communicable disease, including Human Immunodeficiency Virus (HIV) and Acquired Immune Deficiency Syndrome (AIDS).

I understand that treatment or payment cannot be conditioned on my signing this authorization, except in certain circumstances such as for participation in research programs, or authorization of the release of testing for pre-employment purposes. I understand that I may revoke this authorization in writing at any time except to the extent that action has been taken in reliance upon this authorization. I understand that I may be charged a retrieval/processing fee and for copies of my medical records according to Texas Hospital Licensing Law.

Unless revoked sooner, this authorization expires one (1) year from the date of my signature below.

A photocopy or facsimile transmission of this authorization has the same force and effect as an original.

_Frances Sowell_
Printed Name

_Frances Sowell_
Signature

_4/4/15_
Date Signed

SWORN TO AND SUBSCRIBED before me, the undersigned authority, on the ____ day of ___April_____, 2015.



Notary Public in and for
the State of Texas
My Commission Expires: ___

4816-5977-9859, v. 1

COLLEEN RENEE MCGASKEY
Notary Public, State of Texas
My Commission Expires
November 26, 2015



**Gulf Storage Partners, LP**
9325 East 33rd Street
Indianapolis, IN 46235

ACCOUNTING #888-892-9338
SCHEDULING # 800-776-7637
www.PODS.com

15464041
James Johns
10919 Fondren Rd
Apt 921
Houston, TX 77096

*16 26 B 39*

| | | | |
|---|---|---|---|
| Due Date: | 8/11/2012 |
| Invoice #: | 039-247146 |
| Account #: | 15464041 |
| Print Date: | 8/10/2012 |
| Terms: | Auto charge |

| QTY | SKU | DESCRIPTION | RATE | AMOUNT |
|---|---|---|---|---|
| 1 | 16WD | Deliver empty 16' container to your location | $83.00 | $83.00 |
| 1 | 16S | Monthly rental of 16' container in storage center | $195.00 | $195.00 |
| | |   - PODS Container#: | | |
| | |   - Located: 3827 Saxon Hollow | | |
| | |   - Rental Period: 08/11/2012-9/10/2012 | | |
| 1 | L | Lock | $6.00 | $6.00 |
| | | Notice: Additional transportation fees may apply to future moves of your PODS container. Minimum duration of container rental may be required to qualify for certain discounts depending on your local franchise requirements. Seasonal or promotional terms and conditions may apply. | | |

| | | |
|---|---|---|
| | Sub Total | $284.00 |
| **Manage your account online at www.PODS.com** | Tax Amt | $22.00 |
| THANK YOU FOR CHOOSING PODS! between: M-F 830a-6p Eastern | TOTAL | $306.00 |

Please notify us of any changes in address or phone number. Account will be subject to a $35 late fee ,10 days after the account due date.

✂ ------------ ***********TO INSURE PROPER CREDIT, PLEASE RETURN THIS PORTION WITH YOUR PAYMENT*********** ----------- ✂

**PODS**
Houston, TX
15464041
8/10/2012

<u>Change of Address</u>

| Due Date: | Invoice #: |
|---|---|
| 8/11/2012 | 039-247146 |
| Amount Due: | Enclosed: |
| $306.00 | |

Remit To:
**Gulf Storage Partners, LP**
9325 East 33rd Street
Indianapolis, IN 46235    ....

INVOICE

**Gulf Storage Partners, LP**
9325 East 33rd Street
Indianapolis, IN 46235

ACCOUNTING #888-892-9338
SCHEDULING # 800-776-7637
www.PODS.com

15464041
James Johns
10919 Fondren Rd
Apt 921
Houston, TX 77096

| | |
|---|---|
| Due Date: | 8/11/2012 |
| Invoice #: | 039-247147 |
| Account #: | 15464041 |
| | |
| Print Date: | 8/10/2012 |
| Terms: | Auto charge |

| QTY | SKU | DESCRIPTION | RATE | AMOUNT |
|---|---|---|---|---|
| 1 | CPO5 | Contents Protection $ 5,000 Value - Monthly Fee | $34.95 | $34.95 |
| | | Notice: Additional transportation fees may apply to future moves of your PODS container. Minimum duration of container rental may be required to qualify for certain discounts depending on your local franchise requirements. Seasonal or promotional terms and conditions may apply. | | |
| | | | Sub Total | $34.95 |
| | | Manage your account online at www.PODS.com | Tax Amt | $2.71 |
| | | THANK YOU FOR CHOOSING PODS! between: M-F 830a-6p Eastern | TOTAL | $37.66 |

Please notify us of any changes in address or phone number. Account will be subject to a $35 late fee ,10 days after the account due date.

✂----------- \*\*\*\*\*\*\*\*\*\*\*\*TO INSURE PROPER CREDIT, PLEASE RETURN THIS PORTION WITH YOUR PAYMENT\*\*\*\*\*\*\*\*\*\*\*\*\* ----------- ✂

Houston, TX
15464041
8/10/2012

Change of Address

_____

_____

_____

| | |
|---|---|
| Due Date: | Invoice #: |
| 8/11/2012 | 039-247147 |

Remit To:
**Gulf Storage Partners, LP**
9325 East 33rd Street
Indianapolis, IN 46235    ....

| | |
|---|---|
| Amount Due: | Enclosed: |
| $37.66 | |

_____





ANM

PROBATE COURT 1

FILED
6/15/2015 4:43:11 PM
Stan Stanart
County Clerk
Harris County

## CAUSE NO. 415980-401

| | | |
|---|---|---|
| FRANCES SOWELL, INDIVIDUALLY AND AS HEIR OF BRIAN EDWARD JOHNS, DECEASED, AND AS ADMINISTRATOR OF THE ESTATE OF BRIAN EDWARD JOHNS, DECEASED; COREY JOHNS, INDIVIDUALLY AND AS AN HEIR OF BRIAN EDWARD JOHNS, DECEASED *Plaintiffs,* | § § § § § § § § § § § | IN THE PROBATE COURT |
| JAMES JOHNS, SR. *Intervenor,* | § § § | NUMBER ONE (1) OF |
| VICKI JOHNS, INDIVIDUALLY AND AS AN HEIR OF BRIAN EDWARD JOHNS, DECEASED *Intervenor* | § § § § § § | |
| V. | § § | |
| THE DOW CHEMICAL COMPANY, ROHM AND HAAS COMPANY, ROHM AND HAAS TEXAS, INC., TIM FOX, AND JULIO RODRIGUEZ *Defendants.* | § § § § § | HARRIS COUNTY, TEXAS |

### ORDER GRANTING INTERVENOR, VICKI JOHNS', MOTION TO COMPEL DISCOVERY RESPONSES IN PART

On the 24th day of September 2015, Intervenor, Vicki Johns', Motion to Compel Discovery Responses against Plaintiff Frances Sowell and Corey Johns was considered by the Court. After considering the motion, the response, and the arguments of counsel, it appears to the Court that the Motion should be granted.

IT IS THEREFORE ORDERED that, on or before the 20th day after this Order is signed:

1. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 9   *Submit a privilege log for all documents not produced under otherwise DENIED any claim of privilege.*

   _____GRANTED

2. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 10

   _____GRANTED          _____✓_____DENIED

3. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 13

   _____GRANTED          _____✓_____DENIED

4. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 17

   _____GRANTED          _____✓_____DENIED

5. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 20

   _____GRANTED          _____✓_____DENIED

6. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 21

   _____✓_____GRANTED          _____DENIED

7. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 22

   _____GRANTED          _____✓_____DENIED

8. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 23

   _____GRANTED          _____✓_____DENIED

9. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 25

   _____GRANTED          _____✓_____DENIED

10. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 24

_____GRANTED    _____✓_____DENIED

11. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 26

_____GRANTED    _____✓_____DENIED

12. Plaintiffs shall fully respond to Intervenor's Second Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 1

_____GRANTED    _____✓_____DENIED

13. Plaintiffs shall fully respond to Intervenor's Second Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 2

_____GRANTED    ,    _____✓_____DENIED

14. Plaintiffs shall fully respond to Intervenor's Second Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 3

_____GRANTED    _____✓_____DENIED

15. Plaintiff Frances Sowell shall fully answer Interrogatory Number 1 of Intervenor's first set of Interrogatories

_____GRANTED    _____✓_____DENIED

16. Plaintiff Frances Sowell shall fully answer Interrogatory Number 4 of Intervenor's first set of Interrogatories

_____GRANTED    _____✓_____DENIED

17. Plaintiff Frances Sowell shall fully answer Interrogatory Number 5 of Intervenor's first set of Interrogatories

_____GRANTED    _____✓_____DENIED

18. Plaintiff Frances Sowell shall fully answer Interrogatory Number 12 of Intervenor's first set of Interrogatories    ,

_____GRANTED    _____✓_____DENIED

19. Plaintiff Corey Johns shall fully answer Interrogatory Number 1 of Intervenor's first set of Interrogatories    *Submit a privilege log for all documents not produced because of privilege, otherwise*

_____GRANTED    _____DENIED

20. Plaintiff Corey Johns shall fully answer Interrogatory Number 4 of Intervenor's first set of Interrogatories

_____GRANTED                    ___✓_____DENIED

21. Plaintiff Corey Johns shall fully answer Interrogatory Number 5 of Intervenor's first set of Interrogatories

_____GRANTED                    ___✓_____DENIED

22. Plaintiff Corey Johns shall fully answer Interrogatory Number 9 of Intervenor's first set of Interrogatories

___✓_____GRANTED                    _____DENIED


**IT IS FURTHER ORDERED** all other relief not specifically granted be herby denied.

Signed this 25th, day of _September_ 2015.

_____
JUDGE PRESIDING

## CAUSE NO. 415980-401

| | | |
|---|---|---|
| FRANCES SOWELL, INDIVIDUALLY AND AS HEIR OF BRIAN EDWARD JOHNS, DECEASED, AND AS ADMINISTRATOR OF THE ESTATE OF BRIAN EDWARD JOHNS, DECEASED; COREY JOHNS, INDIVIDUALLY AND AS AN HEIR OF BRIAN EDWARD JOHNS, DECEASED *Plaintiffs,* | § § § § § § § § § § § § § | IN THE PROBATE COURT |
| JAMES JOHNS, SR. *Intervenor,* | § § § | NUMBER ONE (1) OF |
| VICKI JOHNS, INDIVIDUALLY AND AS AN HEIR OF BRIAN EDWARD JOHNS, DECEASED *Intervenor* | § § § § § | |
| V. | § § | |
| THE DOW CHEMICAL COMPANY, ROHM AND HAAS COMPANY, ROHM AND HAAS TEXAS, INC., TIM FOX, AND JULIO RODRIGUEZ *Defendants*. | § § § § § | HARRIS COUNTY, TEXAS |

### AMENDED ORDER GRANTING INTERVENOR, VICKI JOHNS', MOTION TO COMPEL DISCOVERY RESPONSES

On the ___ day of _____, 2015, Intervenor, Vicki Johns', Motion to Compel Discovery Responses against Plaintiff Frances Sowell and Corey Johns was considered by the Court. After considering the motion, the response, and the arguments of counsel, it appears to the Court that the Motion should be granted.

**IT IS THEREFORE ORDERED** that, on or before the ___ day after this Order is signed:

1. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 13, by providing an authorization to obtain educational records relating to any disciplinary or administrative hearings regarding Corey Johns at Southern University.

_____GRANTED          _____DENIED

2. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 20, by providing an authorization to obtain employment records relating to Francis Sowell at UTMB.

_____GRANTED          _____DENIED

3. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 22, for the time period of May 1, 2007 to August 18, 2012.

_____GRANTED          _____DENIED

4. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 23, for the time period of May 1, 2007 to August 18, 2012.

_____GRANTED          _____DENIED

5. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 25, for the time period of May 1, 2007 to August 18, 2012.

_____GRANTED          _____DENIED

6. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 24, for the time period of May 1, 2007 to August 18, 2012.

_____GRANTED          _____DENIED

7. Plaintiffs shall fully respond to Intervenor's First Request for Production to Plaintiffs Frances Sowell and Corey Johns Number 26, for the time period of May 1, 2007 to August 18,  2012.

_____GRANTED          _____DENIED

**IT IS FURTHER ORDERED** all other relief not specifically granted be herby denied.

Signed this____, day of _____, 2015.

_____
JUDGE PRESIDING

Code of Federal Regulations

Title 34. Education

Subtitle A. Office of the Secretary, Department of Education

Part 99. Family Educational Rights and Privacy (Refs & Annos)

Subpart D. May an Educational Agency or Institution Disclose Personally Identifiable Information from Education Records?

Effective: January 3, 2012

34 C.F.R. § 99.31

§ 99.31 Under what conditions is prior consent not required to disclose information?

Currentness

(a) An educational agency or institution may disclose personally identifiable information from an education record of a student without the consent required by § 99.30 if the disclosure meets one or more of the following conditions:

(1)(i)(A) The disclosure is to other school officials, including teachers, within the agency or institution whom the agency or institution has determined to have legitimate educational interests.

(B) A contractor, consultant, volunteer, or other party to whom an agency or institution has outsourced institutional services or functions may be considered a school official under this paragraph provided that the outside party--

(1) Performs an institutional service or function for which the agency or institution would otherwise use employees;

(2) Is under the direct control of the agency or institution with respect to the use and maintenance of education records; and

(3) Is subject to the requirements of § 99.33(a) governing the use and redisclosure of personally identifiable information from education records.

(ii) An educational agency or institution must use reasonable methods to ensure that school officials obtain access to only those education records in which they have legitimate educational interests. An educational agency or institution that does not use physical or technological access controls must ensure that its administrative policy for controlling access to education records is effective and that it remains in compliance with the legitimate educational interest requirement in paragraph (a)(1)(i)(A) of this section.

(2) The disclosure is, subject to the requirements of § 99.34, to officials of another school, school system, or institution of postsecondary education where the student seeks or intends to enroll, or

where the student is already enrolled so long as the disclosure is for purposes related to the student's enrollment or transfer.

Note: Section 4155(b) of the No Child Left Behind Act of 2001, 20 U.S.C. 7165(b), requires each State to assure the Secretary of Education that it has a procedure in place to facilitate the transfer of disciplinary records with respect to a suspension or expulsion of a student by a local educational agency to any private or public elementary or secondary school in which the student is subsequently enrolled or seeks, intends, or is instructed to enroll.

(3) The disclosure is, subject to the requirements of § 99.35, to authorized representatives of--

(i) The Comptroller General of the United States;

(ii) The Attorney General of the United States;

(iii) The Secretary; or

(iv) State and local educational authorities.

(4)(i) The disclosure is in connection with financial aid for which the student has applied or which the student has received, if the information is necessary for such purposes as to:

(A) Determine eligibility for the aid;

(B) Determine the amount of the aid;

(C) Determine the conditions for the aid; or

(D) Enforce the terms and conditions of the aid.

(ii) As used in paragraph (a)(4)(i) of this section, financial aid means a payment of funds provided to an individual (or a payment in kind of tangible or intangible property to the individual) that is conditioned on the individual's attendance at an educational agency or institution.

(Authority: 20 U.S.C. 1232g(b)(1)(D))

(5)(i) The disclosure is to State and local officials or authorities to whom this information is specifically--

(A) Allowed to be reported or disclosed pursuant to State statute adopted before November 19, 1974, if the allowed reporting or disclosure concerns the juvenile justice system and the system's ability to effectively serve the student whose records are released; or

(B) Allowed to be reported or disclosed pursuant to State statute adopted after November 19, 1974, subject to the requirements of § 99.38.

(ii) Paragraph (a)(5)(i) of this section does not prevent a State from further limiting the number or type of State or local officials to whom disclosures may be made under that paragraph.

(6)(i) The disclosure is to organizations conducting studies for, or on behalf of, educational agencies or institutions to:

(A) Develop, validate, or administer predictive tests;

(B) Administer student aid programs; or

(C) Improve instruction.

(ii) Nothing in the Act or this part prevents a State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section from entering into agreements with organizations conducting studies under paragraph (a)(6)(i) of this section and redisclosing personally identifiable information from education records on behalf of educational agencies and institutions that disclosed the information to the State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section in accordance with the requirements of § 99.33(b).

(iii) An educational agency or institution may disclose personally identifiable information under paragraph (a)(6)(i) of this section, and a State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section may redisclose personally identifiable information under paragraph (a)(6)(i) and (a)(6)(ii) of this section, only if--

(A) The study is conducted in a manner that does not permit personal identification of parents and students by individuals other than representatives of the organization that have legitimate interests in the information;

(B) The information is destroyed when no longer needed for the purposes for which the study was conducted; and

(C) The educational agency or institution or the State or local educational authority or agency headed by an official listed in paragraph (a)(3) of this section enters into a written agreement with the organization that--

(1) Specifies the purpose, scope, and duration of the study or studies and the information to be disclosed;

(2) Requires the organization to use personally identifiable information from education records only to meet the purpose or purposes of the study as stated in the written agreement;

(3) Requires the organization to conduct the study in a manner that does not permit personal identification of parents and students, as defined in this part, by anyone other than representatives of the organization with legitimate interests; and

(4) Requires the organization to destroy all personally identifiable information when the information is no longer needed for the purposes for which the study was conducted and specifies the time period in which the information must be destroyed.

(iv) An educational agency or institution or State or local educational authority or Federal agency headed by an official listed in paragraph (a)(3) of this section is not required to initiate a study or agree with or endorse the conclusions or results of the study.

(v) For the purposes of paragraph (a)(6) of this section, the term organization includes, but is not limited to, Federal, State, and local agencies, and independent organizations.

(7) The disclosure is to accrediting organizations to carry out their accrediting functions.

(8) The disclosure is to parents, as defined in § 99.3, of a dependent student, as defined in section 152 of the Internal Revenue Code of 1986.

(9)(i) The disclosure is to comply with a judicial order or lawfully issued subpoena.

(ii) The educational agency or institution may disclose information under paragraph (a)(9)(i) of this section only if the agency or institution makes a reasonable effort to notify the parent or eligible student of the order or subpoena in advance of compliance, so that the parent or eligible student may seek protective action, unless the disclosure is in compliance with--

(A) A Federal grand jury subpoena and the court has ordered that the existence or the contents of the subpoena or the information furnished in response to the subpoena not be disclosed;

(B) Any other subpoena issued for a law enforcement purpose and the court or other issuing agency has ordered that the existence or the contents of the subpoena or the information furnished in response to the subpoena not be disclosed; or

(C) An ex parte court order obtained by the United States Attorney General (or designee not lower than an Assistant Attorney General) concerning investigations or prosecutions of an offense listed in 18 U.S.C. 2332b(g)(5)(B) or an act of domestic or international terrorism as defined in 18 U.S.C. 2331.

(iii)(A) If an educational agency or institution initiates legal action against a parent or student, the educational agency or institution may disclose to the court, without a court order or subpoena, the education records of the student that are relevant for the educational agency or institution to proceed with the legal action as plaintiff.

(B) If a parent or eligible student initiates legal action against an educational agency or institution, the educational agency or institution may disclose to the court, without a court order or subpoena, the student's education records that are relevant for the educational agency or institution to defend itself.

(10) The disclosure is in connection with a health or safety emergency, under the conditions described in § 99.36.

(11) The disclosure is information the educational agency or institution has designated as "directory information", under the conditions described in § 99.37.

(12) The disclosure is to the parent of a student who is not an eligible student or to the student.

(13) The disclosure, subject to the requirements in § 99.39, is to a victim of an alleged perpetrator of a crime of violence or a non-forcible sex offense. The disclosure may only include the final results of the disciplinary proceeding conducted by the institution of postsecondary education with respect to that alleged crime or offense. The institution may disclose the final results of the disciplinary proceeding, regardless of whether the institution concluded a violation was committed.

(14)(i) The disclosure, subject to the requirements in § 99.39, is in connection with a disciplinary proceeding at an institution of postsecondary education. The institution must not disclose the final results of the disciplinary proceeding unless it determines that--

(A) The student is an alleged perpetrator of a crime of violence or non-forcible sex offense; and

(B) With respect to the allegation made against him or her, the student has committed a violation of the institution's rules or policies.

(ii) The institution may not disclose the name of any other student, including a victim or witness, without the prior written consent of the other student.

(iii) This section applies only to disciplinary proceedings in which the final results were reached on or after October 7, 1998.

(15)(i) The disclosure is to a parent of a student at an institution of postsecondary education regarding the student's violation of any Federal, State, or local law, or of any rule or policy of the institution, governing the use or possession of alcohol or a controlled substance if--

(A) The institution determines that the student has committed a disciplinary violation with respect to that use or possession; and

(B) The student is under the age of 21 at the time of the disclosure to the parent.

(ii) Paragraph (a)(15) of this section does not supersede any provision of State law that prohibits an institution of postsecondary education from disclosing information.

(16) The disclosure concerns sex offenders and other individuals required to register under section 170101 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. 14071, and the information was provided to the educational agency or institution under 42 U.S.C. 14071 and applicable Federal guidelines.

(b)(1) De-identified records and information. An educational agency or institution, or a party that has received education records or information from education records under this part, may release the records or information without the consent required by § 99.30 after the removal of all personally identifiable information provided that the educational agency or institution or other party has made a reasonable determination that a student's identity is not personally identifiable, whether through single or multiple releases, and taking into account other reasonably available information.

(2) An educational agency or institution, or a party that has received education records or information from education records under this part, may release de-identified student level data from education records for the purpose of education research by attaching a code to each record that may allow the recipient to match information received from the same source, provided that--

(i) An educational agency or institution or other party that releases de-identified data under paragraph (b)(2) of this section does not disclose any information about how it generates and

assigns a record code, or that would allow a recipient to identify a student based on a record code;

(ii) The record code is used for no purpose other than identifying a de-identified record for purposes of education research and cannot be used to ascertain personally identifiable information about a student; and

(iii) The record code is not based on a student's social security number or other personal information.

(c) An educational agency or institution must use reasonable methods to identify and authenticate the identity of parents, students, school officials, and any other parties to whom the agency or institution discloses personally identifiable information from education records.

(d) Paragraphs (a) and (b) of this section do not require an educational agency or institution or any other party to disclose education records or information from education records to any party except for parties under paragraph (a)(12) of this section.

(Authority: 20 U.S.C. 1232g(a)(5)(A), (b), (h), (i), and (j)).

**Credits**

[53 FR 19368, May 27, 1988; 58 FR 3189, Jan. 7, 1993; 58 FR 36871, July 9, 1993; 61 FR 59296, Nov. 21, 1996; 65 FR 41853, July 6, 2000; 73 FR 74852, Dec. 9, 2008; 74 FR 401, Jan. 6, 2009; 76 FR 75641, Dec. 2, 2011]

SOURCE: 53 FR 11943, April 11, 1988; 58 FR 3188, Jan. 7, 1993, unless otherwise noted.

AUTHORITY: 20 U.S.C. 1232g, unless otherwise noted.

**Notes of Decisions (51)**

Current through Oct. 22, 2015; 80 FR 64298.

Vernon's Texas Statutes and Codes Annotated
Government Code (Refs & Annos)
Title 2. Judicial Branch (Refs & Annos)
Subtitle A. Courts
SuperBrowse Chapter 22. Appellate Courts
SuperBrowse Subchapter C. Courts of Appeals (Refs & Annos)

V.T.C.A., Government Code § 22.221

§ 22.221. Writ Power

Currentness

(a) Each court of appeals or a justice of a court of appeals may issue a writ of mandamus and all other writs necessary to enforce the jurisdiction of the court.

(b) Each court of appeals for a court of appeals district may issue all writs of mandamus, agreeable to the principles of law regulating those writs, against a:

(1) judge of a district or county court in the court of appeals district; or

(2) judge of a district court who is acting as a magistrate at a court of inquiry under Chapter 52, Code of Criminal Procedure, in the court of appeals district.

(c) Repealed by Acts 1987, 70th Leg., ch. 148, § 2.03, eff. Sept. 1, 1987.

(d) Concurrently with the supreme court, the court of appeals of a court of appeals district in which a person is restrained in his liberty, or a justice of the court of appeals, may issue a writ of habeas corpus when it appears that the restraint of liberty is by virtue of an order, process, or commitment issued by a court or judge because of the violation of an order, judgment, or decree previously made, rendered, or entered by the court or judge in a civil case. Pending the hearing of an application for a writ of habeas corpus, the court of appeals or a justice of the court of appeals may admit to bail a person to whom the writ of habeas corpus may be granted.

**Credits**

Acts 1985, 69th Leg., ch. 480, § 1, eff. Sept. 1, 1985. Amended by Acts 1987, 70th Leg., ch. 69, § 1, eff. May 6, 1987; Acts 1987, 70th Leg., ch. 148, §§ 1.35, 2.03, eff. Sept. 1, 1987; Acts 1991, 72nd Leg., ch. 58, § 1, eff. May 2, 1991; Acts 1995, 74th Leg., ch. 839, § 1, eff. Sept. 1, 1995.

**Editors' Notes**

**REVISOR'S NOTE**
**2004 Main Volume**

The revised law in Subsection (b) omits "or any Justice thereof, in vacation," from the source law in V.A.C.S. Article 1824 because amendments to V.A.C.S. Article 1816 have changed the original term of the courts of appeals from the first Monday in October until the first Monday in July to a term beginning and ending with each calendar year.

**Notes of Decisions (305)**

V. T. C. A., Government Code § 22.221, TX GOVT § 22.221

Current through the end of the 2015 Regular Session of the 84th Legislature

Vernon's Texas Rules Annotated

Texas Rules of Civil Procedure

Part II. Rules of Practice in District and County Courts

Section 9. Evidence and Discovery (Refs & Annos)

SuperBrowse B. Discovery

SuperBrowse Rule 193. Written Discovery: Response; Objection; Assertion of Privilege; Supplementation and Amendment; Failure to Timely Respond; Presumption of Authenticity

TX Rules of Civil Procedure, Rule 193.2

193.2. Objecting to Written Discovery

Currentness

(a) *Form and Time for Objections.* A party must make any objection to written discovery in writing--either in the response or in a separate document--within the time for response. The party must state specifically the legal or factual basis for the objection and the extent to which the party is refusing to comply with the request.

(b) *Duty to Respond When Partially Objecting; Objection to Time or Place of Production.* A party must comply with as much of the request to which the party has made no objection unless it is unreasonable under the circumstances to do so before obtaining a ruling on the objection. If the responding party objects to the requested time or place of production, the responding party must state a reasonable time and place for complying with the request and must comply at that time and place without further request or order.

(c) *Good Faith Basis for Objection.* A party may object to written discovery only if a good faith factual and legal basis for the objection exists at the time the objection is made.

(d) *Amendment.* An objection or response to written discovery may be amended or supplemented to state an objection or basis that, at the time the objection or response initially was made, either was inapplicable or was unknown after reasonable inquiry.

(e) *Waiver of Objection.* An objection that is not made within the time required, or that is obscured by numerous unfounded objections, is waived unless the court excuses the waiver for good cause shown.

(f) *No Objection to Preserve Privilege.* A party should not object to a request for written discovery on the grounds that it calls for production of material or information that is privileged but should instead comply with Rule 193.3. A party who objects to production of privileged material or information does not waive the privilege but must comply with Rule 193.3 when the error is pointed out.

**Credits**

Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999.

Notes of Decisions (14)

Vernon's Ann. Texas Rules Civ. Proc., Rule 193.2, TX R RCP Rule 193.2

Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through September 1, 2015. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through September 1, 2015. Other state court rules and selected county rules are current with rules verified through June 1, 2015.

Vernon's Texas Rules Annotated

Texas Rules of Civil Procedure

Part II. Rules of Practice in District and County Courts

Section 9. Evidence and Discovery (Refs & Annos)

SuperBrowse B. Discovery

SuperBrowse Rule 193. Written Discovery: Response; Objection; Assertion of Privilege; Supplementation and Amendment; Failure to Timely Respond; Presumption of Authenticity

TX Rules of Civil Procedure, Rule 193.4

193.4. Hearing and Ruling on Objections and Assertions of Privilege

Currentness

(a) *Hearing.* Any party may at any reasonable time request a hearing on an objection or claim of privilege asserted under this rule. The party making the objection or asserting the privilege must present any evidence necessary to support the objection or privilege. The evidence may be testimony presented at the hearing or affidavits served at least seven days before the hearing or at such other reasonable time as the court permits. If the court determines that an in camera review of some or all of the requested discovery is necessary, that material or information must be segregated and produced to the court in a sealed wrapper within a reasonable time following the hearing.

(b) *Ruling.* To the extent the court sustains the objection or claim of privilege, the responding party has no further duty to respond to that request. To the extent the court overrules the objection or claim of privilege, the responding party must produce the requested material or information within 30 days after the court's ruling or at such time as the court orders. A party need not request a ruling on that party's own objection or assertion of privilege to preserve the objection or privilege.

(c) *Use of Material or Information Withheld Under Claim of Privilege.* A party may not use--at any hearing or trial--material or information withheld from discovery under a claim of privilege, including a claim sustained by the court, without timely amending or supplementing the party's response to that discovery.

**Credits**

Aug. 5, 1998, Nov. 9, 1998 and Dec. 31, 1998, eff. Jan. 1, 1999.

**Notes of Decisions (38)**

Vernon's Ann. Texas Rules Civ. Proc., Rule 193.4, TX R RCP Rule 193.4

Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through September 1, 2015. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through September 1, 2015. Other state court rules and selected county rules are current with rules verified through June 1, 2015.

Vernon's Texas Rules Annotated

Texas Rules of Civil Procedure

Part II. Rules of Practice in District and County Courts

Section 9. Evidence and Discovery (Refs & Annos)

SuperBrowse B. Discovery

SuperBrowse Rule 196. Requests for Production and Inspection to Parties; Requests and Motions for Entry upon Property (Refs & Annos)

TX Rules of Civil Procedure, Rule 196.2

196.2. Response to Request for Production and Inspection

Currentness

(a) *Time for Response.* The responding party must serve a written response on the requesting party within 30 days after service of the request, except that a defendant served with a request before the defendant's answer is due need not respond until 50 days after service of the request.

(b) *Content of Response.* With respect to each item or category of items, the responding party must state objections and assert privileges as required by these rules, and state, as appropriate, that:

(1) production, inspection, or other requested action will be permitted as requested;

(2) the requested items are being served on the requesting party with the response;

(3) production, inspection, or other requested action will take place at a specified time and place, if the responding party is objecting to the time and place of production; or

(4) no items have been identified--after a diligent search--that are responsive to the request.

**Credits**

Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999.

**Notes of Decisions (1)**

Vernon's Ann. Texas Rules Civ. Proc., Rule 196.2, TX R RCP Rule 196.2

Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through September 1, 2015. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through September 1, 2015. Other state court rules and selected county rules are current with rules verified through June 1, 2015.

Vernon's Texas Rules Annotated

Texas Rules of Civil Procedure

Part II. Rules of Practice in District and County Courts

Section 9. Evidence and Discovery (Refs & Annos)

SuperBrowse B. Discovery

SuperBrowse Rule 197. Interrogatories to Parties (Refs & Annos)

TX Rules of Civil Procedure, Rule 197.2

197.2. Response to Interrogatories

Currentness

(a) *Time for Response.* The responding party must serve a written response on the requesting party within 30 days after service of the interrogatories, except that a defendant served with interrogatories before the defendant's answer is due need not respond until 50 days after service of the interrogatories.

(b) *Content of Response.* A response must include the party's answers to the interrogatories and may include objections and assertions of privilege as required under these rules.

(c) *Option to Produce Records.* If the answer to an interrogatory may be derived or ascertained from public records, from the responding party's business records, or from a compilation, abstract or summary of the responding party's business records, and the burden of deriving or ascertaining the answer is substantially the same for the requesting party as for the responding party, the responding party may answer the interrogatory by specifying and, if applicable, producing the records or compilation, abstract or summary of the records. The records from which the answer may be derived or ascertained must be specified in sufficient detail to permit the requesting party to locate and identify them as readily as can the responding party. If the responding party has specified business records, the responding party must state a reasonable time and place for examination of the documents. The responding party must produce the documents at the time and place stated, unless otherwise agreed by the parties or ordered by the court, and must provide the requesting party a reasonable opportunity to inspect them.

(d) *Verification Required; Exceptions.* A responding party--not an agent or attorney as otherwise permitted by Rule 14--must sign the answers under oath except that:

(1) when answers are based on information obtained from other persons, the party may so state, and

(2) a party need not sign answers to interrogatories about persons with knowledge of relevant facts, trial witnesses, and legal contentions.

**Credits**

Aug. 5, 1998, Nov. 9, 1998 and Dec. 31, 1998, eff. Jan. 1, 1999.

Notes of Decisions (3)

Vernon's Ann. Texas Rules Civ. Proc., Rule 197.2, TX R RCP Rule 197.2

Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through September 1, 2015. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through September 1, 2015. Other state court rules and selected county rules are current with rules verified through June 1, 2015.

Vernon's Texas Rules Annotated

Texas Rules of Civil Procedure

Part II. Rules of Practice in District and County Courts

Section 9. Evidence and Discovery (Refs & Annos)

SuperBrowse B. Discovery

SuperBrowse Rule 215. Abuse of Discovery; Sanctions (Refs & Annos)

TX Rules of Civil Procedure, Rule 215.1

215.1. Motion for Sanctions or Order Compelling Discovery

Currentness

A party, upon reasonable notice to other parties and all other persons affected thereby, may apply for sanctions or an order compelling discovery as follows:

(a) *Appropriate Court.* On matters relating to a deposition, an application for an order to a party may be made to the court in which the action is pending, or to any district court in the district where the deposition is being taken. An application for an order to a deponent who is not a party shall be made to the court in the district where the deposition is being taken. As to all other discovery matters, an application for an order will be made to the court in which the action is pending.

(b) *Motion.*

(1) If a party or other deponent which is a corporation or other entity fails to make a designation under Rules 199.2(b)(1) or 200.1(b); or

(2) If a party, or other deponent, or a person designated to testify on behalf of a party or other deponent fails:

(A) to appear before the officer who is to take his deposition, after being served with a proper notice; or

(B) to answer a question propounded or submitted upon oral examination or upon written questions; or

(3) if a party fails:

(A) to serve answers or objections to interrogatories submitted under Rule 197,[1] after proper service of the interrogatories; or

(B) to answer an interrogatory submitted under Rule 197; or

(C) to serve a written response to a request for inspection submitted under Rule 196,[2] after proper service of the request; or

(D) to respond that discovery will be permitted as requested or fails to permit discovery as requested in response to a request for inspection submitted under Rule 196;

the discovering party may move for an order compelling a designation, an appearance, an answer or answers, or inspection or production in accordance with the request, or apply to the court in which the action is pending for the imposition of any sanction authorized by Rule 215.2(b) without the necessity of first having obtained a court order compelling such discovery.

When taking a deposition on oral examination, the proponent of the question may complete or adjourn the examination before he applies for an order.

If the court denies the motion in whole or in part, it may make such protective order as it would have been empowered to make on a motion pursuant to Rule 192.6.

(c) *Evasive or Incomplete Answer.* For purposes of this subdivision an evasive or incomplete answer is to be treated as a failure to answer.

(d) *Disposition of Motion to Compel: Award of Expenses.* If the motion is granted, the court shall, after opportunity for hearing, require a party or deponent whose conduct necessitated the motion or the party or attorney advising such conduct or both of them to pay, at such time as ordered by the court, the moving party the reasonable expenses incurred in obtaining the order, including attorney fees, unless the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust. Such an order shall be subject to review on appeal from the final judgment.

If the motion is denied, the court may, after opportunity for hearing, require the moving party or attorney advising such motion to pay to the party or deponent who opposed the motion the reasonable expenses incurred in opposing the motion, including attorney fees, unless the court finds that the making of the motion was substantially justified or that other circumstances make an award of expenses unjust.

If the motion is granted in part and denied in part, the court may apportion the reasonable expenses incurred in relation to the motion among the parties and persons in a just manner.

In determining the amount of reasonable expenses, including attorney fees, to be awarded in connection with a motion, the trial court shall award expenses which are reasonable in relation to the amount of work reasonably expended in obtaining an order compelling compliance or in opposing a motion which is denied.

(e) *Providing Person's Own Statement.* If a party fails to comply with any person's written request for the person's own statement as provided in Rule 192.3(h), the person who made the request may move for an order compelling compliance. If the motion is granted, the movant may recover the expenses incurred in obtaining the order, including attorney fees, which are reasonable in relation to the amount of work reasonably expended in obtaining the order.

**Credits**

Oct. 29, 1940, eff. Sept. 1, 1941. Amended by orders of Aug. 5, 1998, and Nov. 9, 1998, eff. Jan. 1, 1999.

Notes of Decisions (51)

**Footnotes**

1

Vernon's Ann.Rules Civ.Proc., rule 197.1 et seq.

2

Vernon's Ann.Rules Civ.Proc., rule 196.1 et seq.

Vernon's Ann. Texas Rules Civ. Proc., Rule 215.1, TX R RCP Rule 215.1

Rules of Civil Procedure, Rules of Evidence, and Rules of Appellate Procedure are current with amendments received through September 1, 2015. Bar Rules, Rules of Disciplinary Procedure, Code of Judicial Conduct, and Rules of Judicial Administration are current with amendments received through September 1, 2015. Other state court rules and selected county rules are current with rules verified through June 1, 2015.